**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACKPOCKET, INC.,<br><br>     *Plaintiff*,<br><br>  v.<br><br>LOTTOMATRIX NY LLC,<br>LOTTOMATRIX CORPORATION,<br>LOTTOMATRIX OPERATIONS LIMITED<br>d/b/a JACKPOT.COM,<br>LOTTOMATRIX MALTA LIMITED, and<br>99DYNAMICS LIMITED,<br><br>     *Defendants*. | Case No. _____<br><br>**COMPLAINT**<br><br>**Jury Trial Requested** |

Plaintiff Jackpocket, Inc., by and through the undersigned counsel, alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

**NATURE OF THE ACTION**

1. This is a civil action for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq*.; deceptive trade practices and trademark dilution under N.Y. Gen. Bus. Law §§ 349 and 360; and trademark infringement and unfair competition under New York common law.

2. Jackpocket brings this lawsuit to stop the ongoing deception and resulting consumer harm that Defendants set out to create, and already have created, by dressing their foreign-based online gaming operations to appear as if those operations are (or are part of) Jackpocket and/or its trusted services in order to trade off the reputation and goodwill that Jackpocket has earned through years of hard work and investment.

1

3.     Jackpocket, the original and preeminent digital lottery ticket courier service in the U.S., owns and operates a popular mobile application ("app") branded JACKPOCKET.  The JACKPOCKET app allows consumers to securely order official lottery tickets from state-licensed retailers in the U.S. and also offers a suite of corresponding services that allow consumers to, among other things, check results, team up with others in lottery pools, set autoplays, and receive alerts (the "Lottery Courier Services").  Jackpocket worked closely with the lottery and gaming industry as well as state regulators in developing the JACKPOCKET app in order to ensure the integrity of the app and its Lottery Courier Services—while simultaneously helping fund essential state programs, *e.g.*, education, veterans' services, natural resources, etc.

4.     Jackpocket is one of only two lottery courier services that is licensed in both New York and New Jersey.

5.     Word about Jackpocket has spread far and wide through coverage in national media, like *Good Morning America*, *CNBC*, and *CBS News*.  And, for its part, Jackpocket has extensively promoted itself and its service offerings through varied and high-profile advertising in virtually every media (including television, radio, the internet, billboards, stadium and mass transportation signage, product placement, etc.) and sponsorships with major sports teams (including the New York Jets, New York Islanders, and New Jersey Devils).

6.     Foreign-based Defendant 99Dynamics Limited ("99Dynamics") and its affiliated entities—Defendants Lottomatrix NY LLC ("Lottomatrix NY"), Lottomatrix Corporation, Lottomatrix Operations Limited, and Lottomatrix Malta Limited (individually and collectively, "Jackpot")—have been planning to enter the U.S. market to compete head-to-head with Jackpocket's Lottery Courier Services.  Overseas, 99Dynamics and its related companies have and continue to operate derivative lotteries (discussed below), which are illegal and frowned upon in

the U.S. and elsewhere.  As an alternative to doing the hard work that Jackpocket undertook to innovate and establish itself in the U.S., Jackpot sought to jump-start its U.S. business by disguising itself as Jackpocket.  From among a vast universe of non-infringing alternatives available, Jackpot deliberately chose to enter the U.S. with JACKPOT—a name and mark it knew would deceive and confuse consumers and the public into mistakenly believing it was part of a well-established company here, JACKPOCKET.

7.    Arising from Jackpot's June 22, 2022 single public announcement that it received Series A funding and plans to enter the U.S. market, significant and varied confusion has already arisen, including in and among the press.  More confusion and deception will inevitably follow as Jackpot moves beyond its initial announcement and begins offering online lottery courier services to U.S. consumers.  With no harm more irreparable than the loss of reputation that this confusion has and will continue to cause, Jackpocket asks the Court to stop Jackpot from using JACKPOT and JACKPOT.COM and to choose a non-infringing name and mark for its business.

## PARTIES

8.    Plaintiff Jackpocket, Inc. is a Delaware corporation with a principal place of business at 145 W. 45th Street, Floor 12, New York, New York 10036.

9.    Defendant Lottomatrix NY LLC is a New York limited liability company with a principal place of business and an agent for the service of process at 122 E. 42nd Street, 18th Floor, New York, New York 10168.

