**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

JACKPOCKET, INC.,

       *Plaintiff,*

  vs.

LOTTOMATRIX NY LLC, LOTTOMATRIX
CORPORATION, LOTTOMATRIX OPERATIONS
LIMITED d/b/a JACKPOT.COM, LOTTOMATRIX
MALTA LIMITED, and 99DYNAMICS LIMITED,

       *Defendants.*

Case No. 1:22-cv-05772 (LJL)

ORAL ARGUMENT REQUESTED

REDACTED PUBLIC VERSION

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................3

    A.    Jackpot.com's Well-Established Business..................................................3

    B.    Jackpot.com's U.S. Expansion.................................................................5

    C.    Plaintiff's Recent Entry Into The Gaming Business................................5

    D.    The Parties Discuss A Potential Deal ......................................................6

    E.    Jackpot.com Announces Entry Into The U.S. Market And Secures Substantial Investment From Prominent U.S. Investors................................8

    F.    Plaintiff Mimics Jackpot.com in Preparation for Litigation ...................9

    G.    Plaintiff Pursues Litigation .....................................................................9

LEGAL STANDARD....................................................................................................10

ARGUMENT ................................................................................................................11

I.    PLAINTIFF CANNOT ESTABLISH THE REQUIRED LIKELIHOOD OF SUCCESS ON THE MERITS ..................................................................11

    A.    Plaintiff is Not Likely to Succeed on its Trademark Infringement Claim......................................................................................................11

        1.    Plaintiff Cannot Use Its JACKPOCKET Mark to Monopolize The Descriptive Term JACKPOT .........................11

        2.    Plaintiff's Polaroid Analysis Is Both Inapt and Flawed............16

            a.    Plaintiff's weak mark ends the analysis at the first step. ...............................................................................16

            b.    Plaintiff's survey is fatally flawed. ...............................20

            c.    Defendants have consistently acted properly and in good faith. .................................................................24

            d.    Defendants' services are of a high quality....................25

    B.    Plaintiff Is Not Likely to Succeed on its Unfair Competition Claims ....................................................................................................26

    C.    Plaintiff Is Not Likely to Succeed on its Deceptive Trade Practices Claims ....................................................................................................26

      D.      Plaintiff Is Not Likely To Succeed On Its Claim For Trademark
             Dilution ...........................................................................................................266

II.      PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM ..........................27

III.    THE BALANCE OF THE HARDSHIPS TIPS SHARPLY AGAINST
       GRANTING A PRELIMINARY INJUNCTION................................................................29

IV.    PRELIMINARY INJUNCTIVE RELIEF IS AGAINST THE PUBLIC
       INTEREST..........................................................................................................................31

V.      CONCLUSION...................................................................................................................32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 1800Mattress.com IP LLC*,
  586 F.3d 1359 (Fed. Cir. 2009) ......................................................................15

*3M Co. v. CovCare, Inc.*,
  537 F. Supp. 3d 385 (E.D.N.Y. 2021) ........................................................30, 32

*Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.*,
  513 F.2d 1183 (2d Cir. 1975)...........................................................................16

*Algood Casters Ltd. v. Caster Concepts, Inc.*,
  No. 20-cv-4623 (LJL), 2020 WL 5274172 (S.D.N.Y. Sept. 4, 2020) ...................30

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of
  Am., Inc.*, 307 F. Supp. 3d 260 (S.D.N.Y. 2018) ..................................................15

*Am. Cyanamid Corp. v. Connaught Labs., Inc.*,
  800 F.2d 306 (2d Cir. 1986)........................................................................ *passim*

*Beech-Nut, Inc. v. Warner-Lambert Co.*,
  346 F. Supp. 547 (S.D.N.Y. 1972), *aff'd*, 480 F.2d 801 (2d Cir. 1973) ...............19

*Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*,
  662 F. Supp. 203 (S.D.N.Y. 1987) ...................................................................31

*Big Star Entertainment, Inc. v. Next Big Star, Inc.*,
  105 F. Supp. 2d 185 (S.D.N.Y. 2000)................................................................32

*Brennan's, Inc. v. Brennan's Rest., LLC.*,
  No. 02 CIV. 9858, 2003 WL 1338681 (S.D.N.Y. Mar. 18, 2003), *aff'd sub
  nom. Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125 (2d Cir. 2004) .......27

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992)......................................................................15, 27

*Bulman v. 2BKCO, Inc.*,
  882 F. Supp. 2d 551 (S.D.N.Y. 2012)...............................................................31

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985)...........................................................................28

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus
  Christ's Church*,
  613 F. Supp. 2d 1140 (W.D. Mo. 2009) ...........................................................31

*Co. v. Performance Supply, LLC*,
  458 F. Supp. 3d 181 (S.D.N.Y. 2020).............................................................30

*Coscarelli v. ESquared Hosp. LLC*,
  364 F. Supp. 3d 207 (S.D.N.Y. 2019).................................................................................27

*Essie Cosms., Ltd. v. Dae Do Int'l, Ltd.*,
  808 F. Supp. 952 (E.D.N.Y. 1992) ....................................................................................31

*Estee Lauder Inc. v. The Gap, Inc.*,
  108 F.3d 1503 (2d Cir. 1997)............................................................................................17

*Hi-Tech Pharmaceuticals Inc. v. Dynamic Sports Nutrition, LLC*,
  No. 1:16-cv-949, 2021 WL 2185699 (N.D. Ga. May 28, 2021) ......................................21

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
  No. 1:21-cv-00038, 2021 WL 535485 (S.D.N.Y. Feb. 12, 2021) ....................................30

*Horn's, Inc. v. Sanofi Beaute, Inc.*,
  963 F. Supp. 318 (S.D.N.Y. 1997) ....................................................................................26

*Koninklijke Philips Electronics N.V. v. Hunt Control Systems, Inc.*,
  D.N.J. Case No. 11-3684, 2017 WL 3719468 (August 29, 2017).....................................22

*Limited v. Macy's Merch. Grp. Inc*,
  No. 15-CV-3645 KMW, 2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016), *aff'd
  sub nom. Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633 (2d Cir.
  2017) ..................................................................................................................................22

*Medisim Ltd. v. BestMed LLC*,
  No. 10 Civ. 2463, 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012).....................................26

*Mitchell Grp. USA LLC v. Udeh*,
  No. 14-cv-5745, 2017 WL 9487193 (E.D.N.Y. Mar. 8, 2017)..........................................32

*Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*,
  648 F. Supp. 2d 576 (S.D.N.Y. 2009)................................................................................18

*Neology, Inc. v. Fed. Signal Corp.*,
  No. 11-cv-672-LPS/MPT, 2012 WL 2308202 (D. Del. June 18, 2012)............................28

*Parks LLC v. Tyson Foods, Inc.*,
  863 F.3d 220 (3d Cir. 2017)..........................................................................................21, 22

*Pinnacle Advertising & Mkt. Grp., Inc. v. Pinnacle Advertising & Mkt. Grp.*,
  No. 18-cv-81606, 2019 WL 7376782 (S.D. Fla. Sept. 26, 2019) .....................................21

*RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*,
  No. 14CV6294-LTS-HBP, 2015 WL 5008762 (S.D.N.Y. Aug. 24, 2015).....................18, 26

*RiseAndShine Corporation v. Pepsico, Inc.*,
  -- F.4th --, No. 21-2786, 2022 WL 2898794 (2d Cir. July 22, 2022) ............................. *passim*

*Sazerac Co. v. Fetzer Vineyards, Inc.*,
  265 F. Supp. 3d 1013 (N.D. Cal. 2017) .............................................................................21

*SquirtCo v. Seven-Up Co.*,
     628 F.2d 1086 (8th Cir. 1980) ........................................................................20

*THOIP v. Walt Disney Co.*,
     690 F. Supp. 2d 218 (S.D.N.Y. 2010)................................................................21

*Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*,
     308 F.2d 196 (2d Cir. 1962) ......................................................................17, 19

*Two Hands IP LLC v. Two Hands Am., Inc.*,
     563 F. Supp. 3d 290 (S.D.N.Y. 2021).........................................................28, 30

*UHS of Delaware, Inc. v. United Health Servs., Inc.*,
     227 F. Supp. 3d 381 (M.D. Pa. 2016) ..............................................................18

*Union Carbide Corp. v. Ever-ready Inc.*,
     531 F.2d 366 (7th Cir. 1976) ...........................................................................21

*USPTO v. Booking.com B. V.*,
     140 S. Ct. 2298 (2020).............................................................................14, 15

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
     423 F.3d 137 (2d Cir. 2005).............................................................................28

*Winter v. Natural Resources Defense Council, Inc.*,
     555 U.S. 7 (2008) ............................................................................................10

*Woodstock Ventures, LC v. Woodstock Roots LLC*,
     837 F. App'x 837 (2d Cir. 2021) ......................................................................10

**Statutes**

15 U.S.C.A. § 45 .......................................................................................................26

15 U.S.C. § 1116(a) ...................................................................................................27

New York General Business Law section 349 ...........................................................26

New York General Business Law section 360-l...........................................................2

## INTRODUCTION

This lawsuit reflects a naked attempt by plaintiff Jackpocket, Inc. ("Plaintiff") to achieve through litigation what it could not accomplish through a commercial deal.  After trying and failing to purchase Defendants (and thus obtain control over Jackpot.com), Plaintiff is now seeking, through a baseless trademark claim, to improperly corner the U.S. market on a descriptive term in the lottery and gaming business – JACKPOT.  Plaintiff's effort fails as a matter of law.

