UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/07/2022
```

-------------------------------------------------------------------X
:
JACKPOCKET, INC.,                                                  :
:
Plaintiff,            :
:                      22-cv-5772 (LJL)
:
-v-                                 :
:                      OPINION AND ORDER
:
LOTTOMATRIX NY LLC,                                                :
LOTTOMATRIX CORPORATION,                                           :
LOTTOMATRIX OPERATIONS LIMITED                                     :
d/b/a JACKPOT.COM,                                                 :
LOTTOMATRIX MALTA LIMITED, and                                     :
99DYNAMICS LIMITED,                                                :
:
Defendants.           :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

This lawsuit concerns a dispute over a jackpot.  Plaintiff Jackpocket, Inc. ("Plaintiff" or

"Jackpocket") sells lottery tickets online in thirteen U.S. states and the District of Columbia.

Defendants Lottomatrix NY LLC, Lottomatrix Corporation, Lottomatrix Operations Limited

d/b/a Jackpot.com, Lottomatrix Malta Limited, and 99Dynamics Limited (collectively,

"Defendants" or "Jackpot.com") operate an internet gambling website internationally and hope

to sell lottery tickets electronically in the United States.  Jackpocket brings claims of trademark

infringement, unfair competition, and false designation of origin under the Lanham Act and New

York common law and seeks to enjoin Defendants from using the designation "Jackpot" and

"Jackpot.com" in connection with lottery courier services in the United States.  Dkt. No. 1.

Jackpocket filed a motion for a preliminary injunction on July 19, 2022.  Dkt. No. 19.

The Court held an evidentiary hearing on October 11 and October 12, 2022.  *See* Dkt. Nos. 98–

99.  The Court consolidated the motion for a preliminary injunction with a trial on the merits

under Federal Rule of Civil Procedure 65 and held a half-day trial on November 17, 2022.  *See* Dkt. No. 123.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## PROCEDURAL HISTORY

Plaintiff filed its complaint on July 7, 2022 ("Complaint").  Dkt. No. 1.  The Complaint alleges five causes of action: (1) Federal Trademark Infringement under 15 U.S.C. § 1114(1) (First Cause of Action), *id.* ¶¶ 56–57; (2) Federal Trademark Infringement, False Designation of Origin, and Unfair Competition under 15 U.S.C. § 1125(a)(1)(A) (Second Cause of Action), *id.* ¶¶ 58–59; (3) Common-Law Trademark Infringement and Unfair Competition under New York common law (Third Cause of Action), *id.* ¶¶ 60–61; (4) Violation of the New York Deceptive Trade Practices Statute, New York General Business Law § 349 (Fourth Cause of Action), *id.* ¶¶ 62–63; and (5) Trademark Dilution under New York General Business Law § 360 (Fifth Cause of Action), *id.* ¶¶ 64–66.

On July 19, 2022, Plaintiff brought a motion for a preliminary injunction seeking to enjoin defendants from using the JACKPOT and JACKPOT.COM marks during the pendency of this action.  Dkt. No. 19.  Defendants filed their memorandum of law in opposition to the preliminary injunction on August 2, 2022, Dkt. No. 43, to which Plaintiff responded on August 9, 2022, Dkt. No. 55.  After the preliminary injunction motion was fully briefed, Defendants filed a motion to dismiss the Complaint on August 29, 2022, Dkt. No. 64, and Plaintiff filed a response on September 12, 2022, Dkt. No. 80.  The Court granted an extension for Defendants to file their reply memorandum of law on September 15, 2022.  Dkt. No. 85.

On September 8, 2022, the Court granted Defendants' motion for limited expedited discovery and converted the oral argument scheduled for the preliminary injunction into an evidentiary hearing. Dkt. No. 79. The evidentiary hearing ("Evidentiary Hearing") was conducted on October 11 and October 12, 2022. *See* Dkt. Nos. 98–99. Before the Evidentiary Hearing, the Court received testimony on direct examination by declaration and rebuttal testimony, as applicable, of the following witnesses: Peter Sullivan, Jackpocket's founder and Chief Executive Officer ("Sullivan"), Yariv Ron, Jackpot.com's co-founder and CEO ("Ron"), Jackpocket's expert Dr. Michael Barone ("Barone"), and Jackpot.com's expert Dr. Itamar Simonson ("Simonson"). The Court also received briefs from both parties. At the Evidentiary Hearing, the parties called only Sullivan and Ron, whom they cross-examined. The Court heard closing arguments on the preliminary injunction on October 12, 2022.

During the Evidentiary Hearing, the Court indicated that it would consolidate the motion for a preliminary injunction with the trial on the merits under Federal Rule of Civil Procedure 65. Preliminary Injunction Evidentiary Hearing Transcript ("PI Tr.") at 347–48. On November 17, 2022, the Court conducted a half-day bench trial on Jackpocket's equitable claims and Jackpot.com's defenses.[1] *See* Dkt. No. 123. Before the trial on the merits, the Court received testimony on direct examination by declaration and rebuttal testimony, as applicable, of the following witnesses: Michelle Wong, Jackpocket's vice president of Marketing, Jackpocket experts Hal L. Poret, Jeff Anderson, and Michael Pollock, and Jackpot.com experts Dr. Scott D.

---

[1] The Court severed the trial on the merits for the permanent injunction and other equitable relief—specifically, a request for an accounting of profits—from Jackpocket's request for monetary damages. *See* PI Tr. 348–349. This Opinion and Order only addresses Jackpocket's requests for equitable relief and Jackpot.com's defenses to such requests. Jackpocket did not object to the severance and reserved its right to a jury trial for its request for monetary damages and the issues related thereto. *See* Dkt. No. 100.

Swain, Dr. Ward A. Hanson, Dr. Brian Wyman, and Simonson.  *See* Dkt. Nos. 105.  The Court again received briefs from both parties.  At the trial, the Court held oral argument on the trial record.

## FINDINGS OF FACT

I.     **The Internet Lottery Business**

A.     **Internet Gambling and Lotteries**

This case presents another chapter in the evolution of internet gambling.  For most of history, human beings have gambled—they've placed wagers on uncertain outcomes for the prospect of a prize.[2]  For most of that history, gambling has taken place in person: rolling of dice in a back-alley, placing a bet in an office sports pool, or wagering thousands of dollars in an opulent Las Vegas casino.  It is big business.  And just as the games that people play have evolved, so have the means through which bets are placed, from the parlor, to the telephone, and now to the internet.

In recent years, entire industries have developed that permit people to gamble (or engage in "interactive gaming" or "iGaming," as it is commonly known) in an electronic format, from their computers or their mobile phones, with a click of a button and without any direct human interaction.  *See* Declaration of Yariv Ron ("Ron Decl.") ¶¶ 6–7.  The games that can be played, and bets that can be placed, through the internet knows few limits.  iGaming encompasses a broad array of activities, including sports betting, casino games, online poker, and bingos.  *See id*.

As the facts of this case demonstrate, that evolution has included government and state-run lotteries pursuant to which gamblers purchase a ticket (frequently for a relatively low cash

---

[2] Historians have dated gambling to prehistoric times.  *See generally* David G. Schwartz, Roll the Bones: The History of Gambling (2013).

outlay) for the prospect of winning a large reward or, in the vernacular, a jackpot.  *See* Expert Report of Brian Wyman, Ph.D. ("Wyman Rpt.") at 3.  The word "jackpot," which denotes the top prize in a game of chance, is used in connection with gambling of all kinds, including lotteries.[3]  *See* Ron Decl. ¶¶ 9–10; Wyman Rpt. at 5.  And lotteries, like jackpots, come in many forms.  In draw lotteries, players purchase tickets with several pre-selected numbers and try to match an upcoming "draw" to win prizes; players of scratch-off games remove a latex covering from the ticket to instantly discover whether they've won prizes.  Wyman Rpt. at 3–4; Ron Decl. ¶¶ 8–9; Declaration of Peter Sullivan ("Sullivan Decl.") ¶ 2.  Lotteries are big business in the United States: sales totaled approximately $100 billion per year in 2021.  Sullivan Decl. ¶ 87; Ron Decl. ¶ 8; November 3, 2022 Expert Report of Dr. Ward A. Hanson ("Hanson Rpt.") ¶ 11.  Many U.S. lotteries are operated by states and state agencies.  *See* Hanson Rpt. ¶ 13; *id.* fig. 4.3.  New Hampshire was the first state to adopt a lottery in 1964; since then, all but five states have adopted state-run lotteries, the most recent of which was Mississippi in 2019.  *Id.* ¶ 13.  States have adopted lotteries in part because they provide a significant source of revenue, often for a widely supported government program.  *Id.* ¶ 14.  New York, for example, raised approximately $3.59 billion for educational services in New York State during the 2020–2021 fiscal year.  Sullivan Decl. Ex. 6.  Beginning in the 1980s, states formed multi-state lotteries, which evolved into the Mega Millions and Powerball multi-state lotteries.  Hanson Rpt. ¶ 14.

---

[3] The derivation of the word "jackpot" can be traced to the game of poker.  Wyman Rpt. at 5. Historically, a player had to hold a pair of jacks or better before betting would open.  *Id.*  If no player held a pair of jacks, the antes would roll over to the subsequent hand.  *Id.*  In this way, pots would build, until a player had a pair of jacks (or a higher hand), thus leading to the term "jack pot."  *Id.*  Today, the word "jackpot" has come to represent the potential to win a large sum of money through a game of chance.  *Id.*

Traditionally, like most games that have now become iGaming activities, lotteries have been played in-person. A person who wanted to play a lottery and take a chance to win prizes worth millions of dollars, and sometimes more than $1 billion, went to the local convenience store or gas station and bought a ticket in cash. Ron Decl. ¶ 8. That method of distribution imposes limits on the size of the market. Not everyone who is attracted by the allure of a multi-million-dollar prize will have the wherewithal to make it to the local convenience store to buy a ticket or will manage to do so while her interest is whetted. The excitement of a jackpot may fade and the purchasing impulse along with it. And so, as a result of the confluence of interests of big business, government, and consumers, lottery sales have increasingly moved online. As states have permitted tickets to be purchased online (or through brokers who resell the tickets online), the percentage of lottery sales done through the internet has increased. Online sales currently represent approximately 5-7% of all U.S. lottery sales. *Id*.

One way for a consumer to purchase state lottery tickets online is through lottery courier services. After placing an order for lottery tickets electronically, a lottery courier service will purchase physical lottery tickets on the customer's behalf through licensed lottery retailers. Sullivan Decl. ¶ 2; Wyman Rpt. at 5. The lottery courier service then uploads a scan of the physical ticket to the customer's account. Sullivan Decl. ¶ 2. The regulation of lottery courier services varies by state: While certain states, like New York and New Jersey, require licensure to conduct business as a lottery courier service, *see* PX-033–034, others, like Minnesota, do not require licenses to buy lottery tickets on behalf of others, *see* Sullivan Decl. ¶ 4. State regulations generally require customers to be physically present in the state when purchasing a ticket. Wyman Rpt. at 5. Lottery courier services currently represent approximately 7-10% of

online lottery sales in the United States, or approximately 0.5% of total U.S. lottery sales.  Ron Decl. ¶ 8.

Jackpocket offers lottery courier services in the United States.  Jackpot.com operates internationally and is seeking to use the "Jackpot.com" name in connection with lottery courier services in the United States.

### B.    Jackpocket

Jackpocket is currently a market leader in the internet lottery market and operates lottery courier services in thirteen states and the District of Columbia.  The company, which was founded in 2013 by Peter Sullivan, its current chief executive officer, allows customers to order lottery tickets for various lotteries, including the Mega Millions and Powerball lotteries, other daily, state, and multi-state draw games, and instant-scratch games.  Sullivan Decl. ¶ 2.  Sullivan purchased the jackpocket.com domain in April 2013 for $1,400, DX-021 at 1; PI Tr. 16.  The first users registered for Jackpocket's lottery courier services in May 2013, and Jackpocket made its first lottery ticket sales in August 2013.  Sullivan Decl. ¶ 15.  JACKPOCKET owns U.S. Trademark Registration No. 4743194 for the JACKPOCKET mark, which it received on May 26, 2015.  *See id.* Ex. 5.

Customers can access Jackpocket's services either through the Jackpocket application, which can be downloaded to a cell phone, or directly through the Jackpocket website, "jackpocket.com."  PI Tr. 71.  After verifying a customer's identity and geolocating the customer to make sure she can legally play the lottery in a particular state, Jackpocket will purchase a physical lottery ticket on behalf of the customer, scan and store the lottery ticket, and check the results of the lottery drawing.  Sullivan Decl. ¶¶ 2, 6, 19; PI Tr. 169.  If the customer wins the lottery, she will receive the proceeds of the ticket purchased through Jackpocket.  Though the Jackpocket application has been active since Jackpocket's first lottery-ticket sales, its website

functionality is of recent origin.  *See* Wong Dep. at 23–24 (acknowledging that consumers could only purchase lottery tickets directly through the website without downloading an application "earlier this year").  At the time of the Evidentiary Hearing, the Jackpocket website was still in "beta" mode; individuals could purchase lottery tickets in eleven states and Washington D.C.  PI Tr. 169; Sullivan Decl. ¶ 3.

Jackpocket had a rocky start in the internet lottery business, befitting its role as a market pioneer, but it has now achieved significant success.  The company first offered lottery tickets in New York, Sullivan's state of residence, in August 2013.  Sullivan Decl. ¶ 15.  Customer orders were routed through a single lottery retailer on Varick Street in Manhattan; Jackpocket would purchase tickets that consumers ordered electronically from this retailer.  PI Tr. 36.  With time, Jackpocket purchased its own lottery license, which it used to buy lottery tickets on behalf of customers.  *Id.* at 36–37.  In November 2016, however, the New York State Gaming Commission—which had not previously encountered or regulated the internet sale of lottery tickets—suspended or revoked Jackpocket's retail lottery license.[4]  *See* Sullivan Decl. ¶ 15.  As a result, Jackpocket stopped selling lottery tickets in New York from November 2016 until 2021. *Id.*

The business was not entirely quiescent.  Jackpocket maintained its website and application throughout this period so that, even if customers could not purchase lottery tickets

---

[4] Jackpocket and Jackpot.com disagree over the nature of the action taken by New York State. Jackpocket contends that its license was "suspended in New York in 2016," *see* Plaintiff's Pre-Trial Memorandum ("Pl. Pret. Mem.") 75; Trial Transcript ("Trial Tr.") 12, and that Jackpocket did not violate a statute when selling lottery tickets online because "there was no licensing framework" in place, Trial Tr. at 12.  In contrast, Jackpot.com argues that Jackpocket had its license "revoked" by New York regulators.  Defendants' Pre-Trial Memorandum ("Def. Pret. Mem.") 61; PI Tr. 49.  Jackpot.com contends that Jackpocket's license was revoked because "Plaintiff wrongly used that license to offer lottery courier services."  Def. Pret. Mem. 61.

online, consumers could still download the Jackpocket app and use the app to check lottery results, withdraw previous winnings, and find local lottery retailers from whom to purchase tickets. *Id.* In July 2017, Jackpocket began to offer its lottery courier services in Minnesota (which did not require a license for its services), followed by New Hampshire in November 2017. *Id.*; PI Tr. 37. Jackpocket expanded to Texas, New Jersey, and Washington D.C. in 2019 and to nine additional states over the next three years. Wong Decl. ¶ 5.

Jackpocket eventually received a Lottery Courier Service License from New York state on October 30, 2020, which allowed Jackpocket again to conduct business in New York. Sullivan Decl. Ex. 1 at 1. As of November 3, 2022, Jackpocket's application has been downloaded approximately ███████ times, Jackpocket has sold over ███████ of lottery tickets, and Jackpocket has earned over ██████ in revenue. Wong Decl. ¶ 9; PX-363–64. The bulk of Jackpocket's commercial success—over ███ of its application downloads and nearly ███ of its sales—has come since 2021, after it was again able to offer its services in New York. *See* PX-363. Further, these sales follow the peaks and valleys of lottery jackpots; when lottery jackpots rise so too do Jackpocket's sales. *See* Wong Decl. ¶ 29. Approximately ███ of Jackpocket's gross sales were made during the eight days between October 29 and November 5, 2022 at the time that the Powerball jackpot exceeded $1.5 billion. *Id.*; PX-363. Jackpocket captured ███ market share as of July 25, 2022 in New York, ███ in Texas, and ███ in New Jersey. Wong Decl. ¶ 13. During this time, the Mega Millions jackpot was $1.3 billion. Hanson Rpt. ¶ 27.

Around the time of the $1.3 billion Mega Millions jackpot, Jackpocket had the number one most downloaded app in the Apple AppStore for a single day on July 29, 2022. *See* Wong Decl. ¶ 27; PX-374. The day before, Jackpocket had the number one most downloaded

application in the "Entertainment" category.  *See* Wong Decl. ¶ 27; PX-375.  The #Jackpocket

hashtag was the number two and number five trending hashtags on Twitter, coinciding with the

large Mega Millions and the large Powerball jackpots, respectively.  *See* Wong Decl. ¶ 28; PX-

376; PX-479.

Signing up for Jackpocket's services and purchasing a lottery ticket for the first time is an

involved process that can take up to forty steps.  *See* DX-079.  These steps include verifying a

customer's identity and location, linking a customer's payment method to his or her account, and

purchasing a ticket.  PI Tr. 53–54.  States impose limits on the age and location of persons who

can purchase lottery tickets.  *See* Expert Rebuttal Report of Michael J. Pollock ("Pollock Reb.

Rpt.") at 13.  For that reason, Jackpocket must verify each customer's age and identity before the

customer can register for an account to ensure that the customer is of legal age to play a state

lottery.  Sullivan Decl. ¶¶ 7, 19.  Customers can verify their identities by entering their age, date

of birth, and zip code or by scanning the barcode on their driver's license.  *Id.*; PI Tr. 53–54.

About ▮ of customers are verified automatically via Jackpocket's software; the remaining

▮ must send additional information to a dedicated Jackpocket email address.  PI Tr. 53–54.

Jackpocket also geolocates a customer at the time of account funding and at the time of purchase

to confirm that the customer is located in the state where the lottery is offered and therefore is

allowed to purchase the lottery ticket.  Sullivan Decl. ¶ 19.

Jackpocket has designed systems, including ID-barcode scanning and Apple Pay-

integration, that reduce the number of steps required to register for a Jackpocket account and

make account registration and purchases faster.  *Id.*  Approximately ▮ of individuals who

use Jackpocket's application on an Apple device and ▮ of those who use Jackpocket's

application on an Android device scanned their licenses instead of entering their personal

information manually.  Wong Decl. ¶ 36.  █████ of those who deposit money into their Jackpocket

account for the first time use Apple Pay.  *Id.*

As a result, for some, the "full process from account creation to completion of ticket

order typically takes" ██████████ minutes.  Sullivan Decl. ¶ 7.  From October 1 to October 15,

2022, █████ of users signing up for Jackpocket's services did so in less than ██████████, ████ in

less than ██████████, and ████ in less than ██████████.  Wong Decl. ¶ 36; PX-377.  These

timeframes do not appear to include the additional time necessary to fund a Jackpocket account.

*See* Wong Decl. Ex. 8 (defining parameters as "from app open to registration completion").  In

fact, there is evidence that only a small proportion of users end up funding their account after

registration.  During the period around May 2022, only ████ of Jackpocket's users funded their

account the same day that they registered for Jackpocket's application and only ████ of users

fund their account within 30 days of registration.  Wong Dep. at 94–95; Expert Rebuttal Report

of Dr. Ward A. Hanson to Report of Jeff Anderson ("Hanson Reb. Rpt.") ¶ 35.

Once a customer has registered for a Jackpocket account, her identity is verified, and her

account has been funded, the process of buying additional lottery tickets, which cost

approximately $1 to $3 each, can take ██████████.  Sullivan Decl. ¶ 7.  There is evidence that,

at least during periods with large lottery jackpots, Jackpocket has high customer retention; ████

of users who purchased a lottery ticket through Jackpocket during the week of October 17, 2022

also purchased a lottery ticket during the week of October 24, 2022.  Wong Decl. ¶ 29.

Jackpocket currently offers lottery courier and other related services in thirteen states,[5]

including New York, and the District of Columbia through its JACKPOCKET branded

---

[5] These states are Arkansas, Colorado, Idaho, Minnesota, Montana, New Hampshire, New
Jersey, New Mexico, New York, Ohio, Oregon, Texas, and West Virginia.  Sullivan Decl. ¶ 4;
Wong Decl. ¶ 5 n.2.

application.  *Id.*  Jackpocket customers in eleven states and Washington D.C. can also purchase lottery tickets online through a computer.  *Id.* ¶ 3.  Until June 2021, Jackpocket was the only licensed lottery courier service in New Jersey, and until July 2022, Jackpocket was the only licensed lottery courier service in New York.  November 8, 2022 Rebuttal Declaration of Dr. Itamar Simonson ("Nov. 8 Simonson Reb. Rpt.") ¶ 14 & n.21; Wong Dep. at 136, 144.  Jackpocket currently only has a single competitor in each market.  *See* Nov. 8 Simonson Reb. Rpt. ¶ 14 & n.21; Wong Dep. at 136, 144

       **C.**    **Jackpocket's Promotion and Branding**

       Jackpocket's founder and CEO, Sullivan, coined the term "Jackpocket" in early 2013 to refer to his company's product offering.  Sullivan Decl. ¶ 12.  As he testified, the combination of "jackpot" and "pocket," *id.* ¶ 12; PI Tr. 43, was intended to evoke "the use of an app[lication] to remotely purchase lottery tickets that could ultimately result in the user winning . . . [a] 'jackpot.'"  Sullivan Decl. ¶ 12.  The idea was to message to consumers the idea of having a "jackpot in your pocket." PI Tr. 46.

       Jackpocket has aggressively marketed its product, but mostly in recent years.  It has spent ▮▮▮▮▮▮ in advertising from 2013 through November 3, 2022.  *See* Wong Decl. Ex. 2.  Though Wong testified that the ▮▮▮▮▮▮ of this money was spent on advertising, an unspecified amount was also spent on marketing analytics, its advertising agency, and its public-relations firm.  *See* Wong Dep. 158–59.  Jackpocket has advertised through a number of different channels, including broadcast and cable television, radio, public transportation, billboards, direct mail, branded products, digital and social media, and partnerships with professional sports teams. *See* Sullivan Decl. ¶¶ 24–40; *id.* Exs. 8–15.  These advertisements all feature the JACKPOCKET mark.

The bulk of Jackpocket's advertising, however, has come during the past two years, after it gained regulatory approval to sell lottery tickets again in New York; ██ of its nearly ██████ in advertising was spent during the first ten months of 2022.  Wong Decl. Ex. 2. Jackpocket spent only ██ of the ████████, or ██████████, from 2017 through 2020.  *Id.* The remaining ████ of marketing spend came during 2021.  *Id.*  There is no evidence in the record about any Jackpocket spending on advertising from its founding through 2017. Jackpocket spent ██ on marketing in New York from 2017 through 2019; in 2020, Jackpocket spent only $1,574.  Wong Dep. at 203–04.  Approximately ███ of Jackpocket's total marketing expenditures since inception, or nearly ██████, has been spent in New York since 2021.  *Id.* at 204.  These marketing expenditures, like Jackpocket's sales, also follow the ebbs and flows of state lottery jackpots.  *See* Wong Decl. ¶ 14.  For example, Wong highlighted how twice during 2022, "Jackpocket intentionally frontloaded its . . . marketing spend to take advantage of that extremely high top prize."  *Id.*

Jackpocket's mark originally contained cursive lettering with a blue-and-white color scheme.  PI Tr. 22.  Jackpocket used this mark through 2017.  *Id.* 105.  At that point, it switched to its current logo, which substituted bubble lettering for the cursive lettering.  PI Tr. 105–06. This bubble lettering and blue-and-white color scheme continues to be the predominant logo used by Jackpocket in its advertising.  *See* Sullivan Decl. ¶¶ 24–40; *id.* Exs. 8–14.[6]

---

[6] Though the bubble lettering appears consistently across Jackpocket's advertising, the blue-and-white color scheme does not always.  *See, e.g.*, Sullivan Decl. ¶ 30.



*Figure 1.  Jackpocket's Logos Pre- and Post-2017 Change (DX-028; Sullivan Decl. ¶ 25).*

Early in the company's history, Jackpocket used advertising that included references to the "pocket" notion of "Jackpocket."  A video advertisement from 2018 features Sullivan and his father discussing the origin of the idea for Jackpocket.  In the commercial, Sullivan says, while pointing to his pocket, "It's called Jackpocket.  It's like having a jackpot in your pocket."  DX-028.  A 2014 investor deck featured a lottery draw ball inside of the pocket of a pair of jeans:



DX-287 at JACKPOCKET00039195.

More recent advertisements by Jackpocket focus heavily on the "jackpot" message of "Jackpocket," by emphasizing the size of the jackpots offered by different lotteries.  *See* fig. 2 below.  And some, though apparently a minority, of Jackpocket's advertising even feature the word "jackpot."  One advertisement on the New York City subway reads: "Stupid big jackpots on your smart phone."  Sullivan Decl. Ex. 10 at JACKPOCKET00003810–11.





*Figure 2.  Jackpocket Advertisements Emphasizing Jackpot Sizes (TV and Public Transit Advertisements) (Sullivan Decl. ¶¶ 25, 27).*

There is no evidence of any recent advertisement displaying a pocket or emphasizing the "pocket" notion of Jackpocket.

This advertising is reflected in Jackpocket's branding generally; at least when multi-state lottery jackpots are large, these jackpots dominate Jackpocket's application, at the expense of Jackpocket's mark, as shown below:



PX-378; Wong Decl., Ex. 9 at 1:30.

Until recently, Jackpocket's advertising has not been dynamic.  PI Tr. 74.  In other words, the ads have featured current, historical or illustrative jackpots of lotteries whose tickets may be purchased through its app and on its website.  *Id.* at 74, 181–82.  However, these advertisements do not update to show the size of the jackpot that currently is available—those data are only available in the Jackpocket app.  *Id.* at 74–75.  Recently, however, Jackpocket has shown potential customers dynamic advertisements through two media.  *Id.* at 182.  First, for about a year, Jackpocket █████████████████████████████████████████████.  *Id.* Second, Jackpocket uses L-Bar advertisements (which utilizes the left and lower portions of a

television screen) to display advertisements during news segments discussing current jackpots. *Id.*

Jackpot.com presented the expert testimony of Dr. Ward Hanson, a lecturer in Stanford University's Department of Economics, who sought to characterize Jackpocket's marketing expenditures.  *See* Hanson Rpt. ¶¶ 28–31.  Hanson defines traffic steering marketing as "marketing expenditure that is used to direct Internet traffic to a web site or application without relying on or building upon the brand's unique features."  *Id*. ¶ 28.  In contrast, brand building advertising is defined as "marketing expenditure designed to build the strength and consumer recognition of the brand itself based on its own attributes—that the product or service is easy to use, is high quality, or other characteristics."  *Id.* ¶ 29.  Hanson reviewed Jackpocket's advertising and concluded that on average ▮▮▮ of Jackpocket's marketing spending is devoted to traffic steering, emphasizing the size of the current Mega Millions or Powerball jackpots and directing consumers to Jackpocket's services to purchase lottery tickets, without mentioning anything about the services themselves.  *Id.* ¶ 30.  The traffic-steering characteristics of Jackpocket's advertising spend jump during weeks with particularly large jackpots.  *Id.* ¶ 31.  In support of his conclusion, Hanson presented a series of "simple" regression analyses showing that Jackpocket's marketing expenditures and sales are highly correlated with jackpot sizes.  *Id.* ¶¶ 34, 36.

Jackpocket's expert Jeff Anderson ("Anderson"), the Managing Director of CONSOR IP Experts, an economic and intellectual property consulting firm, disputes Hanson's characterization of Jackpocket's advertising.  Noting that Hanson "fails to provide any citations or references to third-party research differentiating brand building and traffic generation efforts," Anderson argues that "the presumption that brand building and traffic generation are isolated,

independent, and mutually exclusive events is nonsensical."  November 8, 2022 Rebuttal Report of Jeff Anderson ("Anderson Reb. Rpt.") at 11.  He argues that "strategic timing of marketing expenditures is not unique to the lottery industry" and that "traffic steering" advertisements also build brands.  *Id.* at 14.

Jackpocket's business has also received sporadic unsolicited media coverage in New York and national media, including through *CNBC*, *CBS News*, *Good Morning America*, the *New York Post*, the *New York Daily News*, *Fortune*, *ABC*, *CBS*, *AXIOS*, *Business Wire*, *Sportico*, *Bloomberg*, *PlayUSA*, *Politico*, and *TechCrunch*.  *See* Sullivan Decl. ¶¶ 50–51; *id.* Exs. 27–28. This coverage has focused on Jackpocket's services, fundraising, expansion plans, and sponsorships.  *See id.* Ex. 28.  On May 18, 2019, the *New York Post* ran an article announcing receipt of Jackpocket's lottery-courier license in New York State.  *Id.* Ex. 28 at JACKPOCKET00000374–75.  On November 9, 2021, *TechCrunch* announced Jackpocket's $120 million fundraising round and efforts to move into other iGaming services.  *Id.* Ex. 28 at JACKPOCKET00000340–42.  Four years earlier, on September 29, 2015, *Good Morning America* aired a segment on Jackpocket and the anchor used its application on air.  *Id.* ¶ 50, Ex. 27.

### 1.    Survey Evidence of Jackpocket Brand Recognition

To assess the strength of Jackpocket's brand, Jackpocket hired Hal L. Poret ("Poret"), who runs a survey design firm.  Poret has designed, supervised, and implemented over 1,000 consumer perception surveys, over 500 of which were related to trademarks.  October 27, 2022 Expert Report of Hal Poret ("Poret Rpt.") at 5.

