**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JACKPOCKET, INC.,

               Plaintiff,

     v.

LOTTOMATRIX NY LLC,
LOTTOMATRIX CORPORATION,
LOTTOMATRIX OPERATIONS LIMITED
d/b/a JACKPOT.COM, LOTTOMATRIX
MALTA LIMITED, and 99DYNAMICS
LIMITED,

               Defendants.

Case No. 1:22-cv-05772(LJL)

---

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR
MOTION FOR ATTORNEYS' FEES AND RELATED NONTAXABLE EXPENSES**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT..............................................................................................................................2

I.      PLAINTIFF FAILS TO REFUTE THAT THIS CASE IS "EXCEPTIONAL".................4

        A.      Plaintiff Fails To Rebut That It Initiated This Lawsuit For An Improper Anti-
                Competitive Purpose, Which Alone Makes It "Exceptional".................................4

                1.      Plaintiff Cannot Overcome That Initiating A Lawsuit As A
                        "Competitive Ploy" Is Enough To Make A Case "Exceptional"................5

                2.      Plaintiff Cannot Dispute The Evidence Showing Its Anti-Competitive
                        Motive, Which Makes This Case "Exceptional" .........................................7

                3.      Plaintiff's *Post-Hoc* Explanations Of Its Litigation Strategies Do Not
                        Counter That This Case Is "Exceptional" ..................................................11

                4.      The Court Should Reject Plaintiff's Attempt To Re-Litigate The
                        Court's Factual Finding Of Bad Faith ........................................................13

        B.      Plaintiff Fails To Rebut That An Award Of Fees Would Advance
                Considerations Of Compensation And Deterrence .................................................15

        C.      Plaintiff Fails To Rebut That Its Claims Were Objectively Unreasonable ............17

        D.      Plaintiff Fails To Rebut That It Litigated In An Unreasonable Manner .................19

II.     PLAINTIFF DOES NOT OPPOSE JACKPOT.COM'S REQUESTS FOR
        RELATED NON-TAXABLE EXPENSES AND TO FILE A FEE APPLICATION ......20

CONCLUSION...........................................................................................................................20

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Anastasia Int'l, Inc. v. EM Online Pty Ltd.*,
2013 WL 5550211 (S.D.N.Y. Oct. 4, 2013)................................................................. 4, 6, 11

*Aspex Eyewear, Inc. v. Revolution Eyewear, Inc.*,
2001 WL 34852697 (C.D. Cal. June 4, 2001) ........................................................... 9

*Baker v. Urban Outfitters*,
431 F. Supp. 2d 351 (S.D.N.Y. 2006)....................................................................... 15

*Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*,
2020 WL 729518 (S.D.N.Y. Feb. 13, 2020)............................................................. 15, 16

*Benihana of Tokyo, LLC v. Benihana, Inc.*,
2018 WL 3574864 (S.D.N.Y. July 25, 2018) ........................................................... 4, 5, 6, 15

*Caixa Geral de Depositos, S.A. v. Jacinto Rodrigues*,
2005 WL 1541055 (D.N.J. June 30, 2005) ............................................................... 11

*Davis v. Stratton*,
2009 WL 1292829 (N.D.N.Y. May 7, 2009)............................................................. 3

*For Life Prod., LLC v. Virox Techs. Inc.*,
2022 WL 1670097 (W.D. Va. May 25, 2022) ........................................................... 18

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)................................................................................................... 3

*Hockeyline, Inc. v. STATS LLC*,
2017 WL 1743022 (S.D.N.Y. Apr. 27, 2017)........................................................... 16

*Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*,
2020 WL 1467118 (S.D.N.Y. Mar. 26, 2020) .......................................................... 16, 18

*I.O.B. Realty, Inc. v. Patsy's Brand, Inc.*,
2020 WL 5518230 (S.D.N.Y. Sept. 13, 2020).......................................................... 14

*IMAF, S.p.A. v. J.C. Penney Co.*,
810 F. Supp. 96 (S.D.N.Y. 1992).............................................................................. 17, 18

*J.T. Colby & Co. v. Apple Inc.*,
2013 WL 1903883 (S.D.N.Y. May 8, 2013) ............................................................. 14

*Joao Control & Monitoring Sys., LLC v. Digital Playground, Inc.*,
2018 WL 1596068 (S.D.N.Y. Mar. 28, 2018) .......................................................... 14

*Kao v. Brit. Airways, PLC*,
2018 WL 501609 (S.D.N.Y. Jan. 19, 2018) ............................................................. 20

*Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ.*,
2006 WL 752872 (D. Conn. Mar. 17, 2006) ............................................................ 3

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
700 F.2d 785 (2d Cir. 1983)...................................................................................... 11

*Most Worshipful Nat'l Grand Lodge v. United Grand Lodge GA AF & AYM, Inc.*,
813 F. App'x 455 (11th Cir. 2020) .................................................................... 18

*MZ Wallace Inc. v. Fuller*,
2018 WL 6715489 (S.D.N.Y. Dec. 20, 2018) ............................................... 6

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ............................................................... 1, 4, 5, 15

*OPA Amsterdam BV v. Am. Ins. of Physics*,
986 F. Supp. 242 (S.D.N.Y. 1997) .................................................... 5

*Procter & Gamble Co. v. Johnson & Johnson Inc.*,
485 F. Supp. 1185 (S.D.N.Y. 1979) ............................................. 6, 16

*Siracuse v. Program*,
2012 WL 1624291 (E.D.N.Y. Apr. 30, 2012) ................................. 13

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
909 F.3d 519 (2d Cir. 2018) ........................................................ 4, 11
2020 WL 1244930 (E.D.N.Y. Mar. 16, 2020) ............................... 6, 11

*Small v. Implant Direct Mfg. LLC*,
2014 WL 5463621 (S.D.N.Y. Oct. 23, 2014) ............................... 5, 16

*Universal Church, Inc. v. Universal Life Church/ULC Monastery*,
2019 WL 4601741 (S.D.N.Y. Sept. 19, 2019) ............................. 12, 16

*United States v. Schroeder*,
1989 WL 68503 (N.D. Ill. June 16, 1989) ......................................... 3

*VIDIVIXI, LLC v. Grattan*,
2016 WL 4367972 (S.D.N.Y. Aug. 13, 2016) ............................... 6, 15

*Watkins v. Smith*,
2013 WL 1935329 (S.D.N.Y. May 10, 2013) ................................... 3

## Statutory Authorities

15 U.S.C. § 1117(a) ............................................. 1, 4, 5, 6, 12, 14, 17, 18

N.Y. Gen. Bus. Law § 349 ............................................................ 12

N.Y. Gen. Bus. Law § 360 ............................................................ 12

## Rules and Regulations

Fed. R. Civ. P. 59 ....................................................................... 3

Fed. R. Civ. P. 60 ....................................................................... 3

Fed. R. Evid. 408 ...................................................................... 13