10.    Defendant Lottomatrix Corporation, trading as Jackpot.com, is a Delaware corporation with a principal place of business and an agent for the service of process at 850 New Burton Road, Suite 201, Dover, Delaware 19904.

11.    Defendant Lottomatrix Operations Limited d/b/a Jackpot.com is a Malta public limited liability company with a principal place of business at Level 3 (Suite No. 1969), Tower Business Centre, Tower Street, Swatar, Birkirkara BKR 4013, Malta.

12.    Defendant Lottomatrix Malta Limited is a Malta public limited liability company with a principal place of business at Level 3 (Suite No. 1969), Tower Business Centre, Tower Street, Swatar, Birkirkara BKR 4013, Malta.

13.    99Dynamics Limited is a United Kingdom limited liability company with a principal place of business and registered office at Mazars, 30 Old Bailey, London, United Kingdom, EC4M 7AU.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 28 U.S.C. § 1338 because this action arises under an Act of Congress related to trademarks.  This Court also has jurisdiction under 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction over the state law claims because they are so related to the claims arising under federal law that they form part of the same case and controversy under Article III of the United States Constitution.

15.    This Court has personal jurisdiction over Jackpot, and venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because Jackpocket is being harmed in this District; Lottomatrix NY is located and registered to do business in this District; Jackpot is preparing to conduct business in this District; and Jackpot is unlawfully using the JACKPOT mark and name in this District.

## JACKPOCKET AND ITS
## JACKPOCKET AND JACKPOCKET.COM TRADEMARKS

16.    Jackpocket is the first officially licensed company in the U.S. to offer lottery players a secure way to order official state lottery tickets through a mobile app.  Jackpocket's mission is

to create a more convenient, fun, and responsible way to play the lottery. Lotteries raise money by selling numbered tickets and awarding prizes to the holders of numbers at random. Lotteries are only lawful if run pursuant to individual state regulation, or in the case of multi-state lotteries like POWERBALL, through agreements between multiple states.

17.  Jackpocket has continuously offered its Lottery Courier Services under the names and trademarks JACKPOCKET and JACKPOCKET.COM (the "JACKPOCKET Marks") since at least as early as October 23, 2013. Jackpocket's founder and CEO, Peter Sullivan, coined the JACKPOCKET Marks as a clever, unique way to identify and differentiate Jackpocket and its Lottery Courier Services.

18.  Through the JACKPOCKET app, people can order tickets for various lottery games (including high-prize, daily, quick-pick, and choose-one's-own-numbers games) in eleven states and Washington, D.C.

19.  Jackpocket has invested substantial time, money, and effort to receive courier licenses from the New York Lottery and New Jersey Lottery, copies of which are attached as Exhibit A. Currently, the other places where consumers can order lottery tickets lawfully through the JACKPOCKET app (Arkansas, Colorado, Minnesota, Montana, New Hampshire, New Mexico, Ohio, Oregon, Texas, and Washington, D.C.) do not require courier licenses.

20.  In addition to facilitating lottery ticket purchases, Jackpocket allows consumers to view scans of their lottery tickets in the JACKPOCKET app; check lottery results and prizes in real time; team up with other Jackpocket players in public lottery pools; create or join a private pool for friends, families, or co-workers; set an autoplay feature to automatically play favorite games; receive automatic alerts for wins; and fund small prizes to players' accounts.

21.     In the last twelve months, approximately 7.5 million customers placed download orders for Jackpocket's Lottery Courier Services, nearly 900,000 of those in New York.

22.     By enabling today's lottery players to participate in the lottery from the convenience of their smartphones, Jackpocket also helps state lotteries, like the New York State Lottery, drive incremental revenue to fund essential state programs, including those for education, veterans' services, and natural resources.  For example, the New York Lottery contributed $3.59 billion during the last fiscal year to support education in the state.

23.     Since inception, Jackpocket has worked closely with the lottery industry and state regulators to ensure the integrity of its innovative gaming app.  And Jackpocket continues to push the industry and encourage states to require a number of consumer protections, including the following, which were incorporated into official courier regulations in New York and New Jersey:

- verifying every customer's age/identity;
- geolocating every customer upon funding and upon ordering;
- requiring third-party certification of age/identify verification, geolocation, and random number generation;
- scanning and uploading the front and back of each hard-copy lottery ticket and emailing receipts with serial numbers so customers can be assured that an actual ticket with their numbers was purchased;
- storing hard-copy tickets in a fireproof safe in a secure location with limited access;
- requiring anti-money laundering audits and SOC-2 reporting;
- meeting minimum insurance requirements;
- providing customers with the ability to self-exclude from the app; and
- prominently displaying responsible gaming hotlines in appropriate jurisdictions.