Plaintiff has known for more than seven months that Defendants[1] had concrete plans to expand their lottery-related businesses – which had long operated worldwide under the name and domain name Jackpot.com – to the United States.  In November 2021, the parties commenced discussions about a potential merger or acquisition.  Following four months of discussions that were premised and centered on Defendants' well-developed plan to expand Jackpot.com into the U.S., Plaintiff indicated that, after looking at "█████████," it was "super interested" in acquiring Jackpot.com, and suggested a price of ██████████████.  At no time during these *months* of discussions did Plaintiff even suggest that Defendants' use of the Jackpot.com name and domain name in connection with their intended offerings in the United States would infringe any of Plaintiff's claimed trademark rights.

Ultimately, Jackpot.com elected not to pursue a potential deal with Plaintiff, and instead

---

[1] 99Dynamics Limited, based in the United Kingdom, is the parent entity of the other Defendants.  Lottomatrix Malta Limited is an intermediary holding company.  Lottomatrix Operations Limited is the entity that owns the Jackpot.com domain, and holds the European gaming licenses allowing it to legally conduct its lottery and gaming businesses, as further described below.  Lottomatrix Corporation is a U.S. holding company, and Lottomatrix NY LLC is the entity that will offer lottery courier services in the licensed states of New York and New Jersey.  For ease of reference, and without admitting personal jurisdiction or liability for any or all Defendants, the Defendants are referred to collectively herein as Defendants or Jackpot.com.

chose to raise independent funding. On May 20, 2022, Jackpot.com publicly announced the hiring of its U.S. CEO, and the next month, Jackpot.com had a successful investment round, raising $36.5 million from prominent U.S. investors, businesspersons, and celebrities.

It was only then, after Defendants elected not to sell their business to Plaintiff, that Plaintiff launched its plan to try to take through litigation what it could not secure through a business deal – control over the term "jackpot" and the name and domain name Jackpot.com. Astonishingly, Plaintiff first took steps to make its website appear *more* similar to Jackpot.com, adding ".com" to its logo (as opposed to merely "Jackpocket") and filing a trademark application for JACKPOCKET.COM on May 23, 2022, the very day it first accused Defendants of trademark infringement.

But regardless of these efforts, Plaintiff's plan will not work, because its claims are meritless. JACKPOT is a descriptive term that is widely used in the lottery and gaming industry to describe what can be won by playing the lottery – a "jackpot" of money. There are scores of registered trademarks that include the term "JACKPOT" – including "JACKPOT WORLD," "JACKPOT CLUB," and "JACKPOT PARTY" – and in each instance, the USPTO has required that the user *disclaim* rights to the term JACKPOT, for the precise reason that Plaintiff's claims fail here: no party can claim exclusive rights to that term in connection with lottery or gaming products or services, without first showing "secondary meaning" (*i.e.*, that the party has invested so much time, money, and effort into the specific mark JACKPOT that consumers came to identify the term JACKPOT solely with that particular party). Plaintiff does not even attempt to argue that it has achieved secondary meaning with respect to JACKPOT, nor could it.

Instead, Plaintiff is attempting to do something even more remarkable, which is to use its weak, suggestive mark – JACKPOCKET – to gain a monopoly over the descriptive term

JACKPOT through litigation.  But Plaintiff cannot obtain indirectly that which it has not obtained directly.  Under well-established authority, Plaintiff's claims fail as a matter of law.

In light of these facts, Second Circuit precedent states that the Court need not even reach the likelihood of confusion analysis, and should instead simply dismiss Plaintiff's complaint. Nonetheless, application of the *Polaroid* factors confirms the same result.  Among other considerations:  Plaintiff's suggestive term JACKPOCKET is weak as a matter of law; the consumer survey that is at the core of Plaintiff's claim suffers from ***multiple*** critical methodological flaws that, according to Stanford University professor and recognized consumer survey expert Dr. Itamar Simonson, render it wholly meaningless; and Defendants adopted the jackpot.com domain name *before* Plaintiff even existed, and have at all times acted in good faith (indeed, it is *Plaintiff* that has attempted to mimic Jackpot.com, not the other way around).

Plaintiff's motion for  a preliminary injunction should therefore be denied for multiple reasons: (1) it cannot show a likelihood of success on any of its claims, (2) it cannot show a likelihood of irreparable harm, particularly given its months-long delay in seeking relief, (3) the balance of hardships favors Jackpot.com, and (4) the public interest will not be served by allowing Plaintiff to exert a monopoly over a descriptive term, when it has not even attempted to show – and cannot show – that it has *any* enforceable rights in that term.  Indeed, under binding Second Circuit precedent, the Court should dismiss Plaintiff's claims with prejudice.

## BACKGROUND

### A.    Jackpot.com's Well-Established Business

Jackpot.com is a world leader in the strictly regulated online gaming and lottery industry, and is backed by prominent investors in the United States and abroad.  Declaration of Yariv Ron ("Ron Decl.") ¶ 2.

Defendants first secured rights to the highly valuable domain name jackpot.com in 2012.

*Id.* ¶ 3.  Between 2012 and 2016, Jackpot.com was operated as a portal, and then an iGaming destination that offered casino and soft games.  *Id.*  In 2016, 99Dynamics incorporated in the United Kingdom and launched its consumer-facing business.  *Id*.  In the ensuing six years, Defendants have spent multiple millions of dollars advertising Jackpot.com via television, newspapers, online, and direct mailing, and developing a highly successful, global licensed gaming business with over 800,000 registered customers from 184 countries.  *Id*.

Jackpot.com operates several lines of related consumer-facing businesses – and contrary to Plaintiff's baseless implication, these businesses are government-recognized, licensed, and regulated.  *Id.* ¶ 4.  Operating under nine licenses in four jurisdictions, Jackpot.com provides its customers with a regulated lottery betting offering, allowing them to bet on the outcomes of lotteries.  *Id*.  Jackpots are paid out via a prize indemnity policy out of the Lloyd's market in London, one of only two such policies in the world, endorsed by leading reinsurers in the global insurance market.  *Id*.  Jackpot.com also has a licensed, robust iGaming portfolio of scratch cards, instant games, custom lotteries, and casino games.  *Id*.

Jackpot.com's operations and systems are highly safeguarded, maintained, and periodically evaluated by third-party certifying entities.  *Id.* ¶ 5.  Monthly, quarterly, bi-annual, and annual reports are submitted by Jackpot.com to the gambling regulators to monitor its ongoing compliance.  *Id*.  In six years of operation, Jackpot.com has an unblemished regulatory record.  *Id*.  Moreover, Jackpot.com pays a gaming duty in all jurisdictions in which it is licensed, for bets made through its service, which serves the communities in the territories in which it operates.  *Id.* ¶ 6.

Since December 2016, Jackpot.com's consumer-facing business has used the Jackpot.com name with bubble lettering, as depicted below:

4

| Logo | Website | Mobile |
|------|---------|--------|

*Id.* ¶ 7.