Poret conducted an online survey of 300 respondents in New York and New Jersey,[7] who either purchased lottery tickets online or via an application in the past twelve months or intended to do so in the subsequent twelve months.  *See id.* at 6, 12.  There were two components to the survey:  An unaided component and an aided component.  In the unaided component, respondents were asked to "list all mobile apps or websites for purchasing state lottery tickets that you have ever seen or heard of."  *Id.* at 8.  This component of the survey measures whether the mark is "top of mind" among consumers.  *Id.*  In the aided component, respondents were shown a series of marks and asked whether they had ever seen or heard of the marks in connection with the purchasing of state lottery tickets.  *Id.* at 9.  These marks include JACKPOCKET, three marks that Poret argued are used in connection with lottery courier services—LOTTO, MIDO LOTTO, and THELOTTER, and two controls—CASHGRAB and ESA WINS.  *Id.* at 6–7, 9–10.  Poret contends that he selected CASHGRAB and ESA WINS because both were highly plausible name for lottery courier services.  *Id.* at 7.  Half of all respondents saw the JACKPOCKET mark before the others, which, according to Poret, controlled for response bias.  *Id.* at 10.

In the unaided portion of the survey, 19.0% of respondents identified Jackpocket as a mobile app or website used to purchase state lottery tickets.  *Id.* at 23.  Another 5.7% of respondents identified "Jackpot" during the unaided portion of the survey.  *Id.*  Poret contends that these respondents could have meant to reference Jackpocket, because fourteen of the seventeen indicated that they were familiar with the Jackpocket mark in the aided component of the survey.  *Id.*  He thus argues that 24.7% of respondents likely had Jackpocket in mind during

---

[7] In his deposition, Poret stated that he limited the survey universe to New York and New Jersey because "[t]hat was the scope of [the] assignment" given to him by Jackpocket.  Poret Dep. at 40.

the unaided portion of the survey. *Id.* at 23–24. In contrast, only 5.3% named "Lotto" or

"Lotto.com" and only one respondent named "TheLotter" or "Mido Lotto." *Id.* at 23. Poret

concludes, "These results indicate that Jackpocket is the only independent lottery courier service

with substantial top-of-mind awareness in New York and New Jersey." *Id.* at 24.

The aided component of the survey revealed that 58.3% of respondents recognized the

Jackpocket mark. *Id.* at 25. In contrast, a much smaller proportion of respondents recognized

the other marks: 14.7% and 7.7% of respondents recognized CASHGRAB and ESA WINS,

respectively, while 13.7% and 12.0% of respondents recognized THELOTTER and MIDO

LOTTO, respectively. *Id.* Over 73.0% of respondents recognized LOTTO. *Id.* Without

addressing the results observed with respect to LOTTO, Poret concludes that "the much higher

58.3% result for JACKPOCKET could only be caused by genuine recognition of the

JACKPOCKET mark." *Id.*

Jackpot.com employed Dr. Scott D. Swain ("Swain") to review and replicate

Jackpocket's survey. Swain is a Professor of Marketing and the inaugural Powers Distinguished

Fellow at Clemson University. November 7, 2022 Expert Rebuttal Report of Scott D. Swain

("Swain Reb. Rpt.") ¶ 7. Swain's area of expertise includes consumer behavior, branding, and

advertising, *id.* at ¶ 8, and he has published dozens of articles in peer reviewed journals, *see id.*

Ex. A. Jackpot.com also retained Simonson, who was the Sebastian S. Kresge Professor of

Marketing at the Graduate School of Business, Stanford University from 1993 through 2020 and

is currently the Sebastian S. Kresge Emeritus Professor of Marketing.[8] Dkt. No. 48 ¶ 1.

Simonson has published over 80 academic articles, many of which relate to consumer

---

[8] Simonson's report was submitted after Swain's and there is no indication that the two parties
coordinated their findings.

psychology, *id.* Ex. A 4–9, and has conducted, supervised, or evaluated over 2,000 marketing research studies related to consumer behavior, *id.* ¶ 8.  Simonson's expert testimony has been relied on by numerous courts.  *See id.* ¶ 11 n.4.

Swain and Simonson level several critiques against Jackpocket's survey methodology and Swain sought to correct some of these critiques in his own survey.  First, both Swain and Simonson take issue with Jackpocket's methodological choice to limit the survey universe to individuals from New York and New Jersey.  *See* Swain Reb. Rept. ¶ 2; Nov. 8 Simonson Reb. Rpt. ¶ 5.  In both New York and New Jersey, there are only two lottery courier service providers: Jackpocket and lotto.com, the latter of which did not enter the New Jersey market until June 2021 and the New York market until July 2022.  *See* Nov. 8 Simonson Reb. Rpt. ¶ 14 & n.21. This universe, Simonson argues, is so narrowly defined that respondents "were likely actual Jackpocket users."  *Id.* ¶ 6.  Simonson concludes that in this context, Jackpocket's unaided awareness was "surprisingly low" because "the geographic area was limited to two states where I understand that Jackpocket has the highest revenue and number of users, the category was narrowly defined, and there is a dearth of competitors."  *Id.* ¶ 21.

Swain largely agrees with Simonson's assessment, *see* Swain Reb. Rpt. ¶ 2, and corrects for this bias in his survey in two ways.  First, he drew respondents from all thirteen states and territories where Jackpocket operated at the time it filed this action.  *Id.* ¶ 16.  Second, although Swain focused on recent or prospective lottery courier service users, *id.*, he broadened his questions and controls to ask about "apps or websites for playing lottery, casino, or betting games," *id.* ¶ 3.  Thus, for the unaided awareness question, he asked respondents to "list all mobile apps or websites for playing lottery, casino, or betting games."  *Id.* ¶ 29.  He also added

Powerball, Mega Millions, Caesars Casino, and DraftKings to the aided awareness question. *Id.* ¶ 33.

Simonson also criticizes Poret's aided awareness results because he did not adequately account for the risk of "false recognition" and "spurious awareness." *See* Nov. 8 Simonson Reb. Rpt. ¶¶ 25, 28. False recognition occurs when the name of a brand fits a particular category and creates an "illusion of familiarity," causing a respondent to select the brand when prompted. *Id.* Because of the similarity between "JACKPOCKET" and "jackpot," Simonson argues that JACKPOCKET may have been "inaccurately 'recognized' . . . by many respondents." *Id.* ¶ 27. As support for this hypothesis, Simonson points to the fact that 73% of respondents "recognized" the LOTTO mark, a fictitious company, suggesting that "respondents were simply identifying the terms that they most closely associated with the activity of purchasing state lottery tickets, and not evincing actual recognition of the brands presented." *Id.* ¶¶ 27, 29. Further, Simonson argues that Poret does not adequately control for this particular bias because neither ESA WINS nor CASHGRAB relate to state lotteries. *Id.* Swain attempted to control for these effects by selecting controls that better "describe or relate to lotteries"—LUCKYDRAW and DAILYSIX.COM. Swain Reb. Rpt. ¶ 33. Swain also reminded respondents that the name they were being shown "may, or may not, be used by a company in the context of mobile apps or websites for playing lottery, casino, or betting games." *Id.* ¶ 31.

Before replicating Jackpocket's survey, Swain made several additional adjustments designed "to ensure that [his] survey adhered to generally accepted principles for litigation surveys," *id.* ¶ 14, including using the correct name of Jackpocket's competitor LOTTO.COM in the aided awareness question, *id.* ¶ 33, removing MIDO LOTTO because it does not operate in many of the states where Jackpocket operates, *id.*, and randomly showing respondents the marks

instead of showing 50% of respondents Jackpocket's mark first, *id.* ¶ 34.  After removing those who had heard of the fictitious controls LUCKYDRAW or DAILYSIX.COM, Swain's survey indicated that 9.7% of respondents had heard of Jackpocket unaided, roughly half of those reported by Poret, and behind the number of respondents who listed DraftKings, FanDuel, Bet MGM / MGM, and Caesars.  *Id.* ¶ 40.  Aided awareness of Jackpocket was 30.7%, or 27.6% below the value reported by Poret.  *Id.* ¶ 44.  If the aided awareness results for the controls LUCKYDRAW and DAILYSIX.COM are subtracted from those for JACKPOCKET, the net aided awareness for Jackpocket's mark falls to 5.1% and 24.7%, respectively, or an average of 14.9%.  *Id.* ¶ 45.  Based on these results, Swain concluded that "the large majority of relevant consumers do not have an awareness of the JACKPOCKET name in the context of mobile apps or websites for playing lottery, casino, or betting games."  *Id.* ¶ 46.

Poret offers one response to Swain's rebuttal survey:  it went "far beyond the relevant context" by expanding the survey category to lottery, casino, and other betting games. November 10, 2022 Expert Rebuttal Report of Hal Poret ("Poret Reb. Rpt.") ¶¶ 10–11.  Poret argues that the fact that there are a small number of competitors in the lottery-courier services market is not a "valid justification" for broadening the survey to "plainly irrelevant types of services."  *Id.* ¶ 10.  He thus concludes that the "only conceivable purpose of asking respondents to think about entirely irrelevant services (casino and betting) was to misdirect respondents to think about a different type of service than Jackpocket."  *Id.* ¶ 12.  Even with Swain's changes, Poret argues, Swain's results support the conclusion that Jackpocket is a well-known brand: Jackpocket's unaided awareness is "statistically equivalent" to "some of the most famous marks in the" casino and sports betting categories, including Caesars (10% unaided awareness), *id.* ¶¶ 6, 12, and the aided awareness results were "also substantial," *id.* ¶ 8.

### D.     Jackpot.com

Jackpot.com is a United Kingdom-based competitor of Jackpocket.  The company was

formed by Yariv Ron, Chris Brown, and Roy Mohr.  On March 30, 2012, Ron, Brown, and Mohr

purchased the domain name "jackpot.com" for $500,000, plus $50,000 in broker fees, through an

entity called Palek International, a company formed to acquire and manage domain names.  *See*

Ron Decl. ¶ 16; *id.* Ex. 1; PI Tr. 207–09.  From 2012 to 2016, the domain name jackpot.com was

used by Ron and his cofounders as a "white-label" casino, through which customers in the

United Kingdom could find links to casino games offered by other websites, and as a portal,

through which consumers elsewhere could obtain information about iGaming and lottery

services.  PI Tr. 271–72.  In 2016, Ron, Brown, and Mor launched Jackpot.com's consumer-

facing business, featuring the Jackpot.com logo, through a business they incorporated as

99Dynamics Limited in the United Kingdom.  Ron Decl. ¶¶ 20–21.  Currently, the jackpot.com

domain is directly owned by Lottomatrix Operations Limited d/b/a Jackpot.com, an indirect

subsidiary of 99Dynamics Limited.  *Id.* ¶ 5.  Lottomatrix Operations Limited sits directly under

Lottomatrix Malta Limited, a holding company.  *See id.*

Through its consumer facing website, Jackpot.com has offered various iGaming

offerings, including scratch cards, instant games, custom lotteries, casino games, and a product

known as derivative lotteries.  *Id.* ¶ 24.  Derivative lotteries offer individuals who are unable to

purchase lottery tickets directly because they are located outside of the lottery's geographic area

the opportunity to take a chance on the outcome of a lottery.  Sullivan Decl. ¶ 21.  Through

derivative lotteries, consumers interested in gambling on the outcome of a lottery can bet on a

range of outcomes in a state-sponsored lottery.  Anderson Reb. Rpt. at 5.  The derivative lottery

sponsor receives the full purchase price for the ticket.  *Id.*  If the consumer is successful, the

jackpot is paid to her by the sponsor, which insures the risk of a customer winning a jackpot

through prize indemnity policies.  *See* Ron Decl. ¶ 24.  Jackpot.com has a prize indemnity policy

with Lloyd's of London, endorsed by reinsurers.  *Id*.  The revenue from derivative lotteries thus

does not benefit the government or state conducting the lottery but rather benefits the company

sponsoring the derivative lottery.  Sullivan Decl. ¶ 21.

        Jackpot.com has used the Jackpot.com name since 2016.  Since December 2016, *i.e.*,

before Jackpocket began using bubble lettering, Jackpot.com used a bubble lettered logo, *see* fig.

3.  *Id.* ¶¶ 21, 23.  Jackpot.com currently holds nine licenses in four jurisdictions and operates in

over 180 countries.  Ron Decl. ¶¶ 5, 25.  There is no evidence in the record that any of the

services Jackpot.com provides run afoul of regulatory requirements.  *See id.* ¶ 25.  Jackpot.com

does not currently hold any licenses for the operation of lottery courier services.  PI Tr. 193.  It

has 800,000 registered customers in 184 countries.  *Id.* ¶ 22.  None of these registered customers

are located in the United States.  PI Tr. 192–93.



*Figure 3.  Jackpot.com logo (Ron Decl. ¶ 21).*

        The Jackpot.com website, however, has been accessible in the United States since April

2012, and the domain has had a large number of visitors from the United States.  From April

2012 through July 2016, jackpot.com and lottery.jackpot.com had 57,143 visitors located in the

United States, 30,434 of whom visited these webpages from April 2012 through September

2013.  Ron Decl. ¶ 30.  From April 2012 through October 2012, individuals located in the United

States who visited jackpot.com were routed to a landing page that contained information about

U.S. and European lottery jackpots.  *Id.*; DX-002–003.  Between November 2012 and the middle

of 2016, individuals located in the United States could also obtain lottery results and information from the subdomain lottery.jackpot.com, and could access jackpot.com, which contained links and advertisements to iGaming services, but could not utilize these iGaming services.  Ron Decl. ¶ 30.  At the same time, beginning in November 2012, U.S.-based visitors to jackpot.com would see a message informing them that U.S. regulations prohibited participation in its iGaming services.  *Id.* ¶¶ 30–31.  Lottery.jackpot.com ceased to exist in mid-2016.  *See id.*  Visitors from the United States could still access jackpot.com with Jackpot.com's iGaming products, which they still were unable to use.  *Id.* ¶ 30.  Between August 2016 and March 2021, there were 351,627 U.S.-based visitors to jackpot.com.  *Id.* ¶ 31.

Currently, Jackpot.com has nine employees in the United States and has entered three contracts for sponsorships with professional sports teams.  PI Tr. 218, 221.  At the time of the Evidentiary Hearing, Jackpot.com had not created a mission statement for its U.S. business, had no advertising plans and had hired no advertising professionals, and had not developed U.S.-specific messaging or brand elements.  PI Tr. 214, 216, 221.  Though Jackpot.com has not finalized its branding, including its color scheme, *see* Ron Decl. ¶ 62, the website design for its Texas launch as of the trial on the merits, featured Jackpot.com's black logo and a black color scheme.  Ron testified that "[w]hile this design is still undergoing final review, once Jackpot.com begins to offer products and services in the State of Texas, individuals in the United States who visit Jackpot.com will see a website that is very similar to the current design depicted" below:



Supplemental Declaration of Yariv Ron ("Ron Supp. Decl.") ¶ 8.; DX-373.

## II.    Jackpot.com's Planned Entry into the United States, Proposed Business Combination Discussions with Jackpocket, and the Road to Litigation

Jackpot.com has never held a U.S. license, has never had a U.S.-based customer, and has never offered any iGaming services in or received any revenue from the United States.  PI Tr. 192–93.  But Jackpot.com has planned to offer products in the United States using the Jackpot.com domain and brand name since Palek International's acquisition of the domain name in 2012.  Ron Decl. ¶¶ 29, 34.  It did not offer lottery courier services or other products in the United States because it believed that they were not yet "clearly legal," *id.* ¶ 28, and offering such products would have the company "operating in a legal 'grey' area," *id.*  With the knowledge that certain states had legalized online lottery-ticket sales in late 2020, "Jackpot.com began planning to enter the U.S.-lottery and -iGaming market."  *Id.* ¶ 32.

In February 2021, Jackpot.com first began to develop the infrastructure necessary to offer its iGaming and lottery courier services domestically in the United States.  *Id.* ¶¶ 34–35.  From April 2021 through the summer of 2021, Jackpot.com took preparatory steps to enter the U.S. market, including meeting with lawyers and New York regulators to discuss Jackpot.com's proposed lottery courier services, putting together fundraising plans, entering into a contract with

a payment processor, and beginning to interview potential candidates to lead Jackpot.com's U.S. business.  *Id.* ¶ 35.  During this time, Jackpot.com was actively raising money to support its U.S.-expansion efforts.  *Id.* ¶ 54.  On April 10, 2021, U.S.-based consumers who visited jackpot.com were shown a pop-up stating: "Coming Soon – the NEW way to play the lottery. Sign up now to hear first when we launch in your State."  *Id.* ¶¶ 36, 83; *id.* Ex. 11.  From April 2021 through June 21, 2022, there were 62,154 U.S.-based visitors to jackpot.com and approximately 11,000 individuals signed up by providing an email address and state of residence.  *Id.*  Jackpot.com has registered three entities through which it plans to conduct business in the United States:  Lottomatrix NY LLC, which will offer lottery courier services in New York and New Jersey, Lottomatrix USA, LLC,[9] which will offer lottery courier services in states that do not require a lottery-courier license, and Lottomatrix Corporation, a holding company that sits above both entities.  *Id.* ¶ 5.

    At the same time, Jackpocket has been looking to expand its presence beyond lottery courier services into additional iGaming services.  These plans have been in the works since at least 2015, when Jackpocket was engaged in an early fundraising round.  In its investor presentation, Jackpocket emphasized its goals of "becom[ing] the household name in mobile/digital lottery sales" and "[e]xpand[ing] to new game formats and new verticals of iGaming including social casino, sports betting, poker, and brand new markets."  DX-292 at JACKPOCKET0042194.  Jackpocket emphasized its goal to expand beyond lottery courier services during fundraising efforts in 2018, 2020, 2021, and 2022.  *See* DX-299, DX-315–16.  In November 2021, Jackpocket raised $120 million, specifically to explore expanding into other online betting verticals, including sports betting, bingo, and casino games.  *See* DX-039; Ron

---

[9] Lottomatrix USA, LLC is not a party to this lawsuit.

Decl. ¶ 7.  During this time, Jackpocket made progress in its goal of expanding beyond lottery courier services; by June 2021, Jackpocket had "signed [a] partnership with Caesars on N[ew] J[ersey] iGaming," DX-316 at JACKPOCKET00005385, and its New Jersey iGaming launch became a core priority in 2022, DX-346 at JACKPOCKET00019544.

Jackpocket's 2021 fundraising efforts for its iGaming expansion positioned it well to consider facilitating Jackpot.com's United States market entry.  Simultaneous with Jackpot.com's fundraising efforts, Ron reached out to Sullivan to discuss a potential business combination between the two companies; the two held an initial call on December 3, 2021.  Ron Decl. ¶¶ 37–39; *id.* Ex. 12; Sullivan Decl. ¶¶ 57–59.  This was not the first time that Jackpocket had engaged in acquisition conversations with potential competitors.  In late 2020 and early 2021, Jackpocket explored acquiring ███████.  Sullivan Decl. ¶ 91.  Other companies, including ████████████████████████, approached Jackpocket about potential business combinations in their efforts to enter the U.S. market.  *Id.* ¶ 87.

Conversations with Jackpot.com continued for several months.  On four occasions, Ron, Sullivan, and Sean Siuda, Jackpocket's chief financial officer ("Siuda"), discussed a potential acquisition of Jackpot.com by Jackpocket; the parties also exchanged several emails.  *See* Sullivan Decl. ¶¶ 57–75; Ron Decl. ¶¶ 37–49. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Ron Decl. ¶ 39; *see also id.* ¶¶ 39, 43. ████████████████████████

████████████████  Sullivan Decl. ¶¶ 61, 67, 71.  Ron appears to have been the driving force behind these conversations:  On roughly ten occasions over the course of the merger discussions

between the two companies, Ron reached out to Sullivan to follow up on the status of Jackpocket's interest in Jackpot.com.  *See* Sullivan Decl. ¶¶ 57, 58, 60, 62, 65, 67, 70.

Jackpot.com also sent Jackpocket diligence materials, including a presentation detailing Jackpot.com's U.S. strategy from February 2022, labeled "Investor Presentation."  *See* Ron Decl. ¶¶ 43–46; *id.* Ex. 15.  The Investor Presentation described Jackpot.com's plans to enter fifteen states and the District of Columbia by the end of 2023 and detailed its "[s]tate [e]ntry [p]laybook."  *Id.* Ex. 15 at JACKPOCKET00001066, -1071.  Jackpot.com also highlighted its "[p]roprietary [t]echnology," the potential acquisition of Take That Ltd., which owns "tier 1 websites" like "powerball.net" and "lottery.net," and the "Jackpot.com brand."  *Id.* Ex. 15 at JACKPOCKET00001067–71.

Sullivan discussed a potential deal with his Board of Directors on several occasions, including as late as May 17, 2022.  Sullivan Decl. ¶ 75.  Sullivan testified that Jackpocket's board was concerned about Jackpot.com's derivative lottery business and the impact that such business conducted in Europe would have on the company's ability to obtain licenses to sell lottery tickets in the United States.  *See id.* ¶¶ 59, 63, 64, 67, 75.  In particular, Sullivan testified that United States regulators have expressed concern that derivative lotteries could draw revenues from state-sponsored lotteries.  *Id.*  He pointed to a statement from the Multi-State Lottery Association ("MUSL"), the organization behind the Powerball lottery, that identified "synthetic lotteries marketing Powerball tickets worldwide without contributing to vital public programs and services supported by lotteries" as a "challenge[]" to Powerball.  *See id.* Ex. 7.  Sullivan also testified that another international competitor was apparently forced to change its name when it entered the United States because it operated derivative lotteries internationally.  *Id.* ¶ 91.  Sullivan stated that he was concerned that, as a condition of doing business in the

United States, regulators would force Jackpocket to divest (or stop operating) Jackpot.com's derivative lottery businesses outside the United States.  *See id*.  ¶¶ 64, 67.  Ron also testified that in their discussions Sullivan expressed concern that Jackpocket might cease to operate derivative lotteries if it acquired Jackpot.com.  Ron Decl. ¶ 53.

While conversations with Jackpocket were continuing, Jackpot.com took parallel steps to enter the U.S. market independently.  Jackpot.com signed a letter of intent to acquire Take That Ltd., a company with strong online properties, which is owned in part by Brown.  PI Tr. 141, 203; DX-015 at JACKPOCKET00001068.  Jackpot.com was also actively raising money to support its U.S. expansion plans.  Ron Decl. ¶ 54.  Sullivan was aware of these actions.  PI Tr. 128, 141; Sullivan Decl. ¶ 93.

Sullivan testified that by early April, he and Jackpocket saw limited synergies between the two companies.  PI Tr. 123.  The evidence supports that Jackpocket was concerned, however, about the competitive threat that Jackpot.com posed to Jackpocket.  That concern was expressed in the form of a desire to obtain the "jackpot.com" name or more precisely, to foreclose Jackpot.com from using that name.  Sullivan testified that he was attracted to one aspect of the company in particular:  It's brand name "Jackpot.com."  *See* PI Tr. 123–25; DX-045.  In a text exchange between Siuda and Sullivan on February 3, 2022, Siuda expressed his preliminary view on a business combination with Jackpot.com:  "I need to dive into the data a little more but I don't really see the synergy with jackpot.com."  Sullivan responded:  "Nor do I.  Only thing is their brand ha ha."  PI Tr. 123.  In a [subsequent] conversation between Andrew Fries, Jackpocket's senior vice president of public affairs, and Siuda, Siuda wrote:  "Pete[ Sullivan]'s hard as a rock for Jackpot.com's domain name."  DX-045.  This interest in the domain name "jackpot.com" dates to at least 2018, before Jackpocket sought to acquire Jackpot.com.  PI Tr.

111.  In a conversation over Slack between Sullivan and other members of his team about other potential website properties in 2019, Jackpocket's head of content wrote "wish we could get jackpot.com tho!"  DX-029 at JACKPOCKET00004173.

Whatever the force of Sullivan's concerns about Jackpocket's derivative lottery business, Jackpocket was able to overcome those concerns.  ████████████████████████

███████████████████████████████████████████████████████████

████████████    Sullivan Decl. Ex. 42 at JACKPOCKET00000810.  By that time, however, it was too late. █████████████████████████████████████████████████

████████████████    *Id.*

## III.    Jackpocket's Other Efforts to Preserve Its Competitive Head Start

On May 20, 2022, Jackpot.com announced that it was hiring Akshay Khanna ("Khanna") to be the CEO of its North American operations.  Ron Decl. ¶ 56.  Sullivan testified that until that point, he had no indication that Jackpot.com had taken any "affirmative steps"—defined as hiring individuals, leasing real estate, or securing licenses—to independently launch in the U.S. market.  *See* Sullivan Decl. ¶ 86; PI Tr. 114–17.  Sullivan testified that three other companies had approached Jackpocket about a business combination as a means to enter the U.S. market in the past, but never ultimately launched U.S. operations after discussions ended.  Sullivan Decl. ¶¶ 87–88.  Further, Sullivan claimed that until Jackpot.com publicly announced its entry into the U.S. market, he was under the impression that Jackpot.com had not determined which marks it would use for its U.S. business.  *Id.* ¶ 90.  In particular, Sullivan pointed to Jackpot.com's Investor Presentation, which contained "numerous brands and domain names" owned by Take That Ltd.[10]  *Id.*; DX-015 at JACKPOCKET00001069.  This presentation prominently featured

---

[10] Page 9 of the presentation shows the web and mobile properties that Take That Ltd. owns in

Jackpot.com's branding; Jackpot.com's logo was on the top right corner of every page.  *See* Ron

Decl. Ex. 15.  Additionally, in a slide titled "Strategy for US Penetration and Scale,"

Jackpot.com suggested the role that Take That Ltd.'s assets would play in Jackpot.com's

strategy:  In a section titled, "Marketing," Jackpot.com wrote "Take That LTD. assets and the

Jackpot.com brand [will be used] to catapult targeted performance marketing campaigns . . . and

app download campaigns."  *Id.* at JACKPOCKET00001071.

In the wake of Jackpot.com's announcement, Jackpocket took additional steps to

maintain its competitive head start.  First, Jackpocket attempted to use legal means to prevent

Jackpot.com's entry into the U.S. market under its existing brand name.  On May 23, 2022,

Jackpocket sent a letter through counsel to Jackpot.com demanding that Jackpot.com "refrain

from use of JACKPOT.COM or any confusingly similar mark in U.S. commerce."  Sullivan

Decl. Ex. 41.  Jackpot.com responded to Jackpocket's demand letter on May 31, 2022 rejecting

Jackpocket's demand.  *Id.* Ex. 43.  The following month, on June 22, 2022, Jackpot.com

announced that it had raised $36.5 million to facilitate its entry into the United States.  Ron Decl.

¶ 57.  Jackpocket then sent two more letters to Jackpot.com, on July 8, 2022 and July 14, 2022,

both indicating that Jackpocket would file a motion for a preliminary injunction on July 14, 2022

if Jackpot.com did not refrain from using the JACKPOT and JACKPOT.COM marks.  Sullivan

Decl. Exs. 44–45.  Jackpot.com did not comply with Jackpocket's demands.

Second, Jackpocket also registered the JACKPOCKET.COM mark (together with the

JACKPOCKET mark, the "JACKPOCKET Marks").  Though Jackpocket's website featured a

reference to "jackpocket.com" as early as 2013 and "jackpocket.com" appeared in some

---

the context of a discussion of Jackpot.com's planned acquisition of Take That Ltd.  *See* DX-015
at JACKPOCKET00001069.  It does not indicate that Jackpot.com intended to abandon its
international branding in favor of a Take That Ltd. property when entering the United States.

Jackpocket advertisements, *see, e.g.*, *id.* ¶¶ 42–49; *Id.* Exs. 19–26, Jackpocket had never registered the JACKPOCKET.COM mark.  It did so on May 23, 2022.  *See* DX-128.  After sending the cease-and-desist letter and registering the JACKPOCKET.COM mark, Jackpocket also took steps to align its branding with Jackpot.com's by adding a ".com" at the end of the logo on its website.  *Compare* DX-049, *with* DX-050.



*Figure 4. Jackpocket's logo before and after the addition of ".com." (DX-049; DX-050).*

Third, Jackpocket lobbied regulators and state governments to encourage them not to sign licenses or otherwise do business with Jackpot.com and to block Jackpot.com from entering the U.S. lottery-courier-service market.  Jackpocket sent information to an individual at the New York State Gaming Commission and the head of the New York Lottery highlighting what it claimed was Jackpot.com's "bad actor stuff," presumably referring to Jackpot.com's involvement with derivative lotteries.  PI Tr. 158–59; DX-029 at JACKPOCKET00004216–17.  The information that Jackpocket shared with the New York regulators contained a report about Jackpot.com and a report about another Jackpocket competitor; together the reports had approximately 20 exhibits and were about 50 megabytes in size.  *Id.* at JACKPOCKET00004218–19.  Jackpocket sent similar packages of information to other lottery associations, including MUSL.  *See* PI Tr. 160.

Jackpocket also tried to enlist Texas regulators to help prevent Jackpot.com from reaching a sponsorship agreement with ▮▮▮▮▮▮▮▮▮▮.  *See* PI Tr. 160–61; DX-073; DX-029 at JACKPOCKET00004230.  After Sullivan found out that Jackpot.com was close to a deal with ▮▮▮▮▮▮▮▮▮▮, he texted Siuda, "Jackpot.com are looking to sign deal

with █████████ . . . But let's block those assholes." DX-073.  Andrew Fries, Jackpocket's senior

vice president of public affairs, then reached out to Gary Grief, the Executive Director of the

Texas Lottery Commission, on July 26, 2022 to help Jackpocket in its efforts.  DX-029 at

JACKPOCKET00004230.  In turn, Grief indicated that he'd call "his guy" at ██████████ and

tell him not to make a deal with Jackpot.com until he spoke to Jackpocket.  *Id.*  When Sullivan

asked to make sure that Grief had told ██████████ that Jackpocket was "preferred," Fries wrote

back, "That's what he already promised he'd do last night if we committed to the deal."  *Id.* at

JACKPOCKET00004231.  The next day Fries asked a colleague who met with ██████████

whether ██████████ "seem[ed] aware that it was TX Lottery's strong preference that they work

with us, or no?"  *Id.* at JACKPOCKET00004232.  When the colleague said that it was not

"explicit[]," Fries responded "I will make sure Gary leans in."  *Id.*

     Jackpocket's efforts were not limited to Texas or to Jackpot.com.  On June 27, 2022,

Fries wrote that Jackpocket "got some good news in Arkansas":  Jackpocket successfully worked

with Arkansas regulators to prevent a different competitor from receiving a license in that state.