## PRELIMINARY STATEMENT

To escape a fee award, Plaintiff's opposition (Dkt. 152) ("Pl. Br.") attempts to rehabilitate this Court's unmistakable findings of fact showing that Plaintiff initiated this lawsuit with an improper, anti-competitive motivation: to maintain its near-monopoly in a newly emerging field. Under Supreme Court and Second Circuit precedent, this renders this case an "exceptional" one under 15 U.S.C. § 1117(a).  And while Plaintiff tries to re-visit and re-frame its past conduct, the Court already considered and resolved these issues against Plaintiff, including:

- Plaintiff has long tried to block competitors from the market, and shortly after Jackpot.com announced its U.S. launch, Plaintiff admitted it was "in the process of *trying to kill*" aspiring lottery courier services competitors, including Jackpot.com as it filed this lawsuit (*see* Op. 35; DX-060 at 1);

- As part of its efforts "to block Jackpot.com from entering the U.S. lottery-courier-service market," Plaintiff tried to convince regulators not to issue lottery courier services licenses to, and counterparties not to enter contracts with, Jackpot.com in the U.S. (Op. 34-35);

- Plaintiff's CEO admitted at trial that Plaintiff initiated this suit to "keep [Jackpot.com] from entering the U.S. market" (10/11 Hr'g Tr. (Sullivan) at 151:17-24); and

- Just before suing, Plaintiff changed its logo to try to make it *more* similar to Jackpot.com, which the Court "[did] not credit … as anything more than one of [Plaintiff's] many attempts to preserve its competitive head start against Jackpot.com" (Op. 96), and found "does bespeak bad faith," concluding that "[t]he evidence supports the conclusion that the addition to the logo was made so that the Jackpocket logo would more closely resemble the Jackpot.com logo, the use of which Jackpocket was seeking to enjoin" (Op. 134).

From this record, the Court can, and should, conclude that Plaintiff brought this case with the improper, anti-competitive motive of protecting its monopoly in the lottery courier services industry.  This alone is sufficient to find that this case is "exceptional" under § 1117(a).  And though the Court need go no further, the remaining *Octane Fitness* factors confirm that an award of Jackpot.com's attorneys' fees is appropriate on the facts presented by this extraordinary lawsuit.

Rather than address the arguments in Jackpot.com's motion (Dkt. 144) ("Mot."), Plaintiff uses its opposition—including the submission of *four* new declarations (including an undisclosed

expert)—to re-litigate the Court's findings primarily as a vehicle to argue that it developed and acted on its anti-competitive plans in part out of a purported sense of "duty" and "concern" about overseas lottery betting products. The Court need not re-address this sideshow, as it already found: (1) there "is no evidence that [Jackpot.com] ha[s] done anything illegal or [is] planning to do anything illegal," and (2) Plaintiff used the fact that Jackpot.com operated *legal* derivative lottery services outside the U.S. "as a cudgel to try to exclude" Jackpot.com from the lottery courier services market "and to keep the United States market for itself." Op. 124.

Plaintiff's insistence on burying the Court with yet more untimely and untested evidence to challenge the Court's findings bespeaks Plaintiff's continuing reliance on misrepresentations and unreasonable tactics, all in service of its anti-competitive motives. Rather than undermine this motion, Plaintiff's submissions prove the point. Jackpot.com's motion should be granted.

## ARGUMENT

Facially apparent from Plaintiff's opposition is that, rather than accept the Court's findings of fact and conclusions of law set forth in its Opinion and Order, Plaintiff seeks to re-litigate, re-argue and supplement its positions on the *merits*—including through the submission of new declarations and new exhibits. For example:

- Peter Sullivan, Plaintiff's CEO, submits a new declaration with new testimony and new exhibits, none of which were previously submitted to the Court. Dkts. 154 & 154-1–4.

- Andrew Fries, Plaintiff's Vice President of Public Affairs, submits a new six-page declaration that presents new testimony, not previously submitted to the Court. Dkt. 155.

- Bishop Woosley, a *never-disclosed* witness (who claims to be the "owner" of Woosley Gaming Advisors, LLC, and who is Plaintiff's paid consultant outside the litigation), submits a new expert report (accompanied by his CV) that seeks to provide new opinions about "derivative lotteries," among other topics. Dkts. 157 & 157-1.

Plaintiff's new evidence should be disregarded in its entirety. "A request for attorney's fees should not result in a second major litigation," which is why such follow-on submissions that simply seek

to re-litigate arguments the Court considered at trial are improper. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Neither Jackpot.com nor the Court had the opportunity to cross-examine and assess the credibility of Mr. Sullivan, Mr. Fries, or Mr. Woosley on their new testimony, and it would be prejudicial for the Court to consider such testimony for the first time in a vacuum on a fees motion. That prejudice is heightened by the evidentiary deficiencies of these new materials (*e.g.*, many statements constitute inadmissible hearsay, others are unauthenticated, yet others are simply irrelevant).

Similarly, the Court should disregard Plaintiff's efforts to reargue the trial record rather than accept this Court's already-issued findings. Plaintiff did not file a motion for the Court to reconsider, alter or amend its judgment, or to supplement the record. Fed. R. Civ. P. 59 & 60. Moreover, Plaintiff filed a notice of appeal, depriving this Court of the jurisdiction to revisit its earlier findings. Dkt. 138 (Notice of Appeal); *see also, e.g.*, *United States v. Schroeder*, 1989 WL 68503, at *2 (N.D. Ill. June 16, 1989) ("because the government has filed a notice of appeal, this court lacks jurisdiction to reconsider its findings of fact and conclusions of law"), *rev'd on other grounds,* 900 F.2d 1144 (7th Cir. 1990). Thus, the Court should reject Plaintiff's opposition to the extent it "merely reargues the evidence presented at trial and challenges this court's findings of fact and conclusions of law." *Id.*; *see also Davis v. Stratton*, 2009 WL 1292829, at *1 n.2 (N.D.N.Y. May 7, 2009) (a losing party cannot use an opposition to a motion for attorneys' fees as an "attempt[] to relitigate whether judgment should have been entered against [it]").[1]

---

[1]    *See also, e.g.*, *Watkins v. Smith*, 2013 WL 1935329, at *5 (S.D.N.Y. May 10, 2013) ("[t]he purpose of the attorney's fees applications is to determine the appropriate amount of the sanctions award, not to relitigate the merits"); *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 2006 WL 752872, at *4 (D. Conn. Mar. 17, 2006) ("The Court will not, on this motion for attorney's fees … relitigate the merits of the case.").

While the Court should not accept Plaintiff's invitation to consider a glut of improper, new material and should only rely on what was before it at trial, even if it were to do so, Plaintiff still has not rebutted Jackpot.com's showing that this case is "exceptional."