24.     From 2015 through 2022, Jackpocket spent nearly $70 million to advertise, market, and promote its JACKPOCKET Marks and Lottery Courier Services, including almost $18 million

during the first half of 2022. Jackpocket advertises through broadcast and cable television stations (including commercial advertisements run in New York on television networks HPIX, WLNY, WPIX, WWOR, WXXA, WNYA, WNYO, WUTV, WNLO, EHAM, WBGT, and WUHF); on radio stations (including commercials run in New York on WFAN, WCBS, WINS, WSKQ, WPAT, WEPN, WNEW, WNYL, Z100, and ESPN); through public transportation venues (including advertisements posted in Metropolitan Transit Authority and PATH systems in New York); via billboards; direct mail; distribution of branded items like fortune cookies, pizza boxes, and coffee cups; in-stadium advertising at stadiums displayed in connection with nationally televised baseball, basketball, football, and hockey games; digital and social media; and social influencers. A representative sampling of Jackpocket's advertisements are shown below:

*Television Commercial*



*Branded-Item Advertising*





*Digital Advertising*





*Stadium Advertising*




 

25.     In New York alone, Jackpocket spent over $26 million to advertise, market, and promote its JACKPOCKET Marks and Lottery Courier Services from 2015 through 2022, including almost $7 million during the first half of 2022.  In addition to the examples above, a representative sampling of Jackpocket's advertising in the New York City area are shown below:








26.     Jackpocket also promotes its JACKPOCKET Marks and Lottery Courier Services through various high-profile partnerships, including enjoying promotional relationships with sports teams like the New York Islanders, New York Jets, New Jersey Devils, Colorado Rockies, Minnesota Twins, Texas Rangers, and Dallas Mavericks; audio content organizations like Audacy Inc.; universities like Rutgers; and non-profit corporations like the New York Racing Association, *e.g.*:

 

  



 

27.     Jackpocket also promotes and showcases its JACKPOCKET Marks and Lottery Courier Services on its own website, the URL for which incorporates the JACKPOCKET mark, www.jackpocket.com, and on banner ads featured on other Internet websites.

28.     As a result of the tremendous success of its JACKPOCKET app, JACKPOT.COM website, and Lottery Courier Services, Jackpocket has received extensive unsolicited media coverage, including in widely circulated media such as *New York Post*, *Daily News*, *Fortune*, *ABC*, *CBS*, *NBC*, *CNBC*, *AXIOS*, *Good Morning America*, and *Cheddar*.

29.     Over the years, Jackpocket has also received numerous corporate and business awards, including:

- Built in NYC, NYC Best Midsize Companies to Work For, 2022
- Built in NYC, NYC Best Places to Work, 2019, 2022
- VentureFizz, Spark Award, 2019
- Appy Awards, Finalist, 2019
- National Council on Problem Gambling ("NCPG"), Corporate Social Responsibility Award, 2019

30.     Jackpocket owns U.S. Trademark Registration No. 4743194 for its JACKPOCKET mark for the following:

*Computer application software for mobile phones, namely, software for use in purchasing lottery tickets and playing lottery games; Computer application software for mobile phones, portable media players and handheld computers, namely, software for use in purchasing lottery tickets and playing lottery games; Computer game software for use on mobile and cellular phones; Computer hardware and computer software programs for the integration of text, audio, graphics, still images and moving pictures into an interactive delivery for multimedia applications; Downloadable electronic game software for use on mobile phones, portable media players and handheld computers; Downloadable mobile applications for use in purchasing lottery tickets and playing lottery games; Downloadable software in the nature of a mobile application for use in purchasing lottery tickets and playing lottery games.*

A printout of this registration, taken from the U.S. Patent and Trademark Office's online database, is attached as Exhibit B.  This registration, which issued on May 26, 2015, is incontestable under 15 U.S.C. § 1065.

31.     The JACKPOCKET Marks have become well-known and famous in at least New York by virtue of their extensive use, public exposure, commercial success, and popularity.