### B.    Jackpot.com's U.S. Expansion

The U.S. lottery business is a $100 billion dollar a year business, which still operates primarily through sales at convenience stores, gas stations, and other brick-and-mortar locations. Ron Decl. ¶ 8.  Due to recent regulatory changes, and to conform to modern consumer habits, the U.S. lottery business is shifting online, though only 5-7% of the lottery business is currently conducted there.  *Id.*  Jackpot.com's robust platform and licensing background make it well-positioned to serve the highly-regulated U.S. lottery market – something it has been planning to do since at least late 2020.  *Id.*  Since April 2021, in anticipation of that launch, U.S. visitors to the Jackpot.com website have been shown a pop-up stating:  "Coming Soon – the NEW way to play the lottery.  Sign up now to hear first when we launch in your State.  Special Offers for early Signups."  *Id.*  Visitors could then enter their email address and state of residence.  *Id.* Moreover, Jackpot.com's plan to enter the U.S. has been communicated within the industry since at least February 2021.  *Id.* ¶ 9.

### C.    Plaintiff's Recent Entry Into The Gaming Business

Plaintiff Jackpocket was founded in 2013, one year ***after*** Defendants secured the jackpot.com domain name.  Sullivan Decl. ¶ 2; Ron Decl. ¶ 3.  Unable to secure the domain

name jackpot.com, Plaintiff instead decided to use the suggestive term JACKPOCKET, which it registered with the USPTO in May 2015.  Sullivan Decl. ¶ 5.  Plaintiff's founder selected the term "Jackpocket" to invoke the idea that the Jackpocket app was like having a potential jackpot in your pocket.  *See* Declaration of Rollin Ransom ("Ransom Decl.") Ex. A.  Thus, even Plaintiff's rationale for selecting its name recognized the descriptive nature of the term "jackpot" in the lottery business.

Initially, Plaintiff used cursive white lettering for its mark:



Sullivan Decl. Ex. F.  In late 2017 or early 2018 (*i.e.*, over a year ***after*** Defendants adopted the stylized Jackpot.com logo depicted above, *see supra* at 5), Plaintiff changed to the more rounded font that Plaintiff now argues is "similar" to Defendants' pre-existing logo:



Ransom Decl. ¶¶ 5-6.

Although founded in 2013, Plaintiff was not licensed to operate a lottery courier service in New Jersey until November 2019, and was not licensed in New York until October 2020. Sullivan Decl., Ex. A.  Plaintiff's self-described "soft launch" in New York was in January 2021. Ransom Decl. Ex B.  In February 2021, after soft launching in New York, Plaintiff secured outside investment, *see id.*, Ex. C; most of Plaintiff's advertising expenditure appears to have occurred after that February 2021 investment.  *See generally* Sullivan Decl.

### D.     The Parties Discuss A Potential Deal

Commencing in late November 2021, the parties began discussing a possible merger or

acquisition.  Ron Decl. ¶ 11.  On December 3, 2021, the parties discussed the opportunity over the telephone, and Jackpot.com described during that call its strategic path forward, ***specifically focused on Jackpot.com's planned expansion into the U.S.***  *Id*.  Thereafter, the parties exchanged documents and information respecting the potential deal.  *Id*.

On January 28, 2022, Plaintiff sent Jackpot.com a diligence list seeking detailed information about Jackpot.com's business, which Jackpot provided.  Ron Decl. ¶ 12.  Less than a month later, on February 22, 2022, Jackpot.com sent to Plaintiff a robust PowerPoint presentation regarding Jackpot.com's detailed state-by-state strategy for providing lottery services in the U.S. market, among other information:

*Id.* Ex. 1 at 6 (title and headings included above, confidential information omitted).

On April 14, 2022, Plaintiff's CEO Peter Sullivan wrote to Jackpot.com CEO Yariv Ron:

> We're presenting a formal memo to the board to make a move in the first week of May. We still remain super interested in Jackpot.com after reviewing ████████ ████████ Can you let us know how we should think about this new combination? We want to make a move and present it as appropriately as we can. The ability to source users is imperative.

Ron Decl. Ex. 2 at 1.  Jackpot.com responded: "We are in the final stages of our financing rounds, so I suggest we touch base a bit further down the line."  *Id.*

On April 19, 2022, Mr. Ron and Mr. Sullivan met by chance at a lottery conference in Miami, Florida.  During that conversation, Mr. Sullivan advised Jackpot.com that Plaintiff Jackpocket was still interested in a deal, and that Plaintiff anticipated paying something in the range of ████████████████.  Ron Decl. ¶ 14.  During the conversation, the parties again discussed Jackpot.com's imminent entry into the U.S. market – indeed, Mr. Sullivan knew

7

that Jackpot.com's entrance into the marketplace was certain to happen, and even remarked that "now you're gonna have to suffer in these boring conferences too . . . ."  *Id.*

Ultimately, Jackpot.com elected not to pursue a deal with Plaintiff.  *Id.* ¶ 15.  At no time during these months-long discussions did Plaintiff express the trademark concerns newly claimed by Plaintiff in this litigation.  *Id.*

### E. Jackpot.com Announces Entry Into The U.S. Market And Secures Substantial Investment From Prominent U.S. Investors

On May 20, 2022, Jackpot.com announced that it hired a former StubHub executive to run its U.S. business, which was picked up by the press:

Ron Decl. ¶ 16.

The next month, Jackpot.com announced it had completed a Series A investment round, raising $36.5 million to fund its United States operations.  Investors include top NBA stars James Harden and Joel Embiid, and NHL great Martin Brodeur.  Ron Decl. ¶ 17.  Funding was led by Accomplice, a venture capital firm co-founded by DraftKings board member Ryan Moore, and Courtside Ventures, an early-stage investor in digital media and gaming businesses.  *Id.*  The investors also included The Kraft Group, which owns the New England Patriots, the Haslam Sports Group, which owns the Cleveland Browns, Fanatics CEO Michael Rubin, DraftKings CEO Jason Robins, and Boston Red Sox president Sam Kennedy.  *Id.*

### F. Plaintiff Mimics Jackpot.com in Preparation for Litigation

Shortly after Jackpot.com publicly announced the U.S. strategy that Plaintiff had known of for at least five months, Plaintiff took affirmative steps to try to mimic the look and style of Jackpot.com, apparently as part of an ill-conceived plan to attempt to bolster its meritless claims in this litigation.  For example, prior to May 2022, Plaintiff used solely the term "JACKPOCKET" as its mark, without the ".com," including in *every* example provided by Mr. Sullivan in his declaration.  *See* Sullivan Decl. ¶ 9.  On May 23, 2022, ***just three days after Jackpot.com publicly announced its U.S. CEO***, Plaintiff applied for a trademark registration for JACKPOCKET.COM, and changed the logo on its website to newly include the ".com" extension.  Ron Decl. ¶¶ 19-21.  For example, as of May 16, 2022, Plaintiff used the logo "JACKPOCKET" on the banner of its website, without the ".com":

*Id.* ¶ 20.  By May 26, 2022, however, Plaintiff had started using the logo "JACKPOCKET.COM," in an apparent effort to more closely mirror "JACKPOT.COM":

*Id.* ¶ 21.

### G. Plaintiff Pursues Litigation

On May 23, 2022, Plaintiff sent a letter to Jackpot.com accusing it for the first time of

trademark infringement, and demanding that Jackpot.com cease all use of the domain name and mark.  Ransom Decl. Ex. D.  Tellingly, it was not until Plaintiff was unsuccessful in its attempt to purchase Defendants' business – including the jackpot.com domain name and associated goodwill, along with the company's "ability to source users" and regulatory expertise – that Plaintiff ostensibly developed these claimed trademark concerns; during the months that the parties were involved in discussions about Defendants' imminent expansion into the United States, Plaintiff never once raised any such issue.  Ron Decl. ¶ 15.  On May 31, 2022, Jackpot.com sent a letter disputing Plaintiff's allegations, noting among other things that "JACKPOT is merely descriptive with respect to lottery and gaming services, and is therefore freely available for use by Jackpot.com in connection with such services."  Ransom Decl. Ex. E. Plaintiff then waited over another month, until July 7, 2022, to file this action.  Nearly two weeks later, on July 19, 2022, Plaintiff filed its motion for preliminary injunctive relief.

## LEGAL STANDARD

"To obtain a preliminary injunction, the movant must show:  (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of the injunction." *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (internal quotations and citation omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Resources*

*Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).