*Id.* at JACKPOCKET00004210.  Sullivan responded, "I think its [sic] time we can get a piece

that lumps [competitor 1] and jackpot.com together."  *Id.*  And on July 11, 2022, ██████████

██████████, a lobbyist for Jackpocket in New York, wrote to Fries that "some European company

called looking for help in getting a lottery courier license in NY."  PI Tr. 152–53; DX-060 at 1.

Fries responded, "Who was it?  We're in the process of trying to kill a bunch of these guys right

now."  DX-060 at 1.

## IV.   Evidence of Actual Confusion

     Jackpocket presented three types of evidence of what it argued was actual confusion

between the JACKPOCKET mark and the JACKPOT.COM mark or the word "jackpot."  First,

there is some evidence from before Jackpot.com's public announcement that it was entering the

U.S. market that the media associated Jackpocket with the generic jackpot.  *See* Sullivan Decl.

¶ 56.  The confusion here does not appear to derive from Jackpot.com's use of the

JACKPOT.COM mark.  For example, on September 29, 2015, KGO (ABC) News in San

Francisco aired a segment about the Jackpocket app, during which the newscaster stated, "[n]ow

there's an app for [purchasing lottery tickets]—It's called Jackpot."  *Id*.  The same newscast

showed a picture of the Jackpocket app, while the chyron read "Jackpot Lottery App Allow

Users to Buy, Play & Receive Winnings on Smartphone."  *Id.*  According to Sullivan, there were

five additional instances before Jackpot.com publicly announced its entry into the U.S. market,

where news sources used the word "jackpot" in connection with JACKPOCKET and several

other instances of individuals using the word "jackpot" in connection with the JACKPOCKET

mark.  *Id.*

        In addition, at least five potential investors sent emails or meeting invitations to Sullivan

referencing "jackpot" instead of Jackpocket.  *See id.* Ex. 36.  Some of the emails date from as

early as August 2013, before the start of Jackpot.com's consumer-facing business abroad, , and

some are from as late as October 2021, after Jackpot.com had begun its preparatory efforts to

enter the U.S. market.   Although the body of the emails do not refer to Jackpocket, all of the

emails were sent to an email address @jackpocket.com.  Two of the emails appear to come from

the same investment advisor.  The emails refer to "Peter Sullivan" and "Jackpot"; there is no

evidence as to how the authors came to use the name "jackpot."  Even a singer commissioned by

Plaintiff to produce a song about Jackpocket's app used the word "jackpot" instead of

"Jackpocket."  *Id.* ¶ 56.  Sullivan also pointed to examples of social media users, *see id.* Ex. 38,

other media outlets, *see id.* ¶ 56, and Jackpocket customers emailing support@jackpocket.com,

*see id.* Ex. 37, using the term "jackpot" instead of Jackpocket.

Second, Jackpocket presented evidence of its customers contacting Jackpot.com's customer support desk (support@jackpot.com) for assistance with various Jackpocket-related issues.  For example, one customer contacted the Jackpot.com customer support desk to ask why her Jackpocket account had not yet been funded.  *See* PX-355.  Two additional customers requested that their Jackpocket accounts be closed.  *See* PX-024; PX-025.  The roughly ten emails that Jackpocket entered into evidence represent a small fraction of the 190,000 messages that have been sent to "support@jackpot.com" since January 1, 2017.  Ron Decl. ¶ 81.  The vast majority of these emails came before Jackpot.com announced its plans to enter the U.S. market. In every case that a customer contacted Jackpot.com asking for help with respect to their Jackpocket accounts, Jackpot.com alerted the customer that Jackpot.com was not associated with Jackpocket.

The emails to Jackpot.com from Jackpocket customers appear to have been the result of how Jackpocket interacts with its customers as opposed to any confusion caused by Jackpot.com. When a Jackpocket customer submits a request to Jackpocket customer support, it is not met with an email to which the customer can directly reply.  *See, e.g.*, PI Tr. 265.  Rather, the customer receives an email from no-reply@jackpocket.com, and the body of the email instructs the customer to send any further responses in a new email to "support@jackpocket.com." *See, e.g.*, *id.*  The customer must then open a new email and type in Jackpocket's email address.  The evidence is consistent with a small minority of customers having mistakenly typed the shortened "support@jackpot.com" instead of the longer "support@jackpocket.com" when they were trying to correspond with Jackpocket.  *Id.* at.265–66.

Finally, Jackpocket presented evidence that *after* Jackpot.com's announcement that it would enter the U.S. market, certain news sources, investors, customers, and suppliers confused

Jackpot.com with Jackpocket.  *See* Sullivan Decl. ¶ 96.  After Jackpot.com announced its

fundraising round in June 2022, several individuals reached out to Jackpocket executives to

congratulate them.  *Id.*  Sullivan received multiple phone calls from various investors

congratulating him on the fundraising round.  *Id.*  One investor forwarded an article about the

fundraising round to Siuda and asked, "Saw this article…is this u guys?"  DX-052.  *PlayUSA*—a

website that covers the iGaming industry—published an article about Jackpot.com's fundraising

titled "Jackpocket Gets $35 Million in New Funding With Possible Expansion Ahead."  Sullivan

Decl. Ex. 50; *see also id.* Exs. 49, 53 (two additional instances of media confusion).  There is no

evidence of the source of this confusion.

Vendors and potential partners also conflated Jackpocket and Jackpot.com.  On August 2,

2022, the president of a geolocation service used by Jackpocket emailed Jackpocket's legal

department and accidentally copied Jackpot.com's chief operating officer.  *Id.* Ex. 55; *see also

id.* Exs. 51, 52, 54.  A representative of the Minnesota Twins—one of Jackpocket's sports

partners—emailed Khanna that the Twins were "eager to develop a deeper relationship with

Jackpocket."  PX-423.  And an MLB employee, after apparently seeing Khanna in Los Angeles,

wrote "would love to see if there's a fit w/ Jackpocket."  PX-424.  And customers continued to

contact support@jackpot.com thinking that they were contacting Jackpocket's support team

instead.  As one customer concluded, "I'm so sorry, I[ was playing] Jackpocket.  I didn't realize

they were 2 different sites."  PX-033; *see also* PX-034.

There is evidence, however, that Jackpocket has intentionally sought to associate itself

with the term "jackpot," both through its branding and its advertising and thus that any confusion

was manufactured by Jackpocket, its choice of brand, and its marketing strategy.  When an

individual first opens Jackpocket's application, the word "jackpot" first appears before

expanding into Jackpocket's mark.  Sullivan Decl. ¶ 54, Ex. 30; *see also id.* Ex. 10 at

JACKPOCKET00003810–11.  Thus, the first and most prominent image the viewer sees is

"Jackpot," the name under which Defendants have been operating.  Jackpocket has also

associated its brand with Jackpot.com by purchasing Google AdWords and Apple Search Ads.

PI Tr. 46–49; DX-88.  Google AdWords offers advertisers the opportunity to purchase certain

keywords and to have their product appear prominently in the search results in response to the

entry of those keywords.  *See Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 125 (2d Cir. 2009).

Apple's Search Ads offers a similar service, but in Apple's App Store.  PI Tr. 48–49.  Jackpocket

has purchased variations of the word "jackpot," including "jackpot," "jackpot app," "lottery

jackpot," and the word "jackpot" preceded by the name of a state, *see* DX-088, to drive traffic to

its website and application.  The purchases took place primarily in 2021 and 2022, around the

time that Jackpocket became aware of Jackpot.com's imminent competitive threat.  Between

2017 and 2022, Jackpocket spent over ███████ on Apple Search Ads for the word "jackpot,"

the vast majority (more than ███████) of which was spent in 2021 and 2022.  *Id*. "ASA Pivot"

Tab.  This spend represented over ███ of the total amount Jackpocket spent on Apple Search

Ads during this period.  *See id.*  Jackpocket has also purchased Google AdWords (though, at

least from March to August 2022, in much smaller volumes) for both "jackpot" and "jackpot

app."  *Id.* "Google Raw" Tab.  Sullivan framed these marketing purchases as "advertis[ing]

against [a] competitor[]" which companies do "all the time."  PI Tr. 47.

     Indeed, Sullivan testified that it was "an ongoing joke inside the boardroom [how] people

mistake Jackpocket and Jackpot.  Some people say the Jackpocket is [$]400 million, some people

say that we're Jackpot."  *Id*. at 129.  Similarly, in 2018, a Jackpocket employee sent a link to

"jackpot.com" to Plaintiff's "Senior Leadership" Slack channel and asked if "anyone kn[e]w the

deal with jackpot.com." DX-029 at JACKPOCKET00004171.  After another employee wrote

back that Jackpot.com "looks like it's owned by a company called lottomatrix," the first

employee responded that "a decent percentage of people do seem to think of our brand as

jackpot." *Id*.  From December 6, 2021 through the beginning of June 6, 2022, a time period that

straddles Jackpot.com's announcement that it was entering the U.S. market, the generic "jackpot

app" and "jackpot lottery app" were two of the top ten search terms used by consumers to find

the Jackpocket website.  Dkt. No. 59 App. A.

Jackpot.com presented evidence of the ubiquity of the word "jackpot."  The word

"jackpot," which denotes the top prize in a game a chance, is used in connection with gambling

of all kinds, including lotteries.  *See* Ron Decl. ¶¶ 9–10; Wyman Rpt. At 5.  As a result,

"jackpot" has been incorporated into marks associated with gambling and lottery services.  As of

October 8, 2022, there were over 370 live trademark registrations for marks that include the

word "jackpot," *see* DX-250; DX-270, of which include the word "gaming" in the corresponding

description of goods and services, *see* DX-256, and 145 of which also include the word "lottery"

in the corresponding descriptions of goods and services, *see* DX-251.  Examples of these

trademarks include JACKPOT PARTY CASINO SLOTS (DX-214); JACKPOT CARNIVAL

(DX-215); JACKPOT SCRATCHERS (DX-216); JACKPOT FUN (DX-217); JACKPOT

BOOM! (DX-218); JACKPOT BASH (DX-219); JACKPOT RUSHER (DX-220); JACKPOT

MEGA SLOT (DX-221); EPIC JACKPOT SLOTS (DX-222); and JACKPOT WORLD (DX-

223).  At least thirteen of these trademarks were granted on the condition that the trademark

owner disclaim the exclusive right to use "jackpot" outside of the trademark.  Dkt. No. 49, Ex. J.

Additionally, there were over 50 pending applications for "lottery" related trademarks

incorporating the word "jackpot."  *See* DX-257.  There is no evidence that any of the owners of

marks that incorporate the word "jackpot" are involved in lottery courier services.  *See* PI Tr.

170.

Some of these marks have been used extensively in commerce.  The ten trademark

examples listed above have applications that have been downloaded over 25 million times and

contain over 2 million customer reviews.  *See* DX-214–23.[11]  Jackpot.com subpoenaed the owner

of Jackpot Magic Slots, a "social casino-style application."  Since 2016, Jackpot Magic Slots has

been downloaded ███████ times, has earned ████████ in revenue, and has benefited from

███████ spent on marketing and advertising.  *See* DX-281 ¶¶ 8–10; DX-274.[12]

---

[11] In its Brief in Support of its Omnibus Motion *in Limine* ("Jackpocket *in Limine* Brief"), Jackpocket argues that the Internet printouts from the Google Play Store showing downloads of these applications are inadmissible hearsay.  *See* Jackpocket *in Limine* Brief at 7–8.  Jackpot.com counters that, *inter alia*, the information is admissible under Federal Rule of Evidence 803(17) as market compilations.  Jackpot.com *in Limine* Brief at 12–13.  Rule 803(17) creates an exemption to the hearsay rule for "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."  Fed. R. Evid. 803(17).  "The basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate."  Fed. R. Evid. 803(17) advisory committee note.  "[T]he admissibility of market reports and commercial publications under Rule 803(17) is predicated on the two factors of necessity and reliability."  5 Weinstein's Federal Evidence § 803.19[1] (2021).  Reliability is based, at least in part, on evidence that the compilers "stake their business or public reputations on the accuracy" of a compilation.  *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 393 (Fed. Cir. 1996), *as amended on reh'g in part* (Jan. 2, 1997).  *See King v. Wang*, 2021 WL 5232454, at *14 (S.D.N.Y. Nov. 9, 2021).

The Court finds that the Internet printouts from the Google Play Store are admissible under Rule 803(17).  The public relies on this information from the Google Play Store (and similar services, like the Apple App Store) for a description of the applications, number of downloads, and customer reviews.  Google "know[s] that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting their product."  5 Weinstein's Federal Evidence § 803.19[1] (2021).  *See Wang*, 2021 WL 5232454, at *13–15 (admitting "information reported to [Artron.net and Artnet.com] regarding sales of Chinese paintings from various Chinese auction houses"); *In re Gonch*, 435 B.R. 857, 862 (Bankr. N.D.N.Y. 2010) (admitting *Kelley Blue Book* data).

[12] Jackpocket also moves to exclude the Declaration of Trung Luu ("Luu Declaration") and the documents produced by Big Fish Games.  *See* Jackpocket *in Limine* Brief at 8–13.  Jackpocket argues that (1) the Luu Declaration is impermissible hearsay, *id.* at 9; (2) the Luu Declaration

Jackpot.com initially, though perhaps unintentionally, heightened any potential confusion between itself and Jackpocket.  Jackpot.com's initial U.S. branding mirrored Jackpocket's.  On the same day that Jackpot.com announced its fundraising round in June 2022, Jackpot.com redirected U.S.-based visitors to jackpot.com to the subdomain us.jackpot.com.  Sullivan Decl. ¶ 80.  Upon reaching this landing page, consumers were confronted with a blue-and-white color scheme, similar to Jackpocket's.  Ron Decl. ¶¶ 59–60.  Ron testified that Jackpot.com hired "a

---

goes beyond a custodian of records declaration under Federal Rule of Evidence 902(11) and Jackpot.com never provided written notice of its intent to offer the records, *id.* at 9–10; and (3) the underlying documents are themselves impermissible hearsay, which are not subject to the Business Records exception under Federal Rule of Evidence 803(6), *id.* at 10–13.  Jackpot.com counters that the Luu Declaration falls squarely within Rule 902(11), notice was provided to Jackpocket, and the underlying records are business records.  Jackpot.com *in Limine* Brief at 14– 16.  The Court relies on the Luu Declaration for the narrow purpose of authenticating DX-274, a spreadsheet that contains marketing and advertising expenditures, revenue, and application downloads for the Jackpot Magic Slots application.  Thus, the Court only addresses Jackpocket's motion *in limine* insofar as it seeks to exclude Paragraphs 8–10 of the Luu Declaration and DX-274.

The Court finds that Paragraphs 8–10 of the Luu Declaration falls within Rule 902(11).  "Rule 902(11) was added to create 'a procedure by which parties can authenticate certain records of regularly conducted activity, other than through the testimony of a foundation witness.'"  *United States v. Komasa*, 767 F.3d 151, 155 (2d Cir. 2014) (quoting Fed. R. Evid. 902 advisory committee note).  Rule 803(6), the business records rule, was simultaneously amended so that the foundation requirements could be satisfied by a certification that complies with Rule 902(11). *See id.*; Fed. R. Evid. 803(6)(D).  Here, Paragraphs 8–10 of the Luu Declaration do just that; they satisfy the requirements for Rule 803(6)(A)–(C) for the data provided in DX-274.  In turn, DX-274, as Luu attests, are business records and thus subject to the business records exception of Rule 803(6).  Additionally, under Rule 902(11), Plaintiff had sufficient notice of the "intent to offer the record . . . so that the party has a fair opportunity to challenge them," Fed. R. Evid. 902(11):  On October 21, 2022, Jackpot.com served Jackpocket with notice of its subpoena to Big Fish Games; Jackpot.com transmitted the subpoenaed documents to Jackpocket on November 4, 2022, the same day that they received them from Big Fish Games; and the Luu Declaration and DX-274 were on Jackpot.com's exhibit list shared with Jackpocket on November 12, 2022, five days before the trial.  Declaration of Jessica Rose ¶¶ 2–4.  Given the time constraints of the trial, Jackpocket had sufficient notice of Jackpot.com's intent to offer the records, as evidenced by its thorough brief in support of its Omnibus *Motion in Limine*.  *See United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013) (finding five days between government disclosure of records and when records admitted into evidence "sufficient time" under Rule 902(11)).

third-party designer" for its U.S. landing page and that the "choice of this color scheme was not directed by Jackpot.com." *Id.* ¶ 59.  This designer was a friend of Ron's whom he had known for twenty-two years and had worked with many times before.  PI Tr. 231.  Jackpocket highlighted the similarities at the beginning of this litigation; thereafter, Jackpot.com changed the color scheme to match the orange-and-black color scheme that it uses internationally.  Ron Decl. ¶¶ 59–60.  Ron claimed that "Jackpot.com has no plans or intention of using the blue-and-white color scheme that first appeared on its U.S. landing page." *Id.* ¶ 61.

There is evidence that Jackpot.com was aware that some individuals believed Jackpocket and Jackpot.com were the same and found the conflation between the two companies humorous. In June 2022, an individual from the National Council for Problem Gambling ("NCPG"), a gaming non-profit, erroneously added Mike Silveira, Jackpot.com's chief of staff, to an email thread with Jackpocket employees, commenting that NCPG has "also had a convo started with Mike Silveira from Jackpocket (cc'd)." Sullivan Decl. ¶ 96; *id.* Ex. 52; PI Tr. 236.  Silveira forwarded the conversation to Khanna, Jackpot.com's U.S. CEO.  PX-014.  After Khanna responded "Lol. Read from the bottom," Silveira wrote "I'm sure these guys love us already" and added a crying/laughing emoticon. *Id.*  Khanna responded with the same crying/laughing emoticon. *Id.*

## V.     Survey Evidence of Confusion

Jackpocket also attempted to support its claim with survey evidence and opinion testimony about the likelihood of confusion between the JACKPOCKET marks and Jackpot.com.  That expert testimony was rebutted by expert testimony offered by Jackpot.com.

### A.     Jackpocket's Survey Evidence

Jackpocket presented the survey evidence and opinion testimony of Dr. Michael Barone, the Brown-Forman Professor of Marketing at the University of Louisville.  Dkt. No. 23 ¶ 1.

43

Over the course of his career, Barone has published over fifty articles on consumer psychology and conducted dozens of empirical studies. *Id.* ¶ 2.  He has also been retained as an expert witness in at least 23 cases.  *Id.* App. A at 21.

      Barone conducted a modified *Squirt* survey designed to gauge the likelihood of confusion between the JACKPOCKET mark and the JACKPOT.COM mark.  Dkt. No. 23 ¶ 7.  In a *Squirt* survey, respondents are first exposed to the senior mark and then to the allegedly infringing mark.  *Id.*  Barone's survey divided its 516 respondents—all New York state residents who are recent or future purchasers of lottery tickets online—into two groups: a test group and a control group.  *Id.* ¶¶ 15–16.  Respondents were first shown a static image of Jackpocket's website and then shown static images of four additional websites in random order.  *Id.* ¶¶ 17–18; *id.* Apps. C, D.  Respondents in the test group were shown images of Jackpot.com's U.S. landing page at the time the survey was conducted, which contained a blue-and-white color scheme (part of which is shown below), and the websites of three Jackpocket competitors.  *Id.* ¶¶ 17–18.



*Figure 5.  Jackpot.com landing page used in Jackpocket's confusion survey (Id. App. C at 36).*

      Respondents in the control group were shown images of the three Jackpocket competitors and of a control website, which substituted the JACKPOT and JACKPOT.COM marks

(collectively, the "JACKPOT.COM Marks") on the Jackpot.com landing page with WINDFALL and WINDFALL.COM marks.  *Id.* ¶ 22; *id.* App. D.  After viewing each website, the respondents were asked whether they thought the website was "owned, operated, or put out" by Jackpocket.  *Id.* ¶ 25.  Respondents were then asked whether they thought the website was "affiliated with, or sponsored or approved by" Jackpocket.  *Id.* ¶ 27.

The survey revealed that 71.7% of those in the test group thought that Jackpot.com's website was connected to Jackpocket's website, while only 45.6% of those in the control group thought that Windfall's website was associated with Jackpocket's, yielding a net confusion ratio of 26.2%.  *Id.* ¶ 30.  Based on these results, Barone concluded that "the Defendant's use of the JACKPOT[.COM] Marks would result in a significant likelihood of confusion with the Plaintiff Jackpocket among relevant U.S. consumers."  *Id.* ¶ 32.

## B.    Jackpot.com's Critique of Jackpocket's Survey Evidence

Jackpot.com retained Simonson to comment on Barone's survey evidence and to present its own survey evidence.  Through Simonson, Jackpot.com presented three primary critiques of Jackpocket's study.  First, Jackpot.com criticized the choice of the *Squirt* survey methodology because it does not approximate the marketplace conditions in which Jackpocket and Jackpot.com find themselves.  Dkt. No. 48 ¶¶ 30–36.  The *Squirt* methodology is only appropriate when products are encountered sequentially or together by prospective purchasers.  *Id.* ¶ 22.  But, Simonson argued, the likelihood that consumers will visit two particular lottery courier service webpages or their applications sequentially is very small.  *Id.* ¶¶ 31–33, 35.  Barone countered that a *Squirt* survey was appropriate because the two marks will be viewed sequentially or simultaneously.  *See* Dkt. No. 59 ¶¶ 3–9.  Barone pointed to the fact that (1) "jackpot app" and "jackpot lottery app" are two of the top ten search terms consumers use to find Jackpocket's services on Google, *id.* ¶ 3, and (2) the Jackpocket app is a top result when

searching "jackpot app" or "jackpot lottery app" on Apple's App Store, *id.* ¶ 4.  Barone thus argued Jackpocket's and Jackpot.com's marks are likely to be viewed in close proximity to one another when Jackpot.com launches in the United States.  *See id.* ¶ 5.

Second, Simonson argued that the *Squirt* survey methodology's use of leading questions risks introducing impermissible "demand effects" into the data.  Dkt. No. 48 ¶ 25.  Demand effects arise when respondents use cues in the survey and the survey questions to give what they perceive to be the "correct" answer, instead of giving a truthful one.  *Id.*  The *Squirt* methodology's reliance on leading questions—in this case, asking respondents whether each website is affiliated with Jackpocket's—combined with the assumption that Jackpocket owned the exclusive right to websites related to lotteries, exacerbated these demand effects, "amount[ing] to nothing more than a matching, memory game." *Id.* ¶ 36.

Finally, Simonson criticized Barone's choice of Windfall as a control.  A properly designed control should be "as similar as possible to the 'junior' (allegedly infringing) mark, without infringing on the 'senior' mark."  *Id.* ¶ 28.  Barone testified that he chose "Windfall" because it is similar in meaning to "jackpot" and thus likely to evoke similar impressions among consumers.  Dkt. No. 59 ¶ 27.  But Simonson argued that the auditory and visual dissimilarity between "Jackpot" and "Windfall"—as he wrote "[t]he only letter that 'Jackpot' and 'Windfall' have in common is the vowel 'a'"—made "Windfall" an inappropriate control.  Dkt. No. 48 ¶ 39.

Simonson also conducted a survey designed to gauge the likelihood of confusion between the JACKPOCKET and JACKPOT.COM Marks using an aided-*Everyday* methodology. September 24, 2022 Declaration of Dr. Itamar Simonson ("Sept. 24 Simonson Decl.") ¶ 13.  In *Everedy* surveys, respondents are shown the allegedly infringing product and asked non-leading questions about the company affiliated with the mark, without being shown the senior mark.  6 J.

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:174 (5th ed. 2017) [hereinafter *McCarthy on Trademarks*].  The *Eveready* methodology is generally appropriate when marks are not likely to be encountered together and the senior mark is readily recognized by consumers.  *Id.*; Dkt. No. 48 ¶ 20.  An aided-*Eveready* survey is similar to the *Squirt* methodology—the allegedly infringing and senior marks are displayed together or sequentially—but asks non-leading *Eveready* questions.  Dkt. No. 48 ¶ 23.

Jackpot.com's survey drew from a similar universe to Jackpocket's survey:  The survey included 439 individuals who had purchased lottery tickets online in the past 12 months or who planned to purchase lottery tickets online in the next twelve months.  Sept. 24 Simonson Decl. ¶ 19.  Jackpot.com's survey included respondents from all of the states and territories where Jackpocket conducts business.  *Id.*  These respondents were divided into test and control groups:  Those in the test group were shown images of Jackpocket's website, Jackpot.com's current United States website (with the orange-and-black color scheme, as shown, in part, below), and four other competitor webpages, including the three additional webpages that were shown in Jackpocket's survey, in a random order.  *Id.* ¶¶ 22–23; *id.* Ex. F.  Those in the control group were shown the same images, except the JACKPOT.COM Marks were substituted for the control's JACK and JACK.COM marks.  *Id.*



*Figure 6.  Jackpot.com landing page used in Jackpot.com's confusion survey (Id. Ex. F at 41).*

After viewing each image, respondents were shown the test or control website image, instructed to scroll to the bottom of the webpage, and asked several non-leading questions aimed at gauging the ownership of the website and the website's affiliation with other entities.  *Id.* ¶ 25. Jackpot.com's survey revealed a net confusion ratio of 0.4%: 1.6% of test-group respondents associated Jackpot.com's website with Jackpocket's website, while 1.2% of those in the control group associated Jack.com with Jackpocket.  *Id.* ¶ 30.  In fact, Simonson argued that these results likely overstate the likelihood of confusion between the two marks because the aided-*Eveready* methodology exposed all respondents to the JACKPOCKET Marks, thus creating awareness and increasing the salience of the marks immediately before asking questions designed to gauge the likelihood of confusion.  *See id.* ¶¶ 8, 34.  Simonson concluded that "the results indicate a lack of any confusion between the two marks at issue."  *Id.* ¶ 35.

Barone levels one primary criticism against Simonson's survey:  The decision to leave the test and control websites on the survey screen while asking respondents questions designed to gauge their likelihood of confusion.  *See generally* October 3, 2022 Rebuttal Report of Dr.

Michael Barone ("Oct. 3 Barone Reb. Rpt.").  This decision potentially biased the survey

participants' responses by leaving two suggestive pieces of information in plain view.  First,

respondents could see a copyright statement with either "jackpot" or "jack" listed as the

copyright owner.  *Id.* ¶¶ 6–9.  Second, respondents could see the logos and names of three

Jackpot.com investors, which, at the time, were listed on the bottom of Jackpot.com's website.

*Id.*  Barone highlighted the fact that 20% of all respondents explicitly referred to the copyright

statement when asked why they thought the website was owned by the company they identified

in the survey, and between 30% and 40% of the respondents identified at least one of the three

Jackpot.com investors when asked whether the test or control website was affiliated with another

company.  *Id.* ¶¶ 18–19.  Barone argues that Simonson's decision created "an artificial reading

test that lacks connection to the actual marketplace."  *Id.* ¶ 13.

CONCLUSIONS OF LAW

Jackpocket brings three categories of claims against Jackpot.com.  First, Jackpocket

brings claims for trademark infringement under federal and New York law.  Second, Jackpocket

alleges that the use of Jackpot.com's marks will dilute Jackpocket's marks.  Finally, Jackpocket

alleges that Jackpot.com actions are deceptive trade practices under New York law.  In turn,

Jackpot.com raises several affirmative defenses: failure to state a claim; unclean hands; waiver,

estoppel, and acquiescence; laches; trademark misuse; and innocent use.  *See* Dkt. No. 112.

Jackpot.com also argues that the JACKPOCKET Marks are not protectable against

Jackpot.com's marks because Jackpot.com has established prior use as the senior user.  Def.

Pretrial Mem. 4–12.

## I.      Trademark Infringement and Unfair Competition Claims

Section 32(1) of the Lanham Act prohibits the "use . . . of a registered mark in connection

with the sale, offering for sale, distribution, or advertising of any goods or services on or in

connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."

15 U.S.C. § 1114(1)(a).  Section 43(a) prohibits the

> use[ ] . . . [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(a).

The standards governing claims for unfair competition, under Section 43(a) of the Lanham Act, and for trademark infringement, under Section 32, are substantially the same.  *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) ("[T]he standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement claims under Section 32 (15 U.S.C. § 1114)."); *see also Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014) ("[A] federal claim of false designation of origin . . . is also referred to as a claim for unfair competition.").

Both claims are governed by a "familiar two-prong test."  *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 440 (S.D.N.Y. 2017) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012)).  "The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 486 (S.D.N.Y. 2008) (quoting *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (internal quotation marks omitted)); *see Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) ("The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent

purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." (internal quotation marks and alterations omitted)).

Under New York common law, the standards for trademark infringement and unfair competition are "virtually identical" to the standard under the Lanham Act, "except that [New York law] requires an additional showing of bad faith." *Lopez v. Adidas Am., Inc.*, 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020) (quoting *TechnoMarine SA v. Jacob Time, Inc.*, 2012 WL 2497276, at *5 (S.D.N.Y. June 22, 2012)).