## I.     PLAINTIFF FAILS TO REFUTE THAT THIS CASE IS "EXCEPTIONAL"

Plaintiff agrees that an "exceptional" case under § 1117(a) "is simply one that stands out from others." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  This is such a case: Plaintiff's anti-competitive motivation, accompanied by this Court's explicit finding that Plaintiff acted in bad faith, alone makes this case "stand[] out from others."  While the Court need go no further, the remaining *Octane Fitness* factors also support such an outcome.

### A.     Plaintiff Fails To Rebut That It Initiated This Lawsuit For An Improper Anti-Competitive Purpose, Which Alone Makes It "Exceptional"

As Jackpot.com explained (Mot. 16-20), Plaintiff initiated this lawsuit not "to vindicate legitimate rights" but rather "to advance [the] ulterior motive" of protecting Plaintiff's near-monopoly position.  *Benihana of Tokyo, LLC v. Benihana, Inc.*, 2018 WL 3574864, at *9 (S.D.N.Y. July 25, 2018).  This *alone* is sufficient for the Court to find this case is "exceptional."

Plaintiff does not seriously dispute that evidence of an improper motivation—*e.g.*, "a substantial overtone … to warrant an inference that th[e] suit was initiated as a competitive ploy"— alone can warrant an award of attorneys' fees.  *Anastasia Int'l, Inc. v. EM Online Pty Ltd.*, 2013 WL 5550211, at *3 (S.D.N.Y. Oct. 4, 2013); *see* Mot. 15 (citing cases).  Thus, a "case presenting … subjective bad faith … may sufficiently set itself apart from mine-run cases to warrant a fee award."  *Octane Fitness*, 572 U.S. at 555.  The trial record here establishes that Plaintiff held and acted upon such an improper motive.

1.   **Plaintiff Cannot Overcome That Initiating A Lawsuit As A "Competitive Ploy" Is Enough To Make A Case "Exceptional"**

As set forth in Jackpot.com's motion, initiating a lawsuit as a "competitive ploy" may establish that a case is "exceptional" under § 1117(a). *See* Mot. 16-17 (citing cases). Plaintiff ignores this legal standard, and instead attempts to nitpick at the facts underlying individual cases reaching such a conclusion. But Plaintiff does nothing to show a different legal standard applies.

*First*, Plaintiff misstates the law, suggesting that initiating a lawsuit as a "competitive ploy" is not sufficient if the underlying claims also "are not frivolous." Pl. Br. 26 (citing *OPA Amsterdam BV v. Am. Ins. of Physics*, 986 F. Supp. 242, 245 (S.D.N.Y. 1997)). Plaintiff's gloss on this pre-*Octane Fitness* case, however, has been vitiated. *See Octane Fitness*, 572 U.S. at 555 ("*either* subjective bad faith *or* exceptionally meritless claims" is sufficient) (emphasis added). Plaintiff's own authorities confirm that under *Octane Fitness* fees may be awarded based on "a finding a case was *either* brought in bad faith or [is] exceptionally meritless." *Small v. Implant Direct Mfg. LLC*, 2014 WL 5463621, at *3 (S.D.N.Y. Oct. 23, 2014) (cited Pl. Br. 16, 17, 30) (emphasis in original).

*Second*, none of Plaintiff's attempts to distinguish Jackpot.com's authorities persuade. For example, while Plaintiff complains that *Benihana of Tokyo* involved "egregious facts" (Pl. Br. 26), the instant case also presents "egregious facts," including: (1) using this lawsuit to try to establish exclusive control of a highly descriptive term as part of a longtime strategy to preserve a near-monopoly; (2) coordinating with lobbyists to try to "kill" Jackpot.com and other competitors, including through this lawsuit; (3) using this case to generate negative press about Jackpot.com, including efforts to force Jackpot.com to divert financial resources to its defense; (4) repeatedly and falsely painting Jackpot.com as an "illegal" actor; (5) interfering with Jackpot.com's business relationships; and (6) Plaintiff's intentional "addition of '.com' to [its] logo" within days of sending a cease-and-desist letter, which "*does bespeak bad faith*." Mot. 17-20; Op. 134 (emphasis

added).  The Court concluded that Plaintiff's lawsuit "would impermissibly impede competition," and that "the Court refuses to use trademark law" to obtain such a result.  Op. 127.  This case thus presented egregious facts, which—taken together—have no comparison to any case Jackpot.com has located.  This case does not involve a few isolated "unsavory comments,"[2] but rather reflects a coordinated, years-long anti-competitive campaign.

Similarly unavailing are Plaintiff's attempts (Pl. Br. 27-28) to distinguish cases that awarded fees under § 1117(a), such as *Anastasia Int'l, Inc. v. EM Online Pty Ltd.*, 2013 WL 5550211 (S.D.N.Y. Oct. 4, 2013) and *VIDIVIXI, LLC v. Grattan*, 2016 WL 4367972 (S.D.N.Y. Aug. 13, 2016)—while each case of course presents its own set of facts, Plaintiff does not explain why those cases are more "egregious" than this one, let alone dispute that each court concluded that initiating a suit as a "competitive ploy" favors an award of fees.[3]  Plaintiff's reliance on *MZ Wallace Inc. v. Fuller*, 2018 WL 6715489 (S.D.N.Y. Dec. 20, 2018) (cited Pl. Br. 28-29), is of no help—that case found that the plaintiff "ha[d] ***not*** … acted in bad faith" and its "business behavior" was unrelated to its "filing and prosecution of this lawsuit." *Id.* at *15 (emphasis added).[4]  Here, however, Plaintiff has been found to have acted in bad faith, and its anti-competitive business activity is closely related to its filing and prosecution of this case.

---

[2]    On remand, the district court in *Sleepy's* found the case was not "exceptional" because a few objectionable "comments" about the litigation "***alone***" was not enough to establish an improper purpose. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 2020 WL 1244930, at *15 (E.D.N.Y. Mar. 16, 2020) (emphasis added).

[3]    *See Benihana of Tokyo*, 2018 WL 3574864 at *11 (plaintiff "pursued this case in bad faith with [an] admitted ulterior goal"); *Anastasia Int'l*, 2013 WL 5550211 at *3 (case initiated "for reasons other than a sincere belief in the merits of the underlying claims"); *VIDIVIXI, LLC*, 2016 WL 4367972, at *4 ("motivated by a competitive ploy to seize partnership property").

[4]    Similarly, in *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1207 (S.D.N.Y. 1979), the court ruled that "I believe it [the suit] is brought in good faith," concluding that, to some degree, an "anti-competitive interest in this lawsuit" is "unavoidabl[e]" as a side effect.  The court, however, never addressed whether the lawsuit was initiated as a competitive ploy, as Plaintiff's suit was here.