32.     Jackpocket has tied its use of JACKPOCKET to the similar term JACKPOT.  For example, when a consumer opens the JACKPOCKET app on their smartphone, they first see the term JACKPOT, as shown below:



The term JACKPOT then expands into JACKPOCKET and the app opens, as shown below:



33.     Over the years, people have frequently referred to JACKPOCKET as JACKPOT;

for example:

- On September 28, 2015, WABC Eyewitness News 7 in New York City aired a segment about the JACKPOCKET app.  In it, the newscaster stated, "[g]etting a lot easier – a lot more high tech for New Yorkers – new app called **Jackpot**" while the JACKPOCKET mark was shown onscreen.  WABC, Eyewitness News at Noon, September          28,          2015,          *available          at*

https://archive.org/embed/WABC_20150928_160000_Eyewitness_News_at_Noon?st
art=3107&end=3180 (Published Sep. 28, 2015; Last Accessed June 27, 2022).

- On September 29, 2015, KGO (ABC) News in San Francisco, California aired a
  segment about the JACKPOCKET app.  In it, the newscaster stated, "[n]ow there's an
  app for that – It's call **Jackpot**."   The onscreen image also identified Jackpocket's app
  as the "'**Jackpot**' Lottery App," as shown below:



ABC7 News 5:00AM:  KGO, September 29, 2015, *available at*
https://archive.org/embed/KGO_20150929_120000_ABC7_News_500AM?start=293
6.8&end=2965.9 (Published Sep. 29, 2015; Last Accessed June 27, 2022).

- On September 30, 2015, KPIX (CBS) News in New York City aired a segment about
  the JACKPOCKET app.  In it, the newscaster stated, "[a] new app could make winning
  millions from the lottery even easier.  It's called JACKPOCKET.  It enables users to
  purchase lottery tickets with an app.  A **Jackpot** employee then physically buys the
  ticket …" while the JACKPOCKET mark was shown onscreen.  KPIX 5 Noon News,
  September           30,           2015,           *available           at*
  https://archive.org/embed/KPIX_20150930_190000_KPIX_5_Noon_News?start=871
  .4&end=901.5 (Published Sep. 30, 2015; Last Accessed June 27, 2022).

- On January 12, 2021, WNBC Today in New York aired a segment about the
  JACKPOCKET app during which the newscaster stated "**jackpot**" while the
  JACKPOCKET mark was shown onscreen.  WNBC Today in New York, January 12,
  2021,                      *available                      at*
  https://mms.tveyes.com/MediaCenterPlayer.aspx?u=aHR0cDovL21lZGlhY2VudGV
  yLnR2ZXllcy5jb20vZG93bmxvYWRnYXRld2F5LmzcHg%2FVXNlcklEPTk1MD
  cyOCZNRElEPTE0Mzc5NTE5Jk1EU2VlZD04NDE5JlR5cGU9TWVkaWE%3D&e
  xpand=true (Published Jan. 12, 2021; Last Accessed June 27, 2022).

- On January 20, 2021, @mchackio, an online influencer with over 26,000 subscribers on YouTube, posted a video titled, "How to install **Jackpot** Lottery app on iPhone?" discussing and showing the JACKPOCKET mobile application, *i.e.*:



*How to install Jackpot Lottery app on iPhone?*, January 20, 2021, YouTube, *available at* https://www.youtube.com/watch?v=vC8JT7sSWlY (Published Jan. 20, 2021; Last Accessed June 27, 2022).

- On March 22, 2021, *Dice Gambling Games* posted an article titled, "How to Install the **Jackpot** Lottery App on a PC" when discussing the JACKPOCKET mobile application, *i.e.*:



*How to install Jackpot Lottery App on a PC*, March 22, 2021, *Dice Gambling Games*, *available* at https://dicegamblinggames.com/how-to-install-the-jackpot-lottery-app-on-a-pc/ vC8JT7sSWlY (Published Mar. 21, 2021; Last Accessed June 27, 2022).

- At least four of Jackpocket's advertising partners have put JACKPOT instead of JACKPOCKET in the email subject line of correspondence and meeting invitations to Jackpocket.

- Numerous social media users on platforms such as Twitter, Instagram, and Facebook have written JACKPOT in posts discussing the JACKPOCKET app.

- Jackpocket commissioned Mark McGrath, the lead singer of the band Sugar Ray, to produce a recording about the JACKPOCKET app.  In it, Mr. McGrath referred to JACKPOCKET as JACKPOT.