## ARGUMENT

### I.   PLAINTIFF CANNOT ESTABLISH THE REQUIRED LIKELIHOOD OF SUCCESS ON THE MERITS

#### A.   Plaintiff is Not Likely to Succeed on its Trademark Infringement Claim.

Plaintiff's trademark infringement claim fails because the law does not allow Plaintiff to monopolize the descriptive term "JACKPOT" for Plaintiff's exclusive use – either directly through trademark registration (which Plaintiff has not even attempted), or indirectly through litigation, as it is attempting here.

#### 1.   Plaintiff Cannot Use Its JACKPOCKET Mark to Monopolize The Descriptive Term JACKPOT

JACKPOT is a descriptive term used in trademarks by dozens (if not hundreds) of companies for products and services involving lotteries and other games that yield large monetary prizes in the nature of jackpots.  Ransom Decl. ¶ 9,  Exs. F-H.  Given this fact, and under binding Second Circuit authority, Plaintiff cannot claim a monopoly over the use of the term JACKPOT by others, whether as a trademark or in a description of their goods or services. *Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986) ("A trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term . . . .").

That the term JACKPOT is descriptive when used in trademarks or service marks associated with lottery-related services is illustrated most clearly by the approach of the United States Patent & Trademark Office ("USPTO") in evaluating applications to register such marks: the USPTO routinely requires applicants to *disclaim* exclusive rights to "JACKPOT," precisely because of that term's descriptive nature.  *See, e.g.*, Ransom Decl. Ex. I (June 1, 2017 Office

11

Action, U.S. Reg. No. 5,415,770, stating that "[a]n applicant may not claim exclusive rights to terms that others may need to use to describe their goods and services in the marketplace," and requiring disclaimer of JACKPOT in JACKPOT PARTY as merely descriptive of computerized lottery and casino games, "namely, games that yield large monetary prizes in the nature of jackpots"). Below is a non-exhaustive sample of such marks, each owned by a *different* registrant, and each required to disclaim exclusive rights to JACKPOT:

| MARK | REG. NO. | INCLUDED GOODS AND SERVICES | DISCLAIMER |
|---|---|---|---|
| JACKPOT PARTY | 4,998,618 | "Entertainment services, namely, providing lottery games via a global computer network, via social networking and via mobile phones and personal electronic devices" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| | 5,415,770 | "Computer software and firmware for games of chance on any computerized platform"<br><br>"Entertainment services, namely, providing non-downloadable casino type computer games through a computer, social networking or mobile platform" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| JUST THE JACKPOT | 5,476,920 | "Lottery services" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| JACKPOT BALL | 5,481,496 | "Gaming machines for gambling including slot machines or video lottery terminals" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| ELECTRIC JACKPOTS | 5,700,953 | "Entertainment services, namely providing online games for playing games of chance" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOTS' APART FROM THE MARK AS SHOWN" |
| THE WHEEL OF JACKPOTS 777 | 5,718,809 | "Organization of lotteries; Prize draws in nature of lotteries via online gaming in the field of wagering, betting, and gambling" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOTS' APART FROM THE MARK AS SHOWN" |
| BIG ACTION JACKPOTS | 5,811,014 | "Computer game programs; …Computer game software for use on mobile and cellular phones; Computer software and firmware for playing games of chance on any computerized platform, including…video lottery terminals" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOTS' APART FROM THE MARK AS SHOWN" |

| MARK | REG. NO. | INCLUDED GOODS AND SERVICES | DISCLAIMER |
|---|---|---|---|
| GO JACKPOTS | 5,924,629 | "prize draws in the nature of operating lotteries; organising and conducting lotteries" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOTS' APART FROM THE MARK AS SHOWN" |
| JACKPOT STAMPEDE | 6,086,478 | "Gaming machines, namely, devices which accept a wager" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| JACKPOT CARDS | 6,132,527 | "games, namely, …casino gaming machines for gambling in the nature of slot machines and video lottery terminals, scratch cards for playing lottery games" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT CARDS' APART FROM THE MARK AS SHOWN" |
| JACKPOT CLASSIC | 6,147,928 | "Computer game software for gambling machines;…Games that accept virtual or monetary wagers sold as a feature of game software" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| JACKPOT KENO | 6,286,750 | "Recorded computer gaming software for gambling" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT KENO' APART FROM THE MARK AS SHOWN" |
| JACKPOT CLUB | 6,504,004 | "Downloadable computer software and firmware for playing games of chance on any computerized platform, including…video lottery terminals" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |
| JACKPOT WORLD | 6,625,989 | "Entertainment services, namely, providing games of chance via the Internet" | "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'JACKPOT' APART FROM THE MARK AS SHOWN" |

Ransom Decl. ¶ 11, Ex. J.

Under these circumstances, the Second Circuit's decision in *Am. Cyanamid* is controlling, and requires dismissal of Plaintiff's claim. In *Am. Cyanamid*, the plaintiff claimed that its registered trademark HIB-IMUNE was infringed by the defendant's use of the trademark HibVAX; both marks were used for "chemically identical vaccines that immunize children against Haemophilus influenzae type b diseases." *Am. Cyanamid*, 800 F.2d at 307. The District Court granted a preliminary injunction, but the Second Circuit reversed, finding that the District Court abused its discretion because there was "no infringement as a matter of law." *Id.*

The Second Circuit explained that the prefix used in both marks – "Hib" – refers to the "Haemophilus polysaccharide vaccine" sold by the parties, and rejected the plaintiff's effort to

monopolize that term through enforcement of its registered trademark:

> A trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term such as "Hib."

*Id.* at 308.  The court therefore concluded that the "Hib" element of the mark had to be removed from the analysis.  What remained was the suffixes, but the court concluded that they likewise could not form the basis for an infringement claim, both because they were entirely different ("IMUNE" vs. "VAX"), and because they were "straightforward, descriptive abbreviations of the medical use to which the product is put."  *Id.* at 309.  Because the court held that there was not "an infringement of protectible trademark interests," the Court not only overturned the preliminary injunction order, it ***ordered the Complaint dismissed***.  *Id.* at 309-10.[2]

To be sure, it is possible to gain trademark rights in a descriptive term, but only where the proponent of those rights has actually ***used*** the descriptive term as a trademark *and* where the descriptive term has achieved "significance 'in the minds of the public' as identifying the applicant's goods or services—a quality called '***acquired distinctiveness***' *or* '***secondary meaning***.'"  *USPTO  v. Booking.com B. V.*, 140 S. Ct. 2298, 2302–03 (2020) (emphasis added) (upholding trademark rights in BOOKING.COM where the owner demonstrated both that the

---

[2] The Court further noted that there was no deceptive use by defendant, citing the fact that the defendant had been using its mark for three years and that the appearance of the parties' respective marks and trade dress was different.  *Am. Cyanamid*, 800 F.2d  at 309.  The same is true here.  As discussed above, Defendants first obtained the jackpot.com domain name ***a decade ago*** – before Plaintiff even existed – and has been using that domain name and the Jackpot.com name in connection with lottery-related services for over six years.  Moreover, if any party is attempting to draw connections to the other, it is Plaintiff.  As discussed above, in advance of filing this lawsuit, Plaintiff took deliberate steps to make the presentation of its mark closer to that of Jackpot.com.  These steps included changing from a cursive font to a rounded font that Plaintiff claims more closely resembles the bubble lettering used by Jackpot.com since 2016, and adding ".com" to its trademark so that it more closely mimics Jackpot.com.

phrase functioned as a trademark *and* where it had achieved secondary meaning).[3]

Here, however, Plaintiff does not claim to have satisfied ***either*** of these conditions.  It does not claim to have used JACKPOT (as distinct from JACKPOCKET) as a mark, nor does it claim to have established – or even attempted to establish – secondary meaning in the term JACKPOT (on the contrary, it is Defendants, and not Plaintiff, who have owned the jackpot.com domain name since 2012, and who have used JACKPOT.COM as the name of their business since 2016).  As a result, Plaintiff has no legal entitlement or ability to exert dominion over the term JACKPOT.  *See, e.g., Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041-1042 (2d Cir. 1992) (descriptive term "PM" was not entitled to trademark protection without plaintiff's demonstration of secondary meaning); *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 290-91 (S.D.N.Y. 2018) (noting that a descriptive mark is entitled to protection only "upon establishing that the mark had acquired a secondary meaning as a designator of source") (internal quotations and citation omitted).