### A.   Validity of the Trademarks

#### 1.   Validity of Jackpocket's Trademarks

The first step of the trademark infringement analysis asks whether a mark is entitled to protection. *See Yurman Studio, Inc.*, 591 F. Supp. 2d at 486.  "A mark is entitled to protection if it is either inherently distinctive or has acquired distinctiveness through secondary meaning." *Coty Inc.*, 277 F. Supp. 3d at 441.  "Under the Lanham Act, an incontestable registration . . . is conclusive evidence of a plaintiff's exclusive right to use the specific mark," subject to a limited number of enumerated defenses. *Id.*; *see* 15 U.S.C. § 1115(b) (enumerating defenses).  "A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993); *see also* 15 U.S.C. § 1065.  Even in the absence of trademark registration, a mark "is entitled to protection if it qualifies for registration." *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 217 (2d Cir. 2003).  To determine whether a mark qualifies for registration, courts look to Judge Friendly's categorization of a mark's distinctiveness: generic, descriptive, suggestive, and arbitrary or fanciful. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)); *see also Coty Inc.*, 277 F. Supp. 3d at 441.

Jackpocket has sufficiently established that the JACKPOCKET mark is a valid mark entitled to protection.  Jackpocket has provided its certificate of registration with the U.S. Patent and Trademark Office ("USPTO") for the JACKPOCKET mark.  *See* Sullivan Decl. Ex. 5. Further, Jackpocket has provided evidence that the use of this mark has been continuous for five years.  There is some question whether Jackpocket's use of the JACKPOCKET mark has been continuous since its registration; in 2016; Jackpocket stopped selling lottery tickets after it was shut down in New York.  *Id.* ¶ 15; *id.* Ex. 1.  During this time, Jackpocket continued to operate its application and users could check lottery results, withdraw previous winnings, and find local lottery retailers.  *Id.* ¶ 15.  Jackpocket's use during this period may not have been continuous under 15 U.S.C. § 1065.  *See Brittingham v. Jenkins*, 914 F.2d 447, 454 (4th Cir. 1990) (finding that two-year time period during which store was closed broke continuous-use requirement because "the five-year continuous use provision of 15 U.S.C. § 1065 applies solely to the use of a mark in connection with the sale of goods and services, and not in relation to other business activities" like leasing a new store and advertising for the new store).[13]  However, in July 2017, over five years ago, Jackpocket started to sell lottery tickets in Minnesota.  Sullivan Decl. ¶ 15; Tr. 37.  Since that date, Jackpocket has continuously used its mark to sell lottery tickets. Jackpocket has thus established that its JACKPOCKET mark is incontestable.  Defendants do

---

[13] To establish that "a trademark . . . is abandoned, two elements must be satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future." *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2d Cir. 1992). Here, there is no claim—and no evidence—that Jackpocket abandoned its trademark during this period.  Even if Jackpocket's actions after New York State pulled its lottery license can be construed as non-use, there is no evidence that Jackpocket intended not to resume use of the trademark—and in fact there is evidence, including Jackpocket's efforts to create a licensing system in New York, that Jackpocket intended to use the mark.

not dispute, nor have they successfully raised any of the enumerated defenses to,[14] the

incontestable status of the JACKPOCKET mark.

Jackpocket's application for a trademark registration of JACKPOCKET.COM has not yet

been approved by the USPTO.  Defendants do not dispute that JACKPOCKET.COM would

qualify for registration.  Even so, the JACKPOCKET.COM mark is entitled to protection

because it would qualify for registration.  As described at length *infra* Section II.B.1.a, the Court

finds that JACKPOCKET is a suggestive mark.  Suggestive marks are inherently distinctive and

thus protectible without showing secondary meaning.  *See Gruner + Jahr USA Pub.*, 991 F.2d at

1076.  Because the addition of ".com" to the suggestive "Jackpocket" does not change the

suggestive nature of the mark, JACKPOCKET.COM is protectable.  *See United States Pat. &*

*Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2306 (2020) (holding that addition of

generic ".com" can "convey to consumers a source-identifying character" that enhances the

distinctiveness of a mark); *see also TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88,

101 (2d Cir. 2001) (The addition of "a top-level domain identifier of .com or .net" "are of little

or no significance. . . . [C]onsumers would see the domain name 'thechildrensplace.com/.net' as

employing functionally the same name as 'The Children's Place.'").

### 2.    Prior Use

Jackpot.com argues that even if the JACKPOCKET Marks are valid, its common-law

rights in the JACKPOT.COM mark are not extinguished because its use of the JACKPOT.COM

mark predates Jackpocket's use of its marks.  Defendants' Pre-Trial Memorandum ("Def. Pret.

Mem.") 10.  Specifically, Jackpot.com points to its subdomain "lottery.jackpot.com," which,

beginning in November 2012, was accessible to U.S. consumers and provided results and

---

[14] Defendants raise an innocent use defense under 15 U.S.C. § 1115(b)(5).  As discussed in
Section I.A.2, *infra*, this defense is unavailing.

information for lotteries, including U.S. lotteries.  *Id.* at 11.  Jackpocket counters that

Jackpot.com did not use the mark in commerce, as required to establish rights in the mark, and if

they did, this use can only be traced to 2016 because Palek International, not Jackpot.com,

owned the mark beforehand.  Plaintiff's Pre-Trial Memorandum ("Pl. Pret. Mem.") at 33–36.

 "Neither application for nor registration of a mark at the federal level wipes out the prior

non-registered, common law rights of others."  5 *McCarthy on Trademarks* § 26:53.  Even if a

mark has become incontestable, "the senior user retains a right to use the mark in the geographic

area wherein that user accrued common law rights superior to the registrant prior to the date of

registration."  *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339,

1353 (E.D.N.Y. 1994) (citing 15 U.S.C. § 1065).  In order to maintain a prior use defense, the

defendant must prove "(1) present rights in the mark; (2) acquired prior to the date of

registration; (3) continual use of the mark since that date; and (4) use prior to the registrant on

the goods or services that are in issue."  *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d

286, 311 (S.D.N.Y. 2000); *see also Dial-A-Mattress Operating Corp.*, 841 F. Supp. at 1354

("[D]efendants must affirmatively demonstrate an unbroken continuum of use without significant

interruption from a date prior to the maturation of plaintiff's rights in the mark.").

 There is superficial appeal to Jackpot.com's argument.  The JACKPOT.COM mark has

been used widely in commercial activity since before Jackpocket started using its mark.  As early

as November 2012, Palek International offered iGaming services internationally using the

Jackpocket mark.  Since that time, Jackpot.com has used its mark extensively in international

commerce; today Jackpot.com offers iGaming products and services in over 180 countries.  *See*

Ron Decl. ¶ 5.  There is no question that Jackpot.com has worldwide goodwill in its mark that it

acquired independently of Jackpocket and that preexists the marketing of Jackpocket's services.

There also is no merit to the argument that Jackpot.com cannot establish a prior use because, prior to 2016, the mark was held in the name of another corporate entity.  Palek International launched the website jackpot.com in 2012.  *See* Ron Decl. ¶ 30; DX-003–007.  From November 2012 through the middle of 2016, individuals located in the United States could obtain lottery results and information from the subdomain lottery.jackpot.com and could access jackpot.com but could not utilize its services.  Ron Decl. ¶ 30.  In 2016, Palek International transferred the domain to 99Dynamics, which launched Defendants' consumer facing website.  *Id.* ¶¶ 16–17, 20.  Jackpocket argues that there is no evidence that Palek International "has any legal affiliation with Jackpot[.com]" and thus Jackpot.com can only establish priority from 2016 when it was founded.  *See* Pl. Pret. Mem. 33–34.  But whether or not Palek International and Jackpot.com are affiliated is beside the point.  "Generally, an assignment of a trademark and its accompanying goodwill will entitle the assignee to 'step into the shoes' of the assignor, gaining whatever priority the assignor might have had in the mark."  *Clark & Freeman Corp. v. Heartland Co.*, 811 F. Supp. 137, 139 (S.D.N.Y. 1993) (citation omitted); *see also Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 874–75 (E.D.N.Y. 1978) ("Upon the valid sale of this asset, the legitimate purchaser becomes transfixed to the position of his predecessor, enjoying the latter's rights in the mark dating from its initial use and suffering the burdens on and limitations of its use that were incumbent on his predecessor.").  Thus, Jackpot.com inherited whatever rights Palek International had in the JACKPOT.COM mark when it was assigned to it, regardless of whether Palek International was an "affiliate."

Jackpot.com's argument runs ashore, however, on the twin shoals of territoriality and commercial use.  The proponent of a "prior use" defense must show that it has used the mark in commerce or engaged in a use analogous to trademark use.  "The term 'use in commerce' means

the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark." 15 U.S.C. § 1127. "Whether a trademark has been used in commerce is a question to be determined 'on a case by case basis, considering the totality of the circumstances' surrounding the alleged use of the mark." *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 2002 WL 460065, at *4 (S.D.N.Y. Mar. 26, 2002) (quoting *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999)). But the party "must show that it has common law trademark rights based on 'actual use of [the] mark in a genuine commercial transaction' . . . or at least an active and public attempt to establish such a trade." *Mills v. Alphabet Inc.*, 2018 WL 1569838, at *4 (S.D.N.Y. Mar. 28, 2018) (quoting *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 365, 370 (S.D.N.Y. 2007)).

The rule follows from a fundamental principle of trademark law: "[T]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus, Co.*, 248 U.S. 90, 97 (1918). A trademark "is not the subject of property except in connection with an existing business." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). The proponent need not actually have successfully sold any goods or services under a mark to be entitled to a "prior use" defense or to be entitled to registration. The statute draws a distinction between the "use in commerce" required to request registration, 15 U.S.C. § 1051(a)(1), and the "use in the United States" which can lead to cancellation, 15 U.S.C. § 1052(d); *see New Look Party Ltd. v. Louise Paris Ltd.*, 2012 WL 251976, at *3 (S.D.N.Y. Jan. 11, 2012). Thus, though trade or shipment of goods under the mark is "highly persuasive evidence" of a trademark's use in commerce, *Chere Amie*, 2002 WL 460065, at *4, courts have "found use analogous to trademark use adequate to establish priority [when there was] an active

56

attempt to target the relevant market," *New Look Party*, 2012 WL 251976, at *3. "Pre-sale

'analogous use' of the mark, such as publicity in advertising brochures, catalogs, newspaper ads,

and articles in newspapers and trade publications," also can be sufficient to establish prior use in

commerce. *Hous. & Servs., Inc. v. Minton*, 1997 WL 349949, at *3 (S.D.N.Y. June 24, 1997)

(internal quotation marks and citation omitted). "The doctrine [of analogous use], however, has

not been stretched so far as to obviate the requirement that [the defendant] show eventual actual

use." *Am. Express Co. v. Goetz*, 515 F.3d 156, 162 (2d Cir. 2008). "[T]he proponent of the

trademark must demonstrate that his use of the mark has been deliberate and continuous, not

sporadic, casual or transitory." *La Societe Anonyme*, 495 F.2d at 1272.

 Moreover, United States trademark law is territorial. *See ITC Ltd. v. Punchgini, Inc.*, 482

F.3d 135, 155 (2d Cir. 2007) ("The principle of territoriality is basic to American trademark

law."). It is not sufficient that a brand has been used worldwide, and has acquired goodwill

worldwide, if it has not been used in the United States or used to sell a good or service in the

United States. A mark cannot be reserved for the United States by use in Europe, South

America, or Asia alone. As Judge Leval explained,

> This principle recognizes that a trademark has a separate legal existence under each
> country's laws, and that its proper lawful function is not necessarily to specify the
> origin or manufacture of a good (although it may incidentally do that), but rather to
> symbolize the domestic goodwill of the domestic markholder so that the consuming
> public may rely with an expectation of consistency on the domestic reputation
> earned for the mark by its owner, and the owner of the mark may be confident that
> his goodwill and reputation (the value of the mark) will not be injured through use
> of the mark by others in domestic commerce.

*Osawa & Co. v. B & H Photo*, 589 F. Supp. 1163, 1171–72 (S.D.N.Y. 1984). In contrast, under

the universality principle, a trademark lawful in one country would be considered lawful

wherever it went and would, by definition, not infringe on the marks of others internationally.

*Id.* at 1171.

Here, Jackpot.com cannot establish that it has present rights in a mark that were acquired prior to Jackpocket's registration, and, even if it could, it cannot establish that its use of the mark in commerce has been continuous.  Jackpot.com's argument turns on the viewership of its website by users in the United States.  From April 2012 through September 2013, jackpot.com and lottery.jackpot.com had 30,434 visitors located in the United States; an additional 26,709 U.S.-based visitors visited the webpages from September 2013 through July 2016.  Ron Decl. ¶ 30.  However, Jackpot.com has established neither that it used its mark in commerce in the United States nor that, prior to 2016 (or indeed until very recently) that it has targeted the U.S. market.

Jackpot.com has never held a U.S. license and it has never had a U.S.-based customer.  PI Tr. 192–193.  It also has never offered any iGaming services in or received any revenue from the United States.  *Id.*  Though it has provided information about lotteries in the United States on its website and that website can be viewed by persons in the United States, there is no evidence that it has engaged in presale activities to develop a market in the United States.  The provision of the "information" was geared specifically towards selling Jackpot.com's iGaming services outside the United States, where its services were legal.  *See* DX-003; *see also* DX-005; DX-007.  The information provided on U.S. lotteries was not directed to U.S. customers who might purchase tickets domestically or were seeking lottery results.  As Jackpocket has argued and as the snapshot of lottery.jackpot.com below demonstrates, Jackpot.com provided information about lotteries in the United States because one of the services it offered was the ability of consumers *outside* the United States to bet on the outcome of those games through a synthetic lottery.  *See* Trial Transcript ("Trial Tr.") 82–83.  Thus, the information provided on lottery.jackpot.com was

accompanied by a prominent "Buy Tickets" button, which U.S.-based customers could not click because they were legally prohibited from purchasing these tickets.

Moreover, even if Jackpot.com's provision of news and information through lottery.jackpot.com could be considered sufficient to establish use in commerce, its use of the JACKPOT.COM mark was not continuous.  In mid-2016, lottery.jackpot.com ceased to exist and Jackpot.com has not offered U.S. consumers similar services since then.  *See* Ron Decl. ¶¶ 30–31.  *See Casual Corner Assocs. Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709, 712 (9th Cir. 1974) (non-use for one year is not continuous use).



*Figure 7.  Screenshot of lottery.jackpot.com from April 18, 2012 (DX-003).*

From the evidence before the Court, then, the viewership that Jackpot.com has attracted in the United States appears to be nothing other than incidental.  While Jackpot.com may not have blocked full access to its website, it certainly did not create access.  Indeed, when it came to demonstrating the number of "hits" it had from viewers in the United States before 2016 for this case, Jackpot.com had to resort to Google Analytics for this data.  *See* Ron Decl. ¶ 30 n.5.  There is no evidence that it was internally tracking its viewers in the United States or even cared about its viewers in the United States prior to and apart from this litigation.  The "worldwide web" or internet is not generally territorial; it is open to all viewers.  Thus, the fact that Jackpot.com happens to have acquired viewers in the United States cannot by itself establish either that the JACKPOT.COM mark was used or used in commerce in the United States.

Jackpot.com's argument to the contrary misses the mark.  It counters that the news and information services that it provided—including "links to lottery results and related information"—through lottery.jackpot.com are sufficient to establish "use in commerce" or "use in the United States" even if Jackpot.com has not earned any revenue from U.S. consumers.  Def. Pret. Mem. 5–7.  However, though actual sales may not be necessary to establish prior use, the activities in the United States must be promotional in nature and undertaken with the eventual goal of earning revenue in the United States.  *See, e.g.*, *New Look Party*, 2012 WL 251976, at *3.  Jackpot.com has not offered any evidence that it tried to earn revenue from U.S. consumers during this period, through promotional activities or otherwise, and thus has not established prior use of its mark.  *See Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 372 (finding the fact that plaintiff "never sought or generated revenue from the services it provided under the mark" sufficient evidence that plaintiff did not "use the mark in the ordinary course of trade"); *see also New Look Party*, 2012 WL 251976, at *4 (concluding that the fact that foreign website had "been

viewed by several hundred thousand U.S. IP addresses" was insufficient to establish priority because plaintiff "provided no evidence that its website was in any way intended to function as marketing toward American . . . consumers, a proposition which seems doubtful because plaintiff did not ship its products to [the] U.S.").

The cases that Jackpot.com cites are inapposite, and if anything, highlight the flaws in Jackpot.com's argument.  In *American Cable News Network L.P., L.L.L.P. v. CNNews.com*, a court in the Eastern District of Virginia found that cnnews.com, a Chinese-language news website, which "apparently neither sells, nor offers to sell, any goods outside China" used the CNN mark in commerce because it "nonetheless offers news and information (*i.e.*, 'commerce') to persons with Chinese language skills in this country."  177 F. Supp. 2d 506, 517 (E.D. Va. 2001).  Cnnews.com, however, was in the business of providing news services and was accused of infringing on CNN's mark in connection with the provision of those services.  Similarly, in *Argos v. Orthotec LLC*, the court found that a website that "provide[d] information about spinal surgery to persons throughout the world" satisfied the "use in commerce" requirement through the operation of that website.  304 F. Supp. 2d 591, 595 (D. Del. 2004).  But Argos was in the business of providing spinal-surgery information.  Here, Jackpot.com is not in the business of providing lottery information; it is in the business of providing iGaming services.[15]  And it did not provide iGaming services in the United States.

---

[15] Jackpot.com also raises an innocent use defense under 15 U.S.C. § 1115(b)(5).  15 U.S.C. § 1115(b)(5) provides a defense to incontestability when a party adopts a mark "without knowledge of the registrant's prior use" and continuously uses the mark.  Further, the "defense or defect shall apply only for the area in which such continuous prior use is provided."  *Id.*  Section 1115(b)(5) essentially codifies the common law prior-use defense as a defect that defeats incontestability.  *See* 5 *McCarthy on Trademarks* § 26:53 ("[P]roof of being a senior user is a § 15 exception to incontestability.").  Because, as described above, Jackpocket cannot prove continuous prior use anywhere in the United States, it also cannot sustain an innocent use defense.

B.       **Likelihood of Confusion**

It is not sufficient for Jackpocket to establish that it has the exclusive right to use its marks in the United States.  It must also show that Jackpot.com's use of its mark is likely to cause consumer confusion.  *See Virgin Enters.*, 335 F.3d at 146.  The Lanham Act looks to whether the use of a trademark "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).  To test whether Jackpocket has satisfied its burden, courts in this Circuit consider the eight factors set forth in *Polaroid v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):  (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the parties' areas of commerce, (4) the likelihood that the plaintiff will bridge the gap separating their areas of activity, (5) actual consumer confusion, (6) whether the defendant acted in bad faith or was otherwise reprehensible in adopting the mark, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer group. *Id.*  "To support a finding of infringement, a probability of confusion, not a mere possibility, must exist."  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

"[T]he evaluation of the *Polaroid* factors is not a mechanical process 'where the party with the greatest number of factors weighing in its favor wins.'"  *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (quoting *Physicians Formula Cosms., Inc. v. W. Cabot Cosms., Inc.*, 857 F.2d 80, 85 (2d Cir. 1988)).  The court must analyze whether the defendant's conduct infringes the interests that the trademark law protects.  Those interests do not include the advertiser's interest in a "muscular . . . marketing tool."  *See RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 122 (2d Cir. 2022).  "While copyright law protects the content of a creative work itself, . . . trademark law . . . protects those symbols, elements or devices which identify the work in the marketplace and prevent confusion as to its source."  *Goetz*, 515 F.3d at 159 (internal citation omitted).  Trademark rights thus are not

accorded "in gross." *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 663 (2d Cir.

1979) (A "well-established principle holds that trademark rights, unlike statutory copyrights or

patents, are not rights in gross or at large.").

Trademark law protects competition and consumers.  The law encourages businesses to

use marks to identify their goods and services, to distinguish them from others offered in the

market, and thereby to develop goodwill.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.

763, 781–82 (1992) (Stevens, J. concurring) ("The purpose of [the Lanham Act] is to protect

legitimate business and the consumers of the country." (internal quotation marks omitted)

(quoting 92 Cong. Rec. 7524 (1946))); *see also La Societe Anonyme*, 495 F.2d at 1271

(Trademark law "protect[s] [a business's] good will against the sale of another's product as

his."); *see also Virgin Enters.*, 335 F.3d at 147 (Identification enables "merchants [to] establish

goodwill for their goods based on past satisfactory performance . . . .").  "[W]here the owner of a

trade-mark has spent energy, time, and money in presenting to the public the product, he is

protected in his investment from its misappropriation by pirates and cheats" and in turn, this

protection "encourage[s] the maintenance of quality by securing to the producer the benefit of

the good reputation which excellence creates."  S. Rpt. No. 1333, 79th Cong., 2d Sess. (1946),

*reprinted in* 1946 U.S.C.C.A.N. 1274.  It protects consumers from the loss that they suffer when

they are unable "to distinguish among the goods of competing manufacturers."  *Inwood Lab'ys,*

*Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 855 n.14 (1982); *see also Virgin Enters.*, 335 F.3d 147

(Trademark protection allows "the consuming public [to] rely on a mark as a guarantee that the

goods or services so marked come from the merchant who has been found to be satisfactory in

the past.").  Thus, "[t]he purpose for which the trademark law accords merchants the exclusive

right to the use of a name or symbol in their area or commerce is *identification*." *Virgin Enters.*,

335 F.3d at 147

As a threshold matter, Defendants argue that the Court need not "march[] through

*Polaroid*," Pl. Preh. Mem. 14, because Plaintiff's infringement argument fails as a matter of law,

*see* Dkt. No. 65 at 8–11.  Defendants point to the Second Circuit's holding in *American*

*Cyanamid Corp. v. Connaught Laboratories, Inc.* in support of this proposition.  In *American*

*Cyanamid*, the Second Circuit reviewed a district court's opinion finding that HibVAX, a

Haemophilus polysaccharide vaccine, infringed on HIB-IMUNE, also a Haemophilus

polysaccharide vaccine, and preliminarily enjoining HibVAX's manufacturer from using the

mark.  800 F.2d 306, 307 (2d Cir. 1986).  The Second Circuit reversed, finding that a "trademark

holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark

infringement finding thus cannot be based on the use of a generic or descriptive term such as

'Hib.'" *Id.* at 308.  After reviewing the policy rationale behind trademark law, the court argued

that the "principle" behind permitting individuals to appropriate generic and descriptive marks,

> applies equally to a generic component of a trademark.  Although such a component
> will not necessarily render the entire mark invalid, its presence does affect the
> analysis of whether a competitor's mark containing the same component is likely
> to create confusion.  As a result, because the generic term "Hib" may not be
> appropriated by [plaintiff] for its exclusive use, any likelihood of confusion
> between HibVAX and HIB–IMUNE, and any consequent finding of infringement,
> must be based on a similarity between the suffixes "VAX" and "IMUNE."

*Id.*  The court found that the descriptive "VAX" and "IMUNE" suffixes, descriptive terms, were

not confusingly similar and thus there was no need to "weigh the various factors set out in

*Polaroid*." *Id.* at 308–09.  Relying on *American Cyanamid*, Defendants argue that the "Court

must first strip out the non-protectible JACKPOT element, so that it can compare what is left.

But once the descriptive 'JACKPOT' element is removed from Jackpot.com, there is nothing left

to compare, and thus no basis for any claim of infringement."  Dkt. No. 43 at 15.

*American Cyanamid* is distinguishable.  The rule that Defendants would have this Court adopt—that descriptive or generic terms should be mechanically stripped from composite marks—is inconsistent with both Supreme Court and Second Circuit precedent.  *See Booking.com*, 140 S. Ct. at 2304 ("[F]or a compound term, the distinctiveness inquiry trains on the term's meaning as a whole, not its parts in isolation.").  In fact, two years after the *American Cyanamid* decision, the Second Circuit "clarified" the *Cyanamid* rule and held that "marks should be compared as composites for the purpose of determining the strength of the senior user's mark.  The long-standing view that the nongeneric components of a mark must be compared in the context of the overall composite mark remains the rule in this Circuit." *Banff, Ltd.*, 841 F.2d at 491;[16] *cf. Streetwise Maps*, 159 F.3d at 744 (analyzing likelihood of confusion through *Polaroid* factors with mark "Streetwise," despite presence of generic term, "street"). Rather, *American Cyanamid* teaches that "a finding of infringement cannot rest solely on the use of the same generic term when the other terms are dissimilar." *Banff, Ltd.*, 841 F.2d at 492.  In *American Cyanamid*, the court compared two composite marks that were unlikely to cause confusion.  The dominant element in each mark "VAX" and "IMUNE," respectively, are "totally different.  They are of different length, sound, and appearance.  They share not even a letter in common." *Am. Cyanamid Corp.*, 800 F.2d at 308.  The addition of a generic term alone cannot render two marks that are distinct from each other confusingly similar.

Here, "jackpot" is not a generic term that can never be protected.  Rather, it is a descriptive term that, with sufficient secondary meaning, would fall under the auspices of trademark law.  Thus, a finding of infringement could rest on a common element "jackpot."  The

---

[16] Defendants tacitly acknowledge as much; they point to only a single out-of-circuit opinion that follows their version of the *American Cyanamid* rule.  *See Medi-Flex, Inc. v. Nice-Pak Prod., Inc.*, 422 F. Supp. 2d 1242, 1254 (D. Kan. 2006).

incorporation of "jackpot" into a mark—as Jackpocket has done—does still "affect the analysis of whether a competitor's mark containing the same component is likely to create confusion." *Id.* at 308; *see also Booking.com*, 140 S. Ct. at 2307 ("When a mark incorporates generic or highly descriptive components, consumers are less likely to think that other uses of the common element emanate from the mark's owner."). And to determine whether consumers are likely to be confused between the JACKPOCKET and JACKPOT.COM Marks and whether a finding of infringement is justified, the Court must look to the *Polaroid* factors.

After reviewing the *Polaroid* factors, the Court finds that JACKPOCKET is a weak, suggestive mark. Because the other *Polaroid* factors do not sufficiently offset the mark's weakness, Plaintiff has not carried its burden of showing a probability of confusion between the JACKPOCKET and JACKPOT.COM marks.

### 1.      Strength of the Marks

Though no single factor is dispositive, *see Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000), the strength of a mark is "often the most important factor," *RiseandShine Corp.*, 41 F.4th at 119. "The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *Id.* at 120.

### a.      Inherent Strength

The "strength of the mark" factor examines the distinctiveness of the mark. *See Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018) (Nathan, J.). Trademark law uses a four-category typology to delineate the inherent distinctiveness of a mark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162

(2d Cir. 2016).  The more distinctive the mark (*i.e.*, the closer it is to being arbitrary or fanciful), the greater the degree of protection it is entitled to enjoy and the lesser the need for the owner to show that it has developed secondary meaning or acquired strength.  *See Abercrombie & Fitch Co.*, 537 F.2d at 9*; CES Publ'g Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975).

A mark is understood to be generic if it "refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch Co.*, 537 F.2d at 9.  Examples include common names, like automobile or pool, used to describe a class of products.  *See Gruner + Jahr USA Pub.*, 991 F.2d at 1075.  A descriptive mark "tells something about a product, its qualities, ingredients or characteristics . . . [and] may point to a product's intended purpose, its function or intended use, its size, or its merit." *Id.*  Suggestive marks are notoriously difficult to define.  *See Abercrombie & Fitch Co.*, 537 F.2d at 10–11.  These marks "suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." *RiseandShine Corp.*, 41 F.4th at 121.  Finally, arbitrary and fanciful marks "make no logical reference to the product or service on which they are used." *Abercrombie & Fitch Co.*, 537 F.2d at 11.

The characterization of a mark as generic, descriptive, suggestive, or arbitrary corresponds with the degree of protection it enjoys.  A generic term is entitled to no protection. "[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Abercrombie & Fitch Co.*, 537 F.2d at 9.  Descriptive terms receive the protection of the trademark laws only if secondary meaning, or the mark's association with a particular source, is established.  *See Gruner + Jahr USA Pub.*, 991 F.2d at 1075; *RiseandShine Corp.*, 41 F.4th at

121 ("Descriptive marks are presumptively unprotectable, but can acquire a degree of protection if they have acquired secondary meaning, *i.e.*, an acquired public recognition as a mark identifying the source."). Suggestive marks are "the weakest marks that are protectable without need to show acquired secondary meaning." *Gruner + Jahr USA Pub.*, 991 F.2d at 1075. Finally, arbitrary and fanciful marks receive the strongest protection because they "make no logical reference to the product or service on which they are used." *Abercrombie & Fitch Co.*, 537 F.2d at 11.

In that way, the trademark law promotes commerce and competition. The inventor of a fanciful term enjoys the greatest degree of protection without the need to show any secondary meaning; she enriches the language of commerce. By contrast, the first entrant to a marketplace who uses merely a generic term to describe her product is not entitled to any trademark protection at all. Reserving for her the right to use the generic term "would tend to diminish the access of others to the full range of discourse relating to their goods." *Virgin Enters.*, 335 F.3d at 147–48. It would, in effect, be anti-competitive and foreclose all others from entering the market. Descriptive and suggestive marks fall somewhere in the middle of the range. As Judge Friendly has noted, suggestive marks as a category receive greater protection than descriptive marks because of the policy behind trademark law:

> [T]he reason for restricting the protection accorded descriptive terms, namely the undesirability of preventing an entrant from using a descriptive term for his product is much less forceful when the trademark is suggested since . . . "[t]he English language has a wealth of synonyms and related words with which to describe the qualities which manufacturers may wish to claim for their products and the ingenuity of the public relations profession supplies new words and slogans as they are needed."

*Abercrombie & Fitch Co.*, 537 F.2d at 11 (quoting *Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp.*, 259 F.2d 314, 317 (2d Cir. 1958)).

"A trademark's inherent distinctiveness is a fact-intensive issue.  It must be evaluated in relation to the particular goods to which the mark is attached, the context in which it is being used, and the possible significance that the term would have to the average purchaser of the goods because of the manner of its use or intended use." *Cross Com. Media, Inc.*, 841 F.3d at 162 (internal quotation marks and citation omitted) (alteration accepted).