2.    **Plaintiff Cannot Dispute The Evidence Showing Its Anti-Competitive Motive, Which Makes This Case "Exceptional"**

In its opposition, Plaintiff either admits or fails to credibly deny multiple fundamental facts demonstrating its anti-competitive motive, which makes this case "exceptional":

(1)    Plaintiff admits it helped erect a regulatory "moat" around itself, and viewed it as a positive way of blocking competitors such as Jackpot.com. Pl. Br. 7 n.4.

(2)    When Plaintiff filed this lawsuit, it admitted it was part of an effort to "kill" Jackpot.com and prevent its U.S. launch. Mot. 18 & n.10 (quoting DX-060).

(3)    Plaintiff used this lawsuit to generate negative press about Jackpot.com. *Compare* Mot. 9-10 (quoting DX-343 & DX-344) *with* Pl. Br. 24-25.

(4)    Plaintiff deliberately misrepresented to regulators that Jackpot.com was an "illegal lottery operator" (*see* Mot. 11 (quoting DX-059); *see also generally* Mot. 10-11), and Plaintiff admits to spreading these misrepresentations (*see* Pl. Br. 8-13).

(5)    Plaintiff interfered with Jackpot.com's prospective business relationships. *Compare* Mot. 11 (quoting DX-073 & DX-029) *with* Pl. Br. 25-26.

*See also* Mot. 3-12, 17-19.  Further, Plaintiff acknowledges that when its CEO was "asked if Jackpocket had done anything to keep Jackpot from 'entering the U.S. market,'" he admitted that filing this lawsuit was a step Plaintiff had taken to do so. Pl. Br. 8 (quoting 10/11 Hr'g Tr. 151:17-24).[5]  And the Court is not to assess whether "each individual action" was "exceptional" if viewed in isolation; rather, the totality of Plaintiff's conduct demonstrates its unreasonable conduct. *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, 2016 WL 1267159, at *3 (D. Del. Mar 31, 2016).  The record evidence of Plaintiff's conduct—especially when considered in its totality—is overwhelming, and none of Plaintiff's attempts to skirt around these facts is persuasive.

---

[5]    Plaintiff tries to undo that admission by arguing the testimony came "at the end of hours of cross-examination" and it supposedly was "unclear if the question was referring to keeping Jackpot from operating in any capacity here." Pl. Br. 3; *see also id.* at 24. But the Court heard Mr. Sullivan's testimony and can assess it for itself: Mr. Sullivan candidly confirmed that the reason Plaintiff brought this lawsuit was to stop Jackpot.com—one of its only serious competitors—from launching in the U.S.

*First*, while Plaintiff argues (Pl. Br. 23-26) that facts showing its anti-competitive motivation are "skewed" or "lack context," it disregards that Jackpot.com's evidence is derived from the Court's findings of fact (supported by trial exhibits) and Plaintiff's own admissions. *See, e.g.*, Mot. 3-12 (citing Op. 6-9, 11-12, 24-25, 27, 29-34, 96, 125). Notably, Plaintiff almost never cites the Court's Opinion and Order; rather, it cites its own witnesses' new self-serving declarations and testimony, and its own new interpretations of documents.

*Second*, Plaintiff offers no meaningful responses to Jackpot.com's evidence. For example, as to communications dated *just before and as it filed suit*, where Plaintiff's executives admitted that they "won't let [Jackpot.com or Lottoland enter the U.S.] for sure" and were "in the process of trying to kill a bunch of these guys," Plaintiff now suggests innocent explanations, such as an unstated intent "to enforce Jackpocket's trademark rights." Pl. Br. 24. The Court already considered this evidence, and made findings of fact that these communications represented "additional steps to maintain [Plaintiff's] competitive head start" (Op. 33), not trademark "enforcement." Additional findings of fact by this Court include:

(1)    "Jackpocket lobbied regulators and state governments to encourage them not to sign licenses or otherwise do business with Jackpot.com and to block Jackpot.com from entering the U.S. lottery-courier-service market." Op. 34.

(2)    "Jackpocket sent information to an individual at the New York State Gaming Commission and the head of the New York Lottery highlighting what it claimed was Jackpot.com's 'bad actor stuff,' presumably referring to Jackpot.com's involvement with derivative lotteries." Op. 34.

(3)    "Jackpocket sent similar packages of information to other lottery associations, including [the Multi-State Lottery Association] MUSL." Op. 34.

(4)    "Jackpocket also tried to enlist Texas regulators to help prevent Jackpot.com from reaching a sponsorship agreement with ████████████." Op. 34.

(5)    "Jackpocket's efforts were not limited to Texas or to Jackpot.com," and after "Jackpocket successfully worked with Arkansas regulators to prevent a different competitor from receiving a license in that state," it intended to "get a piece that lumps [competitor 1] and jackpot.com together." Op. 35.

*See also* Op. 34-35.  In other words, the Court's findings of fact on a full trial record control the

interpretation of evidence, not Plaintiff's after-the-fact attempts to explain them away.

As another example, Plaintiff admits (Pl. Br. 24-25) that it worked with *PlayUSA* to publish

an article that referred to Jackpot.com as operating "illegal" lotteries and suggested this case might

"eat up" Jackpot.com's U.S. fundraising, yet now argues that it did not "tell *PlayUSA* … to smear

[Jackpot.com]."    But all evidence indicates that Plaintiff made its intentions clear:  Plaintiff

"[c]oordinated with [a] PlayUSA reporter about [this] lawsuit" through its PR agency, *PlayUSA*

published a negative article about Jackpot.com, and Plaintiff counted its publication as a "win."

Mot. 9-10 (quoting DX-343 at '187; DX-344).[6]   On this record, the Court should not credit

Plaintiff's after-the-fact argument (Pl. Br. 24-25) that because its VP of Marketing "testified she

was not aware of any communications with *PlayUSA*," perhaps those communications never

happened.  There is no actual dispute that they did, and that the article repeated Plaintiff's promoted

talking points, including its goals of stalling Jackpot.com's launch and bleeding its financial

resources.

As one more example, Plaintiff tries to rehabilitate its misrepresentations about "illegal"

lotteries, primarily by submitting three new fact declarations from its employees and agents.  *See*

Pl. Br. 8-13.  But Plaintiff makes no attempt to rebut Jackpot.com's arguments; rather, it attacks

the Court's findings of fact that: (1) "[t]here … is no evidence that Defendants have done anything

illegal or are planning to do anything illegal"; (2) Jackpot.com's "operation of derivative lotteries

outside the United States has been lawful"; (3) "[t]here is no evidence that Defendants will operate

---

[6]     While Plaintiff cites *Aspex Eyewear, Inc. v. Revolution Eyewear, Inc.*, 2001 WL 34852697, at *9 (C.D.
Cal. June 4, 2001) for the proposition that publicizing a lawsuit does not alone make a case exceptional (Pl.
Br. 25), Plaintiff ignores that, unlike in *Aspex*, its work with the Clyde Group was not part of its trademark
protection, but rather a coordinated anti-competitive PR attack aimed at smearing Jackpot.com and others
to "kill" them and prevent their entrance into the U.S.  *See* Mot. 6-7, 9-10, 18.

derivative lotteries in the United States, much less do so without regulatory permission"; and (4) "there is no evidence that the alleged improper activity here … would impact the attractiveness of Plaintiff's product to consumers inside the United States." Op. 123-124.