## JACKPOT AND ITS DECEITFUL OVERSEAS OPERATIONS

34.     99Dynamics, a UK-based company that owns and operates various Lottomatrix entities, has primarily conducted its lottery-related operations overseas.

35.     Until recently, 99Dynamics and its affiliates have not offered or marketed services like Jackpocket's Lottery Courier Services.  Rather, 99Dynamics and its affiliated entities have been conducting "derivative lotteries" in foreign countries.  Also known as "synthetic" lotteries, derivative lottery operators take bets on lotteries in foreign countries (*e.g.*, allowing someone in Malta to make a bet on the Powerball lottery numbers in the U.S.) without actually buying a ticket and thereby exploiting the official lottery and the communities and people served by it.  Derivative lotteries are prohibited in the U.S. and other countries, like Australia and Ireland.[1]

---

[1] Eoin Burke-Kennedy, *Government likely to face pressure for crackdown on 'synthetic lotteries,'* The Irish Times, *available at* https://www.irishtimes.com/business/retail-and-services/government-likely-to-face-pressure-for-crackdown-on-synthetic-lotteries-1.3448330 (Published Apr. 3, 2018; Last Accessed July 1, 2022), a true and correct copy of which is attached as Exhibit C.

36.     Indeed, the Multi-State Lottery Association ("MUSL"), a U.S.-based non-profit lottery group behind multi-jurisdictional games including POWERBALL, identified synthetic lotteries as one of the most significant challenges it faces.[2]

37.     Additionally, 99Dynamics, through its myriad affiliated companies, has created a scheme to misdirect consumers from legitimate state and U.S. lotteries to lookalike apps.  For example, The Lottery Company, a 99Dynamics-affiliated entity, operates a storefront in the Apple App Store that, as shown below, offers a variety of apps with names that misappropriate official lottery names despite maintaining no association with those lotteries (*e.g.*, the NYLottery.net app, which is similar to official New York Lottery app):



---

[2] Devin O'Connor, *Powerball Mulling International Expansion to Boost Sales, Jackpots,'* Casino.org, *available at* https://www.casino.org/news/powerball-mulling-international-expansion-to-boost-sales-jackpots/comment-page-1078/ (Published Dec. 23, 2020; Last Accessed July 1, 2022), a true and correct copy of which is attached as Exhibit D.



38.     This    scheme    is    furthered    by    the    registration    and    operation    of "NYLOTTERY.ORG" and "POWERBALL.NET" by companies affiliated with 99Dynamics. Like The Lottery Company's apps, these websites are named and designed to trick consumers into believing they are going to the official NY LOTTERY and POWERBALL sites, when they are not:

*www.nylottery.org*



*www.powerball.net*





## JACKPOT'S WILLFUL INFRINGING ACTIVITIES

39.     Jackpot is well aware of Jackpocket and its Lottery Courier Services, market presence, and success.  Among other things, Yariv Ron, an executive at Jackpot, met Mr. Sullivan at the Public Gaming Research Institute conference in Miami in April 2022.  And a Jackpot executive recently signed up to use the JACKPOCKET app.

40.     In late June 2022, Jackpot publicly announced that it is preparing to offer the very same Lottery Courier Services as Jackpocket, namely allowing consumers to buy lottery tickets in the U.S., including in New York, through a mobile device app.  And Jackpot plans to do so under the confusingly similar name and marks JACKPOT and JACKPOT.COM (the "JACKPOT Marks").  A true and correct copy of Jackpot's June 22, 2022 press release is attached here as Exhibit E.  This announcement was picked up across several media outlets.[3]

---

[3] *See*, *e.g.*, Jessica Golden, *Online lottery ticket company Jackpot gets funding from top sports executives*, CNBC, available https://www.cnbc.com/2022/06/22/online-lottery-ticket-firm-jackpot-gets-funding-from-top-sports-execs.html  (Published June 22, 2022; Last Accessed July 1, 2022), a true and correct copy of which is attached as Exhibit F.

41.    On May 23, 2022, Jackpocket sent Jackpot a demand letter explaining the inevitable consumer confusion that its copycat marks would cause in the U.S. and objecting to Jackpot's use of the JACKPOT Marks in U.S. commerce.  Jackpot, however, insisted on moving forward with its unlawful conduct.