Accordingly, under *Am. Cyanamid,* the Court must first strip out the non-protectible JACKPOT element, so that it can compare what is left.  But once the descriptive "JACKPOT" element is removed from Jackpot.com, there is nothing left to compare, and thus no basis for any claim of infringement.[4]  Thus, under binding Second Circuit authority, the Court should both deny Plaintiff's motion for preliminary injunction, and dismiss the Complaint with prejudice.

---

[3] Even in that event, such protection is narrow because "trademark law hems in the scope of such marks short of denying trademark protection altogether," and "[t]he weaker a mark, the fewer are the junior uses that will trigger a likelihood of consumer confusion."  *Id.* at 2307.

[4] The inclusion of the ".com" top-level domain – whether in Jackpocket's claimed mark or in Jackpot.com's name – is irrelevant. It is well established that such top-level domains generally serve no source-identifying function. *See, e.g., In re 1800Mattress.com IP LLC*, 586 F.3d 1359, 1364 (Fed. Cir. 2009).

### 2.   Plaintiff's *Polaroid* Analysis Is Both Inapt and Flawed.

Plaintiff's reliance on the *Polaroid* factors is simply inapt. Where, as here, there is nothing left to compare once the descriptive JACKPOT element is excluded, the Second Circuit has instructed that "we need not weigh the various factors set out in *Polaroid*."  *Am. Cyanamid*, 800 F.2d at 309 (internal citation omitted); *see also Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1185-88 (2d Cir. 1975) (holding, without analyzing *Polaroid* factors, that "Kick'er" did not infringe "Kik-it" despite defendant's use of the mark for a similar tabletop soccer game because plaintiff "cannot claim exclusive rights over every variation of the word 'kick'").  Accordingly, the Court can and should deny Plaintiff's motion and dismiss the claim based solely on the absence of any actionable similarity between the parties' respective marks. But even if the Court were to consider the remaining *Polaroid* factors, the motion should be denied and Plaintiff's claims dismissed, as the critical *Polaroid* factors weigh decisively against any likelihood of confusion.

### a.  *Plaintiff's weak mark ends the analysis at the first step.*

The weakness of Plaintiff's JACKPOCKET mark militates decisively against any actionable likelihood of confusion.  Plaintiff intentionally chose a suggestive term that is intended to convey that by using Plaintiff's mobile app, its customers are carrying a potential jackpot in their pocket – and it chose this name *knowing* that Defendants had already secured the domain name jackpot.com.  Ransom Decl. Ex. A.  Indeed, Plaintiff admits that its use of JACKPOCKET is meant to invoke the descriptive term JACKPOT.  Sullivan Decl. ¶ 17. Plaintiff's decision to pursue a mark that is ***deliberately intended*** to be similar in sound and appearance to the descriptive term JACKPOT, in a field where JACKPOT is commonly used in marks by multiple third parties to describe lottery and gambling-related goods and services, means that Plaintiff is entitled to – at most – a very narrow scope of protection for its

16

JACKPOCKET mark.[5]

For example, less than two weeks ago, in *RiseAndShine Corporation v. Pepsico, Inc.*, -- F.4th --, No. 21-2786, 2022 WL 2898794 (2d Cir. July 22, 2022), the Second Circuit found that the District Court abused its discretion and vacated an order granting a preliminary injunction against Pepsico for branding its energy drinks as MTN DEW RISE ENERGY. *Id.* at *1. Although the plaintiff owned federal trademark registrations for RISE BREWING CO. and had used RISE as a trademark for its nitro-brewed coffee since 2016, the Second Circuit concluded that the plaintiff's RISE mark was extremely weak. *Id.* at *7-*8. While the Second Circuit agreed with the District Court that the mark was suggestive, and thus protectible without secondary meaning, it noted that the association between the word "Rise" and coffee rendered the mark weak, limiting it to a narrow scope of protection. *Id.* at *5; *see also Am. Cyanamid*, 800 F.2d at 309 (explaining that though "HibVAX" did not infringe "HIB-IMMUNE" as a matter of law, "HIB-IMMUNE" might be infringed by "HIB-IMMUN," and "HibVAX" might be infringed by "HibVACS").

---

[5] In addition to the third-party marks identified above, *see supra* at 12-13, there are *hundreds* of other JACKPOT marks used in connection with lottery- and gaming-relating goods and services. *See* Ransom Decl. ¶ 9 & Exs. F-H. Plaintiff attempts to minimize the relevance of such third-party marks, arguing, based on out-of-Circuit authority, that such marks demonstrate the weakness of Plaintiff's JACKPOCKET mark only if they are in the specific field of "Lottery Courier Services." ECF No. 20 ("Mot.") at 16 n.7. Plaintiff's argument is simply wrong. In the *Second* Circuit, evidence of widespread third-party use in various fields is relevant to establish weakness. *See, e.g.*, *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir. 1997) (relying on existence of "more than 70 trademark registrations, pending applications for registration or renewal, or publications-for-opposition" incorporating same trademark as plaintiff's, only some of which were for competing products, as demonstrating weakness of mark); *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*, 308 F.2d 196, 200 n.2 (2d Cir. 1962) (finding "Triumph" was a "weak mark" because there were 207 registrations of it or close equivalents). Moreover, and in any event, the goods and services associated with the above-referenced marks are broadly defined, extending to the full range of lottery-related services, and particularly, online lottery-related services. Accordingly, even under Plaintiff's formulation, these third-party marks are relevant.

The RISE mark was weakened further by the fact that the field was crowded with third parties using the term "Rise" in connection with coffee, energy drinks, and similar products. *RiseAndShine*, 2022 WL 2898794 at \*5-\*6.  And although the plaintiff had spent $17.5 million in publicizing its mark and its products, it failed to show that its mark had "achieved sufficient acquired strength to counterbalance the inherent weakness of its mark."  *Id.* at \*7.

As in *RiseAndShine*, Plaintiff chose a weak, suggestive mark in a field crowded with JACKPOT marks.  *See* Mot. at 14 n.6 (conceding that JACKPOCKET is suggestive).  And while Plaintiff attempts to bolster the strength of its inherently weak mark by contending that it is commercially strong, Plaintiff's arguments are unavailing:

- most of Plaintiff's advertising and other activity has occurred only recently, following its 2021 soft launch in New York, *see generally* Sullivan Decl.;

- a primary reason that Plaintiff was "super interested" in a potential merger with or acquisition of Defendants was Defendants' "ability to source users," Ron Decl. Ex. 2 at 1 – hardly necessary if Plaintiff had the commercial strength it now claims;

- Plaintiff does not present any consumer studies showing that its mark is *in fact* commercially strong and well-known in the minds of consumers – the mere fact that Plaintiff's app has been widely downloaded or used does not translate to *trademark* strength, particularly given the massive size of the U.S. lottery industry, *see, e.g.*, *Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 585–86 (S.D.N.Y. 2009) (noting lack of "consumer studies linking the mark to a source," among other factors, in finding mark weak); *see also UHS of Delaware, Inc. v. United Health Servs., Inc.*, 227 F. Supp. 3d 381, 394 (M.D. Pa. 2016) (observing that plaintiff "touts its advertising expenditures broadly" but "offers no supplemental evidence – such

as consumer perception surveys or focus groups establishing actual market recognition –
to support its commercial strength argument," and noting that "even evidence of
significant expenditures in connection with a mark does not automatically translate into
consumer recognition") (internal quotations and citation omitted); and

-   in all events, Plaintiff does not even claim that these investments were designed to
    establish (much less strengthen) rights in JACKPOT or JACKPOT.COM, *i.e.*, the name,
    domain name, and mark that Plaintiff is attempting to enjoin – on the contrary, it appears
    that the various prior media references to Plaintiff as "Jackpot" that Plaintiff's CEO
    identifies, *see* Sullivan Decl. ¶ 18, were in error (as opposed to the result of Plaintiff
    using JACKPOT as a mark), and neither Plaintiff nor Mr. Sullivan suggests otherwise.