"The difference between [descriptive and suggestive marks] lies in the immediacy of association—how quickly and easily consumers grasp the nature of the product from the information conveyed." *Cross Com. Media, Inc.*, 841 F.3d at 162.  The JACKPOCKET Marks are suggestive.[17]  The JACKPOCKET Marks do not immediately describe Plaintiff's products. *See Am. Home Prod. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 106 (2d Cir. 1978) (concluding that "incongruity" is an indication that a mark is more than merely descriptive); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir. 1990) (internal quotation marks omitted) ("[T]he decision of the Patent and Trademark Office to register a mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is more than merely descriptive.").  Formed by the juxtaposition of "jackpot" and "pocket," "Jackpocket" suggests the nature of Plaintiff's product, the ability to play the lottery (and win a jackpot) from one's phone (or pocket).  *See* Sullivan Decl. ¶ 12; Tr. 46.  By virtue of the addition of the "cke" and the

---

[17] Although Plaintiff asserts that the JACKPOCKET Marks are "at the very least . . . suggestive," Dkt. No. 20 at 14 n.6, Plaintiff does not argue that JACKPOCKET is an arbitrary or fanciful mark.  Defendants concede that the JACKPOCKET Marks are suggestive.  *See* Dkt. No. 43 at 16, 17.  Even if Plaintiff made the argument that the JACKPOCKET Marks are fanciful, that argument would fail.  Fanciful marks are invented terms used as trademarks, *Abercrombie & Fitch Co.*, 537 F.2d at 11 n.12, that "do not communicate any information about the product either directly or by suggestion," *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005).  Although the JACKPOCKET mark is an invented term, *see* Sullivan Decl. ¶ 12, it still conveys essential information about the nature of Plaintiff's product, even if some imagination is required to fully grasp its meaning.

connotation of a pocket, it takes some "imagination, thought and perception to reach a conclusion as to the nature of" Jackpocket's product. *Stix Prod., Inc. v. United Merchants & Mfrs., Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968); *accord Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999). Looking just at the language, a consumer has to view the mark, deconstruct it into its components, and then make an assumption about what having a "Jackpot in your Pocket" might mean, including whether it is related to lottery services or another gambling endeavor.

The demarcation of a mark as descriptive, suggestive, or arbitrary, however, is the start of the analysis. It does not determine its conclusion. Ultimately, the task of the court in measuring the mark's strength is to determine "its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public," *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131–32 (2d Cir. 1979). "A finding of suggestiveness does not guarantee a determination that the mark is a strong one." *RiseandShine Corp.*, 41 F.4th at 121. A suggestive mark can be weaker than a descriptive one if it "conjures up an essential or important aspect of the product." *Id.* at 122.

Jackpocket's marks are weak because they incorporate the word "jackpot," the very purpose of a lottery, in a conspicuous manner and do not contain sufficient additional content to create distance between the mark and the product it is describing. The term "jackpot" itself is best viewed as descriptive; it describes something about the product that the consumer is purchasing through Jackpocket. Plaintiff argues that JACKPOT is a "classically 'suggestive' [and not a descriptive] trademark" because "JACKPOT does not immediately describe what a [lottery] courier service *does*." Dkt. No. 55 at 2 (emphasis added). But that is not the correct test. The distinctiveness of a mark is not measured by the extent to which it describes, in one fell swoop, all of the characteristics of a product. It is measured by whether it communicates "an

70

immediate idea of the ingredients, qualities or characteristics of the goods." *Abercrombie &*
*Fitch Co.*, 537 F.2d at 11 (internal quotation marks and citation omitted).  It can do so by either
"literally describ[ing] the product, or . . . [by] describing[ing] the purpose or utility of the
product." *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 88 (2d Cir. 1984).  A
"jackpot" is a key ingredient of any lottery—perhaps *the* key ingredient of a lottery—and
describes the primary purpose of playing the lottery.  A consumer who buys a lottery ticket does
not ordinarily view herself as merely buying a piece of paper with the name of the lottery contest
and a distinctive set of numbers.  Nor does she buy a scratch ticket for the mere sensation of
pulling off a covering and watching a set of numbers appear.  A lottery ticket is entry to a game
in which the object is to win a "jackpot."  It is for that very reason that tickets can successfully
be offered for sale either physically (through the piece of paper) or virtually (through a lottery
courier service); the consumer is buying a chance to win a jackpot, nothing more, nothing less.
If she wins, she will have exchanged a relatively small sum of money for a pot of gold (hence,
the "pot" in jackpot).  If she loses, she will have received nothing save perhaps the excitement of
having played the game.  *See* Oct. 5 Decl. ¶ 4 ("[W]hat consumers actually buy is the hope that
they will win a very large sum of money (perhaps a million dollars or more), which may change
their lives.").  That is, customers can "quickly and easily grasp the nature of the product from the
information conveyed" by the term JACKPOT.  *Cross Com. Media*, 841 F.3d at 162.  Thus, as
the USPTO has implicitly concluded, the term "jackpot" itself would enjoy trademark protection
only if the mark had acquired secondary meaning and perhaps not even then; the USPTO has
granted trademarks which included the word "jackpot" on the condition that the trademark owner
disclaim the exclusive right to use "jackpot" outside of the trademark.  Dkt. No. 49, Ex. J.

By joining "jackpot" with "pocket," the mark conjures up in an immediate sense the essential part of the product offered by Jackpocket—entryway into the opportunity to win the top prize in a lottery.  Thus, while it takes some "mental gymnastics," *see* Pl. Pret. Mem. 51, to fully understand the extent of Jackpocket's offering, the mark offers "an immediate idea of the ingredients, qualities or characteristics of the goods"—the lottery tickets—Jackpocket offers, *Abercrombie & Fitch Co.*, 537 F.2d at 11 (internal quotation marks and citation omitted).  The mark, which may be "muscular" as a "marketing tool," leaves virtually nothing to the imagination.  Although the mark nestles a "cke" within "jackpot" to form the word "pocket" at the end of the portmanteau, that change does virtually nothing to alter the "primary meaning" that the mark conveys.  *See Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1196 (S.D.N.Y. 1980) (finding mark intrinsically weak because plaintiff "has used one of the most common adjectives in the English language . . . , to convey, through that word's primary meaning, a quality of the product or of a promised consumer reaction to its use.").  In this case, the immediate message conveyed is of a "jackpot."

The visual and phonetic similarity between "Jackpocket" and "jackpot" further emphasizes the association between the two terms.  As Plaintiff acknowledged in its pretrial brief, JACKPOCKET and jackpot "differ by just three letters—C, K, and E—nestled in a manner that's difficult to discern."  Pl. Pret. Mem. 57.  The phonetic "pock" or even "pocket" does little to distinguish JACKPOCKET from the word "jackpot."  *See, e.g., Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 443 (S.D.N.Y. 2016) (holding that misspelling of "Elite" as "Elit" did not change strength of the mark because both are phonetically identical).

The "context in which [Plaintiff's mark] is being used" further confirms its weak, suggestive nature. *See  Cross Com. Media, Inc.*, 841 F.3d at 162.  Plaintiff's use of the term

"Jackpocket" in its advertising confirms what analysis of the mark itself suggests:  The notion of "pocket" is entirely subordinate and incidental to "jackpot."  With the exception of a handful of instances from early in Jackpocket's existence, *see* DX-028; DX-287 at JACKPOCKET00039195, virtually all of Jackpocket's advertising has focused on the "jackpot," not the "pocket," component of the mark.  In its advertising, Jackpocket plays on the visual similarity between its mark and the common word "jackpot."  Jackpocket has presented its mark next to—or in font smaller than—visuals of the prizes consumers could win through the company's services.  *See* Sullivan Decl. ¶¶ 25, 27.  When a consumer opens Jackpocket's application, she first sees the word "jackpot," before "jackpot" expands into the JACKPOCKET mark.  *See infra* p. 87; Sullivan Decl. ¶ 54 & Ex. 30.  In fact, from the evidence that Jackpocket presented of confusion between the JACKPOCKET Marks and the word "jackpot" from before Jackpot.com announced its intention to enter the U.S. market, it appears that a subset of consumers do in fact see the word "jackpot" when they read the JACKPOCKET Marks.  *See* Sullivan Decl. ¶ 56.  It follows here that Jackpocket is at best weakly suggestive.

Rather than using "new words and slogans" as a source-identifier, *see McGregor-Doniger*, 599 F.2d at 1131, Jackpocket thus has sought to appropriate for itself what is in essence a term that is descriptive, *Abercrombie & Fitch Co.*, 537 F.2d at 11; *see also BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 201 (S.D.N.Y. 2000) ("[O]rdinary words only borrowed or adapted rather than created, belongs in the public domain and cannot be appropriated to merchandise exclusively the products of one particular seller.  Other potential entrants share an interest in using such words in connection with the advertisement and sale of goods and should not be foreclosed from using descriptive terms to label their products.").  The mark is intended to and does conjure a jackpot, little more.

The Second Circuit's recent decision in *RiseandShine Corporation v. PepsiCo, Inc.* is instructive.  There, the court examined the strength of the suggestive mark RISE.  41 F.4th at 117.  After Rise Brewing Co. adopted the mark for use in nitro-brewed canned coffee, PepsiCo launched a canned energy drink under the mark MTN DEW RISE ENERGY; Rise Brewing Co. brought suit.  *Id.* at 118.  The court accepted that RISE was "suggestive" but concluded that it was still inherently weak:

> [T]he strong logical associations between "Rise" and coffee represent weakness and place the mark at the low end of the spectrum of suggestive marks. . . . Coffee's capacity to wake one up and lift one's energy, which is what the 'RISE' mark suggests, is such an important part of the perceived virtue of coffee in the eyes of the consuming public as to render this suggestive mark decidedly weak.

*Id.* at 122.  As the court concluded, "When a mark so clearly evokes the claimed virtues of the product it references, that mark, although perhaps muscular as a marketing tool, is weak under the trademark law."  *Id.* at 121.

Plaintiff emphasizes in its briefing that the mark at issue here is JACKPOCKET, a made-up word, not "Jackpot."  *See* Pl. Pret. Mem. 50; Pl. Preh. Br. 27 n.17.  This contention, however, does not distinguish *RiseandShine Corporation*.  The Second Circuit has held that a misspelling, even if accompanied by a change in pronunciation, does not do much to alter the strength of the underlying mark.  *Cf. Oakland Chem. Co. v. Bookman*, 22 F.2d 930, 931 (2d Cir. 1927) (Hand, J.) ("It is, however, generally held that mere misspelling is not enough. . . .  It does seem to us, however, that the misspelling of a single letter is too little, for, while to many it might be enough, over many it would pass unnoticed.  We cannot, therefore, treat the mark at bar as entitled to more protection than [its properly spelled counterpart].").  The result in *RiseandShine Corporation*, and the rule that derives from that case, would not have changed if the weak, suggestive mark contained additional letters that do not meaningfully change its pronunciation, visual identity, or meaning to the average consumer.  As described above, the JACKPOCKET

Marks emphasize their "jackpot" core, both through the connection of jackpots to lotteries and the visual similarity between "Jackpocket" and "jackpot."  And "jackpot" is more closely associated with lotteries than "rise" is with coffee; the jackpot is itself the essence of a lottery, whereas "rise" only strongly suggestive of coffee by reflecting coffee's "capacity to wake one up and lift one's energy." *RiseandShine Corp.*, 41 F.4th at 122.  Thus, no less than "Rise" and coffee, the JACKPOCKET Marks create a "strong logical association" with lotteries and is thus weak. *See id.* at 121.

As in *RiseandShine Corporation*, the inherently weak nature of Jackpocket's mark is confirmed by the testimony at trial.  That testimony establishes that even before Jackpot.com announced that it was planning to enter the U.S. market (and in some instances even before Jackpot.com began its consumer-facing business), investors, media organizations and consumers themselves associated Jackpocket by virtue of its name with the descriptive "jackpot." *See* Sullivan Decl. ¶ 56; *supra* pp. 35–37.  The evidence also establishes that when consumers search for Jackpocket online, many use "jackpot" or "jackpot app" and not anything distinctive to Jackpocket itself. *See* Dkt. No. 59, App. A.

The widespread usage of the term "jackpot" in the lottery and gaming markets "further underlines the weakness of the mark." *RiseandShine Corp.*, 41 F.4th at 122.[18]  "Extensive third-

---

[18] During its closing statement, Jackpocket attempted to discount evidence of third-party registrations because there is no evidence in "the space of lottery courier services." *See* Trial Tr. at 25–26; *see also* Jackpocket *in Limine* Br. 5–6.  Jackpocket's argument misstates the law; the Second Circuit has never held that evidence of third-party registrations should be limited to the narrow market in question.  Use of a mark on totally unrelated products may have little probative value for the strength of a mark. *See Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999) ("Use of a like mark in a different market for different products or services need not undermine the mark's strength in its own market." (internal citations omitted)).  That is because the overlapping portions of the mark can continue to serve a source identifying function when there is little commonality among the products.  But the closer the

party usage of a mark in related products generally weighs against a finding that a trademark is

strong.  '[I]n a "crowded" field of similar marks, each member of the crowd, is relatively "weak"

in its ability to prevent use by others in a crowd.'"  *Id.* at 123 (internal citations omitted).

"[T]hird-party trademarks [are] significant not by virtue of their mere existence but upon proof

of their usage and customer awareness of such marks."  *Sunenblick v. Harrell*, 895 F. Supp. 616,

627 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996) (citing *Scarves by Vera, Inc. v. Todo

Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173–74 (2d Cir.1976)); *see also Lexington Mgmt. Corp. v.

Lexington Cap. Partners*, 10 F. Supp. 2d 271, 282 (S.D.N.Y. 1998) (same).  Here, there is

evidence of both a substantial number of registrations of marks containing the word "jackpot" in

related markets and of significant use of some of those marks.  As of August 1, 2022, there were

145 live registrations for trademarks incorporating the word "jackpot" or "jackpots" that also

include the word "lottery" in the corresponding descriptions of goods and services, *see* DX-251,

and there are an additional fifty applications pending, *see* DX-257.  This number is a fraction of

the total number of registered trademarks incorporating "jackpot," both in the gaming and in

---

products are, the less source-identifying power the overlapping portions of the mark are likely to
have.  *See* 2 *McCarthy on Trademarks* § 11:85 ("In such a crowd, customers will not likely be
confused between any two of the crowd and may have learned to carefully pick out one from the
other."); *In re Broadway Chicken Inc.*, 38 U.S.P.Q.2d 1559 (T.T.A.B. 1996) ("Evidence of
widespread third-party use, in a particular field, of marks containing a certain shared term is
competent to suggest that purchasers have been conditioned to look to other elements of the
marks as a means of distinguishing the source of goods or services in the field.").  That is
perhaps why the *RiseandShine Corporation* court put little weight on the district court's finding
that the plaintiff was "the exclusive users of the principal term 'Rise' to identify a single-serving,
canned caffeinated beverage" and instead looked to the use of the "term 'Rise' in connection
with coffee, tea, bottled beverages, energy drinks, soft drinks, drinkable health supplements,
cafes, yogurts, and granolas" (but not, for example, cars or surfboards).  *RiseandShine Corp.*, 41
F.4th at 123; *see also, e.g.*, *Car-Freshner Corp.*, 980 F.3d 314, 330 (2d Cir. 2020) (examining
the use of the word "breeze" on "competitive, nearly competitive, and other products").  So too,
here, it is appropriate to look beyond the lottery courier services market—a nascent market with
few competitors—to other similar, gambling-related products.

other industries.  *See* DX-250; DX-256.  Registration itself "is circumstantial evidence that [a trademark] has or is likely to [be] use[d] . . . in commerce" because 15 U.S.C. § 1051 requires that a registrant demonstrate past use or a bona fide intention to use the trademark in its application for registration.  *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 634 (S.D.N.Y. 2012) (citing 15 U.S.C. § 1051(a), (b)).  And Jackpot.com presented evidence that at least some of the services associated with these trademarks have achieved significant commercial success, with tens of millions of application downloads, *see* DX-214–DX-223, and, in the case of one of these services, Jackpot Magic Slots, ███████████████ dollars of revenue, *see* DX-281 ¶¶ 8–10; DX-274.

The ubiquity of the word "jackpot" among competitors suggests the weakness of the similar JACKPOCKET mark as a source-identifier.  The fact that no other company has used the precise term "jackpocket" does not itself demonstrate that the term has inherent strength.  *See Streetwise Maps,* 159 F.3d at 744 (finding that conclusion that "Streetwise" is not particularly distinctive was supported by fact that other map manufactures used the word "street" in their product names, including "StreetFinder," "Streetmate", and "Streetscene").  If, as demonstrated above, many companies use some variant of the term "jackpot" to refer to their product, the connection that a consumer would draw between the use of "jackpot" and any particular source is necessarily diminished.  *See Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 330 (2d Cir. 2020) ("When the word that makes a mark somewhat suggestive is widely used in competitive, nearly competitive, and other products, its suggestive quality substantially loses what that quality would otherwise contribute to the strength of a trademark."); *Streetwise Maps*, 159 F.3d at 744 (concluding that "extensive use of the words 'street' and 'wise' in names registered by manufacturers of other products . . . weakens the strength of Streetwise's

[composite] mark"); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 581 (2d Cir.1991)

("[E]xtensive third party use of the words 'Choice' and 'Choice' weighs against a finding that

Lan's trade name is strong."); *Limited v. Macy's Merch. Grp. Inc*, 2016 WL 4094913, at *7

(S.D.N.Y. Aug. 2, 2016), *aff'd sub nom. Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x

633 (2d Cir. 2017) ("The distinctiveness of the JOULES mark in the marketplace is further

weakened by the existence of a number of other trademark registrations and websites that use

'Jules' or a homophone thereof in connection with the sale of women's clothing and

accessories.").

     The Court thus concludes that though suggestive, the JACKPOCKET Marks are

inherently weak.

### b.    Acquired Strength

     A descriptive or weak suggestive mark can acquire distinctiveness through "public

recognition in the marketplace, sometimes called acquired strength." *RiseandShine Corp.*, 41

F.4th at 120.  Thus, through "longevity of use" or "publicity," even an otherwise weak mark can

partake of the qualities that are necessary to identify it to a particular source. *Id.* at 124 ("The

holders of senior marks that are not inherently strong but have achieved a measure of consumer

recognition through longevity of use or through publicity often reasonably point to that acquired

public recognition as fostering a likelihood that customers will believe, to the senior user's

detriment, that a product sold by an allegedly infringing junior user under a similar mark came

from the plaintiff."); *see also Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 289

("Secondary meaning is established when 'the mark comes to identify not only the goods, but the

source of those goods.'") (quoting *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 815 F.2d 8,

10 (2d Cir. 1987)); *see also Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 205–06 (2000)

("[S]econdary meaning [is acquired when] marks whose primary significance, in the minds of the public, is to identify the product's source rather than the product itself.").

There is no single yardstick or metric for acquired strength.  Analysis of whether a mark has acquired meaning requires consideration of factors such as: (1) advertising expenditures; (2) consumer studies linking the name to the source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use.  *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985).  A mark can attain secondary meaning, while still being commercially weak.  *Id.*  However, "the more common the word and the more commonplace the manner of its usage in a trademark, the more difficult it is to displace the word's conventional significance so that it will be associated primarily in the public eye with the product."  *Procter & Gamble*, 485 F. Supp. at 1197.  The ultimate question is not whether the Plaintiff has used a mark for a lengthy period of time or whether it has spent significant money in advertisements that use the mark.  Both can be suggestive that a mark has acquired a secondary meaning just as the absence of either can suggest the opposite.  The ultimate question is whether, in the absence of a mark that is inherently descriptive of the source of the product, there is circumstantial evidence that a substantial portion of the purchasing public associates the mark with the source of the goods. *See RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021) (quoting *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 358 (S.D.N.Y. 1998)).  The Court concludes that Plaintiff's evidence is insufficient to establish commercial strength of the JACKPOCKET Marks.

There is evidence that Plaintiff has spent nearly ███████ between 2015 and November 3, 2022 to advertise and promote the JACKPOCKET Marks and its lottery courier

services through multiple media, including billboards, radio, direct mail, sponsorship of sports

teams, and television.  *See* Sullivan Decl. ¶¶ 24–35; Wong Decl. Ex. 2.  There is also evidence

that such advertising has led to sales success.  The JACKPOCKET application has been

downloaded over ████████ times, and Jackpocket has sold nearly ████████ of lottery

tickets, resulting in ████████ in revenue.  Wong Decl. Ex. 2.

But the Court finds that this evidence is minimally probative of Jackpocket's acquired

strength.  "Advertising expenditures provide circumstantial evidence of the possible effect that

advertising of the trademark or service mark may have on consumers' association of it with the

source of a product or service."  *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New*

*Jersey*, 894 F. Supp. 2d 288, 319 (S.D.N.Y. 2012) (internal quotation marks omitted) (alteration

accepted).  As a general matter, it can be presumed that a company will not spend substantial

sums on advertising unless it thought that the advertising would promote its particular product

and not just the product category.  In addition, "[t]he sales success of a product 'may be

indicative of whether or not a substantial portion of the purchasing public associates the [mark]

with the source of the goods.'"  *RVC Floor Decor, Ltd.*, 527 F. Supp. 3d at 320 (quoting *Tri-Star*

*Pictures, Inc.*, 14 F. Supp. 2d at 358).

At the same time, neither advertising nor sales success alone establishes secondary

meaning.  "[M]erely showing that a certain amount was spent on advertising provides little

support for secondary meaning absent some demonstration that the advertisements caused

consumers to associate the service with Plaintiff."  *Rockland Exposition*, 894 F. Supp. 2d at 319–

320 (internal quotation marks and citation omitted).  The relevant factor is not the amount of

advertising itself but rather that the advertising was "effective in causing the relevant group of

consumers to associate [the mark] with" its source.  *Centaur Commc'ns, Ltd. v. A/S/M*

*Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987); *Hello I Am Elliot, Inc. v. Sine*, 2020 WL

3619505, at *8 (S.D.N.Y. July 2, 2020) ("[P]laintiffs must show that the advertisements involved

the ELLIOT mark and that those advertisements caused consumers to associate the product with

Hello I Am Elliot."); *Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141,

158 (S.D.N.Y. 2011) (finding that advertising factor did not weigh in favor of plaintiff in part

because plaintiff did not show that advertising efforts were "successful in associating the [mark]

with the plaintiff in the minds of consumers").  Likewise, "sales success alone cannot establish"

acquired strength.  *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606,

619 (S.D.N.Y. 2020), *aff'd* 839 F. App'x 545 (Fed. Cir. 2021).

   In this case, neither Jackpocket's advertising revenues nor its sales success provide

probative evidence that the mark has acquired secondary meaning as associating its product with

its source.  To be sure, Jackpocket's advertising expenditures are significant in the aggregate and

in absolute terms.  However, the bulk of Jackpocket's advertising has come only in recent

months and does not establish "longevity of use."  *RiseandShine Corp.*, 41 F.4th at 124.  In

particular, ▮▮▮▮▮▮ of Plaintiff's gross advertising expenditures came since 2020, and ▮▮▮▮

came in the first ten months of 2022, after Jackpocket became aware of Jackpot.com's

competitive threat.  Wong Decl. Ex. 2.  Additionally, the majority of this advertising (▮▮▮) is

what Hanson credibly termed "traffic steering," which was "used to direct Internet traffic to a

web site or application without relying on or building upon the brand's unique features."  Hanson

Rpt. ¶ 28.  This advertising emphasizes the potential jackpot that could be won, not the

Jackpocket brand; the lottery game (*e.g.*, Powerball or Mega Millions) and the game's jackpot

often feature as or more prominently in Jackpocket's advertising.  *See, e.g.*, Sullivan Decl. ¶¶ 25,

27.  A bodega that advertises a multi-state lottery does little to build its store's brand in the mind

of consumers–even if there is signage with the name of the bodega above the message about the lottery.  It merely advertises itself as a location where lottery tickets can be purchased. Similarly, here, the bulk of Jackpocket's advertising is not devoted to identifying itself as a distinctive lottery courier service; it is intended to drive persons to buy lottery tickets and thereby to use Jackpocket's services (in essence to enter its store) not to promote Jackpocket itself as a distinctive or reliable location in which to buy tickets.

Jackpocket's revenue figures are also significant in the aggregate and in absolute terms: ████████.[19]  Wong Decl. Ex. 2.  Most of this revenue, like Jackpocket's advertising, is of recent origin; nearly ███ of Jackpocket's revenue is from 2021 and the first ten months of 2020. *See id.*  The fact that the advertising has generated sales—████████████████████ ███—does not establish that the purchasing public has come to associate its product with the company for two reasons.  First, when a company has a monopoly in a market or is the market leader, it can be presumed that advertising the market generally, as opposed to the underlying brand, will increase sales.  The success of advertising under those that circumstance says nothing in particular as to whether it has been successful in associating the product with its source. Jackpocket is the market incumbent and one of only two companies offering lottery courier services in Jackpocket's largest markets.  It follows that when Jackpocket advertises lotteries and provides an address where tickets to such lotteries can be acquired remotely, Jackpocket's sales will increase—consumers have few, if any, other places to go.  Jackpocket's sales success thus only establishes that Jackpocket successfully promoted the product category.  It does not follow

---

[19] Jackpocket provided two revenue figures: Gross Lottery Sales (or total sales from selling lottery tickets) and Lottery Revenue (revenue to Jackpocket from those sales).  *See* Wang Decl. ¶ 29; *id.* Ex. 2.  To the degree that sales are probative of secondary meaning, the latter figure (*i.e.*, the incremental amount that consumers are willing to pay for the convenience of purchasing a lottery ticket electronically) is the more relevant metric.

that the promotion of the lottery courier services category has translated into the average consumer's association of the product, Jackpocket's application, with its source, Jackpocket the company.

Second, most of Jackpocket's sales, like most of Jackpocket's advertising, appears to come during peaks in multi-state lottery jackpots.  *See* Wong Decl. ¶ 14.  Approximately ███ of Jackpocket's gross lottery sales and ███ of its lottery revenue came during the eight-day period between October 29 and November 5, 2022, around the time that the Powerball jackpot exceeded $1.5 billion.  Wong Decl. ¶ 29; PX-363.  These sales data too suggest that consumers are drawn to the jackpot, not Jackpocket's product itself.

Jackpocket also has not provided context by which the Court can judge the extent or significance of its advertising and sales.  Evidence of advertising and sales "standing alone without a context . . . may not be sufficient to prove that a mark is relatively strong.  That is, . . . sales and advertising figures [should be placed] in perspective by comparing them to the sales and advertising figures for similar products to show that this mark is relatively strong in its category."  2 *McCarthy on Trademarks* § 11:81.  Advertising figures that may be significant for a local seller of a niche product to establish secondary meaning may be miniscule for a new international car manufacturer.  *See BigStar Ent., Inc.*, 105 F. Supp. 2d at 202 (discounting advertising expenditure that "may be significant . . . in quantitative terms" because plaintiff did not, *inter alia*, "suppl[y] comparative data from independent sources contrasting the extent of these commitments . . . with what other comparable" businesses "might be expected to spend").

Jackpocket has offered no evidence about how its advertising expenditures compare to those expenditures generally in the lottery market.  From what is before the Court, Jackpocket's

spending may represent a pittance compared to those of others in the market and given the size of the market.  Its spending also may be significant.  The evidence does not tell.

Similarly, sales figures that may demonstrate an association between a product and its source in a niche market because they show that the plaintiff is a dominant player in that market may not be meaningful in a large market.  For that reason, courts thus look to market share, as well as to raw sales figures.  *See, e.g.*, *Capri Sun GmbH v. Am. Beverage Corp.*, 2022 WL 976270, at *40 (S.D.N.Y. Mar. 31, 2022) (finding that plaintiff demonstrated sales success because "the brand retains the largest market share in the children's single-serve beverages market"); *Connecticut Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 415 (D. Conn. 2008) (examining growth in market share of relevant market before concluding that the factor weighs in favor of finding of secondary meaning).  But, although by virtue of its first-mover and until recently monopoly status in the lottery courier services market, Jackpocket is not a significant market participant in the lottery market generally.  Jackpocket has recorded ███ ███ of lottery sales over its existence.  The lottery market as a whole generates approximately $100 billion in sales per year. *See* Hanson Rpt. ¶ 11.[20]

The remaining factors strengthen the Court's conclusion that Jackpocket has gained only limited acquired strength.  "There is no magical time period which renders a mark sufficiently exclusive; the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning."  *BigStar Ent., Inc.*, 105 F. Supp. 2d at 203.  A mark can acquire secondary meaning in a relatively short period of time.  *See, e.g.*, *Kaplan, Inc. v. Yun*, 16 F.

---

[20] Jackpocket claims that it has ███ market share in New York, ███ in Texas, and ███ in New Jersey as of July 25, 2022.  *See* Pl. Pret. Mem. at 9.  But these figures represent lottery ticket sales for a single Powerball jackpot, *see* Wong Dep. 127, not market shares of the entire New York, Texas, and New Jersey lottery markets.

Supp. 3d 341, 349 (S.D.N.Y. 2014) (noting at the motion-to-dismiss stage that "[i]t is not implausible for a mark to acquire secondary meaning within months in certain peculiar and extraordinary factual circumstances").  It thus is not fatal to Jackpocket that most of its advertising has been conducted recently and in at least partial response to the anticipated Jackpot.com threat.  Its motive for developing a brand identity is irrelevant if, in fact, its advertising has resulted in that brand identity.  However, as a general matter, the longer the mark has been in use and the more sustained the advertising campaigns linked to the mark, the stronger the claim to acquired strength.  All else being equal, a brand that has been consistently and loudly advertised over a lengthy period of time is more likely to have become imprinted on the minds of the consuming public as a source-identifier than a brand that is only the subject of a recent and short-lived campaign.  *See BigStar Ent., Inc.*, 105 F. Supp. 2d at 203.