**Third**, Plaintiff's *post-hoc* rationalizations and new "evidence" still do not rebut the strong inference of Plaintiff's anti-competitive motivation in bringing suit. For example, Plaintiff now relies on new representations that its communications with regulators supposedly were to "help[] craft regulations for the industry" that would "pav[e] … the way for competitors." Pl. Br. 23. As support, Plaintiff cites pages 8-13 of its brief, which rely on: (1) Mr. Sullivan's new declaration and exhibits; (2) a declaration from Plaintiff's paid consultant, who submits a new expert report about the supposed effects of "derivative lotteries" on consumers; and (3) Mr. Fries's new declaration, where he tries to explain away his prior calls and writings. But these declarations self-servingly contradict the trial record showing that Plaintiff's "work behind the scenes" involvement in the regulatory process was intended to construct and preserve an anti-competitive "moat" around Plaintiff's services,[7] and that there was "no evidence" of any wrongdoing by Jackpot.com.[8]

As a prime example of Plaintiff's improper challenge, this Court already ruled that "**[t]he evidence shows** that Plaintiff has used the fact that Defendants (and others) have operated synthetic lotteries outside the United States as a cudgel to try to exclude those others from the market and to keep the United States market for itself." Op. 124 (emphasis added). But Plaintiff now argues that "[g]iven the chorus of industry concern over derivative lotteries, Jackpocket was not using the

---

[7]  *See* Mot. 3-12, 17-18 (citing PX-001 at '892; DX-137 at '903; DX-320 at '504; DX-316 at '424; DX-381 at '343; DX-306 at '308; DX-043 at '043 ; DX-029 at '193; & DX-043 at '043).

[8]  For example, Plaintiff cites Mr. Woosley's declaration to argue (Pl. Br. 12) that its mid-2022 campaign of sending negative information concerning Jackpot.com to agencies was in *response* to those agencies' requests. But to the contrary, Mr. Woosley's *admits* that he sent such material "on Jackpocket's behalf" and "[o]n July 13, 2022"—*i.e.*, just as Plaintiff filed suit and commenced its campaign to "kill" Jackpot.com, and *not* in response to any agency request to Plaintiff. *See* Woosley Decl. ¶ 21.

issue as a 'cudgel' to maintain market share." Pl. Br. 12.[9]  This represents a bald refusal to accept, and an attempt to re-litigate, what this Court has already found.  The Court should disregard it.

### 3.    Plaintiff's *Post-Hoc* Explanations Of Its Litigation Strategies Do Not Counter That This Case Is "Exceptional"

The Court should reject Plaintiff's attempts to hide its improper motive behind descriptions of "nuisance" settlements (Pl. Br. 22), the supposedly "narrow" scope of injunctive relief it sought (*id.* 2-3), or its last-minute offer to settle (*id.* 6).  In fact, these arguments favor an award of fees.

*First*, Plaintiff creates a rule (Pl. Br. 22) that unless a party sues to "extract a nuisance value settlement," it cannot have sued for an improper purpose.  Plaintiff, of course, is wrong.  While such a circumstance may be the most common (or "paradigmatic") example of improper motive, it certainly is not the only one.  In *Sleepy's LLC*, for example, the Second Circuit reminded that an improper motivation may render a case "exceptional," and remanded for consideration as to whether there was evidence the case was brought as a "bad-faith competitive ploy," without reference to a "nuisance" requirement.  909 F.3d at 531 n.7; *see also Anastasia Int'l*, 2013 WL 5550211, at *3 (case "was initiated as a competitive ploy," without reference to "nuisance value settlement").  In contrast, none of Plaintiff's cases addresses an improper **anti-competitive** motive of seeking to delay a competitor's launch while forcing it to divert resources to its defense.[10]

---

[9]    Plaintiff argues in the alternative that it should be excused for misleading regulators about the legality of Jackpot.com's business based on the *Noerr-Pennington* doctrine.  *See* Pl. Br. 25 (citing *Caixa Geral de Depositos, S.A. v. Jacinto Rodrigues*, 2005 WL 1541055, at *10 (D.N.J. June 30, 2005), for the proposition that "all of Jackpocket's communications with regulators are protected")).  Plaintiff cites no authority for the proposition that this doctrine immunizes a plaintiff from an award of attorneys' fees, and in any event it does not apply because Plaintiff's "ongoing claim [to regulators] of harm to the [lottery courier services industry] was baseless" and predicated on the demonstrably false assertion that Jackpot.com was engaged in illegal activity.  *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 811 (2d Cir. 1983) (*Noerr-Pennington* did not apply where "evidence tend[ed] to indicate that AT&T affirmatively misled the FCC").

[10]    *See* Pl. Br. 22-23 (citing *Sleepy's LLC*, 2020 WL 1244930, at *15 (plaintiff litigated case for well over a decade and there was no evidence plaintiff "pressure[d] [defendant] to renegotiate … or to maintain future business dealings," which defendant argued was the improper purpose of the lawsuit); *Universal Church,*

*Second*, Plaintiff's attempt to paint the remedy it sought as "narrow" because it "simply" asked that Jackpot.com "operate under a different name" (Pl. Br. 2-3, 22) should be disregarded. Plaintiff sought to enjoin Jackpot.com from using the branding it had openly been using for at least *six years* and *in over 180 countries* in connection with its planned U.S. launch (including states in which Plaintiff did not operate).[11]  Moreover, Plaintiff knew such relief would require Jackpot.com to re-brand entirely—a lengthy process that would also delay its launch and extend Plaintiff's near-monopoly in lottery courier services.  *See* Ron Decl. ¶ 90.  As this Court concluded: "an injunction would prevent Defendants from using a mark that they have long used internationally and that is generally descriptive of the product that both Plaintiff and Defendants offer, and thus it would impermissibly impede competition."  Op. 127.  This is anything but "narrow."

*Third*, Plaintiff errs (Pl. Br. 21-23) in arguing that its settlement "offer" negates its anti-competitive motivation.  Plaintiff did not make an offer until October 26, 2022 (*see* Dkt. 153-1)—*after* Plaintiff learned the Court would not issue a preliminary injunction, *after* the fact witnesses had already testified, and roughly *two weeks* before final trial submissions were due.  *See* Dkt. 105; Dkt. 111.  A settlement offer on the eve of trial does not undo the damage that had been done. Moreover, Plaintiff misleads the Court in recounting its offer: Plaintiff demanded that in exchange for payment, Jackpot.com "not use JACKPOT or JACKPOT.COM in connection with *any lottery products* or services in the U.S. (including lottery courier services)."  Dkt. 153-1 (emphasis added).