42.    As of June 21, 2022, the website jackpot.com was not accessible to individuals in the U.S.

43.    On June 22, 2022, Jackpot announced it had closed on Series A funding and that it is looking to grow its U.S. lottery business by facilitating the purchase of official state lottery tickets online.

44.    That same day, the jackpot.com domain began automatically redirecting people who tried to access the web site in the U.S. to the us.jackpot.com subdomain name. Jackpot uses the jackpot.com domain and us.jackpot.com subdomain to promote—and, soon, to offer—its online lottery ticket courier services in the U.S., including in New York, in direct competition with Jackpocket.

45.    Not content to mimic just the JACKPOCKET Marks, Jackpot also lifted a blue color scheme similar to the blue color scheme consistently used across Jackpocket's branding in an effort to hew more closely to the Jackpocket branding, *e.g.*:







46.     The confusion Jackpocket warned Jackpot about has already proved to be widespread.  For example, on June 23, 2022, *The Sports Geek*—a globally recognized brand that delivers high-quality resources to beginner, advanced, and professional sports bettors and fans—published an article erroneously titled "Jackpocket Nets $35 Million in Latest Funding Round":



In fact, it was Jackpot and not Jackpocket that has secured the referenced funding. A true and correct copy of the full article is attached as Exhibit G. In it, *The Sports Geek* clearly confused Jackpocket for Jackpot, as it was Jackpot who received the reported funding, not Jackpocket.

47.     In another instance of confusion, also on June 23, 2022, *PlayUSA*—a website covering online casino, poker and sports betting—published an article mistakenly referencing Jackpocket instead of Jackpot, titled "Jackpocket Gets $35 Million in New Funding With Possible Expansion Ahead":


GAMBLING BY STATE ▾    ONLINE CASINOS ▾    SOCIAL CASINOS ▾    SWEEPSTAKES CASINOS ▾    CASINO APPS

## Jackpocket Gets $35 Million In New Funding With Possible Expansion Ahead

**News**

Written By Derek Helling on June 23, 2022





One of the country's most prolific and fastest-growing lottery courier services could be about to build on its success even more. A recent **Jackpocket funding round** has given many names that lottery players will recognize a stake in the company.

A true and correct copy of the full article is attached as Exhibit H.

48.     Similarly, around June 22, 2022, Mr. Sullivan, Jackpocket's founder and CEO, received multiple messages congratulating him on Jackpot's announcement that it received Series A funding and on Jackpot's newly announced investors.

49.     Even before Jackpot announced that it planned to enter the U.S. market, and was only operating abroad, people confused JACKPOCKET with JACKPOT.  For example, at least three people mistakenly contacted Jackpot's customer service team about Jackpocket and its services, *e.g.*:

**Katarina** (Jackpot.com)

Jan 24, 11:42 CET



Hi Mark,

I hope this email finds you well.

I'm afraid that you made a mistake: the email you sent is not in relation with our company. As you can see for yourself, the email was sent by JACKPOCKET and this is Jackpot.com. Those are two different companies so please contact them instead.

Regards,
Catherine, Online Support

**Vlad** (Jackpot.com)

Apr 26, 19:55 CEST

Hi Candy,

Thanks for reaching out to the Jackpot.com Customer Experience Team.

You sent email to JACKPOT.COM, you should send to JACKPOCKET.COM as your bank told you.

If you would like any further assistance please don't hesitate to get in touch with us via email or phone, or you can contact us via LiveChat on Jackpot.com.

We hope you find this information useful.

Kind regards,

Jackpot.com Customer Experience Team

50.     Additional examples of actual confusion between Jackpocket and Jackpot exist and

are multiplying, *e.g.*:

- On June 24, 2022, a marketing company cold-emailed Jackpocket at its marketing@jackpocket.com email address, addressing the email to "Team **Jackpot**," and stating, "[t]he purpose of this email is to discuss having **Jackpot** promoted on our podcasts . . ."