The only other *Polaroid* factor the *RiseAndShine* court considered was a "general"
similarity in the parties' respective marks, which it found insufficient to support issuance of a
preliminary injunction.  *Id.* at *7.[6]  So too here, where Plaintiff *concedes* the parties' marks are
different, and where any alleged similarity disappears when the descriptive term JACKPOT is
removed from the equation.[7]  As another judge in this District noted long ago, "in a well-trodden
field like this, especially where the key word is free as air, small variations are likely to make
enough of a difference to ward off charges of infringement."  *Beech-Nut, Inc. v. Warner-Lambert*

---

[6] For example, the court noted that "on both of the parties' products, the word 'RISE' was
printed in 'large typeface, in all-capital letters, in a bright color against a light background and
[was] the dominant feature occupying the top third of the can.'"  *Id.* (internal citation omitted).

[7] Although Plaintiff makes much of the fact that Defendants used the color blue for the U.S.
landing page at jackpot.com, the color was selected by a third-party designer.  Ron Decl. ¶ 18.
In any event, no products or services can be purchased on that page, and Defendants intend to
adopt a "look and feel" for their consumer-facing website comparable to the orange, black, and
white coloring shown above.  *Id.*  Regardless, Plaintiff can no more claim exclusive rights to the
color blue for websites than it can to the term JACKPOT for lottery-related services.

*Co.*, 346 F. Supp. 547, 549-550 (S.D.N.Y. 1972), *aff'd*, 480 F.2d 801 (2d Cir. 1973).

In sum, the foregoing analysis sounds the death knell for Plaintiff's claim; consistent with the Second Circuit's approach in *RiseAndShine*, the Court need proceed no further.  Indeed, the Second Circuit's conclusion in *RiseAndShine* applies with equal force here:

> To the extent that Defendant's use of its marks caused any likelihood of confusion, this was because Plaintiff chose a weak mark in a crowded field. For this reason, the balance of hardships did not favor Plaintiff.  Plaintiff did not demonstrate a likelihood of success on the merits, and we must overturn the grant of the preliminary injunction.

*RiseAndShine*, 2022 WL 2898794 at *8.

### b.   *Plaintiff's survey is fatally flawed.*

Plaintiff relies heavily on a survey constructed and administered by Michael Barone. However, as set forth in greater detail in the concurrently-filed declaration of Dr. Itamar Simonson, a longtime professor at Stanford University and recognized expert in consumer behavior and survey methodology, as well as relevant case law, Dr. Barone's survey and his corresponding opinions are fatally flawed in multiple respects, and should therefore be rejected.

*First*, Dr. Barone showed potential consumers Plaintiff's website followed by Jackpot.com's U.S. landing page and third-party websites, staged sequentially.  As Dr. Barone concedes, the methodology he adopted is a version of the so-called *Squirt* format, named after *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).  Although *Squirt* is a recognized methodology in limited circumstances – namely, when products are routinely encountered side-by-side, as on a store shelf – courts have rejected *Squirt* surveys as inherently misleading where, as here, the parties' respective services are *not* offered side-by-side or in close proximity or sequence.  This is because the *Squirt* format artificially informs survey participants about both parties' marks and then asks about connections between the two; in most cases, this does not replicate market conditions and instead leads participants to search for any connection (real or

imagined) between the marks.  Declaration of Itamar Simonson ("Simonson Decl.") ¶¶ 21-22, 31-33; *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 235-239, 241 (S.D.N.Y. 2010) ("sequential" *Squirt*-style survey was unreliable indicator of consumer confusion and inadmissible due to failure to replicate actual market conditions, where consumers would not have "proximately encountered" the parties' respective products); *Hi-Tech Pharmaceuticals Inc. v. Dynamic Sports Nutrition, LLC*, No. 1:16-cv-949, 2021 WL 2185699, at *18-19 (N.D. Ga. May 28, 2021) (same); *Pinnacle Advertising & Mkt. Grp., Inc. v. Pinnacle Advertising & Mkt. Grp.*, No. 18-cv-81606, 2019 WL 7376782, at * 3 (S.D.  Fla. Sept. 26, 2019) (noting courts have found *Squirt* format "improperly misleading" in that it "artificially tells respondents about a mark that they did not know about and then asks about connections with that mark"); *Sazerac Co. v. Fetzer Vineyards, Inc*., 265 F. Supp. 3d 1013, 1026-27 (N.D. Cal. 2017) (*Squirt* survey that exposed participants to both parties' marks failed to approximate the marketplace).  Instead, the only acceptable methodology for use in a case such as this, where the parties' products and services are not sold side-by-side, is the so-called *Eveready* methodology, named after *Union Carbide Corp. v. Ever-ready Inc.*, 531 F.2d 366 (7th Cir. 1976), in which survey respondents are shown the alleged infringer's product and asked who they believe offers the product being shown.  Simonson Decl. at ¶ 20.  *Eveready* has been called the "gold standard" of confusion survey methodology.  *See Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 232-233 (3d Cir. 2017).

Notably, Dr. Barone knows better than to use *Squirt* here.  He has previously testified – consistent with the observations of both courts and of Dr. Simonson here – that while a *Squirt* format may be appropriate for products that are viewed side-by-side, the *Eveready* format should be used in cases like this, in which the parties' products or services are offered separately from

each other. *See Koninklijke Philips Electronics N.V. v. Hunt Control Systems, Inc.*, D.N.J. Case No. 11-3684, 2017 WL 3719468, at *12 (August 29, 2017) ("Dr. Barone testified that he conducted an *Eveready* survey in order [to] test reverse confusion…. He testified that a sequential two-room survey [*i.e.*, *Squirt*] was inappropriate here because consumers did not encounter the two marks 'side-by-side on a retail shelf or in close proximity to each other online."). Dr. Barone's decision to nonetheless use a *Squirt* format – despite its inapplicability here, and despite its well-known propensity to overstate levels of alleged confusion – reflects nothing more than a meritless effort to create the false appearance of confusion.

*Second*, Dr. Barone asked participants leading questions that urged them to choose the "correct" answer, namely, that one or more of the websites they were viewing was owned by or affiliated with Plaintiff. *See* Barone Decl. Ex. B at 26-27 (identifying Plaintiff as "Company A" and asking consumers, as to Jackpot.com and third-party websites, "Do you think this website is owned, operated, or put out by Company A?" and "Do you think this website is affiliated with, or sponsored or approved by, Company A?"). This, too, artificially heightens confusion findings. Simonson Decl. ¶¶ 13, 24-27, 31-36; *see also Parks LLC*, 863 F.3d at 233 (criticizing *Squirt* surveys, as their use of closed-ended questions "can lead participants to the desired answer").

*Third*, the claimed "control" that Dr. Barone used – Windfall.com – was nothing of the sort. An appropriate control should replicate the alleged infringing mark as closely as possible without being infringing. Simonson Decl. ¶¶ 28-29, 39-42; *see also Limited v. Macy's Merch. Grp. Inc*, No. 15-CV-3645 KMW, 2016 WL 4094913, at *10 (S.D.N.Y. Aug. 2, 2016) ("A control should be as close as possible to the stimulus being tested . . . except for the allegedly infringing feature."), *aff'd sub nom. Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633 (2d Cir. 2017). Windfall.com and Jackpot.com bear *no* similarity in sight, sound, or meaning,

22

such that Windfall.com did not function as a control in any respect.

   *Fourth*, in a further departure from marketplace conditions, Dr. Barone improperly

adopted an apples-to-oranges comparison, using Plaintiff's consumer-facing website on the one

hand, and Defendants' U.S. landing page for company information, ***where <u>no</u> products or***

***services are currently offered***, on the other hand.  Even if a sequential *Squirt*-format presentation

were appropriate (which it is not), an apples-to-apples comparison would have used the parties'

respective customer-facing apps, ***where products and services <u>are</u> offered***:



Ron Decl. ¶ 7; Simonson Decl. ¶34.