Though Jackpocket has been using the JACKPOCKET marks since 2015, such use has not been consistent, nor has it been "exclusive" in the way in which courts understand the term.  Prior to 2019, Jackpocket had spent only ███████ on marketing and had approximately ███████ in lottery revenue, miniscule amounts in view of its subsequent spending and what appears to be the size of the lottery market; Jackpocket provided no information about its advertising or lottery revenue prior to 2017.  *See* Wong Decl. Ex. 2.  Further, the evidence before the Court is that Jackpocket was not permitted to operate in New York, its largest market, from November 2016 through 2021.  Sullivan Decl. ¶ 15.  While the Jackpocket application was still functional in New York during this time, Jackpocket did not sell lottery tickets again until July 2017 when it entered Minnesota.  Wong Decl. ¶ 5 & n.1.  Jackpocket entered New Hampshire in 2018 before expanding to Texas, New Jersey, and Washington D.C. in 2019.  Wong Decl. ¶ 5 & n.1.  The evidence thus establishes that the vast majority of Jackpocket's use of its mark in

connection with the sale of goods and services has been since 2021, when it was again able to

sell lottery tickets in New York.  *Id.* Ex. 2.  The bulk of that use, moreover, has been to highlight

the "jackpot" aspect of the JACKPOCKET mark, not its "pocket" element.  This factor itself

thus is not sufficient to demonstrate, or to suggest, that "jackpocket" has acquired secondary

meaning.  *See, e.g.*, *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 303

(S.D.N.Y. 2021) (finding seven years not "a sufficiently long time"); *Mr. Water Heater Enters.,*

*Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 586 (S.D.N.Y. 2009) (finding five

years "was of short duration"); *Nat'l Distillers Prod. Co., LLC v. Refreshment Brands, Inc.*, 198

F. Supp. 2d 474, 481 (S.D.N.Y. 2002) (finding length of use insufficient because mark had "only

been in use for six years"). [21]

---

[21] The cases that Jackpocket cites for the proposition that "strength can be established after only
a short period of time" are all distinguishable.  *See* Pl. Pret. Mem. at 53.  The marks at issue in
*Design PLC v. Ben Elias Industrial Corp.* were arbitrary and "are accorded the highest scope of
protection."  1998 WL 998964, at *5 (S.D.N.Y. July 15, 1998).  Further, *Design PLC* was a
motion for a preliminary injunction with a limited evidentiary record.  Still, with $160 million of
sales in a single year after only three years on the market, the court merely found that "the
strength of the mark factor *tips* in favor of plaintiff."  *Id.* (emphasis added).  In *Home Shopping
Club*, the court, in a conclusory fashion in a motion for a preliminary injunction, agreed that
"evidence of modest sales and extensive third-party use of one or more of the key words
supported a finding that the trademark in question had only moderate strength."  *Home Shopping
Club, Inc. v. Charles of the Ritz Grp., Inc.*, 820 F. Supp. 763, 768 (S.D.N.Y. 1993) (citing
*W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993)).  However, *Home
Shopping Club* misinterprets the case that it cites.  In *W.W.W. Pharmaceuticals*, the Second
Circuit upheld the district court's finding that the mark was moderately strong as "not clearly
erroneous."  984 F.2d at 573.  The district court, however, was analyzing a mark that had been in
use for ten years and had concluded that the product's limited sales over that time and the
widespread third-party use of portions of the mark meant that the mark was "not highly
distinctive in the marketplace."  *W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1023
(S.D.N.Y. 1992), *amended* (July 14, 1992), *aff'd*, 984 F.2d 567.  Thus, *W.W.W.
Pharmaceuticals*, and by extension *Home Shopping Club*, does not support the proposition that
Plaintiff's mark acquire strength over a relatively short period of time.

The most probative case for Plaintiff is *Original Appalachian Artworks, Inc. v. Granada Elecs.,
Inc.*, which involved the CABBAGE PATCH KIDS mark.  640 F. Supp. 928, 928 (S.D.N.Y.

Indeed, there is evidence that undercuts the consistency of use factor; some of Plaintiff's spending has been used to attempt to tighten the connection between JACKPOCKET as a mark and the generic word "jackpot," describing the product that can be purchased through its service. For example, when an individual first opens Jackpocket's application, the consumer does not see the word "Jackpocket" or anything identifying the source. She sees the word "jackpot," which appears before expanding into the JACKPOCKET mark, as shown below:



_____

1986), *aff'd*, 816 F.2d 68 (2d Cir. 1987).  The case involved gray market goods:  The original creator of Cabbage Patch Kids licensed the rights to its product to a company in Spain, and the defendant in that case imported these Spanish-licensed dolls.  *Id.* at 929.  The court concluded, without analyzing the *Polaroid* factors, that because both products bore the same mark under the restrictive license agreement, *id.* at 933, the mark "has become famous and associated with [licensee] as the source of its version of the" doll because the U.S. licensee had sold 37 million dolls in the roughly four years since it received the license and spent $38.8 million in marketing expenditures, including $1.8 million during its first full year as a licensee, *id.* at 931.  *Original Appalachian* involved a cultural phenomenon—Cabbage Patch Kids—where the public had come to associate the mark with its source in a relatively short period of time.  Here, as described above, there is no evidence that Jackpocket's advertising and sales have led to a substantial portion of the purchasing public associating its mark with the source.

Sullivan Decl. ¶ 54 & Ex. 30.  In a 2018 investor presentation, Plaintiff explained that this animated logo was part of an effort to "t[ake] a new approach to [Jackpocket's] wordmark," including by creating an "animation that highlights the play on words that Jackpocket was formed from."  DX-302 at JACKPOCKET00035060.

Jackpocket also has used its advertising spend dollars to purchase from Google AdWords and Apple Search Ads variations of the generic word "jackpot" to drive traffic to its website and application.  PI Tr. 46–49; DX-088.  The bulk of Jackpocket's search purchases in Apple's AppStore (over ███) were for the word "jackpot."  *See* DX-088, ASA Pivot.  These actions undermine the acquired distinctiveness of the JACKPOCKET Marks by further associating the marks with a word ("jackpot") that they already visually mimic.

"Exclusivity" does not refer alone to whether there has been another alleged infringer.  Rather, "[t]he Second Circuit has advised . . . that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength."  *BigStar Ent., Inc.*, 105 F. Supp. 2d at 203 (citing *Streetwise Maps*, 159 F.3d at 744).  As described above, there has been extensive use of the word "jackpot" (which forms an important part of the JACKPOCKET Marks) by lottery- and iGaming-related companies.  "The evidence of the ubiquity of this third-party use in the market significantly undercuts the plaintiff's efforts to show that its [mark] has achieved secondary meaning."  *MZ Wallace Inc. v. Fuller*, 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018).

Plaintiff also has not established evidence of secondary meaning through evidence of unsolicited media coverage.  *Capri Sun GmbH*, 2022 WL 976270, at *39 (internal quotation marks and citation omitted) (alteration accepted) ("Extensive, unsolicited media coverage of a product is a strong indication that a mark has obtained secondary meaning.").  Plaintiff identifies

two categories of media in which it claims Jackpocket's marks have been featured, all under the

heading "Unsolicited Media Attention About Jackpocket":  The first category is "local and

national media coverage."  *See* Sullivan Decl. ¶ 50.  The second is "articles published by a

variety of local and national outlets," which Sullivan indicated were "unsolicited."  *See id.* ¶ 51.

The first category is conclusory; Jackpocket has not provided the underlying media referenced in

the first category, and thus the Court cannot credit this evidence.[22]  For the second category,

Jackpocket provided "a representative sampling" of sixty-five articles.  *See id.* ¶ 51, Ex. 28.  Of

these, six were Business Wire press releases and thus not unsolicited.  Twenty-six were articles

from sports or gambling industry publications and thus accorded lest weight.  *See Denimafia Inc.

v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *12 (S.D.N.Y. Mar. 3, 2014)

("[I]solated incidents of . . . unsolicited media coverage in several industry-specific publications

are insufficient to show secondary meaning." (internal citation omitted)).

The remaining thirty-three were articles from approximately twenty-five local and

national media organizations and referenced Jackpocket in a range of contexts, including in

connection with jackpots won by Jackpocket customers and Jackpocket's financing round.

NJ.com, for example, published an article on March 21, 2022 that stated "Someone who bought

a Jersey Cash 5 lottery ticket for Friday's drawing using the Jackpocket app won the $822,078

top prize, New Jersey Lottery officials said."  Sullivan Decl. Ex. 28 at JACKPOCKET00000229.

On July 7, 2019, the *Austin American Statesman* published a feature on Jackpocket announcing

its entry into the Texas market.  *See id.* at JACKPOCKET00000313–16.  Approximately, two

---

[22] In fact, the Court questions whether all of the evidence presented in this category was
unsolicited.  For example, the *Good Morning America* segment from September 29, 2015, which
Sullivan references, is the kind of segment that is usually arranged by a publicist.  *See* Sullivan
Decl. ¶ 50, Ex. 27.

years later, *The Dallas Morning News* covered Jackpocket's $120 million funding round in 2021, prominently featuring Dallas-local Mark Cuban's investment in the company.  These articles are slightly more probative of acquired strength than the "dozen or so unsolicited articles that praise[d]" plaintiff's product.  *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004).  But the fact that isolated news sources—geographically separated from one another and distant in time—made passing references to Jackpocket's application in articles about events such as a jackpot winner and Jackpocket's fundraising hardly demonstrates "the enthusiasm and loyalty of [plaintiff's consumers that] have been the subject of extensive, unsolicited media coverage" that the Second Circuit found supportive of secondary meaning in *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir. 1981); *see also Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012) ("[A]rticles do not confer the same level of market recognition as [other factors]—simply because a reporter knows Plaintiff as [its mark] does not mean that the reporter's audience, or the consuming public, does as well.").  There is no evidence, for example, that lottery ticket winners only purchased their lottery tickets through Jackpocket's app before winning or that entry into the Texas market was followed by extensive subsequent press coverage.  The financing round reflects not just Jackpocket's current offering in the consumer marketplace but its ability to raise money to make or expand that offering into other services.  Indeed, what is telling is how infrequent the references are to Jackpocket's product, given the sales volume that Jackpocket has achieved.  Thus, to the extent that this evidence is probative of Jackpocket's commercial strength, it is only weakly so.

Plaintiff has presented no evidence of plagiarism.

Finally, the consumer study that it offered to demonstrate that consumers associate the

JACKPOCKET Marks with their source lacks probative value.  Although "no single factor is

determinative, and every element need not be proved," *Thompson Medical Co.* 753 F.2d at 217

(internal quotation marks and citations omitted), "[c]onsumer surveys can be the most persuasive

evidence of [acquired strength] because they are direct evidence of the relevant consumer

groups' association of a service with a particular source," *Alzheimer's Foundation*, 907 F. Supp.

3d at 290 (internal quotation marks omitted); *see also LVL XIII Brands, Inc. v. Louis Vuitton*

*Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016), *aff'd* 720 F. App'x 24 (2d Cir. 2017)

("[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary

meaning.").  Even if the bulk of Jackpocket's advertising and sales success have been recent and

has been directed at steering traffic to its website, it might have acquired meaning if that traffic

steering has resulted in brand recognition.  The evidence does not support that it has.  Jackpocket

conducted a survey of 300 individuals from New York or New Jersey; each of those individuals

either purchased lottery tickets online or via an application in the past twelve months or intended

to do so in the subsequent twelve months.  Poret Rpt. at 6, 12.  The survey found that the unaided

awareness of the Jackpocket brand was 19.0% among respondents, while the aided awareness

was 58.3%.  *Id.* at 23, 24.  Though seemingly strong on their face, the survey results reflect a lack

of recognition of Jackpocket in the marketplace.  Jackpocket did not survey respondents in all

twelve of the states in which it operates but limited its survey to respondents from only two

states where it operates:  New York and New Jersey.  In both states, Jackpocket was the

incumbent and had only a single competitor, lotto.com.  The survey was conducted in October

2022.  Jackpocket reentered the New York market in 2021; lotto.com did not enter New York

until July 2022.  *See* Sullivan Decl. ¶ 15; Wong Decl. ¶ 11; Nov. 8 Simonson Reb. Rpt. ¶ 14 &

n.21; Wong Dep. at 136, 144.  Jackpocket entered New Jersey in 2019 and lotto.com did not enter the market until June 2021.  *See* Wong Decl. ¶ 5; Nov. 8 Simonson Reb. Rpt. ¶ 14 & n.21. It is not surprising that some individuals would recognize Jackpocket; there is every reason to believe that those individuals were Jackpocket customers.  What is striking is how few of the respondents recognized Jackpocket.  As noted earlier, Jackpocket has advertised extensively in New York and New Jersey and has achieved some commercial success in those venues; there is no evidence that lotto.com had any commercial success in either state or that survey respondents would have used its service.  Yet, while 73.3% of the respondents had used a lottery courier service in the past twelve months (and 26.7% planned to use these services in the next twelve months), Poret Rpt. at 12, 14, only 19.0% could identify Jackpocket unaided and only 58.3% could identify Jackpocket when aided.  As Jackpot.com has argued, the survey results tend to show that even Jackpocket's consumers do not recognize Jackpocket as the service they have used; these figures are far below what could be expected when the realm of possible choices is so narrowly defined.  *See* Nov. 8 Simonson Reb. Rpt. ¶ 23 ("[O]ne would expect the results to reach 100% when a brand's own customers in such a narrow space are questioned."); *see also Pfizer Inc. v. Astra Pharm. Prod., Inc.*, 858 F. Supp. 1305, 1321 (S.D.N.Y. 1994) ("It is not probative of secondary meaning for respondents to have responded with" the only "brand having significant presence in the market at the time of the survey.").

Tellingly, Jackpocket offers no evidence of any consumer recognition it has achieved in the vast majority of the markets in which it operates.  Jackpot.com's rebuttal survey, however, does give some indication of Jackpocket's market recognition in the broader market in which it operates.  The results are not favorable to Jackpocket.  In its survey,  Jackpot.com included respondents from all states where Jackpocket operated at the time that it filed this action.  *See*

Swain Reb. Rpt. ¶ 16.  Jackpot.com's universe still drew from individuals who had used a lottery courier service in the previous twelve months or planned to use one in the following twelve months.  *Id.* ¶ 13.  But it found that only 9.7% mentioned Jackpocket unaided, while 30.7% recognized Jackpocket when aided.  *Id.* ¶¶ 40, 44.  When the results for Jackpot.com's two controls are subtracted, the net aided awareness of Jackpocket falls to 14.9%.  *See id.* ¶ 45. Those results are far below what would be necessary to establish acquired meaning, particularly for such an inherently weak mark.  *See, e.g.*, *Empresa Cubana del Tabaco v. Culbro Corp.*, 2004 WL 602295, at *36 (S.D.N.Y. Mar. 26, 2004), *aff'd in part, rev'd in part on other grounds*, 399 F.3d 462 (2d Cir. 2005) ("In the Second Circuit, survey data showing 50% or greater recognition has generally been required to establish secondary meaning.") (collecting cases); *Stop & Shop Supermarket Co. LLC v. Big Lots Stores, Inc.*, 2009 WL 10694158, at *3 (D. Mass. Nov. 19, 2009) (37% a "modest level of awareness among the very consumers most likely to be aware of" plaintiff's mark "insufficient to establish secondary meaning").

Moreover, even if Jackpocket's results are taken at face value, the results are insufficient to conclude that the JACKPOCKET Marks have gained commercial strength.  *See Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 290 (concluding that unaided awareness of 10-20% and aided awareness of 35-47% among a targeted demographic was insufficient to conclude that the mark "has developed . . . commercial strength," even when plaintiff raised more than $160 million, spent more than $44 million in advertising, and had 41 million website visitors in a single year).

The Court thus finds that the evidence of acquired strength is insufficient to overcome the inherent weakness of the JACKPOCKET Marks.

### 2.      Similarity of the Marks

The similarity of the marks factor requires the court to look beyond the text of the mark and "analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (internal quotation marks omitted); *accord Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1130 (2d Cir. 1982) ("[A]n inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves.").  "The fact that the two marks appear similar is not dispositive.  Rather, the question is whether such similarity is more likely than not to cause consumer confusion."  *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004).  "The court must consider both the similarity of the names and the manner of their presentation to the public to determine whether confusion is likely to result." *Procter & Gamble Co.*, 485 F. Supp. at 1197.

Plaintiff argues that the two marks are "nearly identical in appearance, sound, and meaning" and focuses primarily on the similarity between the terms "Jackpocket" and "jackpot." Pl. Pret. Mem. 57–58.  In contrast, Defendants argue that these two words—one a "commonplace word" and the other made up—are entirely different in meaning and sound and the marks are visually distinct.  Defendants Prehearing Brief ("Def. Preh. Br.") 23.  The Court has already found that "Jackpocket" and "jackpot" are similar in sound and appearance.  But "the shared use of this ordinary word, used to signify a virtue of the product, is not enough to render the two products 'confusingly similar.'"  *RiseandShine Corp.*, 41 F.4th at 125 (citation omitted). "If the common element in the conflicting marks is suggestive or descriptive of the goods or services, this lessens the likelihood of confusion."  4 McCarthy on Trademarks § 23:48; *see also Booking.com*, 140 S. Ct. at 2307 ("When a mark incorporates generic or highly descriptive

components, consumers are less likely to think that other uses of the common element emanate from the mark's owner."); *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 396 (2d Cir. 2021) (finding no "confusing similarity" because plaintiff's "logo references a ubiquitous [term] with which consumers are already likely to be familiar").

The visual similarity, or lack thereof, between the marks does not support a likelihood of confusion. The first step is to determine which two logos to compare. Jackpocket argues that the relevant comparison is to the original Jackpot.com U.S. landing page, which featured a blue-and-white color scheme. *See* Pl. Pret. Mem. 58–59. Jackpot.com claims the design of that page was the decision of its third-party designer. Ron Decl. ¶¶ 59–60. Jackpot.com thus suggests that the comparison should be to the black logo subsequently adopted in Jackpot.com's U.S. landing page, which is consistent with its international branding. The Court concludes that the comparison should be to the scheme that Jackpot.com plans to use when it enters the United States market. Ron testified that Jackpot.com "voluntarily" changed the color scheme to match the orange-and-black color scheme that it uses internationally after the similarities were "brought to our attention" over the course of the litigation. *Id.* Ron further testified that Jackpot.com intends to use its current logo and does not intend to use the blue-and-white color scheme when it launches in the United States. *Id.* ¶¶ 61–62. There was no evidence to the contrary.

The Court credits that testimony. The use of the original landing page was short-lived and there is no evidence that Jackpot.com made any investments in the new color scheme—it would not have been difficult for Jackpot.com to abandon the color scheme nor would there be value in returning to it. The orange-and-black color scheme subsequently adopted by Jackpot.com is consistent with its international branding and does not appear to be a contrivance or artifice to forestall litigation. Throughout his testimony, Ron highlighted the importance of

consistent branding across jurisdictions, *see* Ron Decl. ¶¶ 89, 34, PI Tr. 231–232, and

Jackpot.com's U.S. Investor Presentation followed its historical black-and-orange template, *see*

DET 15.  Jackpot.com has updated its design for its Texas launch; the most recent design

provided to the Court features Jackpot.com's international black-and-white logo, but abandoned

its use of orange.  *See* DX-373.  There is every reason to believe that Jackpot.com will continue

to use this black template.  In his direct testimony, Ron specifically disavowed use of the blue-

and-white color scheme going forward and stated that Jackpot.com intends to use its current

logo.  The Court thus finds that the appropriate comparison it to Jackpot.com's current logo.  *Cf.*

*Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 372 (S.D.N.Y. 2018)

(comparing plaintiff's mark against two of defendant's marks—one which mirrored plaintiff's

and another altered after the fact—because defendant continued to use the old mark and thus

"has not completely and irrevocably changed its behavior").

In contrast, Jackpocket only added the ".com" to its logo after it knew of Jackpot.com's

intentions to enter the United States and sent a cease-and-desist letter to Jackpot.com.  *Compare*

DX-049, *with* DX-050.  Before that change, Jackpocket had maintained the same logo essentially

unchanged since 2017.  PI Tr. 22.  The Court need not—and does not—credit this change in

Jackpocket's branding as anything more than one of its many attempts to preserve its competitive

head start against Jackpot.com.  The relevant comparison is thus between Jackpot.com's black

logo and Jackpocket's blue logo, without the ".com" suffix.  *Cf. J.T. Colby & Co. v. Apple Inc.*,

2013 WL 1903883, at *21 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014) ("[A]

senior user can[not] alter its mark to more closely mimic the junior user's mark and then claim

injury from the increased likelihood of confusion.").



*Figure 4.  Jackpocket's relevant logo compared with Jackpot.com's relevant logo (DX-049; Ron Decl. ¶ 21).*

Analyzing the two logos in context there is a low likelihood of confusion between the source of the two products.  Both parties use rounded fonts, but the similarities begin and end there.  Plaintiff's logo is on a horizontal plain and consists of a combination of uppercase (the "J," "Cs," and "Ks") and lowercase lettering, while Jackpot.com's logo is rounded and consists of a single uppercase letter, the "J."  Defendants' logo also prominently features the ".com" domain in a similar-sized font as "Jackpot."  The black coloring and white outline of Defendants' logo further separates the logo visually from Plaintiff's white font. [23]

In context of their webpages, moreover, there are fewer similarities.  *See Capri Sun GmbH*, 2022 WL 976270, at *48 ("[A] consumer never encounters [the products] in question in [an] antiseptic manner . . . .  A consumer instead views and handles [the products] in their full glory.  And it is necessary to 'examine the visual appearance of each mark in the context of its use.'" (quoting *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 735 (2d Cir. 1991))).  Plaintiff's homepage, which is shown in part below, features its blue coloring, an animation of a lottery ball logo, and several slogans and pieces of information, including "The #1 Lottery App."  In contrast, Jackpot.com's website, which it plans to use when it launches in the United States, *see* Ron Supp. Decl. ¶ 8, features a different black color scheme, with both Texas

---

[23] As demonstrated above, even if the Court determined that the relevant logo was Jackpocket's blue logo *with* the ".com" suffix, the Court finds that the Jackpocket logo and Jackpot.com logo are dissimilar.

and national lotteries prominently featured.  Plaintiff attempts to emphasize the similarities

between the two marks by pointing to several cases that purportedly stand for the proposition

that simply changing the color scheme is insufficient to avoid infringement.  *See* Pl. Pret. Mem.

58–59 (citing cases).  But the dissimilarities between the two marks go beyond mere color

choices when viewed in context.  "There is little about the appearance of the two [websites] that

would suggest to a consumer that they come from the same source."  *RiseandShine Corp.*, 41

F.4th at 125.

 The Court finds that this factor does not cut in Jackpocket's favor.



*Figure 8. Jackpocket's homepage.  Sept. 24 Simonson Sullivan Decl. Ex. F at p. 17.*



*Figure 9.  Jackpot.com's planned Texas homepage (DX-373).*

### 3.    Proximity of the Products and Bridging the Gap

The third and fourth *Polaroid* factors examine the competitive relationship between the

products at issue.  The proximity of the products factor "concerns whether and to what extent the

two products compete with each other" and "look[s] to the nature of the products themselves and

the structure of the relevant market."  *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480

(2d Cir. 1996) (internal quotation marks and citation omitted).  "[T]he closer the secondary

user's goods are to those the consumer has seen marketed under the prior user's brand, the more

likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at

150; *see also Lang*, 949 F.2d at 582 ("To the extent goods (or trade names) serve the same

purpose, fall within the same general class, or are used together, the use of similar designations is

more likely to cause confusion."); *La Cibeles, Inc. v. Adipar, Ltd.*, 2000 WL 1253240, at *7

(S.D.N.Y. Sept. 1, 2000) ("[C]ourts should consider whether the products serve the same

purpose and whether they share similar geographic distribution, market position and audience appeal." (internal quotation marks and citation omitted)).

Here, Defendants concede that both parties will offer the same services:  An opportunity to electronically purchase lottery tickets.  *See* Def. Preh. Br. 25.  Defendants intend to offer lottery courier services in many of the same states where Plaintiff offers these services, and to sell tickets for many of the same lotteries and games.  *See* Ron Decl. Ex. 15 at JACKPOCKET00001066, [-1071].  Defendants' products, like Plaintiff's, will be offered as an application for a mobile phone and in online form.  *See id.* ¶ 34; Ron Supl. Decl. ¶ 8.  "This evidence establishes that [Jackpocket's] and [Jackpot.com's] 'products serve the same purpose' and 'share similar geographic distribution, market position and audience appeal.'"  *Capri Sun GmbH*, 2022 WL 976270, at *49 (citation omitted).

Because both parties are competing for the same consumers in the same marketplace, the competitive proximity factor favors Plaintiff.  *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988) ("Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity.").

In contrast, the "bridging the gap" factor examines the likelihood of proximity in the future.  *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) ("'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so.").  The tight competitive overlap between the two parties' products leaves little opportunity for Plaintiff to further expand into Defendants' market.  The "bridging the gap" factor is thus neutral for the purposes of the *Polaroid* analysis.  *See Star Indus.*, 412 F.3d at 387 (When two parties "are already in

competitive proximity, there is . . . no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis.").

### 4.     Actual Consumer Confusion

Evidence of actual consumer is particularly probative of likelihood of confusion.  *See Savin Corp.*, 391 F.3d at 459 ("There can be no more positive or substantial proof of the likelihood of [consumer] confusion than proof of actual [consumer] confusion.") (internal quotation marks and citation omitted); *accord Virgin Enters.*, 335 F.3d at 151.  The Lanham Act is designed to protect a senior user's investment in its trademark by barring a junior user "from employing a confusingly similar mark, likely to deceive purchasers as to the origin of the [junior] user's product, and one that would exploit the reputation of the first user."  *Streetwise Maps*, 159 F.3d at 742.  The Second Circuit has thus emphasized that the focus of the confusion analysis must be on the confusion that *consumers* have suffered as a result of the similarity between the marks.  *See id.* at 745; *Lang*, 949 F.2d at 583 ("[T]he relevant confusion is that which affects the purchasing and selling of the goods or services in question. . . .  [T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." (internal quotation marks and citations omitted)).  Proof of actual confusion, although uniquely probative, is not necessary to prove likelihood of confusion.  *See Savin Corp.*, 391 F.3d at 459 ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." (internal quotation marks and citation omitted)).  "Evidence of actual confusion may consist of anecdotal or survey evidence."  *Paco Sport, Ltd. V. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y.), *aff'd sub nom. Paco Sport, Ltd. V Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000).  But anecdotal evidence must be "more than *de minimis*."  *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 312

(S.D.N.Y. 2010).  The Court first discusses Plaintiff's anecdotal evidence of actual confusion and then addresses Plaintiff's expert testimony regarding confusion.

### a.    Anecdotal Evidence of Confusion

Understandably, Plaintiff has not been able to offer any evidence of actual consumer confusion in the marketplace.  Defendants have not yet entered the United States market.  *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ("[I]f the junior mark has not yet appeared on the market, there has been no opportunity for confusion to manifest itself in the marketplace.  It is a logical certainty that no 'specific incidents' of actual confusion will have occurred."); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009) ("[T]he absence of proof of actual confusion is not fatal to a finding of likelihood, particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time." (internal quotation marks and citation omitted)).  Instead, Plaintiff points to three categories of what it claims is actual confusion between Plaintiff's marks and the word "jackpot," which Plaintiff argues is indicative of the actual consumer confusion that will surely follow Defendants' U.S. launch.  *See* Plaintiff Prehearing Brief ("Pl. Preh. Br.") 25; Pl. Pret. Mem. 42–45.  The Court concludes that these examples are insufficient to show actual confusion.

First, Plaintiff points to several examples of the media, potential investors, social media users, and a singer using the word "jackpot" in place of the intended JACKPOCKET mark from before March 2022.  *See* Sullivan Decl. ¶ 56, Exs. 37–38.  However, "to be useful to the *Polaroid* analysis, this evidence of confusion must be related to the actions or behaviors at issue."  *Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 293.  The evidence, all from before Jackpot.com announced plans to enter the market, is not probative of actual confusion; there was no Jackpot.com operating in the United States for these individuals to confuse.  In fact, as

described above, the examples Plaintiff identifies are evidence of the weakness of Jackpocket's marks. Consumers appear not to identify Jackpocket by its source; rather, they identify Jackpocket by its category or genus—an application through which a consumer can purchase a lottery ticket.

Second, Jackpocket points to approximately ten emails it presented where customers wrote to support@jackpot.com about products offered by Jackpocket. This evidence is of the type that could show actual confusion by the purchasing public—it involves messages from consumers who purchased Jackpocket's product. But the evidence does not show that consumers confused Jackpot.com's product for Jackpocket's product or that they were likely to do so. Most of the examples that Jackpocket offers pre-date Jackpot.com's announcement that it was entering the U.S. market and thus are not probative of actual confusion. The handful of emails that post-date Jackpocket's announced U.S. expansion, *see* PEXs 33, 34, represent a small fraction of the tens of thousands of emails "support@jackpot.com" receives each year, *see* Ron Decl. ¶ 81. In context, they do not demonstrate that a consumer was aware of Jackpot.com's product and thought that Jackpot.com and Jackpocket were one and the same. The vast majority of consumers had no confusion. As a legal matter, *de minimis* evidence of actual consumer confusion is at best weekly probative of the potential for actual consumer confusion in the marketplace. *See Capri Sun GmbH*, 2022 WL 976270, at *51 (finding four customer complaints out of "thousands of consumer communications every year" "*de minimis* evidence of actual confusion" and uncompelling); *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 590 (S.D.N.Y. 2015) (finding dozen inquiries out of 17,000 online bank accounts are "minimal"). More fundamentally, there is "no evidence that the[se examples] involve confusion about purchasing decisions or any confusions about the source or affiliation of the products."

*Codename Enterprises, Inc. v. Fremantlemedia N. Am., Inc.*, 2018 WL 3407709, at *10

(S.D.N.Y. Jan. 12, 2018).  The most logical explanation for the few consumers who did email

support@jackpot.com is that Jackpocket advertises itself as a jackpot application and has

directed Google and Apple to direct consumers interested in obtaining a jackpot application to

download Jackpocket's product.  In short, at best, they "reflect carelessness and not confusion."

*Id.*; *see also Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir.