---

*Inc. v. Universal Life Church/ULC Monastery*, 2019 WL 4601741, at *4 (S.D.N.Y. Sept. 19, 2019) (no allegation plaintiff brought claims for anti-competitive purpose or to slow competitor's launch)).

[11]    Plaintiff also sought: (1) an order requiring Jackpot.com to "immediately retract and destroy all … materials and things that contain or bear the JACKPOT Marks"; (2) "trebl[e]" damages for "all profits arising from Jackpot's" allegedly "unlawful acts"; (3) "punitive damages"; (4) "trebl[e]" damages under "15 U.S.C. § 1117, N.Y. Gen. Bus. Law §§ 349 and 360"; (5) an order requiring Jackpot.com "to pay [Plaintiff's] costs and attorneys' fees"; (6) "all available damages pursuant to N.Y. Gen. Bus. Law §§ 349 and 360"; and (7) any "[o]ther relief as the Court may deem appropriate."  Dkt. 1 (Compl.) at 28-30.

That is, it demanded that Jackpot.com not only agree to not use its established branding in connection with "lottery courier services," but "*any* lottery products or services"—much broader than the "narrow" requested relief it now touts.[12]  It is illogical to say a proposed settlement is evidence of "good faith" when it demands *more* concessions than what a party seeks in its lawsuit.

*Fourth*, Plaintiff's own expenditures on attorneys' fees are irrelevant.  *Contra* Pl. Br. 22. That Plaintiff was willing to pay to inhibit a competitor's launch and deplete its capital is exactly why this case is exceptional, and why a simple cost/benefit assessment is not sufficient.  Plaintiff may have made an economic judgment that the payment of its own attorneys' fees was worth the price of an anti-competitive lawsuit, but such bad-faith tactics should have greater consequences.

### 4.   The Court Should Reject Plaintiff's Attempt To Re-Litigate The Court's Factual Finding Of Bad Faith

This Court made a factual finding that Plaintiff's modification of its logo in May 2022 "does bespeak bad faith" and "was made so that the Jackpocket logo would more closely resemble the Jackpot.com logo, the use of which Jackpocket was seeking to enjoin."  Op. 134; *see also* Mot. 19-20.  This is highly probative evidence of improper motive that Plaintiff fails to rebut.

*First*, the Court found that Plaintiff's addition of ".com" to its logo at the same time it sent Jackpot.com a cease-and-desist letter and applied for a registration "does bespeak bad faith."  Op. 134.  Moreover, the Court already considered Plaintiff's evidence regarding other uses of ".com" that it now points to (Pl. Br. 29)—*e.g.*, that "the domain jackpocket.com … has appeared in Jackpocket's advertising since [2013]" (Op. 134), but nonetheless found that the changing of the

---

[12]  Even the proposed payment (for the broader relief Plaintiff demanded) was not evidence of good faith: the ▉▉▉▉ offered in October 2022 was far less than the ▉▉▉▉ Jackpot.com paid for its domain name alone back in 2012 (which Plaintiff knew).  *See* Ron Decl. ¶ 16.  Independently, the Court should not even consider settlement negotiations under Fed. R. Evid. 408.  *Siracuse v. Program for the Dev. of Hum. Potential*, 2012 WL 1624291, at *20 (E.D.N.Y. Apr. 30, 2012) ("challenging an attorney's fee request" does not "appear[] on the short list of permissible other purposes within Rule 408").

logo in May 2022 to "more closely resemble the Jackpot.com logo, the use of which Jackpocket was seeking to enjoin" constitutes bad faith (Op. 134-135). That *other* acts may not have also given rise to a finding of bad faith does not undo the acts that were found to constitute bad faith.

  ***Second***, Plaintiff's argument (Pl. Br. 23) that the Court "already found that Jackpocket did not use its trademark improperly" is both incorrect and beside the point. The Court found that Plaintiff used its trademark improperly when it altered its logo in "bad faith" to make it "more closely resemble the Jackpot.com logo," even if it did not rise to unclean hands. Op. 134-35; *see also J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *21 n.30 (S.D.N.Y. May 8, 2013) ("a senior user [cannot] alter its mark to more closely mimic the junior user's mark and then claim injury from the increased likelihood of confusion"). Moreover, § 1117(a) does not require Jackpot.com to establish the high standard of proving the elements of an unclean hands defense.[13]

  ***Third***, it obviously cannot be correct that Plaintiff's misconduct is excused because it supposedly "had no impact on the outcome of the litigation." Pl. Br. 30. If that were right, a non-prevailing plaintiff would never be liable under § 1117(a) because, by definition, the defendant still won. Plaintiff's cited cases (Pl. Br. 30) stand for the more basic proposition that misconduct that is ***irrelevant*** to the litigation, or that is "largely a sideshow," carries less weight in assessing fees than misconduct that goes to either party's claims or defenses.[14] Here, Plaintiff concocted a new logo to make its own mark appear more similar to Jackpot.com's, to manufacture stronger legal claims. Such bad-faith conduct was not irrelevant, but was central to the issues presented.

---

[13] To be sure, the Court also reasoned that if it were going to award an injunction to Plaintiff, it would have crafted one, but "not one that would protect its new logo"; thus, an unclean hands defense would not "bar the request for equitable relief in its entirety." Op. 134-135. But notwithstanding the scope of such hypothetical relief (which the Court did not award), there is no question that the Court did find bad faith.

[14] *See Joao Control & Monitoring Sys., LLC v. Digital Playground, Inc.*, 2018 WL 1596068, at *5 (S.D.N.Y. Mar. 28, 2018) (cited Pl. Br. 30) ("surreptitiously record[ing] a telephonic settlement conference" while "obnoxious" was "largely a sideshow" that did not go to any of the issues in the lawsuit); *I.O.B. Realty, Inc. v. Patsy's Brand, Inc.*, 2020 WL 5518230, at *14 (S.D.N.Y. Sept. 13, 2020) (similar).

### B.    Plaintiff Fails To Rebut That An Award Of Fees Would Advance Considerations Of Compensation And Deterrence

As Jackpot.com explained (Mot. 20-22), considerations of compensation and deterrence also favor an award of its attorneys' fees.  Plaintiff used this lawsuit as a tool to delay a competitor's entry into the lottery courier services market (where Plaintiff held a near-monopoly) while trying to force Jackpot.com to divert capital from its launch to its defense—and it succeeded in those anti-competitive missions.  An award of attorneys' fees would "deter this plaintiff, and other similarly situated plaintiffs, from bringing unreasonable claims based on a cost/benefit analysis that tells such plaintiffs that they can score big if they win and that there will be no adverse consequences if they lose." *Baker v. Urban Outfitters*, 431 F. Supp. 2d 351, 359 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x. 845 (2d Cir. 2007).[15]  Plaintiff offers no convincing response.