- On June 27, 2022, a gambling addiction group executive director who serves on state and national organizations and committees, including one that Jackpocket sponsors, posted on LinkedIn.  The individual's post stated, "Jackpocket has raised money from top sports executives, and NBA superstars James Harden and Joel Embiid and NHL great Martin Brodeur round out some of the big name investors. #GamblingTrends

24

#OhioLottery," and linked to a CNBC article titled, "Online lottery ticket company **Jackpot** gets funding from top sports executives," *i.e.*:



Jackpocket has raised money from top sports executives, and NBA superstars James Harden and Joel Embiid and NHL great Martin Brodeur round out some of the big name investors. #GamblingTrends #OhioLottery

Online lottery ticket company Jackpot gets funding from top sports executives

cnbc.com • 3 min read

- On June 29, 2022, the NCPG, a non-profit that Jackpocket has received an award from and works with cooperatively, was corresponding with Jackpocket about its membership.  In so doing, NCPG added a jackpot.com employee email address to the email thread that otherwise only included Jackpocket employees and was directed only to Jackpocket, not Jackpot.

## INJURY TO JACKPOCKET AND THE PUBLIC

51.     Jackpot's unauthorized use of the JACKPOT Marks have caused confusion and, if not enjoined, are likely to cause continued and increased confusion, mistake, and deception between the source of origin of Jackpot, its goods and services, its business, and/or its commercial activities and Jackpocket, its goods and services, its business, and/or its commercial activities.

52.     Jackpot's actions described above are likely to dilute the distinctive quality of Jackpocket's JACKPOCKET Marks and trade names by blurring and/or tarnishment.

53.     Jackpot's unauthorized use of the JACKPOT Marks have damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure Jackpocket, the JACKPOCKET Marks, Jackpocket's reputation and goodwill associated with its marks, and the public's interest in being free from confusion, mistake, and deception.

54.     Jackpot knew, or should have known, that its unauthorized uses of the JACKPOT Marks and name violate Jackpocket's rights in the JACKPOCKET Marks.  Thus, Jackpot has acted knowingly, willfully, in reckless disregard of Jackpocket's rights, and in bad faith.

55.     Jackpocket has no adequate remedy at law.

### FIRST CAUSE OF ACTION
### FEDERAL TRADEMARK INFRINGEMENT
### (15 U.S.C. § 1114(1))

56.     Jackpocket repeats and incorporates by reference herein its allegations contained in paragraphs 1-55 of this Complaint.

57.     Without Jackpocket's consent, Jackpot used and continues to use in commerce reproductions, copies, and colorable imitations of Jackpocket's registered JACKPOCKET mark in connection with the offering, distribution, and advertising of good and services, which is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

### SECOND CAUSE OF ACTION
### FEDERAL TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN,
### AND UNFAIR COMPETITION
### (15 U.S.C. § 1125(a)(1)(A))

58.     Jackpocket repeats and incorporates by reference herein its allegations contained in paragraphs 1-57 of this Complaint.

59.     Jackpot's actions described above are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Jackpot, Jackpot's goods and/or services,

and/or Jackpot's commercial activities by or with Jackpocket, and thus constitute trademark infringement, false designation of origin, passing off, and unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

### THIRD CAUSE OF ACTION
**COMMON-LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**
**(NEW YORK COMMON LAW)**

60.     Jackpocket repeats and incorporates by reference herein its allegations contained in paragraphs 1-59 of this Complaint.

61.     Jackpot's actions described above create the impression in the mind of the public that Jackpocket is responsible for the quality and performance of Jackpot's goods and services or is otherwise affiliated, connected or associated with Jackpot, its goods and services, and/or its commercial activities and thus Jackpot's acts constitute common-law trademark and trade name infringement of Jackpocket's proprietary rights in its JACKPOCKET Marks, misappropriation of Jackpocket's goodwill in the JACKPOCKET Marks, and unfair competition under the common law of the State of New York, as provided for in N.Y. Gen. Bus. Law § 360(o).

### FOURTH CAUSE OF ACTION
**VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES STATUTE**
**(NEW YORK GENERAL BUSINESS LAW § 349)**

62.     Jackpocket repeats and incorporates by reference herein its allegations contained in paragraphs 1-61 of this Complaint.

63.     Jackpot's actions as described above constitute deceptive acts or practices in the conduct of a business, trade, and commerce, and in the furnishing of a service in New York, in violation of N.Y. Gen. Bus. Law § 349.

### *FIFTH CAUSE OF ACTION*
### TRADEMARK DILUTION OF THE JACKPOCKET MARK
### (NEW YORK GENERAL BUSINESS LAW § 360)

64.     Jackpocket repeats and incorporates by reference herein its allegations contained in paragraphs 1-63 of this Complaint.

65.     The JACKPOCKET Marks are distinctive, widely recognized, and considered famous by the general consuming public in New York as a designation of source for Jackpocket's goods and services.