   And *fifth*, the results of Dr. Barone's survey themselves actually illustrate the

fundamentally flawed nature of its design.  As Dr. Barone concedes, his supposedly non-

infringing control – Windfall.com – ostensibly resulted in a confusion rate of nearly 50%.  A

survey design that results in half of the respondents evincing confusion over an admittedly *non*-

infringing mark is simply an improperly-designed survey.  Simonson Decl. ¶¶ 13, 41.[8]

---

[8] Plaintiff also points to a handful of instances of alleged actual confusion following the
announcement of Defendants' recent equity raise.  Mot. at 8-9.  While Defendants dispute
whether these alleged examples are remotely representative of alleged consumer confusion (none
purports to come from a consumer), any such confusion is, at most, a consequence of Plaintiff's
selection of "a weak mark in a crowded field."  *RiseAndShine Corporation v. Pepsico, Inc.*, --
F.4th --, 2022 WL 2898794, at *8 (2d Cir. July 22, 2022).

      c.  *Defendants have consistently acted properly and in good faith.*

Plaintiff contends that after Jackpot.com decided not to pursue a potential deal between the parties, Defendants "opted to jump-start their U.S. business" by "disguising themselves as Jackpocket": "From among a vast universe of non-infringing alternatives available, Jackpot chose to enter the U.S. with JACKPOT." Mot. at 2. This is nonsense. Defendants acquired the jackpot.com domain name a decade ago – ***before Plaintiff even existed*** – and have been providing lottery-related services using that domain name and the Jackpot.com name globally for ***six years***, with the ***same*** logo as they currently use. Moreover, Defendants adopted the Jackpot.com U.S. landing page (inviting visitors to register their e-mails for additional information) well over a year ago, and had a well-developed plan to enter into the U.S. before ever talking to Plaintiff, which Plaintiff was aware of as of December 2021 and actually reviewed in a presentation provided to it in February 2022. In short, Jackpot.com has a proven track record of success in its industry and an inherently valuable domain name, and it did not need to, and did not, capitalize on Plaintiff's goodwill.

Plaintiff also attempts to attribute to Defendants the actions of companies – namely, The Lottery Company and Take That – that are not even named parties in this action. Mot. at 6-7, 20. In any event, the referenced apps and websites merely provide lottery results for the referenced lotteries, Ron Decl. ¶ 22, and Take That actually works directly with official state lotteries, including Michigan, Pennsylvania, and Virginia, and drives traffic to those lotteries from the sites and apps identified in connection with Plaintiff's motion (including both state-specific apps and the Powerball.net website). Declaration of Mika Brown ¶ 6. Moreover – and incredibly, given Plaintiff's arguments – ***Plaintiff actually approved Take That's participation in*** ***<u>Plaintiff's</u> "affiliate program,"*** seeking and obtaining user "traffic" from Take That's sites and

apps. *Id.* ¶¶ 2-5. This reality eviscerates Plaintiff's claim that any affiliation between Take That and Defendants would diminish Plaintiff's brand.

In fact, the overwhelming evidence demonstrates if any party has acted in bad faith, it is Plaintiff. It is Plaintiff that changed its logo ***twice*** in a manner that Plaintiff now claims more closely resembles that of Jackpot.com (first by abandoning the cursive lettering, and then shortly before filing suit by adding ".com" to look more like Jackpot.com). And more fundamentally, it is Plaintiff that is improperly attempting to monopolize a descriptive term in which it has not invested and that it does not own, to the detriment of Defendants – in other words, to steal through litigation what it could not purchase commercially.

d. *Defendants' services are of a high quality.*

Plaintiff contends that "[t]he quality of Jackpot's services is less than Jackpocket's," ostensibly due to its involvement in derivative lotteries. Mot. at 20. The evidence does not remotely support that claim. Jackpot.com operates its businesses within a highly-regulated and licensed regime – it holds nine licenses in four European jurisdictions. Ron Decl. ¶¶ 3-4. In six years of operation, Jackpot.com has an unblemished regulatory record. *Id.* ¶5. It has over 800,000 users, and some of the most well-respected investors in the United States. *Id.* ¶¶ 3, 17. And just three months ago, Plaintiff wanted to acquire Jackpot.com in an amount equal to ███ ███████████, due in part to its ability to source users and its experience in the iGaming field. Ron Decl. ¶14, Exs. 1-2. Plaintiff's assertion that Jackpot.com's services are of a low quality – relative to Plaintiff or anyone else in the industry – is a baseless claim, manufactured for litigation, that is belied both by Plaintiff's own conduct and by the objective evidence.

\* \* \*

For all of the foregoing reasons, Plaintiff will not succeed on its trademark infringement

claim; on the contrary, that claim fails as a matter of law.  Accordingly, Plaintiff's motion for preliminary injunction should be denied and this action dismissed with prejudice.

**B.      Plaintiff Is Not Likely to Succeed on its Unfair Competition Claims**

Plaintiff correctly concedes that "[t]he test for trademark infringement is the same" as its claims for unfair competition and false designation of origin under the Lanham Act (Second COA), as well as its claims for New York common law infringement and for unfair competition (Third COA).  Mot. at 21.  These claims are not likely to succeed for the reasons stated above.

**C.      Plaintiff Is Not Likely to Succeed on its Deceptive Trade Practices Claims**

Plaintiff does not even attempt to argue that it is likely to succeed on its deceptive trade practice claim under New York General Business Law section 349 (Fourth COA), tacitly conceding that success is not likely.  Plaintiff's effective abandonment of this claim is hardly surprising.  "A competitor's right of action under § 349 . . . is limited. Since 'trademark or 'trade dress' infringement claims . . . fall outside the original intent of §§ 349 and 350 . . . federal courts have determined that the provisions require the sort of offense to the public interest which would trigger FTC intervention under 15 U.S.C.A. § 45.").  *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F. Supp. 318, 328 (S.D.N.Y. 1997).  Thus, Plaintiff must allege "specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution." *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294-LTS-HBP, 2015 WL 5008762, at *4-5 (S.D.N.Y. Aug. 24, 2015) (internal quotations and citation omitted); *see also Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463, 2012 WL 1450420, at *3 n. 21 (S.D.N.Y. Apr. 23, 2012).  Plaintiff has not demonstrated actionable trademark infringement, much less the heightened showing necessary to support a deceptive trade practices claim.

**D.      Plaintiff Is Not Likely To Succeed On Its Claim For Trademark Dilution**

Plaintiff's state law claim for dilution is based on New York General Business Law

section 360-l.  In order to prevail on such a claim, "a plaintiff must prove, first, that its trademark either is of truly distinctive quality or has acquired secondary meaning, and, second, that there is a 'likelihood of dilution.'" *Brennan's, Inc. v. Brennan's Rest., LLC.*, No. 02 CIV. 9858, 2003 WL 1338681, at *6 (S.D.N.Y. Mar. 18, 2003), *aff'd sub nom. Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125 (2d Cir. 2004) (internal citation omitted).  In interpreting this statute, the Second Circuit has held that it ***"protects only extremely strong marks."***  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1049 (2d Cir. 1992) (citation omitted, emphasis added) (upholding denial of injunction sought on basis of anti-dilution statute because subject mark was not "extremely strong").  Plaintiff is not likely to prevail on this claim because, as discussed above, its mark is extremely weak, and Jackpot.com's use of the term JACKPOT does not dilute Plaintiff's mark any more than the dozens of other users who use JACKPOT in trademarks associated with lottery-related goods and services.

## II.   PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

Plaintiff has failed to show irreparable harm.  Under the Lanham Act, a rebuttable presumption of irreparable harm arises if a plaintiff demonstrates a likelihood of success on the merits. 15 U.S.C. § 1116(a).  As discussed above, Plaintiff has not made such a showing, but even if it had, the presumption is rebuttable – and rebutted – where, as here, Plaintiff's delay in seeking relief establishes that interim relief is not appropriate.

Courts in the Second Circuit routinely hold that a party's delay in seeking to enforce purported rights is persuasive evidence that the extraordinary remedy of preliminary injunctive relief is not necessary to prevent irreparable harm.  "There is no bright-line rule for how much delay is too much, but courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (internal quotations and citations omitted) (collecting

cases); *accord Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005)

("We have found delays of as little as ten weeks sufficient to defeat the presumption of

irreparable harm that is essential to the issuance of a preliminary injunction."); *Citibank, N.A. v.*

*Citytrust*, 756 F.2d 273, 276–77 (2d Cir. 1985) (ten-week delay following a press release

rebutted a claim of irreparable injury); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp.

3d 290, 300 (S.D.N.Y. 2021) (delay of less than four months counseled against a preliminary

injunction); *see also Neology, Inc. v. Fed. Signal Corp.*, No. 11-cv-672-LPS/MPT, 2012 WL

2308202, at *3 (D. Del. June 18, 2012) (plaintiff learned of infringement pursuant to NDA but

did not file suit until months later; delay weighed against granting a preliminary injunction),

*report and recommendation adopted*, 2012 WL 3236718 (D. Del. Aug. 2, 2012).