2017) ("However, not all confusion counts: evidence of actual confusion must show more than a

fleeting mix-up of names . . . .").  As in *Doral Conference Center Associates v. Southbury Hotel*

*Associates*, where individuals wrote defendant's mark "Arrowhead" instead of plaintiff's mark

"Arrowwood," these likely represent "typographical errors, resulting from the fact that

"[jackpot]" is generally a far more familiar term that "[Jackpocket]."  1987 WL 11173, at *5

(S.D.N.Y. May 8, 1987).

Finally, Plaintiff points to several instances of actual confusion between Plaintiff's and

Defendants' marks *after* Defendants publicly announced their intent to enter the United States.

In particular, Plaintiff points to media reports after Defendants announced their fundraising

round in June 2022 that confused Jackpocket for Jackpot.com, *see* Sullivan Decl. Exs. 49, 50, 53;

vendors, potential partners, and non-profit organizations who sought to do business with

Jackpocket and accidentally emailed a Jackpot.com employee or congratulated Jackpocket on

Jackpot.com's fundraising round, *see id.* Exs. 51–52, 54, 55, PX-423–24; and Jackpocket

investors who questioned whether Jackpocket was associated with Jackpot.com's fundraising

round, Sullivan Decl. ¶ 96, DX-052.  These examples are insufficient to sustain Plaintiff's

burden; they are not probative of consumer confusion between the two products.  *See LVL XIII*

*Brands, Inc.*, 209 F. Supp. 3d at 672 ("[P]ersons [with] a pre-established personal or business

relationship" with plaintiff "are not representative of the typical consumer."); *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 370 (E.D.N.Y. 2007) ("[C]ourts have concluded that testimony from persons closely associated with the plaintiff does not adequately reflect the views of the buying public." (internal quotation marks and citation omitted)).  At most, they appear to suggest that those already in the marketplace assumed that the entity engaged in fundraising for a lottery courier service application was the incumbent, not a newcomer.  It was Jackpocket's burden to demonstrate that these instances of confusion represent something more—and are thus probative of the likelihood of confusion among customers—which they have not carried.  *See Macy's Merch. Grp.*, 2016 WL 4094913, at *11 ("Plaintiff has offered no evidence to show whether these examples were the result of actual confusion" as opposed to some other factor.).

In fact, the examples Plaintiff provides of apparent confusion after Defendants announced their U.S. plans are strikingly similar to the examples Plaintiff mustered from *before* Defendants announced their intention to enter the United States.  The similarities in the kinds of confusion between Jackpocket and the word "jackpot" thus reflect the weakness of the Jackpocket mark, not a risk that a consumer would download Defendants' application thinking that it was Plaintiff's.  *See Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 294 ("[C]onfusion between the [marks] . . . supports the notion that it is the weakness of the marks and consumers' inattention . . . that yields confusion.").

Plaintiff points to *Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 562 (S.D.N.Y. 2012) (Sullivan, J.), where a court found that evidence of confusion in news articles and media reports, among consumers, and by a potential investor soon after the competitor launched its allegedly infringing product was "sufficient evidence at this early stage of the case for the Court to

conclude that 'prospective purchasers' are likely confused by the marks at issue." But *Bulman* is distinguishable. In *Bulman*, the court found that Plaintiff's marks "are arbitrary, or at the very least suggestive." *Id.* at 559 (internal quotation marks omitted). It was in that context that the court concluded that these examples of confusion were probative of the likelihood of consumer confusion. Where a mark is arbitrary, the confusion is telling, because arbitrary marks "make no logical reference to the product or service on which they are used." *Abercrombie & Fitch Co.*, 537 F.2d at 11. Here, by contrast, Jackpocket's marks are weakly suggestive and consumers have been confusing Jackpocket's marks with the word "jackpot" since before Jackpot.com announced its intentions to enter the U.S. market. It does not follow that consumers are thus likely to confuse Jackpocket's and Jackpot.com's marks when Jackpot.com enters the market.

**b.      Survey Evidence of Confusion**

Finally, Plaintiff relies on its survey evidence to argue that consumers are likely to be confused between the JACKPOCKET Marks and the JACKPOT.COM Marks. As discussed above, Plaintiff presented survey evidence and opinion testimony of Barone and Defendants presented survey evidence and opinion testimony of Simonson. "[S]urvey evidence is not evidence of actual confusion, because surveys do not measure the degree of actual confusion [or the lack thereof] by real consumers; instead, surveys provide circumstantial evidence of the likelihood of confusion." *Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 294 (internal quotation marks omitted) (quoting 2 *McCarthy on Trademarks* § 32:184). "To be probative [of the potential for actual confusion], a survey must have been fairly prepared and its results directed to the relevant issues." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994). "[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 6 *McCarthy*

*on Trademarks* § 32:163; *see also Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 739

(S.D.N.Y. 2011) ("[E]rrors in survey methodology usually go to weight of the evidence . . . .").

To determine the evidentiary weight to give particular survey results, courts consider the

following factors:

> (1) the proper universe was examined and the representative sample was drawn
> from that universe; (2) the survey's methodology and execution were in
> accordance with generally accepted standards of objective procedure and
> statistics in the field of such surveys; (3) the questions were leading or
> suggestive; (4) the data gathered were accurately reported; and (5) persons
> conducting the survey were recognized experts.

*Coty Inc.*, 277 F. Supp. 3d at 449–50 (quoting *Guess?, Inc.*, 831 F. Supp. 2d at 738).  "There is

no such thing as a 'perfect' survey," 6 *McCarthy on Trademarks* § 32:178, and Barone's and

Simonson's surveys are no exceptions.  The Court finds that because of the flaws in Barone's

survey, which are underscored by Simonson, the survey is entitled to little if any evidentiary

weight.  It does not establish likelihood of confusion.

As described above, Barone's survey used a *Squirt* methodology to gauge the likelihood

of confusion between Jackpocket's and Jackpot.com's marks because, he argued, Jackpocket and

Jackpot.com products are often viewed together or in close proximity.  *See* Dkt. No. 59 ¶¶ 3–9.

The *Squirt* methodology has a tendency to increase the likelihood of confusion, because

consumers are exposed to both the senior and junior mark.  It thus should only be employed if it

mimics marketplace reality—that is, if consumers view the products together or in close

proximity to each other.  In his survey, Barone presented respondents first with a static image of

Jackpocket's website and then with static images of four additional websites in random order.

*Id.* ¶¶ 17–18; *id.* Apps. C & D.  Barone presented respondents in the test group with

Jackpot.com's U.S. landing page at the time the survey was conducted, which contained a blue-

and-white color scheme, and the websites of three Jackpocket competitors.  *Id.*  Barone presented

respondents in the control group with images of the three Jackpocket competitors and of a control website, which substituted the JACKPOT and JACKPOT.COM marks on the Jackpot.com landing page with WINDFALL and WINDFALL.COM marks.  *Id.* ¶ 22 App. D. After viewing each website, respondents were asked whether they thought the website was "owned, operated, or put out" by Jackpocket or "affiliated with, or sponsored or approved by" Jackpocket.  *Id.* ¶¶ 25, 27.  On the basis of this test, Barone found a net confusion ratio of 26.2%. *Id.* ¶ 30.  Based on these results, Barone concluded, "the Defendant's use of the JACKPOT [m]arks would result in a significant likelihood of confusion with the Plaintiff Jackpocket among relevant U.S. consumers."  *Id.* ¶ 32.

There are numerous flaws in Barone's analysis.  "[T]he principal question is whether either survey, if not both, sufficiently simulated the actual marketplace conditions in which consumers encountered the parties' products so as to be a reliable indicator of consumer confusion."  *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 232 (S.D.N.Y. 2010).  In using a *Squirt* methodology to compare the Jackpocket and Jackpot.com marks side-by-side, Barone assumed Jackpocket and Jackpot.com products are often viewed together or in close proximity. *See id.* ¶¶ 3–9.  But Barone offered little, if any, evidence that would support that assumption. He reasoned from the fact that the webpages for both products are responsive to the same Google and Apple App Store search terms for "jackpot," *see id.* ¶¶ 3–4, that consumers—before purchasing the application—would engage in Google searches and look at the webpages side by side.  That argument proves too much.  Both Jackpot.com and Jackpocket's applications, as well as other products offering remote gambling services, could be responsive to those terms.  For that matter, the dictionary definition of "jackpot (noun)" might appear high in Google's search results for "jackpot."  The fact that two products may be responsive to a Google or Apple search

does not establish that consumers in the marketplace all do Google searches and make their purchasing decisions based on the result of those searches.  If it did, the *Squirt* methodology would always be the preferred method for products that can be purchased online regardless of the extent to which they were purchased online.  *See* Dkt. No. 48 ¶ 32.

Rather, to show that his analysis is probative, Barone would have had to generate evidence or analysis to support that consumers who purchase products such as Plaintiff's and Defendants' in the actual marketplace do so in the way that he hypothesizes in his survey.  In that respect, Barone's expert opinion falls short.  He provides no evidence that the comparison shopping he hypothesizes in any way resembles the process that consumers undertake in the marketplace in deciding whether to obtain Jackpocket's application rather than a competitor's. The evidence Barone presents merely demonstrates that Jackpocket and Jackpot.com, like every product, can be found on Google, not that consumers use Google to access their services and purchase lottery tickets.

Indeed, there is reason to suspect that Barone's analysis at best only reflects potential confusion in one segment of Jackpocket's target audience.  As discussed above, before a ticket is purchased through Jackpocket, a consumer needs to go through at least two steps.  She has to download the application and register for Jackpocket's services before making the decision to use the application to purchase tickets rather than a competitive application.  *Cf.* Sullivan Decl. ¶ 7.  Registration for a Jackpocket account should only happen once; purchasing lottery tickets will hopefully be repeated.  To the degree consumers are searching Google or the Apple AppStore, they are likely doing so *before* they have downloaded Jackpocket's application or made a Jackpocket account; once a consumer has the Jackpocket app downloaded to her phone, there is no need to reenter a search in order to redownload Jackpocket's app or make a

Jackpocket account.  As a result, there is much less—if any—opportunity for consumers to view Jackpocket's and Jackpot.com's marks simultaneously.  Thus, to the degree Barone's survey is probative of the likelihood of confusion, it is only probative of this confusion for a subset of potential Jackpocket consumers—those who have not yet downloaded the Jackpocket application and who go about locating a lottery application through an internet search.  *Cf. Macy's Merch. Grp.*, 2016 WL 4094913, at *10 (discounting expert survey because it only captured one way that consumers encountered competing marks (*i.e.*, online) and not another (*i.e.*, in-store)).

But even assuming Barone's use of the *Squirt* survey for this subset of the consumer population was methodologically correct, he presents no evidence that consumers would click through to Jackpocket's and Jackpot.com's respective websites or applications.  Rather, it is as or more likely that consumers would view the search results (either Google plain text results or Apple icons) simultaneously among many several others, instead of clicking through to the full websites or downloading the full applications.  *See* Dkt. No. 48 ¶ 33.  There thus is no evidence or analysis to support that the display of full webpages, which Barone uses for his survey (as opposed to the search results), would mirror the marketplace reality that consumers are expected to encounter when the Jackpot.com application enters the United States.  *See Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043 (S.D. Ind. 2000) (discounting survey results because "[i]f the possibility of consumer confusion between these two sites stems from the use of search engines to find either" homepage then the survey should not have shown respondents the underlying webpages and instead should have asked respondents "to view actual search engine results containing hyperlinks to these sites in a way that might actually occur in the marketplace").

Additionally, Barone tested Jackpot.com's U.S. landing page (which contained a blue-and-white color scheme similar to Jackpocket's) and not its then-consumer-facing website (with its black-and-orange color scheme).  But there is no evidence that consumers in the United States will in the future be confronted with a Jackpot.com landing page with a blue and white color scheme.  In fact, the most recent design of Jackpot.com's website for its Texas launch features a black banner and Jackpot.com's black-and-white logo.  *See* DX-373; Ron Supp. Decl. ¶ 8.  Thus, Barone tested the wrong thing, and there is no evidence that the confusion respondents experienced when presented with two websites with similar color schemes would be replicated when they are presented with two websites with very different schemes.

Not only did Jackpocket's survey fail to approximate actual marketplace conditions, but it also produced impermissible demand effects.  Leading questions produce demand effects because they "suggest[] to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items."  *Simon Prop. Grp. L.P.*, 104 F. Supp. 2d at 1048.  Here, Jackpocket's survey asked participants two leading questions after displaying each of the three competitor websites and the Jackpot.com/Windfall.com test/control websites: (1) "Do you think that this website is owned, operated, or put out by COMPANY A[ (i.e., Jackpocket)]?" and (2) "Do you think that this website is affiliated with, or sponsored or approved by, COMPANY A?"  Dkt. No. 23 App. B at 27–28.  Both questions lead a survey participant to search for similarities with Jackpocket's website, even if many of these similarities might be overlooked by consumers in the marketplace.  For this reason, courts have viewed surveys that have asked questions of this type skeptically.  *See, e.g.*, *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (finding "To the best of your knowledge,

was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" an "obvious leading question" and concluding "survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion" (internal quotation marks omitted)); *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (rejecting survey that asked, "Looking at this ad, would you say this company is in any way affiliated with, connected with, sponsored by, associated with or authorized by the Kirby Company?" (citing *Universal City Studios*, 746 F.2d 112)).

The fact that 45.6% of the control group "confused" Windfall and Jackpocket, when the only commonality between the two websites was the blue-and-white color scheme, suggests that respondents were searching for associations that they may not have otherwise identified. The shared color scheme made the Windfall website appear more similar than the others to the Jackpocket website, and thus respondents assumed the two websites must have been associated with each other. These results alone indicate that the survey was testing respondents' recall, instead of testing potential confusion in the marketplace, lessening its probative value. *See Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at *9 (S.D.N.Y. Aug. 6, 2007) (concluding that "[t]he only plausible explanation" for a finding that participants associated a "clearly non-infringing" mark with a senior mark was that the survey "was designed (successfully) to lead its respondents to infer that a connection existed between the parties' products").

A well-designed control can mitigate some of these flaws by correcting errors in survey methodology and filtering out "noise." *THOIP*, 690 F. Supp. 2d at 240; *see also id.* ("Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology."). A control should "share[] as

many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."  Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence 359, 399 (3d ed. 2011).  Barone's control substituted the word "Windfall" for "Jackpot" on Jackpot.com's but otherwise left the U.S. landing page unchanged.  Dkt. No. 23 App. D.  Barone testified that he chose "windfall" because it is semantically similar to "jackpot."  Dkt. No. 59 ¶ 27.  But there is no reason to believe that "windfall" is generally used in association with lottery winnings; all of the evidence in the record highlights the prize won in a lottery winning is a jackpot.  Although a person who wins a lottery may earn a windfall, there is no basis to think that an association with the word "windfall" would come to the consumer's mind.  Though, with some thought and aided by suggestion, windfall may conjure associations similar to the word Jackpot, it is unlikely to evoke these associations when respondents glanced over the mock website.  The control "Windfall" thus does not mitigate the other flaws in the study.

Additionally, "[d]epending upon what is at issue, the control may seek to be semantically, acoustically or visually (*e.g.*, graphically) comparable to the allegedly infringing element."  Jacob Jacoby, Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys, 92 TRADEMARK RPT. 890, 918 (2002).  The core question of the likelihood of confusion analysis is whether consumers will be "confused as to the *source* of the goods in question."  *Streetwise Maps*, 159 F.3d at 743 (emphasis added).  Given the visual and auditory similarity between the JACKPOCKET and JACKPOT.COM Marks, it is as or more likely that survey respondents would have been confused by the similarity in names, than by any confusion as to the source of the goods in question.  The control that Jackpocket selected, "windfall," contains no visual or acoustic similarity to "jackpot."  "By refusing to test whether

any possible confusion between these two parties is a result of the competitive proximity between the services offered . . ., or instead the result of mere similarity in names," Simonson's survey does not fully "test for truly relevant consumer confusion."  *Simon Prop. Grp. L.P.*, 104 F. Supp. 2d at 1047 (arguing that control should have had included the word "Simon," a shared trait of both marks, because plaintiff "must show there is something different about [allegedly infringing mark] that makes it more confusing than a level of perhaps inevitable confusion based solely on the name"); s*ee also Macy's Merch. Grp.*, 2016 WL 4094913, at *10 (criticizing control because it is "neither acoustically nor semantically similar" to defendant's mark); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 575 (E.D.N.Y. 1999) (criticizing controls in trade dress lawsuit because none had "a name sounding remotely like" plaintiff's mark).  Barone argues that "courts have rejected surveys using control stimuli that contain too many elements of the allegedly infringing mark."  Dkt. No. 59 ¶ 25.  But his argument misses the mark.  A control that also infringes the senior mark must be disregarded.  *See* Diamond, *Reference Guide on Survey Research* 399–401.  But, that does not excuse the failure to use a control that is acoustically closer to Jackpocket's mark or permit Jackpocket to use a term that is so dissimilar from the JACKPOCKET mark.  *See* Dkt. No. 48 ¶¶ 39–40.

Jackpot.com's survey further illustrates the methodological flaws in Jackpocket's survey.  Although Simonson criticized Jackpocket's choice of a *Squirt* survey because the Jackpocket and Jackpot.com marks will not be viewed simultaneously, *see id.* ¶¶ 30–36, Simonson used an aided-*Everyday* methodology, which is also only appropriate "when the products at issue are in fact commonly seen together or one immediately after the other," *see id.* ¶ 23.  As described above, Simonson's survey is thus likely only relevant to a subsection of Jackpocket's market— those registering for Jackpocket's services for the first time.  Further, like Barone, Simonson

showed survey participants the entire website, and thus did not mimic how consumers would necessarily view Jackpot.com's and Jackpocket's websites in the marketplace.

However, Jackpot.com's survey remedied many of the deficiencies identified above in Barone's survey. First, unlike Barone's survey, Jackpot.com's survey used Jackpot.com's current orange-and-black landing page, which is consistent with its international branding and likely to reflect Jackpot.com's consumer-facing U.S. brand. Jackpot.com also used an aided-*Eveready* instead of a *Squirt* survey format. As with the *Squirt* format, an aided-*Eveready* survey ensures that survey participants are exposed to Jackpocket's mark before they are asked questions designed to estimate the likelihood of confusion. *See* Sept. 24 Simonson Decl. ¶ 8. But unlike in the *Squirt* format, Simonson did not ask participants leading questions.[24] Simonson's open-ended questions about confusion decreased the possibility that his data were skewed by impermissible demand effects. Finally, Jackpot.com's control "Jack.com" is a non-infringing mark[25] that is more visually and acoustically similar to Jackpot.com than Jackpocket's "windfall" control.

Barone's main critique of Jackpot.com's survey is that survey participants could continue to view the test or control stimulus while responding to the survey questions aimed to gauge the likelihood of confusion. Sept. 24 Simonson Decl. ¶ 24. The core of the debate over whether Simonson's methodological choice accurately reflects the nature of the lottery courier service market rests on whether the decision to purchase Plaintiff's product is a high- or low-involvement decision. High-involvement decisions are significant purchase decisions to which

---

[24] Jackpot.com's survey asked "Which company owns, operates, or puts out this website?" and "Do you think that this website is affiliated with, or sponsored or approved by another company?" Sept. 24 Simonson Decl. Ex. E at 5.
[25] Jackpocket does not argue, nor can it, that Jack.com would infringe Jackpocket's marks.

consumers are expected to exercise a high degree of care.  *Id.* ¶ 29.  In contrast, low-involvement

decisions are impulsive purchases, often involving little thought or intention on behalf of the

consumer.  Oct. 3 Barone Reb. Rpt. ¶ 30.  If a purchasing decision is high involvement, then

there is an argument that the stimulus (in this case a website) should remain in view during the

survey.  Sept. 24 Simonson Decl. ¶ 24 n.19.  Barone argued that purchasing lottery tickets is low

involvement because the purchasing decision presents low levels of financial risk (often a dollar

or two) and is impulsive in nature.[26]  Oct. 3 Barone Reb. Rpt. ¶ 11.  In contrast, Simonson argued

that purchasing a lottery ticket is high involvement because consumers are not purchasing the

lottery ticket itself, but rather the potential to win large sums of money, and go to great lengths

(sometimes waiting in line for hours) to do so.  Oct. 5 Decl. ¶ 4.

Both parties presented substantial expert testimony on whether the act of purchasing a

lottery ticket was high or low involvement.  Jackpocket's expert Anderson calculated something

that he called a "research ratio" to measure the level of involvement in purchasing a lottery ticket

and concluded that purchasing a lottery ticket was a low-involvement activity.  *See* November 3,

2022 Expert Report of Jeff Anderson 8–9.  Anderson's testimony was supported by Jackpocket

expert Michael J. Pollock ("Pollock"), who overseas lottery-related engagements for Spectrum

Gaming Group, an independent research firm.  Pollock testified that "[l]ottery courier services

are largely considered impulse buys."  Pollock Reb. Rpt. at 10.

Jackpot.com's experts attacked Anderson's research ratio as "an ad hoc approach,

without basis in any accepted marketing or economics methodology," *see* Hanson Reb. Rpt. at

---

[26] Barone also posited that in confusion surveys, the stimulus arguably should be removed
regardless of whether the purchasing decision is high or low involvement.  *See* Oct. 3 Barone
Reb. Rpt. ¶ 13.  In contrast, Simonson argued that "the webpage should have remained in view
when questions were asked, just as it would in the actual marketplace . . . ."  Oct. 5 Decl. ¶ 3.

6–7; *see also* Nov. 8 Simonson Reb. Rpt. ¶ 34 ("[A]s far as I know, [the research ratio] has no scientific basis or support as it relates to consumer decision involvement . . . ."). Simonson argued that because the purchase of a lottery ticket involves "high risk," it is "a high involvement process." Nov. 8 Simonson Reb. Rpt. ¶ 36. And Jackpot.com's expert Dr. Brian Wyman, a Partner at The Innovation Group, Inc., a research and consulting firm in the gaming, entertainment, hospitality, and leisure sectors, argued that "60% of in-person lottery purchases are not impulsive, *i.e.*, these purchases are intentional and planned." Wyman Rpt. at 8.

The Court does not need to determine at this juncture whether purchasing a lottery ticket in general through a physical ticket is a high- or low-involvement decision because neither Jackpocket nor Jackpot.com sells lottery tickets alone. Rather, Jackpocket sells and Jackpot.com intends to sell virtual lottery tickets, tickets that can only be purchased online through an application or a website. And the process for purchasing those tickets is different from the process of walking into a corner grocery store to buy a physical ticket. A consumer must download the application and register for a lottery courier service account, she must fund the account, and then she must decide to use the money in the account to purchase a ticket. There is evidence that the purchase of a lottery ticket through a lottery courier service is a high-involvement decision. Even before a customer decides to sign up for a Jackpocket account, customers exercise caution. It is not intuitive that the product that Jackpocket offers is legitimate or that consumers will receive the lottery ticket, in the unlikely, but hoped-for, event that it turns out to be a winner. For the uneducated marketplace, the answers to these questions have not been obvious. From January 24 through March 7, 2022, one of the top-ten searches weekly that led individuals to the Jackpocket website was █████████ *See, e.g.*, DX-325 at JACKPOCKET00005055; DX-326 at JACKPOCKET00005197; DX-329 at

JACKPOCKET00004936.  Jackpocket's frequently asked questions page include "is Jackpocket legal?", "Why do I need to provide a picture of my ID?", and "How do I know that Jackpocket won't just steal my ticket if I win?"  *See* DX-371.  Stated simply, the type of service that Jackpocket offers elicits questions and requires thought before a consumer makes a decision to register for an account and purchase a ticket.

Moreover, even once a consumer has decided that the service will provide what it proports to offer, the process of signing up for an account is involved and requires thought and care.  Registering for a Jackpocket account and linking payment information is a multi-step process that "typically takes ███████████."  Sullivan Decl. ¶ 7.  The consumer must first download the Jackpocket application, then register for the application's services, and finally fund the newly created account.  Hanson Reb. Rpt. ¶ 31.  All of this takes time and suggests consumer engagement.  *See Fremantlemedia N. Am., Inc.*, 2018 WL 3407709, at *12 ("[U]sers of Plaintiff's services must register with Plaintiff's website and provide a username, email address, and password before accessing Plaintiff's web development tools.  Because they are forced to spend more time on the site, they would be more likely to exercise a greater degree of care."); *Flushing Bank*, 138 F. Supp. 3d at 592 (finding that sophistication factor favored defendant because multi-step process to open a bank account provides "plenty of time and opportunity for a consumer to learn all of the relevant information regarding product origination and association").  It is not a small matter to register for a lottery courier service, nor is it analogous to buying a physical ticket.  The consumer must also make the decision to entrust the service with her personal information.  Before an account may be opened, she must share with the service and place into the internet not only her name, but also her email address, date of birth, zip code, and financial information, which suggests that consumers will exercise care while registering for a

Jackpocket account.  *See* Sullivan Decl. ¶ 7.  *See 1-800 Contacts, Inc. v. JAND, Inc.*, 2022 WL

2316181, at *7 (S.D.N.Y. June 27, 2022) ("[R]easonably sophisticated consumers would likely

exercise substantial caution . . . where they may be prompted to provide sensitive information

ranging from home addresses to credit card numbers. . . . [T]hese consumers would [] take time

to meaningfully review the contents and layout of the website before taking any further action.").

In fact, at each stage of the signup process, Jackpocket loses potential customers: only about

████ of users fund their account within thirty days of registration.  Wong Dep. at 94–95.  The

evidence shows that consumers are not passively downloading the Jackpocket app and

registering for an account; they are actively engaged with the signup process when making

decisions about whether to register for an account.

Jackpot.com expects to require a registration process similar to Jackpocket's and each

step of the process "will bear the Jackpot.com name and/or logo."  Ron Decl. ¶¶ 64–74.  The

upshot is clear:  the process of registering for an account, which requires entering both personal

and financial information, is not an "impulsive," low-involvement decision; it is high

involvement.  Neither Simonson nor Barone explicitly tested the likelihood of confusion while

registering for an account.  But because account registration is a high-engagement activity, the

Court finds that Simonson's decision to leave the test and control websites visible does not

represent substantial error.

Jackpot.com's survey found a net confusion ratio of 0.4%, leading Simonson to conclude

that "the results indicate a lack of any confusion between the two marks at issue."  Sept. 24

Simonson Decl. ¶¶ 25, 35.  The Court does not accept Simonson's conclusion.  Nor does it need

to do so.  Simonson decided to use the aided-*Eveready* methodology, and there is insufficient

evidence his survey mirrored or approximated marketplace reality.  But Jackpot.com's survey—

which corrected many of the deficiencies in Jackpocket's, including its demand effects and absence of an adequate control, and reached very different results—has demonstrated sufficient weakness in Jackpocket's methodology to further conclude that Jackpocket's survey has little probative value.  "In borderline cases where evidence of confusion is not available or is not persuasive, the gap can sometimes be filled by a properly conducted survey of the relevant class of prospective customers of the goods or services at issue." *Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 294–95 (quoting 2 *McCarthy on Trademarks* § 23.17 (internal quotations marks and alteration omitted).  Here, Jackpocket's survey does not fill this gap.  The Court finds that Barone's survey was not properly conducted.  The Court thus finds that the actual confusion factor favors Jackpot.com.

### 5.    Good Faith

The good-faith factor looks to the defendant's intentions for adopting the mark.  In particular, the factor examines "whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp.*, 391 F.3d at 460 (internal quotation marks omitted).  Because the good faith of the party "does not bear directly on whether consumers are likely to be confused," a "finding that a party acted in bad faith can affect the court's choice of remedy or can tip the balance where questions are close." *Virgin Enters.*, 335 F.3d at 151.  Though "bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark," "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, [the Second Circuit has still] found the junior user to be in good faith." *Star Indus.*, 412 F.3d at 388.

Here, Plaintiff and Defendants tell opposing stories about why Defendants adopted the JACKPOT.COM mark for its Lottery Courier Service application.  In its briefing, Plaintiff

argues that the similarities between Jackpocket and Jackpot.com's marks, Jackpot.com's knowledge of Jackpocket's marks, and Jackpot.com's continued efforts to enter the U.S. market all bespeak Jackpot.com's bad faith. *See* Pl. Preh. Br. 32–34; Pl. Pret. Mem. 64–66. Plaintiff offered additional evidence of Defendants' alleged bad faith through its testimony. As Plaintiff tells it, Defendants approached Plaintiff about a potential business combination in order to facilitate Jackpot.com's entry into the U.S. market. *See* Sullivan Decl. ¶¶ 57–59. During these conversations, Defendants never indicated that they would use the JACKPOT.COM Marks and suggested that other potential marks were available. *Id.* ¶ 90. Once conversations fell apart, however, Defendants decided to launch under its own mark and copied JACKPOCKET Marks' blue-and-white color scheme to leverage Jackpocket's brand. *See* Pl. Preh. Br. 12.

In contrast, Defendants argue that they did not adopt the JACKPOT.COM mark "with the intent to exploit Jackpocket's reputation." *See* Def. Preh. Br. 32. Defendants presented evidence that they have used the JACKPOT.COM mark on its consumer facing website since 2016 and has long intended to launch services in the United States under the JACKPOT.COM mark, which are used in over 180 countries. Ron Decl. ¶¶ 5, 20, 29, 34. Further, Defendants contend that the color scheme for their U.S. landing page was selected by a third-party designer, not by Defendants themselves, and that they intend to launch their services using the orange and black scheme used by Jackpot.com abroad. *Id.* ¶ 59.

This factor favors Defendants. Defendants have operated a consumer-facing website under the JACKPOT.COM mark for nearly six years; it is logical, indeed expected, that Defendants would want to use the same branding that it uses to serve customers in over 180 countries upon entry into a new market. Furthermore, the word "jackpot," as discussed above, is intimately linked to, and highly descriptive of, the precise product Defendants are offering—

lottery tickets.  Courts in this district have found that these circumstances do not bespeak bad faith.  *See Girl Scouts of the United States of Am. v. Boy Scouts of Am.*, 2022 WL 1047583, at *9 (S.D.N.Y. Apr. 7, 2022) ("Evidence a defendant adopted marks related to other of its marks, or that an adopted mark describes the characteristics of a given product, will weigh in favor of a finding that the defendant acted in good faith."); *J.T. Colby & Co.*, 2013 WL 1903883, at *23 (finding that selecting "a mark that described characteristics of its product" and is "related to marks [defendant] has adopted for other products and services it offers" is "evidence of [defendant's] good faith").