*First*, as noted above, it does not matter that Plaintiff did not bring this action to extort a "nuisance" settlement (Pl. Br. 30), as there are many other acts that courts recognize should be deterred.  Plaintiff's purposes here were more nefarious: to use this lawsuit to exclude a legitimate competitor from encroaching on its monopoly; effectively pay for a short-term injunction; and force that competitor to divert crucial finances right before its planned launch.  These "self-help actions … are the kind of tactics the courts should deter." *VIDIVIXI, LLC*, 2016 WL 4367972, at *4.  While initiating a lawsuit to extract a settlement is an act worthy of deterrence, it is not the only such act.[16]  Nor does it matter that Plaintiff has not (yet) filed similar lawsuits against

---

[15]    That *Baker* was not a Lanham Act case is of no moment (Pl. Br. 32); it was a copyright case where the court addressed the **same** factors adopted by *Octane Fitness*, and on this factor concluded that "[a]n award of fees and costs is necessary to convince Baker and other like-minded plaintiffs that federal courts do not exist so that they can roll the dice on unreasonable allegations." *Baker, Inc.*, 431 F. Supp. 2d at 360; *Octane Fitness*, 572 U.S. at 554 & n.6 (relying on same factors "in the comparable context of the Copyright Act").

[16]    *See, e.g., Benihana of Tokyo*, 2018 WL 3574864, at *11 (compensation and deterrence factors favored fees award given "broader pattern of [plaintiff's anti-competitive] conduct" and fact that "[defendant] was required to expend significant resources … defending against claims"); *Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, 2020 WL 729518, at *5 (S.D.N.Y. Feb. 13, 2020) (award "necessary to

competitors.  *See, e.g., Beijing Daddy*, 2020 WL 729518, at *5 (awarding fees despite "no indication that the plaintiff in this case is a serial Lanham Act litigant").  This market just recently came into existence, and Plaintiff historically succeeded in blocking competition by preparing "oppo[sition] doc[s]" on potential competitors, and then working with its PR agencies, private investigators, and lobbyists to deploy the material in an effort to persuade regulators to ban those potential competitors before they could even launch.[17]  Because that playbook did not work against Jackpot.com, Plaintiff ratcheted up its behavior by filing this lawsuit.

**Second**, Plaintiff was not "required" by "trademark laws" to bring this lawsuit.  Pl. Br. 31. If Plaintiff were correct, fees would never be granted to trademark defendants.  Moreover, Plaintiff does not cite a single document suggesting it brought its suit based on "perceive[d] … actionable confusion," to "defend[] its marks," or to prevent future infringement.  Pl. Br. 31.  Rather, Plaintiff's plain motivation was to stop a new market entrant from disturbing its near-monopoly.[18]

**Third**, Plaintiff does not rebut that an award of fees would advance considerations of compensation.  While Plaintiff argues that it was Jackpot.com's "choice" to delay its U.S. launch while the case was pending (Pl. Br. 33), this Court recognized that "an early decision [would] be helpful, if it went in [Jackpot.com's] favor, to eliminate the uncertainty involved with their

---

compensate [defendant] … and to deter plaintiff and others from pursuing similarly frivolous claims going forward").  None of Plaintiff's cited cases (Pl. Br. 30) involved a plaintiff who sued in bad faith as a competitive ploy.  *See Universal Church*, 2019 WL 4601741, at *4 (no allegation case was a competitive ploy; defendants "failed to show that plaintiff sued it in bad faith"); *Hockeyline, Inc. v. STATS LLC*, 2017 WL 1743022, at *5 (S.D.N.Y. Apr. 27, 2017) (similar); *Small*, 2014 WL 5463621, at *4 (similar).

[17]  *See, e.g.*, DX-314 at '338; DX-025 at '378; *id*. at '377; and DX-314 at '270.

[18]  Plaintiff's cited cases (Pl. Br. 31) are inapposite because none involve a plaintiff with a "weak suggestive mark" in a "crowded field" suing to stifle competition.  Op. at 76.  *See, e.g., Procter & Gamble Co.*, 485 F. Supp. at 1207 ("bringing of the lawsuit was justifiable"); *Universal Church*, 2019 WL 4601741, at *4 (acknowledging not "all claims brought to enforce … valid trademarks are … objectively unreasonable" but finding plaintiff's claims were reasonable); *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 2020 WL 1467118, at *3 (S.D.N.Y. Mar. 26, 2020) (claims "were objectively reasonable").

launching a business." 8/8/22 Hr'g Tr. at 7:20-8:2.[19] The Court then resolved this case in the most efficient manner possible by ensuring a bench trial within approximately a month of the preliminary injunction hearing. This, if anything, supports the reasonableness of Jackpot.com's fees request, as it took steps to expedite final resolution and reduce costs as much as possible.

*Fourth*, that a few *other* third parties competed with Plaintiff on a small scale while Jackpot.com could not (Pl. Br. 34) has no bearing on *Jackpot.com's* fees. Putting aside that Jackpot.com is nothing like those other potential competitors—Jackpot.com already served customers under its brand for over six years in over 180 countries, and had garnered significant funding (*see* Ron Decl. ¶¶ 5, 57 & n.9)—the point is that Plaintiff sought to exclude what it saw as the real threat to its monopoly, and used this lawsuit as a tool to do so.

### C.    Plaintiff Fails To Rebut That Its Claims Were Objectively Unreasonable

Although the issue need not even be reached, Plaintiff's weak legal theories and misleading factual contentions confirm that this case is "exceptional" (Mot. 22-24), including because Plaintiff presented a weak theory of seeking to exclude a competitor from incorporating a highly descriptive term, and relied on a deficient factual record. Plaintiff's responses are not persuasive.

*First*, Plaintiff errs in its tautological argument (Pl. Br. 17-19) that because trademark law "encourage[s] … enforcement," Plaintiff should not be held responsible for bringing a weak case. There is no such rule that owners of "incontestable" trademark registrations are given special favor; otherwise, no defendant could be awarded its attorneys' fees when a plaintiff has an incontestable mark, upending the purpose of § 1117(a). *See, e.g.*, *IMAF, S.p.A. v. J.C. Penney Co.*, 810 F. Supp.

---

[19] Plaintiff also asserts (Pl. Br. 33) that Jackpot.com supposedly was not ready to launch before trial because it had no "performance marketing plan" or similar documents. While such documents are not necessary to operate a business, Plaintiff actually proves the point—Jackpot.com could not develop "brand" materials during the pendency of a lawsuit ***about which brands and trademarks it would be permitted to use***. Similarly, Plaintiff's argument that "marketing delays … are not exceptional" (Pl. Br. 33) misses the point—here, this lawsuit caused the delay of Jackpot.com's entire U.S. launch and all associated revenue.