66.     Jackpot's actions, as described above, all occurring after the JACKPOCKET Marks became famous, are likely to dilute the distinctive quality of Jackpocket's famous JACKPOCKET Marks and trade names by blurring and/or tarnishment and injure Jackpocket's business reputation, in violation of N.Y. Gen. Bus. Law § 360-L.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Jackpocket respectfully demands a trial by jury on all issues properly triable by a jury in this action.

### PRAYER FOR RELIEF

WHEREFORE, Jackpocket respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including the following:

1.      An Order declaring that Jackpot's use of the JACKPOT Marks infringes Jackpocket's JACKPOCKET Marks, dilutes the JACKPOCKET Marks, and constitutes false advertising and unfair competition, as detailed above;

2.      An Order enjoining Jackpot, its officers, directors, employees, agents, subsidiaries, distributors, dealers, related companies, and all persons in active concert or participation with any of them:

    a)   From using, registering, or seeking to register any name, mark, logo, trade name, company name, source identifier, or designation comprised of or containing the JACKPOCKET Marks or any other confusingly similar name, mark, logo, trade name, company name, source identifier, or designation (including JACKPOT) in any manner likely to cause confusion with Jackpocket's JACKPOCKET Marks, or to otherwise injure Jackpocket and/or its reputation;

    b)   From representing, by any means whatsoever, directly or indirectly, that Jackpot, its goods and services, and/or its activities originate from, are sponsored by, or are associated, affiliated, or connected with Jackpocket in any way; and

    c)   From assisting, aiding, and/or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs 3(a) through 3(b) above.

3.      An Order requiring Jackpot to immediately retract and destroy all products, packaging, signage, advertisements, promotional materials, stationary, forms, and/or materials and things that contain or bear the JACKPOT Marks, and/or any other name, mark, trade name, company name, source identifier, or designation that contains or is confusingly similar to or dilutive of Jackpocket's JACKPOCKET Marks;

4.      An Order directing that, within thirty (30) days after the entry of the injunction, Jackpot file with this Court and serve on Jackpocket's attorneys a report in writing and under oath setting forth in detail the manner and form in which Jackpot complied with the injunction;

5.      An Order requiring Jackpot to account for and pay to Jackpocket all profits arising from Jackpot's unlawful acts, and increasing such profits, including trebling them, in accordance with 15 U.S.C. § 1117 and other applicable laws;

6.      An Order requiring Jackpot to pay Jackpocket punitive damages in an amount to be determined due to the foregoing willful acts of Jackpot;

7.      An Order requiring Jackpot to pay Jackpocket damages, in an amount to be determined (but exceeding $75,000), resulting from Jackpot's unlawful acts, and trebling such damages in accordance with 15 U.S.C. § 1117, N.Y. Gen. Bus. Law §§ 349 and 360, and other applicable laws;

8.      An Order requiring Jackpot to pay Jackpocket's costs and attorneys' fees in this action pursuant to 15 U.S.C. § 1117, N.Y. Gen. Bus. Law §§ 349 and 360, and other applicable laws;

9.      An Order requiring Jackpot to pay all available damages pursuant to N.Y. Gen. Bus. Law §§ 349 and 360; and

10.     Other relief as the Court may deem appropriate.

Dated:  July 7, 2022                          Respectfully submitted,


                                              /s/ Mary Kate Brennan
                                              Mary Kate Brennan
                                              Douglas A. Rettew (*pro hac vice* to be filed)
                                              Danny M. Awdeh (*pro hac vice* to be filed)
                                              **FINNEGAN, HENDERSON, FARABOW,**
                                              **    GARRETT & DUNNER, LLP**
                                              901 New York Avenue, NW
                                              Washington, DC 20001-4413
                                              Tel: (202) 408-4000
                                              Fax: (202) 408-4400
                                              marykate.brennan@finnegan.com
                                              doug.rettew@finnegan.com
                                              danny.awdeh@finnegan.com

Amy Sullivan Cahill
**STEPTOE & JOHNSON PLLC**
700 N. Hurstbourne Parkway, Suite 115
Louisville, Kentucky 40222
Tel: (502) 423-2054
Fax: (502) 423-2001
amy.cahill@steptoe-johnson.com

*Attorneys for Plaintiff*
*Jackpocket, Inc.*