  Here, the U.S. landing page at the jackpot.com website permitted visitors to register e-

mail addresses to obtain updates about Defendants' U.S. offerings as long ago as April 2021, and

Defendants specifically advised Plaintiff (and others) in December 2021 of their intention and

plans to enter the U.S. market in connection with the Jackpot.com name and domain name.  Ron

Decl. ¶¶ 9-11.  Jackpot.com also provided Plaintiff with its detailed plans for its U.S. rollout in

February 2022.  *Id.* ¶ 12. At no point during that entire time did Plaintiff claim to Defendants that

it had any concerns about any alleged similarity of marks, much less that its rights were being

infringed, nor did it take any steps to seek relief from Jackpot.com or the Court.  *Id.* ¶ 15.  If

Plaintiff truly believed that it had rights to assert, or that Defendants' U.S. actions were causing

or would cause it irreparable harm, it was incumbent on Plaintiff to act.  Instead, Plaintiff eagerly

discussed a potential merger deal into at least April 2022, during which time it knew that

Defendants were acting on their plans.  And even when those discussions fell through, Plaintiff

waited two and one-half more months to file suit, and another two weeks thereafter to bring the

present motion.  These actions are *all* inconsistent with Plaintiff's newly-manufactured claim of irreparable harm, and require denial of Plaintiff's motion.[9]

## III.   THE BALANCE OF THE HARDSHIPS TIPS SHARPLY AGAINST GRANTING A PRELIMINARY INJUNCTION

The balance of hardships weighs strongly against the granting of preliminary injunctive relief.  Plaintiff cannot (1) choose a suggestive mark (JACKPOCKET) that is linked to a descriptive term that is used widely in the lottery and gaming field (JACKPOT), and (2) then claim that equity dictates that others be stopped from using that term.  As recently explained by the Second Circuit, "[t]o the extent that Defendant's use of its marks caused any likelihood of confusion, this was because Plaintiff chose a weak mark in a crowded field. For this reason, the balance of hardships did not favor Plaintiff."  *RiseAndShine*, 2022 WL 2898794, at *8.

Jackpot.com, in contrast, will be substantially harmed by a preliminary injunction.  Jackpot.com built its business over the last six years and has spent multiple millions of dollars advertising, navigating regulatory hurdles, and gaining the hundreds of thousands of customers that have positioned its move in the U.S. lottery courier service business.  Ron Decl. ¶¶ 3, 10.  In connection with that launch, Jackpot.com hired U.S. employees, developed a detailed U.S. strategy, and raised $36.5 million from savvy and prominent investors on the strength of its history, plan, investment, and domain name and trade name Jackpot.com.  *Id.* ¶ 10.  Indeed, it has spent over $1 million on that effort just in the last several months, while Plaintiff delayed taking any action.  *Id*.

Forcing Jackpot.com to use a different name will cause Jackpot.com harm; it will substantially diminish Defendants' investment in its valuable domain name and associated

---

[9] Nor is Plaintiff's delay excused by the fact that Jackpot.com is not yet offering its services in the United States.  Indeed, Plaintiff itself concedes that the offering of services was not necessary for it to seek relief.  *See* Mot. at 24.

goodwill, and further require Defendants to incur considerable expense in marketing a new name and logo. *See Algood Casters Ltd. v. Caster Concepts, Inc.*, No. 20-cv-4623 (LJL), 2020 WL 5274172, at *5 (S.D.N.Y. Sept. 4, 2020) (denying motion for preliminary injunction because, in part, Defendants have "sunk resources and its good will" into its brand); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 308 (S.D.N.Y. 2021) (finding balance of equities weighed in favor of defendants where they "would incur considerable expense in redesigning their logo and references to it and in marketing any new design and name" and "would also lose whatever goodwill they have built up in their current design and name"). Multiplying the inequity to Defendants, much of the investment into the U.S. expansion of Jackpot.com occurred during the seven months between when Plaintiff learned of Jackpot.com's plans to enter the U.S., and when it finally took action to enforce its purported rights. *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, No. 1:21-cv-00038, 2021 WL 535485, at *9 (S.D.N.Y. Feb. 12, 2021) (balance of the equities weighted against granting injunctive relief where plaintiff delayed in filing lawsuit and seeking injunctive relief, during which time defendants took steps that would be undone by injunctive relief).

Plaintiffs' cases are not to the contrary. In *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), the accused infringer was unlawfully pirating plaintiffs' television programs and streaming them over the internet. *Id.* at 277. No such criminal activity is alleged here. *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181 (S.D.N.Y. 2020) is similarly inapposite; in that case, the accused infringer was re-selling plaintiff's products at a massive markup in the middle of the COVID-19 pandemic. *Id.* at 190, 197. Such facts bear no relation to this action.

Plaintiff also argues that the balance of hardships weighs in its favor because Defendants have not yet started offering services in the U.S. Mot. at 24. However, all of the cases cited by

Plaintiff are readily distinguishable.  In *Essie Cosms., Ltd. v. Dae Do Int'l, Ltd*., 808 F. Supp. 952 (E.D.N.Y. 1992), the defendant's business was "devoted to products other than" the single allegedly infringing product (which in all events was "identical" to the distinctive trade dress owned by plaintiff); enjoining distribution of that product would therefore have minimal impact on the defendant.  *Id.* at 960–61.  Here, in contrast, Plaintiff is trying to stop Jackpot.com from using a trade and domain name into which it has poured years of work and millions of dollars, and which is tied directly to its central product.  Likewise, neither *Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.* nor *Bulman v. 2BKCO, Inc.* is analogous, because neither involved an accused infringer who was already using the mark in other markets.  *Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F. Supp. 203, 205 (S.D.N.Y. 1987) (defendant's company was incorporated less than a year before suit and product had not yet been advertised or sold); *Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 565 (S.D.N.Y. 2012) (defendants only selected the name within the last several months).  And *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 613 F. Supp. 2d 1140 (W.D. Mo. 2009) involved accused infringers who exactly copied plaintiff's names, seals, and marks.  *Id.* at 1142.  Here, in contrast, Jackpot.com engaged in no such "exact" copying.  In sum, the balance of harms weighs strongly against the granting of preliminary injunctive relief.

## IV.   PRELIMINARY INJUNCTIVE RELIEF IS AGAINST THE PUBLIC INTEREST

Finally, the public interest will not be served by granting preliminary injunctive relief.  Such relief would effectively give Plaintiff exclusive use over a descriptive term that is ubiquitous throughout the lottery and gaming industry, without any requirement that Plaintiff first acquire and prove secondary meaning; the notion – implicit in Plaintiff's motion – that it can simply skip past the hurdle of demonstrating secondary meaning is fundamentally inconsistent

with the strong public interest in keeping descriptive terms available for use.  *Big Star Entertainment, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 201 (S.D.N.Y. 2000) (there is a "strong public interest" against restricting the use of descriptive terms, thus "placing an undue burden on the right of the public to the freest use of common words").

Both cases cited by Plaintiff are inapposite, as they involved efficacy and safety concerns impacting consumers.  In *Mitchell Grp. USA LLC v. Udeh*, No. 14-cv-5745, 2017 WL 9487193 (E.D.N.Y. Mar. 8, 2017), *report and recommendation adopted,* No. 14-cv-5745 (AMD), 2017 WL 3208532 (E.D.N.Y. July 28, 2017), the Court found the public interest would be served because "an injunction would provide the public with more accurate (or at least less false) information about the efficacy and safety of the pertinent products."  *Id.* at *8.  And in *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385 (E.D.N.Y. 2021), the Court found that failing to enjoin the distribution of counterfeit N95 respirator masks would put the public at risk, and the risk "is particularly acute in the context of the COVID-19 pandemic." *Id.* at 405.  Plaintiff does not argue that any safety or health concerns are implicated by its claims, for the simple reason that there are none.  The public interest requires that Plaintiff's motion be denied.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for preliminary injunction and dismiss its complaint with prejudice.

Dated:   August 2, 2022                    Respectfully submitted,

*/s/ Rollin A. Ransom*
Rollin A. Ransom
Eric B. Schwartz (*pro hac vice* pending)
SIDLEY AUSTIN LLP
555 W. 5th Street, Suite 4000
Los Angeles, CA  90013
Tel.: (213) 896-6000
rransom@sidley.com
eschwartz@sidley.com

*Attorneys for Defendants*

32