Plaintiff has not presented evidence that Defendants sought to promote confusion or capitalize on Plaintiff's reputation by using the JACKPOT.COM mark.  The only direct evidence that Plaintiff offered that Jackpot.com sought to capitalize on Plaintiff's mark was the adoption of the blue-and-white color scheme for Defendants' U.S. landing page.  Defendants have since abandoned this color scheme on its pre-launch webpage and, as discussed above, the Court credits Ron's testimony that it does not intend to use the blue-and-white color scheme when it launches in the United States.  *Id.* ¶¶ 61–62.  There is no evidence that Jackpot.com engaged in the discussions about a business transaction in bad faith or that it had an obligation to tell Plaintiff that it intended to use the JACKPOT.COM Marks.  Without more, Jackpocket's argument that Defendants acted in bad faith falls short.  *See W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993) ("[Plaintiff] has not put forth any evidence that [defendant] intended to promote confusion between the products or appropriate [plaintiff]'s good will and therefore has not shown any bad faith on [defendant]'s part.").

### 6.    Quality of Products

The quality of a junior user's products "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of

inferior quality." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (internal quotation marks omitted).  This analysis also does not bear directly on the issue of likelihood of confusion but goes rather "to the harm that confusion can cause the plaintiff's mark and reputation."  *Virgin Enters.*, 335 F.3d at 151–52.  Plaintiff does not contend that courier lottery services are of inferior quality.  Instead, Plaintiff argues that Defendants' association with "derivative lotteries"—which allow individuals to bet on foreign lotteries without purchasing a lottery ticket and are illegal in the United States—risks tarnishing its reputation.  *See* Pl. Preh. Br. 34–35.  Defendants counter that Jackpot.com's services have not run afoul of any laws and Jackpot.com's products are not of inferior quality, as evidenced by Plaintiff's attempts to purchase Jackpot.com.  Def. Preh. Br. 33–35.

Plaintiff's assertions do not speak directly to the quality of Defendants' product and there is nothing in the record to suggest that Jackpot.com's product will be of inferior quality.  At least one court has suggested that the association of illegal activity with a junior user's product can undermine the reputation of a senior user.  *See Rd. Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Rd. Dawgs, Inc.*, 679 F. Supp. 2d 259, 290 (N.D.N.Y. 2009) (concluding illegal activity on defendants' premises jeopardized plaintiff's reputation as a club for law-enforcement professionals); *cf. Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 505 (2d Cir. 1996) (observing, in a case for trademark dilution under New York law, that a mark can be "tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity").  These courts reason that illegal activity associated with a junior mark could tarnish the senior user's mark in the minds of consumers just as an inferior product could.  But there is no evidence that the alleged improper activity here—the operation of synthetic lotteries available to consumers outside the United States—would impact the attractiveness of Plaintiff's product to

consumers inside the United States.  There also is no evidence that Defendants have done anything illegal or are planning to do anything illegal.  Defendant's operation of derivative lotteries outside the United States has been lawful.  There is no evidence that Defendants will operate derivative lotteries in the United States, much less do so without regulatory permission.  Indeed, the evidence suggests that Defendants have been careful not to enter the United States until it became clear that they can do so lawfully.  *See* Ron Decl. ¶¶ 28–29.

The evidence shows that Plaintiff has used the fact that Defendants (and others) have operated synthetic lotteries outside the United States as a cudgel to try to exclude those others from the market and to keep the United States market for itself.  *See* PI Tr. 158–60; DX-029 JACKPOCKET00004216–18; DX-060 at JACKPOCKET00001256.  It does not show that an association with a company that offers derivative lotteries outside of the United States would in any way damage Plaintiff in the mind of a consumer.  Absent a showing that Defendants' association with derivative lotteries would undermine Plaintiff's reputation or its marks, the Court finds Plaintiff's argument unpersuasive.  *See The Sports Auth.*, 89 F.3d at 965 (finding plaintiff's argument that association with defendant's bar would tarnish its reputation unpersuasive because plaintiff "set forth no evidence that it would be injured by being associated with a bar").

The quality of a junior trademark user's products can also affect the potential for confusion among consumers: "products of equal quality may tend to create confusion as to source because of this very similarity."  *Hormel Foods*, 73 F.3d at 505; *see also Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013) ("[I]f the products are roughly equal in quality, the court must also consider whether 'that very similarity of quality' may tend to create confusion as to source by bringing the products into even closer proximity."

(quoting *Morningside Grp. Ltd. V. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999))).  Here, Plaintiff has not offered any evidence about the comparative quality of its and Defendants' products and whether the comparative quality of the two products risks fostering confusion.  Whether analyzed through a reputational or comparative lens, the Court finds that this factor is neutral.  *See Star Indus.*, 412 F.3d at 389 ("[A]bsent . . . evidence one way or the other, this factor is at most evenly balanced."); *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 341 (S.D.N.Y. 2013) ("The Court concludes that this factor is neutral.  The current record contains scant evidence as to whether [defendant's] products are inferior . . . [and] whether any similarity or difference in quality would make consumer confusion more or less likely.").

### 7.        Sophistication of the Consumer

This factor analyzes the degree to which a buyer examines a product before purchase. *Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d at 298.  "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks."  *TCPIP Holding Co.*, 244 F.3d at 102.  Expert opinions and surveys can be used to prove consumer sophistication, but "in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price."  *Star Indus.*, 412 F.3d at 390.  In general, consumers exercise less sophistication with respect to lower priced products.  *See Playtex Prod., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 162–63 (2d Cir. 2004); *see also Tri-Star Pictures, Inc.*, 14 F. Supp. 2d at 358 ("[C]onsumers are not apt to be very careful when purchasing relatively inexpensive products.").

Plaintiff contends that these consumers are unlikely to be sophisticated when purchasing lottery tickets that cost a couple of dollars.  *See* Pl. Preh. Br. 31–32.  Defendants argue that the low cost of a lottery ticket is not the relevant factor because the lottery ticket is a means to a very

lucrative end and the behavior of consumers suggests that these purchases are high involvement. Def. Preh. Br. 36.  Defendants further argue that the lengthy process necessary to set up a Jackpocket account suggests that consumers will pay careful attention to the products before purchase.  *See id.* at 36–37.

As described above, *see supra* Section I.B.4.b, the purchasing decisions of lottery-courier-service customers can be divided into two phases: registering for the application and then purchasing a lottery ticket.  The first stage of this process takes time and care as consumers enter personal and financial information over a multi-step process, which favors a finding that customers exercise care and diligence.  The Court finds that it is this stage of the process that is most meaningful to Jackpocket's sales.  Jackpocket has dedicated resources trying to make the signup process as seamless as possible; Plaintiff has enabled Apple and Google Pay integration and potential customers can scan an ID instead of manually entering personal information.  *See* Sullivan Decl. ¶ 7.  And for good reason.  There is evidence that once an individual becomes a Jackpocket customers, she remains a Jackpocket customer:  ▮ of users who purchased a lottery ticket through Jackpocket during the week of October 17, 2022 also purchased a lottery ticket during the week of October 24, 2022.  Wong Decl. ¶ 29.  Thus, the Court finds that the most relevant consumer decision is deciding to register for a lottery courier service account, and during that decision, customers exercise a high degree of caution.  This factor thus favors Jackpot.com.

### 8.     Balancing

"The *Polaroid* factors are to be weighed holistically in determining whether the party seeking to establish an infringement claim has demonstrated the probability of confusion of a substantial number of consumers of the relevant class."  *Capri Sun GmbH*, 2022 WL 976270, at *57 (quoting *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 366

(S.D.N.Y. 2003)) (internal quotation marks omitted).  However, "[w]eak marks are entitled to only an 'extremely narrow scope' of protection, 'unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion.'"  *RiseandShine Corp.*, 41 F.4th at 124 (quoting *Plus Prod. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983)).  The Court has found that the JACKPOCKET Marks are weak, suggestive marks, and Plaintiff has not demonstrated that the other *Polaroid* factors counterbalance the weakness of its marks; the remaining factors were either neutral or weakly favored Plaintiff.

Plaintiff chose a mark that both inherently and in its use suggests the product that Plaintiff offers: lottery tickets.  Plaintiff has not presented sufficient evidence that it has devoted resources to developing a distinct brand identity so that its trademarks are associated with their source.  An injunction would not protect Plaintiff from misappropriating of its goodwill in its marks; there is no evidence that Plaintiff has developed any.  Nor would an injunction protect consumers from the losses that they suffer as a result of confusion as to source of Plaintiff's and Defendants' product; there is no evidence that consumers identify Plaintiff's lottery courier services by their source.  Rather, an injunction would prevent Defendants from using a mark that they have long used internationally and that is generally descriptive of the product that both Plaintiff and Defendants offer, and thus it would impermissibly impede competition.  Competition is not the evil that the Lanham Act was designed to guard against, and the Court refuses to use trademark law for that purpose.

The Court finds that Plaintiff failed in its effort to show that consumers are likely to be confused between Jackpocket's and Jackpot.com's marks and thus finds that Plaintiff is not entitled to a permanent injunction.

## II.      Affirmative Defenses

Jackpot.com raises several affirmative defenses, including failure to state a claim;

unclean hands; waiver, estoppel, and acquiescence; laches; trademark misuse; and innocent use.

*See* Dkt. No. 112.  The Court already addressed Jackpot.com's failure to state a claim and

innocent use defenses.  *See* Section I.A.2 and I.B, *supra*.  In light of the Court's conclusions that

Defendants have not infringed Plaintiff's marks, the Court need not reach the merits on

Defendants' remaining affirmative defenses.  However, for purposes of completeness, the Court

briefly discusses each in turn.

### A.      Laches and Acquiescence

To prove laches, a defendant "must show that plaintiff had knowledge of defendant's use

of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that

defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."

*Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1096 (S.D.N.Y. 1978),

*aff'd*, 607 F.2d 995 (2d Cir. 1979).  "The elements of acquiescence are: '(1) the senior user

actively represented that it would not assert a right or a claim; (2) the delay between the active

representation and assertion of the right or claim was not excusable; and (3) the delay caused the

defendant undue prejudice.'"  *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports

Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002) (quoting *Times Mirror Magazines, Inc. v.

Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir.2002)).  The core difference between

these "closely related doctrines" is that "acquiescence implies active consent, while laches

implies a merely passive consent."  *Id.* (internal quotation marks omitted) (quoting *Sara Lee

Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 460, 462 (4th Cir.1996)).  Active consent can be "an

explicit or implicit assurance that plaintiff, with knowledge of defendant's conduct, will not

assert its trademark rights."  *Id.* at 68.

The Court finds that Jackpocket did not unreasonably delay in bringing this lawsuit. "The laches clock begins to run when the trademark owner 'knew or should have known, not simply that [the infringer] was using the potentially offending mark, but that [it] had a provable infringement claim against [the infringer.]'" *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018) (quoting *ProFitness*, 314 F.3d at 70). That is, a plaintiff "has no obligation to sue until the likelihood of confusion looms large and his right to protection [has] clearly ripened." *ProFitness*, 314 F.3d at 68 (internal quotation marks and citation omitted). "There is a presumption against laches where the lawsuit was initiated within the applicable statute of limitations." *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 196 (S.D.N.Y. 2008); *see also Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) ("Th[e] statute of limitations then determines which party possesses the burden of proving or rebutting the defense."); *cf. SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 959 (2017) ("[L]aches . . . cannot be invoked to bar legal relief [i]n the face of a statute of limitations enacted by Congress." (internal quotation marks and citation omitted)). The Lanham Act "is properly analogized to New York's six year fraud statute." *Conopco*, 95 F.3d at 191.

Jackpot.com argues that Jackpocket knew, or should have known, as early as 2015 of its allegedly infringing activity. At that time, Sullivan received an email from a payment processor inquiring about services for http://lottery.jackpot.com, to which he responded, "I think you have the wrong site/company there. We are Jackpocket, not jackpot. Our website is Jackpocket.com." *See* DX-029 at JACKPOCKET00000769–70. Sullivan also acknowledged that he visited Jackpot.com's website in May 2017. *See* Sullivan Dep. at 126. As described

above, Jackpot.com did not use the JACKPOT.COM mark in U.S. commerce and thus Jackpocket did not have a provable infringement claim at that time.

The earliest that Jackpocket's claims could have ripened against Jackpot.com was in April 2021 when Jackpot.com publicly indicated that it was planning to enter the U.S. market. At that point, Jackpot.com updated its website so that U.S.-based consumers who visited jackpot.com were shown a pop-up stating: "Coming Soon – the NEW way to play the lottery. Sign up now to hear first when we launch in your State."  Ron Decl. ¶ 36; *id.* Ex. 11.  Plaintiff presented evidence that by the end of May 2021, individuals at Jackpocket were aware that Jackpot.com was planning to enter the U.S. market.  *See* DX-037.  In December 2021, Jackpocket received notice that Jackpot.com was planning to launch lottery courier services in the United States during the first conversation between Sullivan and Ron.  Sullivan Decl. ¶ 59. Jackpocket sent Jackpocket a demand letter on May 23, 2022, *see* Sullivan Decl. Ex. 43, and initiated this action on July 7, 2022, *see* Dkt. No. 1.

Even assuming that Jackpocket's infringement case had sufficiently ripened in April 2021 for it to bring suit, the fifteen-month period between when the case apparently ripened and when Jackpocket filed this lawsuit is insufficient to find the delay in seeking to enforce its rights unreasonable.  *See, e.g.*, *Coty Inc.*, 277 F. Supp. 3d at 439 (finding a "few years of operation" with insignificant sales insufficient for laches); *Gross*, 641 F. Supp. 2d at 196 (finding two-year delay insufficient).

The first time that representatives of Jackpocket communicated with representatives of Jackpot.com was December 2021.  Thus, the earliest point at which Jackpocket could have acquiesced, either implicitly or explicitly, to Jackpot.com's infringement was seven months before it filed the lawsuit in this case, which is insufficient to be inexcusable.  *See Coop.*

*Regionale De Vins De Champagne v. Chatam Int'l Inc.*, 1987 WL 123987, at *3 (S.D.N.Y. Nov. 6, 1987) ("Five months, six months or eight months, however, is insufficient to constitute laches . . . .   With the failure of the laches defense, the estopp[el] and acquiescence defenses must fail as well.").

### B.      Unclean Hands and Trademark Misuse

"The doctrine of unclean hands is based on the principle that since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff." *Dunlop-McCullen v. Loc. 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) (internal quotation marks and citation omitted).  This doctrine "is recognized as a valid defense in an appropriate trademark infringement or unfair competition case."  *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999).  The application of unclean hands is appropriate "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *William Penn Life Ins. Co. of New York v. Viscuso*, 569 F. Supp. 2d 355, 362 (S.D.N.Y. 2008) (internal quotation marks omitted) (quoting *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996)).  But the "defense of unclean hands applies only with respect to the right in suit."  *Warner Bros. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983).  Thus, in a trademark infringement case, the "alleged unclean hands must relate to [plaintiff's] *acquisition or use* of the . . . trademark, and does not apply to issues which are collateral to the infringement litigation." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999); *see also De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 2005 WL 1164073, at *4 (S.D.N.Y. May 18, 2005) ("Defendants [must] allege that plaintiffs have misused their trademarks or trade identities in furtherance of inequitable conduct.").  "[E]xamples of conduct that might qualify as sufficiently related to a trademark action to support an unclean

hands defense are when a plaintiff encouraged or induced the commission of a wrong, or . . . a

trademark, allegedly infringed by the defendant, is itself deceptive, or . . . the plaintiff procured

or maintained his trademark registrations by false or fraudulent misrepresentations." *DeBeers*,

2005 WL 1164073, at *4 (internal quotation marks and citation omitted).

Jackpot.com asserts unclean hands as a separate defense from trademark misuse. *See*

Dkt. 112 ¶ 5. "'[T]rademark misuse' is not a separate legal or equitable defense. 'Trademark

misuse' is merely another name for a defense of unclean hands when asserted in the context of a

trademark infringement case." 6 *McCarthy on Trademarks* § 31:44. "To the extent that courts in

[the Second Circuit] recognize trademark misuse as an independent defense, they have held that

it requires a showing that the plaintiff has used its trademark in violation of anti-trust laws."

*LPD New York, LLC v. Adidas Am., Inc.*, 2022 WL 4450999, at *26 (E.D.N.Y. Sept. 24, 2022)

(quoting *Gucci Am. Inc.*, 868 F. Supp. 2d at 245). It is inherent to the operation of the trademark

law that one company will not be able to use a mark developed by its competitor, but "denial of a

plaintiff's exclusive right to the use of his trademark is not essential to the restoration of

competition" and it therefore is "enough merely to prove that merchandise bearing a trademark,

however valuable the trademark, has been used in furtherance of antitrust violations." *Carl Zeiss*

*Stiftung v. V. E. B. Carl Zeiss, Jena*, 298 F. Supp. 1309, 1315 (S.D.N.Y. 1969) (Mansfield, J.),

*aff'd in relevant part sub nom. Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686 (2d Cir.

1970). "An essential element of the antitrust misuse defense in a trademark case is proof that the

mark itself has been the basic and fundamental vehicle required and used to accomplish the

violation." *Id.* As with unclean hands in the trademark context more generally, the defendant

must "demonstrate that the trademark, as distinguished from collateral activities with respect to

goods bearing the trademark, was itself being used as the prime and effective instrument to

effectuate the antitrust activity." *Id.* at 1314.  If not, any antitrust violation involving a trademarked good could lead to forfeiture of the trademark itself, and the underlying policies behind trademark law—to prevent consumer confusion. *Id.* at 1315.  An antitrust misuse defense thus "is extremely narrow." *Estee Lauder*, 189 F.R.D. at 272.

Jackpot.com claims that Jackpocket has engaged in unclean hands by (1) taking "steps outside of this lawsuit to block its competitors, including Jackpot.com, from fair competition to maintain and extend its monopoly," Def. Pret. Mem. 56–59; (2) registering the JACKPOCKET.COM mark to make its mark more similar to Jackpot.com's in order to strengthen its infringement claims and "stifle competition," *id.* at 59–60; (3) purchasing search terms including "jackpot," "jackpot app," and other competitors, *id.* at 60; and (4) operating illegally in New York without a license, *id.* at 61.

Properly understood, the law of unclean hands and trademark misuse does not bar this lawsuit or Plaintiff's request for injunctive relief.  Jackpocket may or may not have engaged in anti-competitive activity in seeking to block Jackpot.com's entry in order to "maintain and extend its monopoly."  Def. Pret. Mem. 56–59.  It may or may not have engaged in conduct that would constitute tortious interference with contract.  The Court need not address those issues. With a single potential exception, all of the activity that Jackpot.com alleges is collateral to Jackpocket's efforts to protect its trademark; the activity does not involve the acquisition or use of Jackpocket's trademarks, *see Campaniello Imports, Ltd.*, 82 F. Supp. 2d at 131, improperly, to restrain competition or otherwise, *see Carl Zeiss*, 298 F. Supp. at 1315.

Jackpot.com makes one argument that sounds more squarely within the framework of unclean hands in a trademark infringement case:  Jackpot.com alleges that Jackpocket made its trademark look more similar to Jackpot.com's mark in order to bolster its likelihood of confusion

argument.  Specifically, Jackpot.com points to (1) Jackpocket's registration of JACKPOCKET.COM on the same day it sent Jackpot.com a cease-and-desist letter and (2) Jackpocket's addition of the ".com" suffix to its website logo, apparently to make the logo appear more similar to Jackpot.com's.  *See* Def. Pret. Mem. 59–60.  But these actions fall far short of what would be necessary to demonstrate unclean hands.  Jackpocket started to use the domain jackpocket.com as early as 2013 and it has appeared in Jackpocket's advertising since then.  *See* Sullivan Decl. ¶¶ 42-49; *id.* Exs. 19–26.  Federal registration of the mark "confers important legal rights and benefits" on the owner of a registered mark,[27] but federal registration was not necessary for Jackpocket to use or protect its mark.  *See Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017) (internal quotation marks omitted) (quoting *B&B Hardware v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015)).  Even before Jackpocket registered JACKPOCKET.COM, it had the right to enforce its trademark under Section 43(a) of the Lanham Act and under state law.  *Id.* at 1752–53.  Thus, Jackpocket's registration of the mark does not bespeak bad faith, even if it did so in anticipation of litigation and to prevent Jackpot.com from using a substantially similar mark; it had an interest in that mark that preceded Jackpot.com's decision to enter the United States.

The addition of ".com" to Jackpocket's logo does bespeak bad faith.  The evidence supports the conclusion that the addition to the logo was made so that the Jackpocket logo would more closely resemble the Jackpot.com logo, the use of which Jackpocket was seeking to enjoin.

---

[27] "Registration on the principal register (1) serves as constructive notice of the registrant's claim of ownership of the mark, (2) is prima facie evidence of the validity of the registered mark and of the registration of the mark of the owner's ownership of the work, and of the owner's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the certificate; and (3) can make a mark incontestable once a mark has been registered for five years."  *Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017) (internal quotation marks and citations omitted).

But that change to the logo on its website is insufficient to bar Jackpocket's entitlement to an injunction, if one were available.  A finding of unclean hands need not serve as a complete bar to relief.  *See* 6 *McCarthy on Trademarks* § 31:44; *see also Bambu Sales, Inc. v. Testini*, 1988 WL 138055, at *3–5 (E.D.N.Y. Dec. 21, 1988) (rejecting plaintiff's motion to strike the unclean hands defense because, although the defense could not "defeat the issuance of an injunction," it might be relevant to the extent of the damages that plaintiff is able to seek).  In *Adray v. Adry-Mart, Inc.*, for example, the Ninth Circuit upheld a district court's refusal to issue an absolute injunction after "the judge found [plaintiff] had changed his logo to make it virtually identical with that of [defendant]."  76 F.3d 984, 991 (9th Cir. 1995).  Instead, the court carved out a geographic area where each party was prohibited to advertise without a disclaimer.  *Id.*  Here, the only change that Defendants assert Plaintiff made to its mark is the addition of ".com" to its website's logo.  This is not a case where Plaintiff also changed the orientation, capitalization, and color scheme of its logo to make its mark "virtually identical" to Defendants.  If Plaintiff were entitled to an injunction, the Court would have been permitted to craft one, though perhaps not one that would protect its new logo.  Thus, the Court finds that Jackpocket's addition of ".com" to its logo, without more, would at most shape the injunction it would fashion, but would not necessarily bar the request for equitable relief in its entirety.[28]

---

[28] Jackpot.com also points to *J.T. Colby & Co.* to support its proposition that Jackpocket's hands are unclean.  In that case, the district court held that plaintiff's consumer study of actual confusion should be excluded, in part because it lacked any visual representation of plaintiff's mark at all.  *J.T. Colby & Co.*, 2013 WL 1903883, at *21.  In the course of reaching that conclusion, the court stated that a "trademark owner can make non-material alteration to his mark without risking abandonment of the mark," but that "this principle does not suggest that a senior user can alter its mark to more closely mimic the junior user's mark and then claim injury from the increased likelihood of confusion."  *Id.* at *21 n.30.  This Court already addressed Jackpocket's attempts to claim injury from the addition of ".com" to its logo; it considered Jackpocket's pre-May 2022 logo in the likelihood of confusion analysis by analyzing the

The Court thus finds Jackpot.com's unclean hands defense would not bar the issuance of an injunction, if one were warranted in this case.

## III.    Other Causes of Action

Jackpocket brings two additional causes of action: (1) Trademark Dilution under New York General Business Law § 360-l and (2) violation of the New York Deceptive Trade Practices Statute, New York General Business Law § 349.  As Jackpocket's infringement claim fails, so too do its trademark dilution and deceptive trade practices claims.

### A.    Trademark Dilution

Jackpocket alleges trademark dilution under New York General Business Law § 360-l. Section 360-l provides for "injunctive relief" when there is a "likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name."  N.Y. Gen. Bus. Law § 360-l.  "Unlike claims for trademark infringement, no proof of 'competition between the parties or . . . confusion as to the source of goods or services' is required."  *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 439 (S.D.N.Y. 2018) (quoting N.Y. Gen Bus. Law § 360-l); *see also Hormel Foods*, 73 F.3d at 506 ("This injury to the mark's selling power need not involve any confusion as to source or sponsorship.").  In order to establish dilution, the plaintiff must show "(1) ownership of a distinctive mark, and (2) a likelihood of dilution."  *Hormel Foods*, 73 F.3d at 506.  Dilution can occur through either blurring or tarnishment.  *See id.* 506–09. Here, Jackpocket only asserts dilution by blurring, so the Court does not address dilution by tarnishment.  Jackpocket's claim fails for two independent reasons:  It cannot establish that its mark is distinctive, and it cannot establish dilution by blurring.

---

similarity of Jackpocket's and did not credit any confusion that would flow from the addition of ".com" to its logo.

A distinctive mark is one with a "distinctive quality or [that] has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the plaintiff that it identifies goods sold by that entity as distinguished from goods sold by others." *Gucci Am., Inc.*, 868 F. Supp. 2d at 241 (internal quotation marks and citation omitted). The Second Circuit has equated "[d]istinctiveness for dilution purposes . . . with [both] the [inherent and commercial] strength of a mark for infringement purposes." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989). Dilution by blurring "occurs 'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'" *New York Stock Exch., Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (quoting *Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)). Courts look to six factors to determine the likelihood of dilution by blurring: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *Id.* The first five factors are similar to their counterparts in the *Polaroid* test. *See Coty Inc.*, 277 F. Supp. 3d at 460. But "New York law does not permit a dilution claim unless the marks are 'substantially' similar." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). "The substantial similarity test requires more than the 'familiar test of similarity' used in the traditional infringement context. Marks must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

The Court has already found that Jackpocket's marks are not distinctive, either inherently or commercially.  Further, Jackpocket's claim fails the test of dilution by blurring; the marks are not similar.  "Because [Defendants' mark] is not similar enough to [Plaintiff's] to infringe it, it follows that the former is not similar enough to dilute the latter."  *Miss Universe*, 672 F. Supp. 2d at 596 (concluding that a suggestive mark that "verges on descriptive" was not protected by New York's anti-dilution law because the marks were not substantially similar).  The other factors, in aggregate, also point against a finding of dilution.  As described above with respect to Jackpocket's trademark infringement claim, though the products are similar, registering for a Jackpocket account is a high-engagement activity, and there is no evidence of predatory intent on behalf of Jackpot.com.  *See Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 393 (S.D.N.Y. 2008) (granting summary judgment on dilution claim because marks were dissimilar, consumers were sophisticated, and there was only "de minimis" evidence of predatory intent, even though similarity of products and renown of senior mark, Louis Vuitton, favored plaintiff).

## B.    Deceptive Trade Practices

Finally, Jackpocket claims that Jackpot.com's actions violate New York General Business Law § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."  N.Y. Gen. Bus. Law § 349.  Under Section 349, "a plaintiff 'must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act.'"  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)).  When corporate competitors bring a claim under Section 349, a consumer protection law, "the gravamen of the complaint must be consumer injury or harm to the public interest."  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d

Cir. 1995) (internal quotation marks and citation omitted).  Moreover, the majority view in this

Circuit holds "that trademark infringement claims are not cognizable under . . . § 349 unless

there is specific and substantial injury to the public interest *over and above* the ordinary

trademark infringement."  *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 58

(S.D.N.Y. 2015) (emphasis added) (internal quotation marks omitted) (quoting *Van Praagh*, 993

F. Supp. 2d at 305).  These courts argue that there is insufficient public harm that results from

trademark infringement alone to satisfy Section 349.  *See id.* (quoting *Perfect Pearl Co. v.

Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 542 (S.D.N.Y. 2012)).

Here, Jackpot.com's mark does not infringe Jackpocket's.  Further, Jackpocket has

presented no evidence of public harm that has resulted from Jackpot.com's actions, yet alone

public harm beyond that which would result from Jackpot.com's alleged trademark infringement.

Thus, Jackpocket cannot prevail on its deceptive trade practices claim.  *See Now-Casting Econ.,

Ltd. v. Econ. Alchemy LLC*, 2022 WL 4280403, at *11 (S.D.N.Y. Sept. 15, 2022) (rejecting

Section 349 claim because plaintiff failed to establish trademark infringement under the Lanham

Act and plaintiff failed to present any evidence of public harm).

## IV.    Relief

Jackpocket seeks both an accounting of Jackpot.com's profits and a permanent

injunction.  Under Section 35(a) of the Lanham Act, a plaintiff who has established that its

trademark was infringed is "entitled . . . subject to the principles of equity, to recover []

defendant's profits."  15 U.S.C. § 1117(a).  Because the Court has found that Jackpot.com is not

infringing on Jackpocket's marks, it also finds that Jackpocket is not entitled to an accounting of

profits.

Jackpocket also seeks a permanent injunction enjoining Defendants and their "officers,

directors, employees, agents, subsidiaries, distributors, dealers, related companies, and all

persons in active concert or participation with any of them" from, *inter alia*, using or registering the Jackpot.com marks.  *See* Dkt. No. 1 at 28–29.  A party seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The Court found that Jackpot.com's marks do not infringe or dilute Jackpocket's.  It follows that Jackpocket will not suffer cognizable harm as a result of Jackpot.com's use of its mark.  Thus, Jackpocket is not entitled to an injunction.

## CONCLUSION

For the reasons stated above, Jackpocket has not demonstrated that Jackpot.com has infringed its trademarks or that its other causes of action have merit.  Jackpocket's request for a permanent injunction and accounting is thus denied.

The Clerk of Court is respectfully directed to close Dkt. No. 19.

SO ORDERED.

Dated: December 7, 2022
      New York, New York

                                       LEWIS J. LIMAN
                             United States District Judge