96, 98 (S.D.N.Y. 1992) (§ 1117(a) "was not intended to protect and serve only plaintiffs" and "afford[s] protection to defendants against unfounded suits") (quotations omitted).[20]    Moreover, Plaintiff's own cases involving "trademark[s] that the Court held to be **strong**," *Hypnotic Hats Ltd.*, 2020 WL 1467118, at *3 (emphasis added), confirm that holders of **weak** trademarks—like Plaintiff (*see* Op. 66)—will be held accountable for bringing suits based upon unreasonable theories, such as the wholesale exclusion of competitors from using a ubiquitous industry term.

  **Second**, Plaintiff does not rebut that its unreasonable surveys and false allegations concerning derivative lotteries further demonstrate the weakness of its claims.    As to Plaintiff's surveys, the point is not that the Court attributed no weight to them, but rather that Plaintiff intentionally **skewed** their outcomes in the first place, with the purpose of generating biased results. Mot. 23-24.    And as to Plaintiff's false allegations concerning the legality of Jackpot.com's overseas services—which the Court rejected, as it found Jackpot.com's "operation of derivative lotteries outside the United States has been lawful" (Op. at 124-25)—Plaintiff turns logic on its head by arguing (Pl. Br. 21) that such allegations should be ignored because they "ha[d] no bearing" on this suit.    But such arguments were the centerpiece of Plaintiff's attempt to convince third parties to not do business with Jackpot.com, as well as its failed dilution claims, where it asserted injury based on perceptions that Jackpot.com's overseas business was "illegal."    Dkt. 1 (Compl.) ¶¶ 6, 64-66; Pl.'s Pre-Trial Br. at 18, 22, 66 n.29, 78.

  **Third**, Plaintiff cannot evade a fee award by mounting a collateral attack on the Court's findings on the *Polaroid* factors, such as actual confusion.    Pl. Br. 19-20.    The Court found

---

[20]    Contrary to Plaintiff's claim (Pl. Br. 18), courts routinely award attorneys' fees to defendants even where the plaintiff sought to enforce an incontestable registered mark.    *See, e.g.*, *Most Worshipful Nat'l Grand Lodge v. United Grand Lodge GA AF & AYM, Inc.*, 813 F. App'x 455, 458 (11th Cir. 2020) (affirming award of attorney's fees to defendant notwithstanding incontestable registration); *For Life Prod., LLC v. Virox Techs. Inc.*, 2022 WL 1670097, at *11 (W.D. Va. May 25, 2022) (similar).

Plaintiff's evidence was "insufficient to show actual confusion" and, in many instances, actually evidenced "the weakness of [Plaintiff's] marks" because it tended to show consumers did *not* "identify Jackpocket by its source."  Op. 102-106.  And as to Plaintiff's remaining argument that *Polaroid* may involve a fact-intensive analysis (Pl. Br. 19-20), this is true of every trademark case. Plaintiff did not prevail on *any* contested factor; while that may not alone be "exceptional," taken together with the other evidence discussed above it certainly confirms an award is justified here.

### D.    Plaintiff Fails To Rebut That It Litigated In An Unreasonable Manner

Plaintiff concedes that: (1) it sought to block Jackpot.com's attempts to seek discovery "on Jackpocket's motion for preliminary injunction"; and (2) it produced 55,000 pages of documents "on the eve of trial."  Pl. Br. 14-15.  Plaintiff's after-the-fact justifications do not undo such unreasonable litigation tactics.

*First*, while Plaintiff asserts its late-produced documents were "beyond what was appropriate, necessary, or responsive" (Pl. Br. 15), it concedes that its production contained documents that were *cited in the Court's findings of fact*, meaning they were responsive, relevant, and should have been produced.  Moreover, Plaintiff's last-minute production of *11 times* its entire prior production left Jackpot.com with 55,000 pages of documents to review on the eve of trial; thus, Jackpot.com only had time to review and present a subset of the new evidence in its trial submissions.  And while Plaintiff relies on the fact that the Court denied Jackpot.com's motion to compel (Pl. Br. 35), this ignores that the motion was denied *as moot* because, on the same day Jackpot.com filed it, "Plaintiff … represented [to the Court] that it … produced or [was] in the process of producing the requested documents in [two of the three categories of documents sought]."  Dkt. 121 (11/10 Order).  In other words, Jackpot.com's motion to compel was denied only because, at the last minute and after Jackpot.com told Plaintiff the motion would be filed, Plaintiff finally committed to make the requested production.

***Second***, Plaintiff errs (Pl. Br. 35) in defending its misconduct as not "substantial" because some unidentified subset of the late-produced documents supposedly were "duplicative" of documents previously produced. Plaintiff ignores the significance of documents that had not been produced in any form until days before trial, such as, *e.g.*, (1) DX-302 (cited Op. 88), which Plaintiff tacitly admits was new by arguing it was only partly "duplicative" of Mr. Sullivan's testimony and of individual pages from three different documents (*see* Pl. Br. 35), and (2) DX-299 at '996-'007 (late-produced "███████████████" presentation quoted in Jackpot.com's Proposed Findings of Fact & Conclusions of Law ¶ 96). Plaintiff also ignores the substantive differences between the late-produced documents—which also contained email correspondence with investors and additional, unique portions of investor materials—and the single, cherry-picked copy of certain presentations Plaintiff originally produced. *See* Pl. Br. 35 ("[c]ompar[ing] DX-287, 292 and 346 with Rettew Decl. at Exs. 2-4," but ignoring previously unproduced portions of late-produced documents). And even if credited, Plaintiff confirms that these documents were responsive and relevant, and never should have been withheld; Plaintiff cannot have it both ways.

## II.    PLAINTIFF DOES NOT OPPOSE JACKPOT.COM'S REQUESTS FOR RELATED NON-TAXABLE EXPENSES AND TO FILE A FEE APPLICATION

Plaintiff does not respond to Jackpot.com's arguments that the Court should: (1) award its related nontaxable expenses (Mot. 25-26); and (2) grant Jackpot.com leave to submit a fee application setting forth and supporting its specific calculations of its requested fees and expenses (Mot. 26-27). Plaintiff's "failure to oppose [these] specific argument[s] … is deemed waiver of th[ese] issue[s]." *Kao v. Brit. Airways, PLC*, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018).

## CONCLUSION

The Court should grant Jackpot.com's motion in its entirety.

Dated: New York, New York
       February 21, 2023

Respectfully submitted,

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

By:  */s/ Rachel E. Epstein*
     Rachel E. Epstein
     Carey R. Ramos
     Todd Anten
     Donald J. Reinhard, II
     rachelepstein@quinnemanuel.com
     careyramos@quinnemanuel.com
     toddanten@quinnemanuel.com
     donaldreinhard@quinnemanuel.com

     51 Madison Avenue, 22nd Floor
     New York, NY 10010
     Tel: (212) 849-7000
     Fax: (212) 849-7100

     *Attorneys for Defendants*