# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JACKPOCKET, INC., | **Case No. 22-cv-05772 (LJL)** |
| *Plaintiff*, | |
| v. | |
| LOTTOMATRIX NY LLC, LOTTOMATRIX CORPORATION, LOTTOMATRIX OPERATIONS LIMITED d/b/a JACKPOT.COM, LOTTOMATRIX MALTA LIMITED, and 99DYNAMICS LIMITED, | |
| *Defendants*. | |

## PLAINTIFF JACKPOCKET, INC.'S PROPOSED
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Pursuant to the Court's Amended Scheduling Order (Dkt. 123) and Rule 2(B)(iv) of the Court's Individual Practices in Civil Cases, Plaintiff Jackpocket, Inc. submits its proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACTS

### A.  Jackpocket and Its Jackpocket Marks

1.     Founded in 2013, Jackpocket owns and operates a popular app branded JACKPOCKET.  (October 9, 2022 Testimonial Declaration of Peter Sullivan ("Sullivan Decl.") ¶ 2.) The JACKPOCKET app offers lottery players a secure way to order official state lottery tickets from the convenience of their smartphones (called "Lottery Courier Services") in thirteen states and Washington, D.C., and is the first officially licensed third-party company in the United States to do so. (*Id.*; November 6, 2022 Testimonial Declaration of Michelle Wong ("Wong Decl.") ¶ 5, n.2.)

2.     After a customer places an order on the JACKPOCKET app, that order is then fulfilled on the customer's behalf. (Sullivan Decl. ¶ 2.) Jackpocket then safely and securely stores customers' physical tickets and uploads scans of those tickets to the customers' accounts, obviating the need to visit a retailer in-person or wait in any lines (to the extent any line exists) to purchase their ticket. (*Id.* ¶ 6.)

3.     In addition to the JACKPOCKET app (which can be downloaded from Jackpocket's website www.jackpocket.com and on app stores), customers can also use Jackpocket's Lottery Courier Services in eleven states and Washington, D.C. online through a computer at play.jackpocket.com. (*Id.* ¶ 3.)

4.     Through the JACKPOCKET app and website, people can order tickets for various lottery games (including the well-known MegaMillions and Powerball lotteries, as well as other high-prize, daily, quick-pick, instant-scratch, and choose-one's-own-numbers lottery games). (*Id.*

¶ 2.) The individual lottery tickets offered in connection with Jackpocket's Lottery Courier Services range from around $1 to $3 per ticket. (*Id.* ¶ 8.)

5.      Jackpocket invested substantial time, money, and effort to receive lottery courier licenses from the New York Lottery and New Jersey Lottery and is one of only two lottery courier services that are licensed in either state. (*Id.* ¶ 4; PX-033-35.) The other places where consumers can order lottery tickets lawfully through Jackpocket (Arkansas, Colorado, Minnesota, Montana, New Hampshire, New Mexico, Ohio, Oregon, Texas, West Virginia, and Washington, D.C.) do not require courier licenses. (Sullivan Decl. ¶ 4; Wong Decl. ¶ 5.)

6.      Creating an account to use Jackpocket's Lottery Courier Services is quick, easy, and streamlined, requiring the entry of basic personal information and a form of payment, which can be done by linking to bank accounts or various payment services (like PayPal or Venmo) or using Apple or Google Pay. (*See* Sullivan Decl. ¶ 7; Wong Decl. ¶¶ 33-37; PX-377-79.) Once an account is created, placing a ticket order through Jackpocket takes seconds and only a few clicks on the user's phone or computer. (Sullivan Decl. ¶ 7; Wong Decl. ¶ 34.) The following metrics demonstrate the ease by which customers can and do sign up and order lottery tickets through Jackpocket:

- ██ of users signing up for Jackpocket's services from October 1 to 15, 2022 did so in less than ███████████ in less than ████████, and ██ in less than ████████.

- ██ of first-time depositors (i.e., people funding their account for the first time) from mid-September to mid-October 2022 used Apple Pay (a very quick and easy payment method) to fund their account.

- ██ of first orders between mid-September and mid-October 2022 were made using a promo code, which eliminated the need for purchasers to enter any payment information to complete their order.

- ████ of people using the JACKPOCKET app on iOS and ██ of people using JACKPOCKET app on Android scanned their license (instead of manually entering

their date of birth and zip code) when signing up for a JACKPOCKET account, which reduces the time it takes to sign up.

(Wong Decl. ¶ 36; PX-377-379.)

7.    Several experts in this case have testified that the purchase of lottery tickets, including through a Lottery Courier Service like Jackpocket, is a gut decision and/or a low-involvement purchase. Jackpot's survey expert Dr. Itamar Simonson testified that buying lottery tickets is a "gut decision." (October 5 Deposition Transcript of Itamar Simonson ("Simonson Dep. Tr.") 38:6-10.) Dr. Simonson's testimony is consistent with that of Jackpocket's marketing and survey expert Dr. Michael J. Barone who, citing to marketing literature specifically discussing the purchase of lottery tickets, explained that these low-involvement purchases are made "as impulse purchases . . . with little or no prior planning." (October 3, 2022 Declaration and Report of Dr. Michael Barone in Reply to Survey and Supplemental Declaration of Dr. Itamar Simonson ("Barone Rebuttal Report") ¶¶ 11-12.)

8.    Jackpocket's economics expert Jeff Anderson, Managing Director at CONSOR, quantitatively assessed the difference between high- and low-involvement purchases based on the amount of research consumers do. (November 3, 2022 Expert Report of Jeff Anderson ("Anderson Report") at 5-11; PX-387-89, 392-93, 395-97.) Mr. Anderson concluded that Jackpocket's Lottery Courier Services qualify as low-involvement purchases (akin to printer paper, hand soap, and toilet paper), not high-involvement purchases (e.g., vehicles and houses). (*Id.*) And in his rebuttal to Jackpot's expert Dr. Bryan Wyman, Anderson showed that the amount of research done before ordering a lottery ticket via a Lottery Courier Service is akin to the low-involvement process of ordering a ride through Uber. (November 8, 2022 Rebuttal Report of Jeff Anderson ("Anderson Rebuttal Report") at 16-24; PX-399-401, 406, 408, 412, 414.)

9.      Jackpocket's lottery industry expert Michael Pollock, Managing Director of Spectrum Gaming Group, who has consulted for lottery commissions and testified before Congress and the Hague, similarly testified that lottery tickets, particularly those purchased through courier services, are ordered on impulse with little care and deliberation. (November 8, 2022 Rebuttal Report of Michael Pollock ("Pollock Rebuttal Report") at 10-12.) He explained that state lotteries themselves deem lottery ticket purchases as "impulse" decisions, with the Illinois Lottery noting "[l]ottery products are impulse purchases driven by convenience" and the Connecticut Lottery noting "[l]ottery products add to impulse purchases . . . ." (*Id.* at 10.) And, as Pollock explains further, Lottery Courier Services "leverage the Internet's inherent convenience," making these impulse purchases even easier. (*Id.* at 7-8, 10-12.)

### 1.      The Selection and First Use of the JACKPOCKET Name and Mark

10.      Jackpocket's name and mark JACKPOCKET is a made-up term that was first coined by its CEO and founder, Peter Sullivan, in early 2013. (Sullivan Decl. ¶ 12.) He wanted a name that was unique and clever. (*Id.*) To achieve that objective, Mr. Sullivan chose JACKPOCKET because it cleverly suggests that somebody using the app on their phone (which is typically stored in a person's pocket) could do so to remotely purchase lottery tickets that could ultimately result in the user winning any number of prizes if they had the winning ticket, possibly (albeit highly unlikely) including the top prize. (*Id.*)

11.      At the time Mr. Sullivan selected the JACKPOCKET name and mark in 2013, he was not aware of the jackpot.com domain. (*Id.* ¶ 13.) None of the Defendants existed in 2013, and the site at jackpot.com was passive and did not have any functionality in the United States in 2013. (October 11, 2022 Hearing Transcript ("Oct. 11 Tr.") at 207:4-6, 209:7-10; 209:15-210:4, 210:13-21; 272:5-24.)

4

12.     Around the same time Mr. Sullivan selected JACKPOCKET, he also chose the name, mark, and domain JACKPOCKET.COM (referred to together as the "JACKPOCKET Marks") to have consistent branding. (Sullivan Decl. ¶ 14.) He acquired the jackpocket.com domain in around April 2013, and the website went live for registrations shortly thereafter. (*Id.*)

13.     In May 2013, the first users registered for Jackpocket's Lottery Courier Services, and in August 2013, Jackpocket made its first sales. (*Id.* ¶ 15; PX-036.) Since then, Jackpocket has continuously offered its Lottery Courier Services in the United States under its JACKPOCKET mark, except for a brief period from November 2016 through July 10, 2017 (the latter date being when Jackpocket launched its Lottery Courier Services under the JACKPOCKET Marks in the state of Minnesota, which was followed by New Hampshire in November 2017) due to regulatory issues in New York. (Sullivan Decl. ¶ 15.) During that time, (1) the Jackpocket website remained active, accessible, and usable with the JACKPOCKET Marks prominently displayed; (2) the Jackpocket app remained available for download and consumers did download the app (although they could not order lottery tickets during those months); (3) consumers could and did use the app to withdraw winnings from their accounts, find local retailers near their location (and were provided a direct link in the JACKPOCKET app to order an Uber rideshare that was automatically populated with the nearest retailer as the destination), and check lottery results; and (4) Jackpocket continued to actively advertise and promote the JACKPOCKET Marks and services to the public. (*Id.*)

14.     Since July 2017, Jackpocket has consistently expanded the states in which it has offered its JACKPOCKET-branded Lottery Courier Services. (Wong Decl. ¶ 5.) After launching in Minnesota and New Hampshire, Jackpocket expanded into Texas, New Jersey, and Washington, D.C. in 2019. (*Id.*) In 2020, Jackpocket further expanded into Colorado, Oregon, Arkansas, and

Ohio. (*Id.*) In 2021, Jackpocket re-launched in New York, and in 2022, launched in New Mexico, Montana, Idaho, and West Virginia. (*Id.*) Jackpocket's three largest markets (measured in terms of population over 18 and existing draw-based lottery ticket sales) are, in order, ███████████ ████████████ (*Id.*)

### 2.   **Jackpocket's Commercial Success**

15.    Since its 2013 launch, Jackpocket has been a commercial success. As of November 3, 2022, approximately ███ million customers have downloaded the app for Jackpocket's services (with over ████ in New York); Jackpocket has sold over ████ million worth of lottery tickets (with over ███ million in New York); and Jackpocket earned over ███ million in revenue. (Sullivan Decl. ¶ 16; PX-036-37; Wong Decl. ¶ 9; PX-363-64.) .) In recent weeks:

| *Date* | *Tickets Ordered From Jackpocket (in Dollars)* | *Jackpocket Revenue* |
|---|---|---|
| October 29, 2022 | ██████ | █████ |
| October 30, 2022 | ██████ | █████ |
| October 31, 2022 | ██████ | █████ |
| November 1, 2022 | ██████ | █████ |
| November 2, 2022 | ██████ | █████ |
| November 3, 2022 | ██████ | █████ |
| November 4, 2022 | ██████ | █████ |
| November 5, 2022 | ██████ | █████ |

(Wong Decl. ¶ 29.)

16.    Jackpocket has also seen success in key marketing metrics, including:

- From November 1-5, 2022, Jackpocket's first-time depositors were up ███████ over the corresponding time in October.

- From November 1-5, 2022, Jackpocket's cost-per-acquisition was down ████ from the corresponding time in October.

- From November 1-5, 2022 alone, Jackpocket had ████ players, up ████ over the corresponding time in October.

- On November 2, 2022 alone, Jackpocket had ████ active players and ████ orders.

- The week of October 24, Jackpocket had an ████ week-over-week retention, meaning it retained ████ of the users who played the previous week.

(*Id.*)

17.     Jackpocket has been the number one app in Apple's entire U.S. App Store for free apps in at least July 2022, ranking higher than YouTube, Google, and TikTok. (Sullivan Decl. ¶ 16; Wong Decl. ¶ 27; PX-374.) Around the same time, Jackpocket was also ranked the number one "Entertainment" app in the Apple App Store—over Ticketmaster, Netflix, Amazon Prime Video, and Disney+. (Wong Decl. ¶ 27; PX-375.) And at least as of November 1, 2022, the JACKPOCKET app was ranked the number six "Entertainment" app in the Apple App Store, above Hulu, HBO Max, YouTube, and others. (Wong Decl. ¶ 27.) #Jackpocket was also trending number two on Twitter at least on July 29, 2022 and was trending number five on Twitter at least on October 31, 2022. (Wong Decl. ¶ 28; PX-376; PX-479.)

18.     Jackpocket has also garnered a significant market share in the overall lottery industry. (Sullivan Decl. ¶ 17; PX-038; Wong Decl. ¶¶ 13, 26.) As of July 25, 2022, Jackpocket had a ████ market share in New York, ████ in Texas, and ████ in New Jersey. (*Id.*) Additionally, Jackpocket was responsible for ████ in ticket sales in Texas in 2021—more than any retailer in the state by over ████ million. (Wong Decl. ¶ 29.)

3.      **Jackpocket's Advertising of Its JACKPOCKET Marks**

19.     From 2017 to November 3, 2022, Jackpocket spent nearly ▮▮▮ million to advertise, market, and promote its JACKPOCKET Marks and Lottery Courier Services. (Wong Decl. ¶ 9; PX-363.)

20.     Jackpocket advertises in virtually all media outlets, including television, radio, streaming services, podcasts, public transportation venues, billboards, direct mail, distribution of branded items, in-stadium advertising for nationally broadcast sports games, digital and social media (e.g., affiliate/ad networks, App Store/Google Play Store/Samsung Galaxy Store, Facebook, Google, Snapchat, Reddit, and Twitter), a referral program (where, for example, an existing player can give a friend a $2 free ticket and receive $10 in credits when that friend deposits money for the first time), social influencers, and experiential advertising (e.g., street teams). (Sullivan Decl. ¶¶ 24-31; PX-042-124; Wong Decl. ¶¶ 6, 20; PX-362.) Jackpocket spends ▮▮▮▮▮▮, and in some cases ▮▮▮▮▮▮ of dollars, per week on these different channels. (Wong Decl. ¶ 21; PX-365-373.) In New York alone, Jackpocket spent over ▮▮ million to advertise, market, and promote its JACKPOCKET Marks and Lottery Courier Services from 2017 through August 2022, including around ▮ million from January through August 2022. (Sullivan Decl. ¶ 32.)

21.     Jackpocket also promotes its JACKPOCKET Marks and Lottery Courier Services through various high-profile partnerships, including with professional and collegiate sports teams, audio content organizations, universities, and non-profit corporations, including the New Jersey Devils (hockey), the New York Islanders (hockey), the New York Jets (football), the New York Mets (baseball), the Colorado Rockies (baseball), the Minnesota Twins (baseball), Circle K (nationwide retailer), Audacy (non-profit organization), and ESPN New York (sports broadcasting), among others. (Sullivan Decl. ¶¶ 34-35; PX-125-159; Wong Decl. ¶¶ 8, 23-24.) Jackpocket is currently in the final stages of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████, which include the Dallas Mavericks (basketball) and the Texas Rangers (baseball). (Wong Decl. ¶ 23; Oct. 11 Tr. at 179:23-180:3.) These partnerships provide value to Jackpocket by bolstering Jackpocket's reputation (tying Jackpocket to established brands with a strong reputation), improving Jackpocket's name recognition, and increasing exposure of the JACKPOCKET brand to hundreds of thousands of additional potential users. (Wong Decl. ¶¶ 8, 23.)

22.     Through Jackpocket's partnership with the New York Islanders professional NHL hockey team, where Jackpocket is the home helmet sponsor (the JACKPOCKET mark appears on the helmet of every Islanders player in every home game of the 2022-23 season) (Sullivan Decl. ¶ 35), tens of thousands of fans at the stadium—and thousands more watching at home (in New York and beyond)—are continuously exposed to the JACKPOCKET mark throughout the games. (Wong Decl. ¶ 8.)

23.     Through Jackpocket's partnership with NFL football teams like the New York Jets, over 82,000 fans (the capacity of MetLife Stadium, where the Jets' home games are played) are potentially exposed to the JACKPOCKET name and mark through in-stadium advertising and promotions. (Sullivan Decl. ¶ 31; PX-117-124; Wong Decl. ¶ 8.)

24.     Through Jackpocket's partnership with Circle K, thousands of people are exposed to the JACKPOCKET mark in their everyday lives, for example when they get gas or stop for a snack. (Wong Decl. ¶ 8, PX-132.)

25.     Jackpocket's partnerships place its JACKPOCKET mark prominently in the public eye and at the top of mind on a daily and/or weekly basis for hundreds of thousands to see. (Wong Decl. ¶ 8.)

26.     Jackpocket promotes and showcases its JACKPOCKET Marks and Lottery Courier Services on its own website, www.jackpocket.com, and on banner ads featured on other websites. (Sullivan Decl. ¶¶ 38-39; PX-160.)

27.     Jackpocket has prominently used and promoted its JACKPOCKET.COM name, mark, and domain in advertising from 2013 onward. (*Id.* ¶¶ 41-49; PX-185-192; Oct. 11 Tr. at 165:22-166:15.)

28.     Jackpocket promotes its JACKPOCKET Marks using multiple different colors, including blue (Jackpocket's primary color), orange, yellow, red, green, and others. (Sullivan Decl. ¶ 30; PX-088-92.)

29.     Over the years, as Jackpocket has expanded, its marketing spend has increased. (Wong Decl. ¶ 10; PX-038, 363.) This has been a result of its growth and success. (*See id.*) Jackpocket has been afforded the opportunity to continuously expand its marketing budget and spend commensurate with its geographic expansion for two reasons: (1) Jackpocket's financial success as it has grown; and (2) the receipt of additional investor funding through Jackpocket's various funding rounds. (*Id.*)

30.     Jackpocket's increased advertising spend into the ███████████ annually over the last couple of years (which naturally occurred as Jackpocket expanded geographically and received additional funding) is generally consistent with increases from earlier years (in terms of percentages), ██████████████████████████████████████████ e.g., Texas and New Jersey in 2019 and reentering New York in 2021. (Wong Decl. ¶ 11; PX-363-364.) ████████████████████████████████████ are incurred to immediately begin advertising in those states to develop brand recognition and earn market share. (Wong Decl. ¶ 11.)

31.     None of the increases in Jackpocket's marketing spend over the years were the result of any competitor or potential competitor in the marketplace. (*Id.* ¶¶ 12, 15-16; PX-365-73.)

32.     Jackpocket allocates and sets its marketing budget by considering two primary factors: (1) ███████████████████████████ and (2) ████████████████ ████████████████████ (Wong Decl. ¶ 12.) Jackpocket █████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████. (*Id.*)

### 4.     Unsolicited Media Attention About Jackpocket

33.     As a result of Jackpocket's success, it has received extensive local and national media coverage. (Sullivan Decl. ¶¶ 50-51; PX-193-258; Wong Decl. ¶ 30.) For example, on September 29, 2015, ABC's *Good Morning America* aired a segment about JACKPOCKET where the anchors used the JACKPOCKET app on air. (Sullivan Decl. ¶ 50; PX-193.)  More recently, Jackpocket was featured in a New York Post article discussing Jackpocket on October 31, 2022, as well as on a Colorado news station on November 3, 2022. (Wong Decl. ¶ 30.) In addition to this local and nationwide unsolicited media coverage, Jackpocket has also received (and/or been named a finalist for) various corporate and business awards, most recently including being named a finalist for PR Daily's *Media Relations Award* in "Exclusive Content Strategy." (Sullivan Decl. ¶ 52; PX-259-265; Wong Decl. ¶ 31.)

### 5.     Consumer Survey Showing the Strength of the JACKPOCKET Mark

34.     Jackpocket's survey expert Hal Poret assessed the level of recognition of the JACKPOCKET mark. (*See generally*, October 27, 2022 Declaration of Hal Poret ("Poret Declaration").) Using an accepted survey format, Poret measured recognition of JACKPOCKET in New York and New Jersey among consumers of Lottery Courier Services. (Poret Declaration at 6-10, 12-15.) Respondents were first asked to list all mobile apps or websites for purchasing

state lottery tickets that they have ever seen or heard of, measuring unaided awareness. (*Id.* at 6.) Respondents were then shown a total of six names one at a time, including JACKPOCKET, and asked whether they have ever seen or heard them, measuring aided awareness. (*Id.*) Poret's survey found that 58.3% of New York and New Jersey consumers of lottery courier services recognize the JACKPOCKET mark, with an unaided awareness of 19–24.7%. (*Id.* at 11, 24-25.)

35.     Jackpot conducted a counter recognition survey through Scott Swain.  (November 7, 2022 Expert Rebuttal Report of Scott Swain ("Swain Rebuttal Report".) That survey, however, used overly broad questions not directed to Lottery Courier Services, like all the other survey experts did when conducting their surveys. (*See generally id.*; Poret Response Report ¶¶ 2, 9-11.) Mr. Swain's survey showed that the JACKPOCKET mark has unaided awareness equal or greater to such well-known marks as CEASARS, MGM, and DRAFT KINGS. (*See* Response from Hal Poret to Survey Conducted by Scott D. Swain ("Poret Response Report").)

### 6.      Jackpocket's Incontestable Federal Registration

36.     In addition to its common-law trademark rights, Jackpocket owns U.S. Trademark Registration No. 4743194 for its JACKPOCKET mark. (Sullivan Decl. ¶ 18; PX-039.) This registration, which issued on May 26, 2015, from an application filed on October 1, 2014, is incontestable under 15 U.S.C. § 1065. (*Id.*)

### 7.      Jackpocket's Involvement with the Lottery Industry

37.     Jackpocket has worked closely with the domestic lottery industry, as well as state regulators, in developing the JACKPOCKET app and to ensure the integrity of its app and Lottery Courier Services. (Sullivan Decl. ¶ 19.) For example, Jackpocket worked with the New York Lottery to help create the licensing framework for courier services in the state. (Oct. 11 Tr. at 37:12-38:16, 167:12-168:3.)

38.    Jackpocket continues to encourage the industry and states to require various consumer protections. (Sullivan Decl. ¶ 19.) By enabling today's lottery players to legitimately participate in lotteries from their smartphones, Jackpocket also helps state lotteries drive incremental revenue to fund essential state programs, including those for education, veterans' services, and natural resources. (*Id.* ¶ 20; PX-040.)

39.    Through Jackpocket's involvement with the official state lotteries and regulators, multiple lottery officials and regulators have informed Jackpocket that derivative lotteries (also known as "insurance" or "synthetic" lotteries), are one of the most significant challenges the U.S. lottery industry faces. (Sullivan Decl. ¶ 21; PX-041; Oct. 11 Tr. 178:2-18.) Through derivative lotteries, individuals in certain foreign countries can bet on the outcomes of lotteries (e.g., allowing someone in Malta to make a bet on the Powerball lottery numbers in the United States) without actually buying tickets for those lotteries, thereby exploiting them at the expense of local lotteries, who lose sales to the derivative lottery. (Sullivan Decl. ¶ 21.) As a result of this concern, at least the New York Lottery and Multi-State Lottery Association ("MUSL") have asked Jackpocket to inform them of any derivative lottery operators that intend to launch in the United States or of any entities already operating in the United States who are affiliated with derivative lotteries overseas. (*Id.* ¶ 22.) Jackpocket has done so as requested. (Oct. 11 Tr. at 178:2-18, 179:5-11.)

**B.   Jackpot, Its JACKPOT Marks, and Its Overseas Business Operations**

**1.    Jackpot's 2016 Launch and Overseas Operations**

40.    The first Jackpot entity was founded in 2016, and Jackpot has conducted business overseas ever since. (Oct. 11 Tr. at 189:7-190:5.) Specifically, Defendant 99Dynamics Limited was formed in 2016. (*Id.* at 190:9-18.) The other Lottomatrix entities were formed in 2021, including Lottomatrix Corporation (the U.S. entity founded for Jackpot's U.S. activities); Lottomatrix New York LLC (which will operate licensed activity in New York); and Lottomatrix

LLC (which will operate activities in non-licensed jurisdictions, like Texas). (*Id.* at 190:19-192:18.) None of the Defendant entities that make up Jackpot existed until 2016 or later. (*Id.* at 192:19-21.)

41.     Jackpot presented itself to its Series A investors in the United States as a company that launched in 2016 and operates abroad. (*See* PX-425 at Jackpot.com_00001422; PX-435 at Jackpot.com_00001882; PX-437 at Jackpot.com_00002044; PX-447 at Jackpot.com_00004152; PX-448 at Jackpot.com_00004447; PX-449 at Jackpot.com_00004646; PX-451 at Jackpot.com_00004861; PX-455 at Jackpot.com_00007680; PX-456 at Jackpot.com_00008084; PX-457 at Jackpot.com_00008085.) For example:



Jackpot.com's core business since its launch in 2016 is the insurance-backed betting on lottery model, mostly in regulated territories via four licenses – UKGC, SGA, MGA, Ireland.  In late 2020, the B2B arm (Lottomatrix) was launched to provide a technology and services solution for iLottery clients, focusing on emerging markets.

**Background**

➢ Founded in 2016, Jackpot.com is a global online lottery operator providing customers the ability to participate in domestic and custom lotteries from around the world.

```
Company overview
```

> Launched in 2016 and incorporated in the United
> Kingdom, Jackpot.com is a global online lottery
> operator providing customers the ability to
> participate in international, domestic and custom
> lotteries from around the world



**Jackpot.com is seeking expressions of interest from potential investors looking to gain access to an established global online lottery platform that is expanding into the growing online US lottery market. The market penetration and accelerated growth is enabled via the acquisition of TakeThat Ltd., the leading affiliate and SEO company in the industry.**



| Key Investment Highlights | Company Overview |
|---|---|
| **Experienced Team of Industry Veterans** – Pioneers in the online lottery space | ▪ Launched in 2016 and incorporated in the United Kingdom, Jackpot.com is a global online lottery operator<br>▪ Jackpot.com offers: |

*I founded Jackpot.com along with my partner, Roi More (also co-founder of GETT) in 2016, with the goal of disrupting the lottery industry - one of the last to make the transition online.*

(PX-425 at Jackpot.com_00001422; PX-435 at Jackpot.com_00001882; PX-447 at Jackpot.com_00004152; PX-449 at Jackpot.com_00004646; PX-456 at Jackpot.com_00008084.) These materials do not mention that Jackpot had any connection with the jackpot.com domain before 2016 in any manner, nor do they mention that the jackpot.com domain was used at any time before 2016, including in the United States. (*Id.*)

42.     Jackpot obtained the jackpot.com domain name in 2016. (Oct. 11 Tr. at 210:22-211:1.) Before that, jackpot.com was owned by a different entity named Palek International—a holding company with no employees, formed for the sole purpose of acquiring domains—which is unrelated to and has no affiliation or connection with Jackpot, except for having common

founders. (*Id.* at 207:4-10; 207:17-208:1; 208:16-22; 209:1-6. *See also* Direct Testimony Declaration of Yariv Ron ("Ron Decl.") at ¶ 16, n.3.) From 2012 through 2016, when Palek owned jackpot.com, it had no U.S. operations or activities. (Oct. 11 Tr. at 207:4-6; 210:13-17.) U.S. visitors to jackpot.com could not play any games, place any bets, or transact any business. (*Id.* at 209:15-210:4.) While Palek owned the jackpot.com domain, in the United States it was a website that only allowed visitors to see the results of various lotteries around the world. (*Id.* at 272:5-24.) There is no evidence of the amount of money or revenue, if any, that Palek made from U.S. visitors to the jackpot.com website when Palek owned it from 2012 to 2016. (*Id.* at 209:7-10; 210:18-21.)

43.     Since Jackpot acquired the jackpot.com domain, it has used the JACKPOT name and jackpot.com domain name to offer services exclusively for derivative lotteries (which are illegal in the United States and elsewhere), as well as other iGaming offerings abroad. (*Id.* at 189:11-18; 199:1-200:7.) Jackpot has no U.S. licenses, has no registered customers in the United States, and does not and has not offered any transaction or gaming services in the United States. (*Id.* at 193:4-10; 193:17-194:13.)

### 2.     Jackpot's Plans to Launch Lottery Courier Services Under the JACKPOT and JACKPOT.COM Brands in the United States

44.     Jackpot does not offer Lottery Courier Services in the United States, but plans to do so. (*Id.* at 194:14-16; 196:19-24.) Jackpot intends to use JACKPOT and JACKPOT.COM (referred to together as the "JACKPOT Marks") as brands for its Lottery Courier Services, with both brands being of equal importance. (*Id.* at 201:19-23; 202:7-13; 276:20-23.)

45.     Before deciding to enter the United States under the JACKPOT and JACKPOT.COM brands for Lottery Courier Services, Jackpot did not undertake any legal due diligence or conduct any investigations to determine whether those marks infringed, diluted, or otherwise conflicted with pre-existing U.S. trademark rights. (*Id.* at 276:24-277:1, 277:24-278:4.)

Jackpot understands that it can use a brand other than JACKPOT or JACKPOT.COM for its planned Lottery Courier Services in the United States, and Jackpot's co-founders have discussed other possible names. (*Id.* at 206:2-14.)

### 3.   Jackpot's Lack of Advertising in the United States

46.   To date, Jackpot has done nothing to develop or market the JACKPOT Marks in the United States. (*See generally*, *id.* at 212:6-213:19; 213:24-214:5; 214:22-216:11, 222:25-223:6.) Jackpot has not directed any advertising to the United States and has spent no money specifically advertising here. (*Id.* at 212:6-213:12.) Jackpot has not done any prelaunch advertising. (*Id.* at 213:14-16.) It has no written advertising plans, and it has not hired any employees for its marketing department. (*Id.* at 213:7-19; 213:24-214:5; 222:25-223:6.) Jackpot also has not created or developed a mission, messaging, brand guidelines, written creative, or slogan for the United States. (*Id.* at 214:22-216:1.) Other than its website landing page, Jackpot has not created any brand elements for the United States. (*Id.* at 216:2-7.) Jackpot also has no planned date for the launch of any advertising in the United States. (*Id.* at 216:9-11.)

### 4.   Jackpot's Awareness of Jackpocket and Its U.S. Business

47.   Jackpot is and has been aware of Jackpocket, Jackpocket's JACKPOCKET-branded Lottery Courier Services, and Jackpocket's standing as a market leader in the United States. (*See*, *e.g.*, *id.* at 224:6-226:9; PX-341 at Jackpot.com_00001109; PX-478 at Jackpot.com_00000800; PX-475 at Jackpot.com_00000083.) Jackpot considers Jackpocket its "most relevant competitor" and the "market leader" for Lottery Courier Services. (Oct. 11 Tr. at 224:6-226:9; PX-341 at Jackpot.com_00001109.) In a Jackpot investment memo, Jackpocket is described as the "clear market leader." (PX-478 at Jackpot.com_00000800.) Jackpot has also described Jackpocket as the "benchmark" in the industry. (PX-475 at Jackpot.com_00000083.)

48.     When Jackpot talks about the competitive landscape with investors and others, Jackpocket usually comes up. (Oct. 11 Tr. at 226:15-17.) Jackpot keeps its investors apprised of Jackpocket's business operations, leverages Jackpocket's success in pitching Jackpot's proposed Lottery Courier Services, has gathered and shared Jackpocket's financial information with investors, and includes Jackpocket in its investor materials. (*See* PX-425 at Jackpot.com_00001424; PX-426; PX-428-431; PX-435 at Jackpot.com_00001886; PX-437 at Jackpot.com_00002053; PX-438 at Jackpot.com_00002102; PX-439 at Jackpot.com_00002230; PX-440 at Jackpot.com_00002245; PX-441 at Jackpot.com_00002257; PX-442 at Jackpot.com_00002299; PX-443 at Jackpot.com_00002536; PX-445 at Jackpot.com_00002708; PX-447 at Jackpot.com_00004176; PX-448 at Jackpot.com_00004447; PX-449 at Jackpot.com_00004646; PX-450 at Jackpot.com_00004838; PX-451 at Jackpot.com_00004861; PX-453; PX-455 at Jackpot.com_00007680; PX-456 at Jackpot.com_00008084; PX-457 at Jackpot.com_00008085; PX-463 at Jackpot.com_00009345; PX-474; PX-476; PX-477.)

49.     Jackpot's executives have acknowledged the overlap between the parties' marks, noting that searching for "Jackpot" and/or "Jackpot.com" on the Apple App Store returns results for Jackpocket. (PX-465 at Jackpot.com_00010136.) Jackpot has also compared itself to "Jackpocket 2020, right before the license and hockey stick [growth]." (PX-444 at Jackpot.com_00002687.)

50.     The U.S. website that Jackpot launched in June 2022 used the same color scheme and a strikingly similar design to Jackpocket's website. (*Id.* at 230:23-25; 232:10-11; PX-342.) Jackpot changed its website design to black and orange (which was a quick change to make) after Jackpocket objected, filed its complaint, and filed its motion for preliminary injunction. (Oct. 11 Tr. at 231:20-232:18.)

51.     Jackpot's U.S. site was created by a freelancer, who is a friend of Jackpot's CEO, Mr. Yariv Ron, who he has known for 22 years. (*Id.* at 231:8-12.) Mr. Ron testified that he had no knowledge of whether the freelancer looked at Jackpocket's website when designing Jackpot's site. (*Id.* at 231:15-19.) An email produced after Mr. Ron's testimony shows that Jackpot told the freelancer to use Jackpocket's website as an example in designing portions of Jackpot's website. (PX-466 at Jackpot.com_00010316.) Mr. Ron was copied on that email. (*Id.*)

### 5.     The Parties' Business Discussions

52.     On November 29, 2021, Mr. Ron sent Jackpocket's CEO Peter Sullivan a private message on LinkedIn asking if he was available to meet to discuss "strategic options going forward" with Jackpot. (Sullivan Decl. ¶ 57.) Mr. Ron and Mr. Sullivan then began corresponding, speaking for the first time over Zoom on December 3, 2021. (*Id.* ¶¶ 58-59.) On that call, Mr. Ron indicated that Jackpot was interested in entering the U.S. to offer Lottery Courier Services and that it was ███████████████████████████████████████ (*Id.* ¶ 59.) Mr. Sullivan understood Mr. Ron's proposal to mean that Jackpot ██████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████ (*Id.*) On that call, Mr. Sullivan also expressed concern about Jackpot's operation of derivative lotteries overseas, but because he was interested in evaluating Mr. Ron's proposal for ██████████████████, suggested that the parties share some materials. (*Id.*)

53.     Jackpocket began internally evaluating a potential business deal ██████ █████████████████████ (*Id.* ¶ 61.) During a January 7, 2022 call, Mr. Sullivan again expressed concern to Mr. Ron over Jackpot's operation of derivative lotteries overseas and indicated that Jackpot would need to stop operating such lotteries if it were to ██████████ ██████ (*Id.* ¶ 63; Oct. 11 Tr. at 227:11-228:13.) Mr. Ron and Mr. Sullivan also discussed that

Jackpot was in the process of trying to acquire another company that owned multiple different brands and lottery-associated domains (which were discussed generally, and not specifically) to facilitate its entry into the United States. (Sullivan Decl. ¶ 64.) At that time, Mr. Sullivan believed those brands (which Jackpot was trying to acquire) were possible brands under which Jackpot hoped to eventually launch its Lottery Courier Services in the United States. (*Id.*)

54.     It was Mr. Sullivan's understanding that because the United States lottery market is a heavily regulated industry with numerous restrictions, certain state regulators would not allow companies that run derivative lotteries overseas to operate in the U.S. under the same brand used for the derivative lotteries abroad. (*Id.* ¶ 91.) For example, in late 2020 into early 2021, Jackpocket was negotiating to acquire an entity named ▓▓▓▓ that, like Defendants, operates derivative lotteries overseas. (*Id.*) During the negotiations, ▓▓▓▓ presented Jackpocket with a presentation similar to the one Jackpot provided to Jackpocket, with ▓▓▓▓▓▓▓▓▓▓ branding repeated throughout presentation. (*Id.*; PX-310.) ▓▓▓▓ however, did not use ▓▓▓▓▓▓ for its Lottery Courier Services in the United States; it used ▓▓▓▓ (Sullivan Decl. ¶ 91.) Mr. Sullivan understood that ▓▓▓▓ ultimately could not use the ▓▓▓▓▓ brand shown in the presentation because that brand was used for derivative lotteries overseas. (*Id.*) It thus was (and is) Mr. Sullivan's belief and understanding that U.S. regulators similarly will not allow Jackpot to enter the United States using the JACKPOT brand for Lottery Courier Services given its use of the JACKPOT Marks abroad for derivative lottery services that are illegal here. (*Id.*)

55.     Jackpot and Jackpocket continued their communications on April 14, 2022 via email. (*Id.* ¶ 71.) Mr. Ron indicated that Jackpot was in its final stages of its financing round and that they should "touch base a bit further down the line." (*Id.* ¶ 72; PX-304.) Mr. Ron's email did

not indicate that Jackpot was no longer interested ███████████████████ (Sullivan

Decl. ¶ 72.) That was the final correspondence Mr. Sullivan received from Mr. Ron or anyone else

at Jackpot. (*Id.* ¶ 73.)

### 6.    Jackpot's Announcement to Enter the United States

56.    Around May 20, 2022, Jackpot publicly announced it hired Mr. Akshay Khanna as

its North American CEO. (*Id.*) Promptly after learning of this, Jackpocket sent Jackpot a demand

letter objecting to the use of JACKPOT (and any confusingly similar mark) in the United States.

(*Id.* ¶ 77; PX-305.) Before sending that letter, Mr. Sullivan emailed Mr. Ron as a courtesy to ask

what was happening and to inform him that a cease-and-desist letter would be sent. (Sullivan Decl.

¶ 78; PX-306.) Jackpot, however, did not respond to Mr. Sullivan's email and moved forward.

(Sullivan Decl. ¶ 79; PX-307.)

57.    In late June 2022, Jackpot publicly announced that it closed on Series A funding

and was preparing to offer Lottery Courier Services in the United States, including in New York.

(Sullivan Decl. ¶ 80.) The same day as that announcement, the jackpot.com domain began

automatically redirecting people who tried to access the website in the United States to the

us.jackpot.com subdomain name. (*Id.*)

58.    Jackpocket filed this action on July 7, 2022. (Dkt. 1). Jackpocket wrote Jackpot's

counsel two more times, on July 8, 2022 and July 13, 2022, asking that it stop using the JACKPOT

Marks for Lottery Courier Services in the United States. (Sullivan Decl. ¶¶ 82-83; PX-308-309.)

Jackpot refused, and Jackpocket sought preliminary injunctive relief. (Sullivan Decl. ¶ 84.)

59.    Jackpot plans to launch in ███████████████ (Oct. 11 Tr. at 196:19-24.) But it

has not yet done so. (*Id.* at 196:17-18.)

60.    Jackpot's owners are aware of the possibility that Jackpot will have to operate under

a different name and have discussed both the need for a contingency plan and other possible names

that could be used for their Lottery Courier Services. (*Id.* at 206:2-21.) Jackpot has not, however, created a contingency plan in the event it is required to use a different mark in the United States as a result of this litigation. (*Id.*)

61.    Jackpot proceeded with its U.S. business plans after Jackpocket's May 23 objections (and follow-ups), July 7 complaint, and/or July 14 motion for preliminary injunction. Specifically, Jackpot: (1) decided on a U.S. launch date of October 1, 2022 (which did not go forward) after having no set launch date before Jackpocket objected (*id.* at 195:8-196:18); (2) entered into deals with retailers in Texas (*id.* at 196:19-197:6; 197:14-17); (3) applied for a lottery courier license in ███████ on ████████████ (*id.* at 198:7-19); (4) acquired a company named Take That for ████████ on August 12, 2022 (*id.* at 202:14-24; 203:12-16); (5) began re-directing traffic to Jackpot's U.S. subdomain (us.jackpot.com) in the third week of June 2022 (*id.* at 212:3-5); (6) entered into three contracts for sponsorships with sports teams in Texas (including the Dallas Cowboys) between August and October 2022 (*id.* at 218:1-219:4); and (7) hired ████ ████ U.S. employees, increasing its number of U.S. employees from one at the time Jackpocket objected ████████ (*id.* at 221:13-222:24).

### C.  Actual Confusion Has Occurred and Continues Occurring

62.    Over 35 instances of actual confusion have already occurred and been discovered. (*See* Sullivan Decl. ¶¶ 96-97; PX-311-31, 344-61, 380-83, 421-24, 470, 480-81; Oct. 11 Tr. at 172:18-173:24; 234:14-238:9; 241:6-242:20; 242:23-245:12; 246:4-262:7; Wong Decl. ¶ 38.) This confusion has been experienced by both parties. (*See id.*) The confusion ranges from customers contacting one party's customer support instead of the other's; customers signing up for one party's service when they meant to sign up for the other's; customers reviewing one party's service when they meant to review the other's; news outlets mistakenly reporting about one party when they meant to report on the other; investors and partners reaching out to one party thinking they

were speaking with the other (including one of Jackpocket's pro sports sponsors the ████ ████ communicating with Jackpot believing they were corresponding with Jackpocket); and industry representatives confusing the parties during business discussions and elsewhere. (*See id.*)

63.     As this case has progressed on an expedited schedule, Jackpocket has continued to discover and learn of more confusion between its JACKPOCKET Marks and Jackpot's JACKPOT Marks. (*See* Dkt. 20 at 8-9; Dkt. 55 at 7; and Jackpocket's October 9, 2022 Pre-Hearing Br. at 13-16.) The known confusion to date can be broken down into three general categories, discussed below.

64.     First, confusion from multiple sources arose from Jackpot's announcements that it plans to launch in the United States, e.g.:

- Around June 22, 2022, Mr. Sullivan received multiple messages congratulating him on Jackpot's announcement that it received Series A funding and on Jackpot's newly announced investors. (Sullivan Decl. ¶ 96; PX-311; Oct. 11 Tr. at 172:18-173:24.)

- Also on June 22, 2022, Andrew Fries, Senior Vice President of Public Affairs at Jackpocket, received multiple messages congratulating him on Jackpot's announcement that it received Series A funding and on Jackpot's newly announced investors. (Sullivan Decl. ¶ 96; PX-312.)

- Around the same time, Mr. Sullivan also received multiple phone calls from various investors who mistakenly believed that Jackpocket had just secured Series A funding, when in fact it was Jackpot. (Sullivan Decl. ¶ 96; Oct. 11 Tr. at 172:18-173:24.)

- On June 23, 2022, *The Sports Geek* published an article erroneously titled "Jackpocket Nets $35 Million in Latest Funding Round." It was Jackpot and not Jackpocket that secured the referenced funding. (Sullivan Decl. ¶ 96; PX-313.)

- On June 23, 2022, *PlayUSA* published an article mistakenly referencing Jackpocket instead of Jackpot, titled "Jackpocket Gets $35 Million in New Funding With Possible Expansion Ahead." (Sullivan Decl. ¶ 96; PX-314.)

- On June 23, 2022, Jackpocket's Chief Financial Officer Sean Siuda received an email from an investor ████████, expressing confusion over whether an

article discussing Jackpot's Series A funding was associated with Jackpocket. (PX-480.)

- On June 27, 2022, Derek Longmeier, a gambling addiction group executive director who serves on state and national organizations and committees, including one that Jackpocket sponsors, posted on LinkedIn: "Jackpocket has raised money from top sports executives, and NBA superstars James Harden and Joel Embiid and NHL great Martin Brodeur round out some of the big name investors. #GamblingTrends #OhioLottery." It was Jackpot, not Jackpocket, that raised this funding. (Sullivan Decl. ¶ 96; PX-315.)

- On July 14, 2022, financial blog *Seeking Alpha* published an article discussing Jackpot's Series A funding, wrongly indicating that Jackpocket investor Mark Cuban is involved with Jackpot, and linking to another blog post about Jackpocket, not Jackpot. (Sullivan Decl. ¶ 96; PX-317.)

- On July 28, 2022, the VP of Business Development & Strategic Partnerships for the professional soccer team Austin FC contacted Jackpocket's CEO congratulating Jackpocket for hiring Akshay Khanna as CEO. Jackpot, not Jackpocket, hired Mr. Khanna. (Sullivan Decl. ¶ 96; PX-318.)

65.    Second, after Jackpot's announcement, confusion continued in other forms, e.g.:

- On June 29, 2022, the National Council for Problem Gaming ("NCPG"), a non-profit that Jackpocket has received an award from and works with cooperatively, was corresponding with Jackpocket about its membership. (Sullivan Decl. ¶ 96; PX-316.) In so doing, NCPG added a jackpot.com employee to the email thread that otherwise only included Jackpocket employees and was directed only to Jackpocket, not Jackpot, because the NCPG mistakenly believed that the jackpot.com employee worked for Jackpocket. (*Id*.) Jackpot's internal emails pertaining to this instance of confusion indicate that Jackpot's executive found this confusion humorous and laughed about it, via emojis, as opposed to addressing it. (Oct. 11 Tr. at 235:19-238:9; PX-346-349; PX-470.)

- On July 18, 2022, ████████████████████████████ with the ████████████████—one of Jackpocket's sports partners—emailed Akshay Khanna confused, telling him that the ██████ were "eager to develop a deeper relationship with *Jackpocket*." (PX-423.) Jackpot, however, had no relationship with the ████ Mr. Khanna responded to ████████ to correct his confusion: ████- one point. My company is Jackpot. You can look us up at our website www.jackpot.com. Not Jackpocket, who I know you're partners with. Just wanted to confirm, given your email below and the title of the calendar invite you sent for our call next week." (*Id*.) ████████ responded to Mr. Khanna acknowledging his confusion by telling Mr. Khanna, "[a]ppreciate your clarifying that, Akshay." (*Id*.)

- On July 27, 2022, a Jackpocket customer ███████ from Dallas, Texas reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Oct. 11 Tr. at 251:9-253:24; PX-359.) After some back and forth with Jackpot's customer service agent, the customer apologized and said, "I'm so sorry, it was Jackpocket. I didn't realize they were 2 different sites." (*Id.*)

- On August 2, 2022, the President of a geolocation service used by Jackpocket emailed Jackpocket's legal department and mistakenly copied Jackpot's COO, revealing confidential business information to one of Jackpot's executives. (Sullivan Decl. ¶ 96; PX-319.)

- On August 17, 2022, Casey Brett, Vice President of Gaming and New Business Ventures at Major League Baseball, texted Mr. Khanna of Jackpot that MLB has "had our eyes on ways to create RNG/Lottery games tied to MLB and MiLB for a while now … would love to see if there's a fit w/ Jackpocket." (PX-424.) Mr. Khanna responded "*[w]e are Jackpot btw.*" (*Id.*)

- An individual named ████████████████ on Twitter) entered into one of Jackpocket's social media promotions run on Twitter in August 2022 where the first prize was a $100 Amazon gift card and the second prize was one free play on Jackpocket. (Sullivan Decl. ¶ 96; PX-320-324.) On September 1, 2022, Jackpocket notified █████████ on Twitter via Direct Message that he was a second-prize winner. (*Id.*) Jackpocket also notified █████████ that to claim his prize, he needed a Jackpocket account, and Jackpocket could not locate one for him. (*Id.*) ███████ then responded that he created an account, and he took a screenshot to show proof that he set one up. (*Id.*) The account ████████ created and attached was an account for Jackpot.com, not Jackpocket. (*Id.*)

- On September 20, 2022, a person ████████████ reached out to Jackpocket's customer support team thinking she was contacting Jackpot, and forwarded a screenshot of the jackpot.com website to Jackpocket's support team. (Wong Decl. ¶ 38; PX-382-384.)

- On September 26, 2022, the mother ███████ of a student looking for an internship who is acquainted with Jackpocket's in-house counsel mistook Jackpot's website for Jackpocket's. (Sullivan Decl. ¶ 96; PX-325.)

66.     Third, before Jackpot announced that it planned to enter the U.S. Lottery Courier Service market, and was only operating abroad, people confused JACKPOCKET with JACKPOT. For example, in at least the following reported instances, individuals contacted either Jackpot's or Jackpocket's customer support email confusing one for the other (*see* Sullivan Decl. ¶ 97):

- On January 24, 2020, a Jackpocket customer ███ mistakenly reached out to Jackpot's customer service team about Jackpocket and its services.  (Sullivan Decl. ¶ 97; PX-326; Oct. 11 Tr. at 242:23-243:21; PX-352.)

- On April 26, 2020, another Jackpocket customer ███ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Sullivan Decl. ¶ 97; PX-327; Oct. 11 Tr. at 259:8-260:23; PX-353.)

- On January 16, 2021, a Jackpocket customer ███ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Oct. 11 Tr. at 246:4-247:5; PX-355.)

- On January 18, 2021, another Jackpocket customer ███ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Wong Decl. ¶ 38; PX-381.)

- On January 26, 2021, another Jackpocket customer ███ thought a communication from Jackpot was from Jackpocket. (Sullivan Decl. ¶ 97; PX-328.)

- On January 28, 2021, a Jackpocket customer ███ reached out to Jackpot's customer service team thinking he was contacting Jackpocket. (Oct. 11 Tr. at 250:4-251:8; PX-358.) During the conversation, the customer asked Jackpot's customer service team "what's the difference between Jackpocket.com and jackpot.com" and admitted that he was "getting confused now if jackpot and Jackpocket are not the same." (*Id.*)

- On April 21, 2020, a Jackpocket customer ███ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Oct. 11 Tr. at 248:18-250:3; PX-357.)

- On May 25, 2021, a Jackpocket customer ███ reached out to Jackpot's customer service team thinking he was contacting Jackpocket. (Oct. 11 Tr. at 257:9-259:7; PX-361.)

- On July 12, 2021, another Jackpocket customer ███ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Sullivan Decl. ¶ 97; PX-329; Oct. 11 Tr. at 247:6-248:17; PX-356.)

- On July 25, 2021, another Jackpocket customer ███ reached out to Jackpocket's customer service team and noted that she "thought you [Jackpocket] were jackpot.com only to realize when I emailed them they say am [sic] not with them and my account is with you." (Sullivan Decl. ¶ 97; PX-330.)

- On September 15, 2021, Jackpocket customer Mohsen Faghini left a direct review on the third-party website TrustPilot to Jackpot that was meant to be

directed to Jackpocket. (Oct. 11 Tr. at 234:14-235:18; PX-344-345.) Jackpot's head of customer service handling this review admitted in an email to Mr. Ron that Mr. Faghini is "100% a customer of Jackpocket" and was "100% confusing us [Jackpot] with Jackpocket." (*Id.*)

- On September 22, 2021, a Jackpocket customer ████ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Oct. 11 Tr. at 241:6-242:20; PX-350.)

- On September 28, 2021, another Jackpocket customer ████ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Wong Decl. ¶ 38; PX-380.)

- On October 19, 2021, Don Zinn, Senior Vice President of StevenDouglas (a search and interim resources professional services firm) emailed Mr. Ron telling him that he has "been hearing commercials suddenly for jackpot on the radio" and they are "great." (PX-421.) Mr. Ron emailed Mr. Zinn on October 20, 2021 telling him that he has been "hearing commercials for Jackpocket" because "they are already live in the market." (PX-421.)

- On February 21, 2022, a Jackpocket customer ████ reached out to Jackpot's customer service team thinking he was contacting Jackpocket. (Oct. 11 Tr. at 243:23-245:12; PX-354.)

- On February 28, 2022, a Jackpocket customer ████ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Oct. 11 Tr. at 260:24-262:7; PX-351.)

- On March 16, 2022, another Jackpocket customer ████ reached out to Jackpot's customer service team thinking he was contacting Jackpocket. (Sullivan Decl. ¶ 97; PX-331.)

- On May 8, 2022, Mr. Khanna received a text saying "I've seen Jackpocket in the past let me brush off my notes" in response to a text from Mr. Khanna discussing Jackpot. (PX-422; PX-481.) Realizing their confusion, the person said, "ah jackpot, miss read [sic] your text." (*Id.*)

- On May 18, 2022, a Jackpocket customer ████ reached out to Jackpot's customer service team thinking she was contacting Jackpocket. (Oct. 11 Tr. at 253:25-257:8; PX-360.)

### D. The Parties' Confusion Surveys and Reports

#### 1. Jackpocket's Expert Survey and Report from Dr. Michael Barone

67.     To empirically assess the rate at which consumers are likely to be confused, Jackpocket retained survey expert and university professor Dr. Michael Barone to conduct a confusion survey.  (July 19, 2022 Declaration of Dr. Michael Barone ("Barone Decl.") ¶¶ 1-4; PX-333-336.) Using the standard and accepted *Squirt* methodology (articulated in *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)), Dr. Barone showed Jackpocket's website to buyers of New York lottery tickets. (Barone Decl. ¶¶ 17, 18, 21, 22, 29; PX-334-336.) Respondents were shown a series of four other websites from entities that offer Lottery Courier Services, including Jackpot, and asked a series of standard questions to see if they confused any of the sites with Jackpocket. (Barone Decl. ¶ 18.)

68.     To control for "noise" (*i.e.*, confusion responses unrelated to the parties' marks), a separate control/placebo group was implemented where Jackpot's website was modified so that the JACKPOT Marks were replaced with the synonymous terms WINDFALL and WINDFALL.COM. (*Id.* ¶ 20; PX-336.) Adjusting for the control, the net confusion was at least 26.1%.  (Barone Decl. ¶¶ 4, 24, 30, 32.) The control was conservative because it maintained Jackpot's same font and color scheme. (Barone Decl. ¶ 24.) As such, the true confusion levels are even higher than 25%. (*Id.* ¶¶ 24, 31.) Using the internal control groups, the net confusion ranged from 46.2% to 48.4% to 55%. (*Id.*)

#### 2. Jackpot's Expert Survey and Report

69.     Jackpot retained Dr. Itamar Simonson to conduct a survey. (August 2, 2022 Dr. Itamar Simonson Declaration & Report ("Simonson Decl. & Rep.").) As explained below, the Simonson survey contains a number of flaws that render it unreliable. (*See generally* October 3,

2022 Declaration of Dr. Barone in Rebuttal to Survey of Dr. Itamar Simonson ("Barone Rebuttal Decl.").)

**PROPOSED CONCLUSIONS OF LAW**

**I.      THE COURT HAS SUBJECT MATTER AND PERSONAL JURISDICTION OVER JACKPOT**

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1338 and 1367.

2.      The Court has personal jurisdiction over Jackpot, and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because Jackpocket is being harmed in this District; one of the defendants (Lottomatrix NY) is located and registered to do business in this District; Jackpot is preparing to conduct business in this District; and Jackpot is unlawfully using the JACKPOT and JACKPOT.COM names and marks (the "JACKPOT Marks") in this District.

**II.     JACKPOT IS LIABLE FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**

3.      Jackpocket asserts two Lanham Act claims: trademark infringement under Section 32(1), 15 U.S.C. § 1114(1); and infringement, false designation of origin, and unfair competition under Section 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A). (Dkt. 1 at ¶¶ 56-59.)

4.      Section 32(1) of the Lanham Act makes unlawful the use of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in such a way as "is likely to cause confusion or to cause mistake, or to deceive." 15 U.S.C. § 1114(1).

5.      Section 43(a) of the Lanham Act similarly makes unlawful the use in commerce of "any word, term, name, symbol, or device" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person." 15 U.S.C. § 1125(a).

6.      The tests for liability under Section 32(1) and Section 43(a) are the same, as is the test for Jackpocket's claims for trademark infringement and unfair competition under common law and New York law. *See Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 423 (S.D.N.Y. 2018) ("The [Section 43(a)] test utilizes the same principles and standards as are used for

29

trademark infringement claims.") (citation omitted); *Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 372 (S.D.N.Y. 2018) ("[T]he elements of a cause of action for New York common law infringement and for unfair competition mirror the requirements of claims stated under the Lanham Act.") (citation omitted).

7.       For New York common law infringement, a plaintiff also must show "a defendant's bad faith or intent" in addition to proving likely confusion. *Spin Master*, 325 F. Supp. 3d at 424.

8.       To prevail on its infringement and unfair competition claims, Jackpocket must show (1) either of its JACKPOCKET or JACKPOCKET.COM marks (the "JACKPOCKET Marks") are entitled to protection, and (2) Jackpot's use of either of the JACKPOT Marks is likely to cause confusion or mistake. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).

9.       Jackpocket has the burden of proving likelihood of confusion between the JACKPOCKET Marks and the JACKPOT Marks by a preponderance of the evidence, i.e., that likely confusion between the marks is more probable than not. *See C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 232 (S.D.N.Y. 2013).

### A.  The JACKPOCKET Marks are entitled to protection.

10.       For the first element of Jackpocket's trademark infringement and unfair competition claims, courts "look[] first to whether the plaintiff's mark is entitled to protection . . . ." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (citation omitted). This may be established via "a certificate of registration[,]" which "is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)).

11.     If a registration becomes incontestable, it is "conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce," so a defendant "may not succeed in a defense that declares the mark is entitled to no protection because it is descriptive." *Lopez v. Adidas Am., Inc.*, No. 19-cv-7631, 2020 WL 2539116, at *8 (S.D.N.Y. May 19, 2020) (Liman, J.) (emphasis added) (quoting *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076-77 (2d Cir. 1993)).

12.     If a registration becomes incontestable, it is "conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce," so a defendant "may not succeed in a defense that declares the mark is entitled to no protection because it is descriptive." *Lopez v. Adidas Am., Inc.*, No. 19-cv-7631, 2020 WL 2539116, at *8 (S.D.N.Y. May 19, 2020) (Liman, J.) (emphasis added) (quoting *Gruner + Jahr USA Pub.*, 991 F.2d at 1076-77).

13.     "A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use[.]" *Gruner + Jahr USA Pub.*, 991 F.2d at 1076.

14.     Jackpocket's valid incontestable federal registration for its JACKPOCKET mark establishes that the JACKPOCKET mark is entitled to protection, satisfying the first element. *Savin Corp.*, 391 F.3d at 456 (finding mark valid and protectible, explaining that with an incontestable registration, courts "need not tarry with the first prong of the infringement test.").

15.     Jackpocket has also developed "common law" rights in its JACKPOCKET Marks dating back to at least May 2013 (when the first customer registered for Jackpocket's JACKPOCKET-branded service (Sullivan Decl. ¶ 15; PX-036)) through substantial use and promotion over the years, including through its extensive sales (i.e., over ███ million in ticket sales and over ███ million in revenue (Sullivan Decl. ¶ 16; Wong Decl. ¶ 9; PX-363) and

advertising of the JACKPOCKET Marks (i.e., investing ▆▆ million from 2017 to November 3, 2022 (Sullivan Decl. ¶ 23; Wong Decl. ¶¶ 9, 21; PX-363; PX-365-373)) in the United States. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) ("One who first uses a distinct mark in commerce thus acquires rights to that mark.").

### B. Jackpocket has priority over Jackpot, and Jackpot does not have priority via Palek International.

16.     Part of the standard test for trademark ownership is priority of use. "[S]o long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is 'entitled to prevent others from using the mark to describe their own goods' in that market." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985) and citing *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir.1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.")).

17.     Proof of prior rights requires use of a designation as a trademark, that is "actual use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16.1 (5th ed. 2022). Thus, for Jackpot to succeed in arguing priority over Jackpocket, it must show prior use of JACKPOT as a trademark. *Id.*

18.     The only evidence Jackpot has presented regarding its alleged priority is the passive website jackpot.com, operated by an entity called Palek International from 2012-2016. (Oct. 11 Tr. at 207:4-10; 207:17-208:1; 208:16-22; 209:1-6; 272:5-24. *See also* Direct Testimony Declaration of Yariv Ron ("Ron Decl.") ¶ 16, n.3.) While Palek operated the domain name, the

site did not offer any goods or services in the United States and served the sole purpose of passively showing lottery results to visitors. (Oct. 11 Tr. at 207:4-6; 209:7-10; 210:13-21; 272:5-24.)

19.     The passive use of a domain name in the United States with no active and/or interactive U.S. operations or activities does not create U.S. trademark rights. *See New Look Party Ltd. v. Louise Paris Ltd.*, No. 11-CV-6433, 2012 WL 251976, at *2-4 (S.D.N.Y. Jan. 11, 2012).

20.     Palek's operation of jackpot.com was not "aimed at priming [the visitors] to purchase" its goods or services and did not have a "substantial impact on the purchasing public" sufficient to develop trademark rights in JACKPOT or JACKPOT.COM. *See id.*

21.     It is also worth noting that Palek's operation of the passive jackpot.com domain in the United States was not enough to create jurisdiction for Jackpocket to sue Palek in the United States. *See, e.g.*, *Bensusan Rest. Corp. v. King*, 937 F. Supp. 295, 299 (S.D.N.Y. 1996) (rejecting notion that passive website confers jurisdiction; "The mere fact that a person can gain information . . . is not the equivalent of a person advertising, promoting, selling or otherwise making an effort to target its product in New York"), *aff'd* 126 F.3d 25 (2d Cir. 1997); *Pitbull Prods., Inc. v. Universal Netmedia, Inc.*, 2008 WL 1700196, at *6 (S.D.N.Y. Apr. 4, 2008) ("Merely posting information on a website is an inherently passive act, which 'has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant"; finding no jurisdiction) (citation omitted); *A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 568 (E.D.N.Y. 2011) (finding "website that only provides information . . . without any ability to directly purchase the services . . . is considered 'passive' and there 'insufficient to demonstrate that the website operator has purposefully availed itself of the privilege of conducting activities within New York'"; finding no jurisdiction); *ISI Brands, Inc. v. KCC Int'l*, 458 F. Supp. 2d 81, 86 (E.D.N.Y. 2006) ("Internet

websites that are not of a commercial nature and do not permit the purchase of products on-line are not sufficient to confer personal jurisdiction"; finding no jurisdiction).

22.     For the reasons above, Jackpot cannot claim priority over Jackpocket via Palek. *See New Look Party*, 2012 WL 251976. at *2-4.

23.     With Jackpot unable to establish priority through Palek, there is no priority issue. By the time Jackpot acquired the jackpot.com domain in 2016, Jackpocket had already made over ▮▮▮▮▮ in ticket sales and ▮▮▮▮ in revenue (Sullivan Decl. ¶ 15; PX-036) and obtained its JACKPOCKET trademark registration (Sullivan Decl. ¶ 18; PX-039)., giving it priority over Jackpot.

### C.  Jackpot's use of the JACKPOT Marks has caused confusion and is likely to continue causing confusion unless enjoined.

24.     To determine the likelihood of confusion, courts in the Second Circuit apply the factors set out in *Polaroid Corp. v. Polarad Elecs. Corp.*: (1) the strength of plaintiff's trademark, (2) the degree of similarity between the parties' marks, (3) the proximity of the products and their competitiveness with one another, (4) the likelihood the prior owner may "bridge the gap" in the markets for the products, (5) evidence of actual consumer confusion, (6) the defendant's good faith in adopting its imitative mark, (7) the quality of defendant's product compared with the plaintiff's product, and (8) the sophistication of the buyers. 287 F.2d 492, 495 (2d Cir. 1961).

25.     These factors are not mechanically applied, and each "must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986).

1. **Actual confusion between the parties' marks has occurred.**

26.     "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear*, 799 F.2d at 875.

27.     "Evidence of actual confusion may consist of anecdotal or survey evidence." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000).

28.     While actual confusion evidence is not required, when it exists, as here, it is highly and "strongly probative" of the ultimate issue of likelihood of confusion. *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 293 (S.D.N.Y. 2018) ("[E]vidence of actual confusion is strongly probative of a likelihood of confusion."); *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 356 (S.D.N.Y. 1998) ("Although the party seeking to demonstrate a likelihood of confusion need not show actual confusion, evidence of actual confusion is highly probative as to whether likelihood of confusion exists."). *See also 3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 195 (S.D.N.Y. 2000) (noting evidence of actual confusion and granting preliminary injunction); *Museum of Mod. Art*, 339 F. Supp. 3d at 378 (granting preliminary injunction after evaluating "multiple anecdotal instances of actual confusion"); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 155 (E.D.N.Y. 2011) (issuing preliminary injunction because, *inter alia*, plaintiff submitted evidence of actual confusion "even at this early stage in the action").

29.     "There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion," *Savin Corp.*, 391 F.3d at 459 (citation omitted), and "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 715–16 (S.D.N.Y.

1973), *modified*, 523 F.2d 1331 (2d Cir. 1975) ("Although evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion."); *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018) ("[T]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.") (citation omitted).

30.     Although Jackpot has not begun offering or advertising services in the United States, over 35 known instances of confusion have already come to light. (*See* Sullivan Decl. ¶¶ 96-97; PX-311-31, 344-61, 380-83, 421-24, 470, 480-81; Oct. 11 Tr. at 172:18-173:24; 234:14-238:9; 241:6-242:20; 242:23-245:12; 246:4-262:7; Wong Decl. ¶ 38.) And they are ample and varied, including news articles, calls and messages to Jackpocket's executives, emails and text messages to Jackpocket and Jackpot, and social media posts. *See Virgin Enters. Ltd.*, 335 F.3d at 151 (finding that a single affidavit of a former employee attesting to confusion "weighed in plaintiff's favor").

31.     The known confusion here is notable because Jackpot has not even begun operating in the United States. Just the announcement of Jackpot's Series A funding and plans to enter the U.S. market was enough to trigger confusion. *See TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001) (noting that typically when a defendant launches, there usually is "little or no opportunity for actual confusion to be manifested"); *Lois Sportswear*, 799 F.2d at 875 (holding "[i]t would be unfair to penalize [plaintiff] for acting to protect its trademark rights before serious damage has occurred" where minimal sales of the infringing product had occurred because "there has been little chance for actual confusion as yet"); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y 2009) (holding that when "the junior mark has been in the marketplace for a relatively short period of time," the absence of actual confusion is not fatal to plaintiff's claim); *Am. Ort, Inc. v. Israel*, No. 7 CV 2332, 2007 WL 2049733, at *8 (S.D.N.Y. July 17, 2007) (finding

that the actual confusion factor favors plaintiff where "in the short time since [d]efendant began soliciting donations in the United States, at least one of [p]laintiff's donors has already been confused").

32.     With more time, there will be more confusion. And if Jackpot enters the market using the JACKPOT Marks, that confusion will very likely increase in level and scope. *See Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551 (S.D.N.Y. 2012) ("Given Defendant's rapidly growing customer base, and its recent announcement that it will soon develop and launch an app, *further examples of confusion are likely to abound*.").

33.     Additionally, while not required, Jackpocket's confusion survey corroborates what the market has shown. Jackpocket's survey shows a 26.1% net confusion rate. This exceeds the percentages that courts in this and other circuits have found to be strong evidence of actual confusion. *Grotrian*, 365 F. Supp. at 714–16 (8.5% and 7.7% confusion is "strong evidence of [ ] likelihood of confusion"); *Volkswagen Astiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447, 1995 WL 605605, at *5 (S.D.N.Y. May 11, 1995) (finding two surveys showing 15.8% and 17.2% net confusion justified grant of injunction); *Energybrands, Inc. v. Beverage Mktg. USA, Inc.*, No. 2 Civ. 3227, 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002) (finding 17% net confusion reinforced court's conclusion that there is a "substantial likelihood of consumer confusion," warranting preliminary injunction); *Lon Tai Shing Co. v. Koch + Lowy*, No. 90 Civ. 4464, 1991 WL 170734, at *22 (S.D.N.Y. June 20, 1991) (finding 18% "is within the range of cognizable confusion recognized in this circuit"); *Kraft Gen. Foods, Inc. v. Allied Old Eng., Inc.*, 831 F. Supp. 123, 130 (S.D.N.Y. 1993) (finding survey with net confusion of 26% is an "extreme demonstration of confusion" and "even a substantially lesser showing of confusion would support [plaintiff's] motion").

34.     Jackpot's critiques (through its expert Dr. Simonson) of Dr. Barone's survey methodology and results should be disregarded. First, Dr. Barone's selection of a sequential *Squirt* survey was justified because the parties' competing websites appear on the first page of search results for the same term. (Barone Reply Decl. ¶¶ 2-13.) Indeed, Dr. Simonson conceded that *Squirt* surveys are appropriate in cases of "competitive proximity," and that Jackpocket and Jackpot "were within a manageable number of hits from each other" in the searches that Dr. Barone conducted to support his survey. (Simonson Dep. Tr. at 42:16-43:9; 54:19-55:1, 164:3-21.) As well-respected trademark survey commentor Jerre Swann (who Dr. Simonson cites) explains, this is precisely the scenario where a *Squirt* survey like the one conducted by Dr. Barone is appropriate:

> To demonstrate sufficient competitive proximity for a Squirt format as two products sold on the Internet:  (a) the underlying products or information about them should commonly be sought on the Internet and (b) both sites (or products) typically should be accessed by commonly used search terminology that produces both the senior and junior users within a manageable number of hits.

109 TM Rep. 671, 680.

35.     Second, the stimuli shown to Dr. Barone's survey respondents were proper as the "respondents were presented with lottery courier service marks in the context of their respective web pages." (Barone Reply Decl. ¶¶ 14-20.) This was proper as "the *Squirt* format must utilize stimuli that carefully replicate the real world, Internet marketplace, such as screenshots of actual search-result listings or screenshots of webpages." 109 TM Rep. 671, 680-81.

36.     Third, "any possible bias" from Dr. Barone's questions "was eliminated from [his] use of a separate control group." (Barone Reply Decl. ¶¶ 21-22.)

37.     Fourth, "the use of WINDFALL as the control mark for the Defendants' JACKPOT Marks is highly appropriate," as it eliminates the infringing portion of the mark (JACKPOT) while maintaining an identical meaning. (*Id.* ¶¶ 21-22.) Dr. Simonson conceded this when he testified

that WINDFALL means "to gain money unexpectedly" e.g., by putting money in a slot machine and winning. (Simonson Dep. Tr. at 39:9-41:1.).

38.     Fifth, the universe of New York state residents who had purchased or planned to purchase state lottery tickets online at the time of the survey was proper because it is a major market that Jackpot could enter. (Barone Reply Decl. ¶ 35.)

39.     Dr. Simonson conducted his own counter-survey, which was flawed in several respects, including that it was an "artificial reading test" that does not mirror marketplace realities, as it must. (Barone Rebuttal Decl. ¶ 13.) First, Dr. Simonson's survey inappropriately "use[d] . . . a methodology that is predicated on the erroneous assumption that the purchase of lottery tickets costing around \$1 - \$2 each involves high levels of risk and therefore represents a high-involvement decision for consumers." (*Id.* ¶ 1.) As a result, Dr. Simonson left his stimulus visible to respondents when they answered the critical confusion questions. (*Id.*) Leaving "source-related information immediately above the confusion questions" "artificially induced respondents to focus, perhaps exclusively, on that information." (*Id.* ¶ 17.) The survey was thus "an artificial reading test producing results that are irrelevant in determining whether consumers are likely to confuse the Defendants' JACKPOT marks with the Plaintiff's JACKPOCKET marks" among other flaws, including that it never asked any questions to see if respondents were thinking of Jackpocket when they typed the similar Jackpot. (*Id.*) This is evident from the results of the "association" question, where respondents did something they would not have done had they not been reading the page put in front of them. They volunteered that they thought Jackpot was associated with the investors emblazoned on the bottom of the page, right above the question they were being asked, namely "Arctos" (38.8% in the test group, 42.4% in the control group), "Courtside" (26.3% test, 29.7% control), and "Elysian Park" (24.7% and 29.1%). (*Id.* ¶ 19.)

40.     Dr. Simonson's survey also did not test a number of real-life situations, including ones where somebody would type a term into a search engine and then receive website hits and only go to one site, people see the parties' apps in an app store, or someone hears another person mention the mark JACKPOCKET and then later encounters JACKPOT on the Internet. (Simonson Dep. Tr., 129:8-14, 129:17-20, 133:3-10.)

41.     Given the substantial evidence of actual confusion that is already occurring, which is further confirmed by Jackpocket's survey, this factor favors Jackpocket.

## 2.     The JACKPOCKET Marks are strong.

42.     "A mark's strength is measured by two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *Alzheimer's Disease*, 307 F. Supp. 3d at 287 (citations omitted).

43.     The first inquiry "focuses on 'the distinctiveness of the mark, or more precisely, its tendency to identify the goods' as coming from a particular source." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991) (quoting *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979)).

44.     Because the made-up JACKPOCKET trademark is federally registered and incontestable, it "enjoys a conclusive presumption of distinctiveness," which Jackpot has not rebutted. *Savin*, 391 F.3d at 457 (citations omitted).

### i.     The JACKPOCKET Marks are inherently strong.

45.     The JACKPOCKET Marks, not the JACKPOT Marks must be the focus of the strength inquiry. *Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 283, 292 (S.D.N.Y. 2008) ("Critical to this [likelihood of confusion] inquiry is an analysis of the strength of *plaintiffs' mark*.") (emphasis added) (citation omitted). As discussed below, the JACKPOCKET Marks are inherently strong.

46.     "Generally, if a term is suggestive it is entitled to trademark protection . . . and recognition as a strong mark." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d. Cir. 1988); *see also Citigroup Inc. v. City Holding Co.*, 171 F. Supp. 2d 333, 345 (S.D.N.Y. 2001) (suggestive marks are "strong marks"). Here, JACKPOCKET is a made-up term that does not exist in the English language and has no significance other than as a trademark to identify Jackpocket's Lottery Courier Services. *See West & Co., Inc. v. Arica Inst., Inc.*, 557 F.2d 338, 342-43 (2d Cir. 1977) (made-up term PSYCHOCALISTHENICS strong and protectable despite multiple suggestive meanings and affirming infringement finding).

### ii.     The JACKPOCKET Marks are commercially strong.

47.     "The commercial strength inquiry focuses on 'the degree of consumer recognition that the mark has achieved.'" *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045, 2020 WL 5758917, at *10 (S.D.N.Y. Sept. 28, 2020) (citing *TCPIP Holding Co.*, 244 F.3d at 100). To determine this, "courts consider a number of non-exhaustive factors: (1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to the source." *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 499 (S.D.N.Y. 2013). "No one factor is determinative, and not all factors need to be proved." *Id.* (finding marks strong where plaintiff spent significant sums on advertising and marks were subject to widespread media coverage).

48.     As between inherent and commercial strength, commercial strength is the more important of the two. *See Centaur Commc'ns., Ltd. v. A/S/M Commc'ns., Inc.*, 830 F.2d 1217, 1225-26 (2d Cir. 1987) (finding strength of MARKETING WEEK mark weighed in plaintiff's favor where mark had "achieved relative -- if not great -- strength in its market context" despite it being descriptive and, "by definition, somewhat weak").

49.     Strength can be established after only a short period of time. *See Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 71 (2d Cir. 1987) (affirming finding of strength and fame of mark based on evidence of high sales and advertising expenses over prior *three years*); *Home Shopping Club, Inc. v. Charles of the Ritz Grp., Inc.*, 820 F. Supp. 763, 768 (S.D.N.Y. 1993) (holding suggestive mark was moderately strong where plaintiff adduced evidence of moderate sales in prior *two years* and product had only recently arrived on the market); *By Design PLC v. Ben Elias Indus. Corp.*, No. 98-CIV-1588(LAP), 1998 WL 998964, at *5 (S.D.N.Y. July 15, 1998) (finding strength-of-mark factor tipped in plaintiff's' favor based on evidence of sales in the past *three years* totaling $160 million).

50.     Applying the above factors, the evidence demonstrates that, in addition to their inherent strength, the JACKPOCKET Marks are commercially strong based on at least the following:

- ***Advertising Expenditures***:  From 2017 through November 3, 2022 alone, Jackpocket spent over ▮ million to advertise and promote its brand through various media platforms, including television, radio, billboards, stadiums, social media and influencers, high-profile partnerships, sports teams, and its website and third-party websites—with ▮▮▮▮▮▮▮▮▮▮ per week spent on these different channels.  (Sullivan Decl. ¶ 23; Wong Decl. ¶¶ 9, 21; PX-363; PX-365-373.)

- ***Sales Success***:    Approximately ▮ million customers have downloaded the JACKPOCKET app for Jackpocket's Lottery Courier Services, over ▮ of those customers in New York.  (Sullivan Decl. ¶ 16.)  Further, Jackpocket has sold over ▮ million worth of lottery tickets, resulting in over ▮ million in revenue, since launching.  (Sullivan Decl. ¶ 16; Wong Decl. ¶ 9; PX-363.)

- ***Unsolicited Media Coverage***:  Jackpocket has received extensive unsolicited media coverage, including in widely circulated media such as *New York Post*, *Daily News*, *CBS*, *NBC*, *CNBC*, *AXIOS*, *Good Morning America*, and *Cheddar*.  (Sullivan Decl. ¶¶ 50-52; PX-193265; Wong Decl. ¶¶ 30-31.)

- ***Length and Exclusivity of Use***:  Jackpocket began offering its Lottery Courier Services under the JACKPOCKET Marks since at least as early as August 2013. (Sullivan Decl. ¶ 15.)

51.     In addition, Jackpocket has developed a significant market share in its three biggest

markets ███████████████████████ (Sullivan Decl. ¶ 17; PX-038; Wong Decl. ¶ 13), has

ranked as the number one app in the entirety of Apple's App Store (Wong Decl. ¶ 27; PX-374-

375), and has trended as #2 and #5 on Twitter on separate occasions (Wong Decl. ¶ 28; PX-376;

PX-479.) Jackpocket's economics expert Jeff Anderson notes that Jackpocket has done everything

it needs to have developed a strong and well-recognized brand for Lottery Courier Services, and

industry expert Michael Pollock concludes the brand has indeed gained recognition. (Anderson

Rebuttal Report at 11-15; Pollock Rebuttal Report at 4-5.)

52.     These figures and metrics far surpass those deemed sufficient for a finding of

strength. *See Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020) (finding

mark strong where sales totaled in the tens of millions of dollars in a five-year period, and the mark

received "widespread recognition" in unsolicited news and social media coverage and in popular

culture); *Goat*, 2020 WL 5758917, at *1 (finding mark commercially strong where plaintiff spent

around $300,000 for marketing expenses, averaged $300,000 per year in wholesale sales, and

received various instances of unsolicited media coverage).

53.     Jackpocket also retained well-respected survey expert Hal Poret to directly and

empirically assess the level of recognition of the JACKPOCKET Marks. Using an -accepted

format, Poret's survey found that 58.3% of New York and New Jersey consumers of Lottery

Courier Services recognize the JACKPOCKET mark, with an unaided awareness of 19-24.7%.

(Poret Decl. at 6.) These figures are consistent with what this court has found sufficient to support

a finding of strength, and even fame. *See Cartier Inc. v. Four Star Jewelry Creations, Inc.*, 348 F.

Supp. 2d 217, 230, 245 (S.D.N.Y. 2004) (finding that aided awareness in the 50-60% range was

sufficient to support commercial strength of plaintiff's trade dress); *Stix Prods., Inc. v. United*

*Merchs. & Mfrs., Inc.*, 295 F. Supp. 479, 491 n.43 (S.D.N.Y. 1968) (holding defendant's mark was famous where unaided brand awareness for mark was 19.4% and aided brand awareness was 65.1%); *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, No. 96 CIV-2717, 1996 WL 929597, at *4, 17 (S.D.N.Y. Oct. 21, 1996) (finding mark was commercially strong where consumer recognition was greater than 50%).

54.     Jackpot's counter-survey does not prove otherwise. As Poret explains, even with the counter-survey's flaws—including overly broad questions that tried to divert attention away from the Lottery Courier Services at issue—the survey shows that JACKPOCKET is strong, with unaided awareness equal or greater to such well-known marks as CAESARS, MGM, and DRAFT KINGS. (*See* Response from Hal Poret to Survey Conducted by Scott D. Swain ("Poret Response Report").)

55.     The various third-party marks Jackpot contends weaken the strength of the JACKPOCKET Marks are irrelevant for multiple reasons.

56.     First, none of the third-party references contain the asserted trademark at issue here—JACKPOCKET—making them irrelevant. *Scarves by Vera, Inc. v. Todo Imps. Ltd.*, 544 F.2d 1167, 1174 (2d Cir. 1976) (third-party marks irrelevant to the strength of VERA where the marks "contained combinations of words, rather than the word 'Vera' alone"). *See also Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982) ("Third-party users that incorporate the word Safeway along with distinctive additional words . . . may not diminish the strength of the Safeway mark."); *Dynamic Aviation Grp., Inc. v. Dynamic Int'l Airways, LLC*, 15-CV-00058, 2016 WL 1247220, *19 (W.D. Va. Mar. 24, 2016) (according little weight to third-party uses of "Dynamics" marks because plaintiff's and defendant's marks contained the word "Dynamic," which had a slightly different connotation).

57.     Second, none of the third-party references are for the services at issue here, namely, Lottery Courier Services, and are instead for unrelated products or services, further diminishing their relevance. *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 255 (S.D.N.Y. 1999) (trademark applications and registrations for clothing not relevant to show alleged weakness of plaintiff's marks because the relevant product universe was jackets or parkas); *WIZKIDS/NECA, LLC v. TIII Ventures, LLC*, No. 17-CV-2400, 2019 WL 1454666, at *7 (S.D.N.Y. Mar. 31, 2019) (third-party marks "d[id] little to undermine" the strength of plaintiff's mark because the inquiry was limited to third-party uses within the plaintiff's market). *See also Nat'l Cable Television Ass'n v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 1579 (Fed. Cir. 1991) ("ACE for canned, large peas could not escape likelihood of confusion with a prior use of ACE for canned, small peas because ACE is concurrently used by unrelated third parties on . . . canned carrots"; holding that "the relevant public in the example need be defined no broader than purchasers of canned peas, and the third party ACE marks outside the segment become essentially irrelevant"); *Eclipse Assocs. v. Data Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) (affirming exclusion of third-party marks "for goods unrelated to the [relevant] field").

58.     Finally, other than a single third party offering social casinos (i.e., games for virtual currency, that is, not real money) and slot machines, Jackpot has offered no evidence of the marketplace impact of any of these purported third-party uses, further minimizing their relevance. *See Scarves by Vera*, 544 F.2d at 1173 ("The significance of third-party trademarks depends wholly upon their usage,"; disregarding third-party marks where defendant introduced no evidence that the marks "were well promoted, or that they were recognized by consumers"); *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 283 (S.D.N.Y. 1998) ("[B]ecause

defendant's evidence does not demonstrate actual third-party use, under *Scarves by Vera* it is incompetent to diminish the strength of plaintiff's mark.").

59.     The mere existence of a trademark application or registration "is not evidence of what happens in the marketplace or that consumers are familiar with [the mark's] use." *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 255 (S.D.N.Y. 1999) (citing *Scarves by Vera*, 544 F.2d at 1173), *aff'd*, 216 F.3d 1071 (2d Cir. 2000); *Cache, Inc. v. M.Z. Berger & Co.*, No. 99 Civ. 12320, 2001 WL 38283, at \*7 (S.D.N.Y. 2001) ("evidence of registration alone does not establish the extent to which . . . marks are actually used or promoted or the degree to which they have weakened [a] plaintiff's mark").

60.     Because the JACKPOCKET Marks are both inherently and commercially strong, this factor favors Jackpocket.

61.     Irrespective, Jackpocket need not establish strength to prevail here given the similarity between the parties' marks and identity of their services. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988) (holding, for a mark deemed "weak" that "finding the mark strong, or somewhere between strong and weak, is not necessary for the district court's ultimate holding of likelihood of confusion" and "the finding of weakness is not essential to the final judgment."); *In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 2010 WL 22358, at \*4 (TTAB Jan. 4, 2010) (finding even weak marks "are entitled to protection from the use of a very similar mark for legally identical services"); *In re Conchemco*, 185 USPQ 190, 1974 WL 20154, at \*1 (TTAB Dec. 9, 1974) ("Even assuming that 'MEAD' is a weak mark, it is nevertheless entitled to protection against a confusingly similar mark for virtually identical goods.").

### 3.     The JACKPOCKET Marks and JACKPOT Marks are similar.

62.     "[M]arks are considered similar when they are similar in appearance, sound and meaning." *Museum of Mod. Art*, 339 F. Supp. 3d at 375 (quoting *Clinique Lab'ys, Inc. v. Dep*

*Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y. 1996)). Less similarity is required where, as here, the parties offer the same products/services. *See Juicy Couture*, 930 F. Supp. 2d at 500.

63.    The JACKPOCKET Marks and JACKPOT Marks are nearly identical in appearance, sound, and meaning—in fact, they are so similar that others frequently refer to JACKPOCKET as JACKPOT. (Sullivan Decl. ¶ 56; PX-267-303.) The marks differ by just three letters—C, K, and E—nestled in a manner that is difficult to discern. See Museum of Mod. Art, 339 F. Supp. 3d at 375 (holding that the mark MOMACHA is confusingly similar to the mark MOMA, even with certain logo design differences); *Bulman*, 882 F. Supp. 2d at 560 (in comparing PINWEEL and PINWHEEL, the court noted that "a casual observer may not even note the misspelling"); *Syntex Lab'ys, Inc. v. Norwich Pharmacal Co.*, 315 F. Supp. 45, 50–51 (S.D.N.Y. 1970) (finding "striking" similarity and likelihood of confusion between VAGITROL for vaginal cream and VAGESTROL for vaginal suppository product), *aff'd*, 437 F.2d 566 (2d Cir. 1971); *N.K. Fairbank Co. v. Cent. Lard Co.*, 64 F. 133, 135 (S.D.N.Y. 1894) (finding COTTOLEO and COTTOLENE similar).[1]

---

[1] *See also Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183-185 (3d Cir. 2010) (finding FORSLEAN and FORSTHIN for Coleus forskohii-based weight loss products confusingly similar despite the suggestive FORS-prefix, which is an abbreviation for the generic term Coleus forskohii); *TBC Corp. v. Holsa, Inc.* 126 F.3d 1470, 1472 (Fed. Cir. 1997) (finding GRAND AM and GRAND SLAM, both for tires, confusing similar although the common prefix "GRAND" was laudatory and weak); *Am. Mfg. Co. of Tex. v. Heald Mach. Co.*, 385 F.2d 456, 458 (CCPA 1967) (finding BORMASTER and BORE-MATIC, both for metal working machines related to boring, confusingly similar despite finding the common prefix BOR- belonging to the public and the marks "highly suggestive"); *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1019 (N.D. Ill. 2005) (finding PERSONETA and PERSONA, both for telecommunications software, confusingly similar); *Ortho Pharm. Corp. v. Am. Cyanamid Co.*, 361 F. Supp. 1032, 1037-38 (D.N.J. 1973) (finding RHOGAM and RHO-IMUNE, both for Rh0 Immune Globulin, confusingly similar despite the common prefix RHO- being "descriptive of the generic name [Rh0]"); *A. H. Robins Co., Inc. v. Evsco Pharma. Corp.*, 190 USPQ 340, 342 (TTAB 1976) (finding E-Z DIP and E-Z GROOM, both for insecticide-cleaners for pets, confusingly similar despite the highly suggestive nature of the common prefix E-Z-because "the purchasing public would be most likely to remember and associate [E-Z] . . . to rely on as an indicia of origin"); *Gastown Inc. of Del. v. Gas City, Ltd.*, 187 USPQ 760, 762-63 (TTAB 1975) (finding GAS CITY for gas and GASTOWN for automobile and truck supply services confusingly similar despite the "obvious[ly] descriptive" common prefix "GAS"); *Alfacell Corp. v. Anticancer Inc.*, Cancellation No. 92032202, 2004 WL 1631116 (TTAB 2004) (deeming ONCONASE and ONCASE, both for anti-cancer drugs, confusingly similar).

64.     Jackpot's post-Complaint color change of its copycat website is not sufficient to avoid infringement because here, the marks appear and are heard beyond a website, e.g., billboards, radio advertising, and word-of-mouth. *See Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, No. 96-Civ-2717, 1996 WL 929597, at \*23 (S.D.N.Y. Oct. 21, 1996) (finding that the "simpl[e] use of a different color scheme is insufficient to escape the infringing impact through the use of a brand name that bears similarity to [plaintiff's mark]"); *Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*, 899 F. Supp. 1204, 1210 (S.D.N.Y. 1995) (finding defendant's use of a different color and masthead insufficient to prevent confusion with plaintiff's newspaper where the two word marks were highly similar). *See also Oral-B Laby's, Inc. v. Mi-Lor Corp.*, 611 F. Supp. 460, 463 (S.D.N.Y. 1985) (finding defendant's packaging infringed plaintiff's despite change in color of defendant's design because shape remained unchanged and highly similar to plaintiff's); *Finchley, Inc. v. George Hess Co.*, 24 F. Supp. 94, 96 (E.D.N.Y. 1938) ("In order to constitute an infringement, it is not necessary that the trade-mark be literally copied. . . . Dissimilarity in size, form, and *color* of the label and place where it is applied are not conclusive against infringement.") (citation omitted) (emphasis added).

65.     It is also inconsequential that Jackpot sometimes uses .COM along with its JACKPOT brand. First, Jackpot readily admits that it intends to use both JACKPOT and JACKPOT.COM as its brands and that both are equally important. (Oct. 11 Tr. at 201:19-23; 202:7-13; 276:20-23.) Regardless, the addition of the top-level domain ".com" has no trademark significance and thus does not meaningfully distinguish JACKPOT (or JACKPOT.COM) from JACKPOCKET. *See TCPIP Holding*, 244 F.3d at 10 ("Those differences [i.e., the addition of a top-level domain identifier of .com or .net], however, are of little or no significance. . . . [C]onsumers would see the domain name 'thechildrensplace.com/.net' as employing functionally

the same name as 'The Children's Place.'"); *First Jewellery Co. of Can. v. Internet Shopping Network LLC*, No. 99 CIV. 11239, 2000 WL 122175 (S.D.N.Y. Feb. 1, 2000) ("ISN's domain name, www.firstjewelry.com, is substantially the same as FIRST JEWELLERY. Identical aurally, the only difference is in the respective spellings 'jewellery' and 'jewelry.'").

66.     The similarity factor favors Jackpocket.

### 4.     The Parties' Lottery Courier Services are identical, competitive, and will be promoted through identical channels.

67.     "This factor focuses on whether the two products compete with each other." *Lang*, 949 F.2d at 582. "The closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150.

68.     Jackpot admits that its planned Lottery Courier Services are identical to those offered by Jackpocket and will be offered to the same consumers, in direct competition with Jackpocket. (Oct. 11 Tr. at 195:8-11.) Indeed, Jackpot deems Jackpocket its "most relevant competitor" and the "benchmark" for how it should operate in the United States, and Jackpocket usually comes up when Jackpot discusses the competitive landscape. (*Id.* at 224:6-226:9; 226:15-17; PX-475 at Jackpot.com_00000083.)

69.     Further, the parties' Lottery Courier Services will be marketed the same way. A prime example of this is sports partnerships, which Jackpocket uses and Jackpot plans to use to promote their similar brands and identical services. (*See* Sullivan Decl. ¶¶ 34-37; PX-117-159; Wong Decl. ¶¶ 22-23; Oct. 11 Tr. at 217:25-218:7.) In fact, both have secured partnerships in Dallas, Texas, with Jackpocket having sponsorships with the Texas Rangers (baseball), Dallas Mavericks (basketball), and ███████████ (Sullivan Decl. ¶ 34; Wong Decl. ¶ 23; Oct. 11 Tr. at 179:23-180:3) and Jackpot having a sponsorship with the Dallas Cowboys (Oct. 11 Tr. at

217:25-218:7). The potential crossover doesn't end in Texas. After Jackpot learned that Jackpocket secured a partnership with the New York Jets NFL team, Mr. Ron expressed his desire to secure a partnership with the ███████████████████████████████████████ in the future. (*See* PX-446.) And Jackpot's efforts enter these partnerships has caused confusion. The ████████████████████████ with the ███████████—one of Jackpocket's sports partners—emailed Akshay Khanna, telling him the ████ were "eager to develop a deeper relationship with ***Jackpocket***" and sent Mr. Khanna a meeting invite labeled for Jackpot. (PX-423 (emphasis added).)

70.     Because the services "here are in direct competition with each other," this factor favors Jackpocket. *CJ Prods.*, 809 F. Supp. 2d at 154.

### 5.     The likelihood that Jackpocket will bridge the gap is irrelevant.

71.     Where the parties' services are identical, as they are here, there is "no gap to bridge," and this factor is neutral. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (treating this factor as neutral where both parties used marks on liquor bottle labels).

### 6.     The relevant consumers are not sophisticated.

72.     Confusion is more likely when the goods at issue are inexpensive and purchased more casually. 4 McCarthy, *supra* at § 23:95; *Playtex Prods., Inc. v. First Quality Hygienic, Inc.*, 965 F. Supp. 339, 344 (E.D.N.Y. 1996) (noting the long-established proposition that "[a] lower price indicates that the normal buyer will exercise relatively less caution, making confusion more likely . . . is grounded in common sense") (citation omitted).

73.     Here, both parties agree that lottery tickets cost about one to three dollars. (Sullivan Decl. ¶ 8; Oct. 11 Tr. at 220:4-6.) At this low cost, the parties' customers are unlikely to devote much attention to ascertaining the source of those tickets, thus making confusion more likely. *See, e.g.*, *Tri-Star Pictures, Inc.*, 14 F. Supp. 2d at 358 (finding purchasers of motion picture tickets are

inclined to be less sophisticated buyers because tickets are relatively inexpensive and consumers are likely to pay less care and attention when purchasing).

74.     Jackpot's marketing/survey expert characterized the purchase of lottery tickets as a "gut decision." (Simonson Dep. Tr. at 38:6-10). In fact, even state lotteries themselves deem lottery ticket purchases as "impulse" decisions, with the Illinois Lottery noting that "[l]ottery products are impulse purchases driven by convenience" and the Connecticut Lottery noting that "[l]ottery products add to impulse purchases . . . ." (Pollock Rebuttal Report at 10.)

75.     Courts have also found consumers of both lottery tickets and casino products are neither careful nor sophisticated, and the result should be no different here. *See Aztar Corp. v. NY Ent., LLC*, 15 F. Supp. 2d 252, 261 (E.D.N.Y. 1998) (holding that consumers of casino products are not "sophisticated"), *aff'd sub nom. Collins v. Aztar Corp.*, 210 F.3d 354 (2d Cir. 2000); *Califon Prods. Inc. v. Stupak*, Opp. Nos. 91116967, 91116968, 2004 WL 390937, at *9 (TTAB Feb. 26, 2004) (finding purchasers of tickets for casino games and other "games of chance" are not sophisticated purchasers because they are "members of the general public" and "would not, therefore, be expected to exercise a great deal of care or deliberation in their selection of such common forms of entertainment as . . . deciding whether to purchase tickets for lotteries and other games of chance").

76.     It is of no moment that to use Jackpocket's Lottery Courier Services, one must first sign-up for the service and (when not using a promotional code) fund their account. In our modern technological world, many things can be done through a mobile application that requires both a sign-up process and some form of payment—e.g., grocery shopping (INSTACART), restaurant dining (DOORDASH), ride sharing (UBER), book reading (KINDLE), entertainment (NETFLIX, SPOTIFY), and others—all of which are low-involvement purchases. And for the JACKPOCKET

app, the sign-up process is simple and quick, with several different ways to easily fund the account, including linking it to existing payment methods like Apple Pay, Venmo, or others. (Sullivan Decl. ¶ 7; Wong Decl. ¶¶ 33-37; PX-377-379.)

77.     The sophistication factor favors Jackpocket. However, "[r]egardless of how sophisticated the relevant consumers are, given the similarities between the marks and the market, it is reasonable to believe that consumers are, and will continue to be, confused." 882 F. Supp. 2d at 564; *Pfizer*, 652 F. Supp. 2d at 524 ("[E]ven a highly sophisticated and discriminating class of consumers cannot be relied upon to allay confusion when the marks . . . are nearly identical.") (citation omitted).

### 7.     Jackpot adopted the JACKPOT Marks knowingly and in bad faith.

78.     "It is well established that wrongful intent is not a prerequisite to an action for trademark infringement or unfair competition, and that good faith is no defense." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d. Cir. 2004) (citation omitted). In *Sunward*, the Second Circuit affirmed a preliminary injunction even where defendant "never acted in anything but an entirely lawful manner." *Id.* at 25.

79.     Where a wrongful intent is present, however, it "raises a presumption of consumer confusion." *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991).

80.     A finding of bad faith can be found where the junior user knew of the prior mark and the junior mark shows "similarities so strong that it seems plain that deliberate copying has occurred." *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993). This, in turn, gives rise to a presumption "that the copier has succeeded in causing confusion." *Id.* at 586; *see Charles of Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1322 (2d Cir. 1987) ("[E]vidence of intentional copying raises a presumption that the second comer intended to create a confusing similarity."). Such is the case here.

81.     As it was planning its entry into the United States under the JACKPOT Marks, Jackpot knew of Jackpocket and its success. Jackpot referenced Jackpocket in numerous investment materials and other correspondence to investors, tracked and gathered Jackpocket's financial information (sharing that information with investors), and, multiple times, referred to Jackpocket internally and to investors as the "market leader" or the "benchmark" in the industry. Jackpot also copied the look and feel of Jackpocket's website. (Oct. 11 Tr. at 230:23-25; 232:10-11; PX-342; PX-466 at Jackpot.com_00010316.)

82.     In addition, as it eyed the United States, Jackpot knew full well that trademark rights are territorial. (Oct. 11 Tr. at 276:24-277:1.) Still, it continued on—ignoring the confusion that had already arisen and come to its attention—without getting an opinion or doing any investigations to see whether the JACKPOT Marks were available in the United States, and without creating any contingency plans in the event it cannot use the JACKPOT Marks here. (Oct. 11 Tr. at 195:8-197:6; 197:14-17; 198:7-19; 202:14-24; 203:12-16; 206:2-21; 212:3-5; 218:1-219:4; 221:13-222:24; 277:24-278:4.)

83.     Jackpot's knowledge of Jackpocket and its JACKPOCKET Marks coupled with Jackpot's continued expansion in the face of Jackpocket's repeated objections and knowledge of confusion supports a finding of bad faith. *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 536 (S.D.N.Y. 2011) ("Bad faith can be found where prior knowledge of the senior user's mark or trade dress is accompanied by similarities so strong that it seems plain that deliberate copying has occurred."); *see also MetLife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 234-235 (S.D.N.Y. 2005) (finding "circumstantial evidence of bad faith" where "the similarity between the parties' marks is such that it strains credulity to believe that neither [defendant] nor the firm it hired to redesign its logo were not consciously influenced by the

[plaintiff's] logo"); *Goat*, 2020 WL 5758917, at *16 (granting preliminary injunction where defendant began selling apparel with GOAT mark after plaintiff filed a complaint and after settlement negotiations had begun because defendant "acted with full knowledge of the potential implications of this action—it assumed the risk of entry of the preliminary injunction that [plaintiff] seeks").

84.     This factor favors Jackpocket.

### 8.     The quality of Jackpot's services is less than Jackpocket's.

85.     Quality focuses on "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Museum of Mod. Art*, 339 F. Supp. 3d at 379 (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)).

86.     Even if Jackpot's services were "high quality," that is irrelevant, as "a senior user may sue to protect his reputation even where the infringer's [services] are of top quality." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259-60 (2d Cir. 1987) (citation omitted).

87.     Jackpocket has worked closely with regulators and the industry to ensure the integrity of its Lottery Courier Services (and even helped develop the regulations). (Sullivan Decl. ¶ 19; Oct. 11 Tr. at 37:12-38:16, 167:12-168:3). And, as it communicated to Jackpot during the parties' discussions, Jackpocket does not want to be associated with derivative lotteries, or those who engage in derivative lotteries. (*Id.* ¶¶ 59, 63-64, 67). As lottery expert Mr. Pollock testified, Jackpocket's compliance with regulations and its reputation stemming from that compliance is critical to Jackpocket's brand in this highly regulated marketplace. (Pollock Rebuttal Report at 5-7, 12-15.)

88.     This factor favors Jackpocket.

### 9.     The totality of the Polaroid factors favors Jackpocket.

89.     In sum, the relevant *Polaroid* factors favor Jackpocket. The federally registered and incontestable JACKPOCKET Marks are inherently and commercially strong, confirmed by a consumer recognition survey; the parties' marks are similar (differing by only three letters toward the end) and identify identical, directly competitive services that are not purchased with considerable care or deliberation; Jackpot acted knowingly and with bad faith as it planned to expand into the United States in the face of actual confusion; Jackpot's derivative lotteries are a cause for concern; and actual confusion has already arisen even though Jackpot has not yet even launched in the U.S.—empirically confirmed through a consumer survey.

### D.  That "jackpot" is a word in the English dictionary does not change that Jackpot is liable for trademark infringement and unfair competition.

90.     "[T]he critical question in an action for infringement under the Lanham Act is the likelihood of confusion resulting from defendant's use of a mark allegedly imitative of plaintiff's registered mark." *Venetianaire Corp. of Am. v. A & P Imp. Co.*, 429 F.2d 1079, 1081 (2d Cir. 1970). As the Second Circuit explained, "[t]he test [for trademark infringement] looks first to whether the plaintiff's mark is entitled to protection," and then to whether the defendant's use of its mark is likely to cause confusion with plaintiff's mark. *Savin Corp.*, 391 F.3d at 456 (citation omitted).

91.     Here, Jackpocket has demonstrated prior valid and protectible rights in its asserted mark and a likelihood of confusion stemming from Jackpot's activities. Jackpot argues, however, that its JACKPOT Marks cannot infringe because they are allegedly descriptive. This runs directly contrary to the Lanham Act itself (*see* 15 U.S.C. §§ 1114(1) and 1125(a)) and is inconsistent with Second Circuit precedent. *See, e.g.*, *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305-08 (2d Cir. 2013) (holding that a plaintiff need not plead and prove that the accused designation is a "trademark use"

or used "as a mark" as a threshold to establish infringement and finding defendant's use of OWN

YOUR POWER, even though possibly descriptive, was "certainly used . . . in commerce" because

it "appeared prominently on the front cover of the Magazine . . . and on the Oprah Website.");

*Venetianaire*, 429 F.2d at 1082  (finding "defendant obviously used the term [HYGIENIC] 'as a

symbol to attract public attention'" and holding that the "use of 'Hygienic' infringed the trademark

owned by plaintiff [HYGIENT], even though the word 'hygienic' was capable of

descriptive . . . use").

92.     Jackpocket is not seeking to prevent any permitted descriptive uses of a term.

Jackpot and other competitors alike are free to continue using "jackpot" in its descriptive sense,

e.g., "win the jackpot," "hit the jackpot," "tonight's jackpot is . . .," and the like. Rather, Jackpocket

is seeking only to prevent Jackpot from using its JACKPOT Marks as a brand to identify Lottery

Courier Services in the United States—something Jackpot admits it is going to do (Oct. 11 Tr. at

201:19-23; 202:7-13; 276:20-23)—which has and is likely to continue causing confusion with

Jackpocket's JACKPOCKET Marks. Jackpot (and others) are free to use "jackpot" fairly and

descriptively in a manner not likely to cause confusion.

93.     Thus, the fact that "jackpot" can be used descriptively does not absolve Jackpot

from liability under the Lanham Act from its infringing, non-descriptive, trademark use of the

JACKPOT Marks.

III.     **JACKPOT IS LIABLE FOR DILUTION UNDER NEW YORK COMMON LAW**

94.     Under New York common law, dilution "is a gradual whittling away of a firm's

distinctive trade-mark or name." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497,

506 (2d Cir. 1996) (citation omitted). New York law provides that a "[l]ikelihood of injury to

business reputation or of dilution of the distinctive quality of a mark or trade name shall be a

ground for injunctive relief . . . notwithstanding the absence of competition between the parties or

the absence of confusion as to the source of goods or services." *Id.* (quoting N.Y. Gen. Bus. Law § 360–l).

95.     To establish dilution, "two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution." *Id.* Significantly, Section 360–l of the New York General Business Law "does not require a mark to be 'famous' for protection against dilution to apply." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 212 (S.D.N.Y. 2015) (citation omitted).

96.     "Blurring occurs 'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'" *NYSE, Inc. v. N.Y., N.Y. Hotel, LLC & N.Y., N.Y. Hotel & Casino, LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)).

97.     "To determine the likelihood of blurring, [the Second Circuit] . . . look[s] to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *NYSE*, 293 F.3d at 558; *accord E.A. Sween Co.*, 787 F. App'x at 786.

98.     Here, as discussed, these factors favor Jackpocket. The parties' marks are similar, the parties' products are identical, the relevant consumers are not sophisticated, Jackpot acted knowingly and in bad faith, and the JACKPOCKET Marks are well-known in the lottery space— particularly in New York where JACKPOCKET has spent millions on advertising and partnered with the New York Lottery—unlike the JACKPOT Marks, which have not yet been launched in the United States.

**IV.**      **JACKPOT'S AFFIRMATIVE DEFENSES DO NOT PRECLUDE LIABILITY**

> **A.  Jackpocket's conduct does not constitute unclean hands or trademark misuse.**

99.     Jackpot asserts "Trademark Misuse" as a separate defense from "Unclean Hands." (Dkt. 112 at ¶ 5.) "'Trademark misuse' is merely another name for a defense of unclean hands when asserted in the context of a trademark infringement case." Both defenses are thus addressed in tandem below. 4 McCarthy, *supra* at § 25:69 (citation omitted); *see also Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 256 (S.D.N.Y. 2012) (finding trademark misuse defense "duplicative" of unclean hands and denying both).

100.     The unclean hands defense forecloses the ability of a party who has acted "with inequitableness or bad faith relative to the matter in which he seeks relief" from obtaining equitable relief. *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (citation omitted). "The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect to the matter in litigation.'" *Id.* (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)); *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, No. 04 Civ. 4099, 2005 WL 1164073, at *3 (S.D.N.Y. May 18, 2005) ("Misconduct that is 'unrelated to the claim to which it is asserted as a defense,' however, 'does not constitute unclean hands'") (citation omitted).

101.     "[A]n unclean hands defense requires a finding of bad faith," *Deere & Co. v. MTD Holdings, Inc,*, No. 00 Civ. 5936, 2004 WL 1794507, at *2 (S.D.N.Y. Aug. 11, 2004) (citation omitted) (finding no unclean hands), and "it should be remembered that the 'unclean hands doctrine' is 'not to be used as a loose cannon, depriving a plaintiff an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct." *Tiffany (NJ) Inc. v.*

*eBay Inc.*, No. 04-CV-4607, 2006 WL 8461405, at *2 (S.D.N.Y. March 31, 2006) (citation omitted) (finding no unclean hands).

102.    Courts typically find unclean hands or trademark misuse only where the plaintiff is "guilty of truly unconscionable and brazen behavior." *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (collecting cases); *Gucci Am., Inc*, 868 F. Supp. 2d at 245 ("Where the defendant can show that the plaintiff has committed an 'unconscionable act' that is related to the matter at issue, the court may, in its discretion, deny plaintiff relief based on the doctrine of unclean hands.") (citation omitted).

103.    Here, Jackpot's asserted bases for its unclean hands and trademark misuse defenses fail. (*See* Dkt. 112 at ¶¶ 2, 5.)

104.    First, Jackpot claims that Jackpocket attempted to "restrict competition" and "unfairly seek to build a monopoly" (*Id.*) does not give rise to unclean hands or misuse. *See De Beers*, 2005 WL 1164073, at *3 (rejecting unclean hands defense premised on alleged "anti-competitive, monopolistic, and inequitable conduct," including restraint of competition, price fixing, and cooperating with oppressive regimes in foreign countries).

105.    Second, Jackpot's contention that Jackpocket has "engaged in illegal acts, including operating lottery courier services in jurisdictions for which it was not licensed to offer lottery courier services" (Dkt. 112 at ¶ 2) is unrelated to Jackpocket's assertion of trademark rights in its JACKPOCKET Marks against Jackpot, and thus cannot form the basis for an unclean hands defense. It is also not true. (*See* Oct. 11 Tr. at 41:15-42:2.)

106.    Finally, Jackpot's allegation that Jackpocket made its "JACKPOCKET Marks appear more similar to Defendants' JACKPOT.COM designations" (Dkt. 112 at ¶ 2) also does not give rise to unclean hands or misuse. *See Deere & Co.*, 2004 WL 1794507, at *3 (rejecting unclean

hands defense premised on the defendant's allegation the plaintiff engaged in "bad-faith efforts to 'own' the color green and the combination green and yellow" and took actions "calculated to cause precisely the kind of confusion on which [plaintiff's] trademark infringement claims depend.").

107.    Jackpot's unclean hands and trademark misuse defenses thus fail.

108.    To the extent "trademark misuse" might be recognized as an independent non-duplicative defense, the defense "requires a showing that the plaintiff has used its trademark in violation of anti-trust laws." *LPD N.Y., LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2022 WL 4450999, at *26 (E.D.N.Y. Sept. 24, 2022) (citation omitted) (quoting *Gucci Am.*, 868 F. Supp. 2d at 245). Because Jackpot has not shown that Jackpocket violated any anti-trust laws, Jackpot's trademark misuse defense fails. *Id.* ("Plaintiff has not alleged that Defendants violated anti-trust laws and also pled the unclean hands defense. Thus, this defense fails as a matter of law.").

### B.  Jackpocket's claims are not barred by the defense of laches.

109.    To prove laches, Jackpot must show "that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that the defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1096 (S.D.N.Y. 1978).

### 1.    Jackpocket did not have knowledge of a provable claim for infringement until May 20, 2022.

110.    The laches clock begins to run when the trademark owner "knew or should have known, not simply that [the infringer] was *using* the potentially offending mark, but that [it] had *a provable infringement claim* against [the infringer]." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d. Cir. 2002) (citation omitted). "'[A]ny other rule would require each trademark owner to sue first and ask questions later,' and

would foster meritless litigation." *Id.* (quoting *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997)).

111.    Jackpot argues that Jackpocket knew of the jackpot.com domain both in 2015—when Mr. Sullivan received an email from a payment processor mistakenly sending a link to lottery.jackpot.com instead of jackpot.com (Sullivan Decl. ¶ 95)—and 2017, when Mr. Sullivan received another email from an investor linking to the jackpot.com domain (*id.* at ¶ 94). Neither triggers the clock for laches.

112.    In 2015, the jackpot.com domain was not owned by Jackpot (Oct. 11 Tr. at 207:4-10; 207:17-208:1; 208:16-22; 209:1-6; 210:2-4.), and at both times, the jackpot.com domain (both before and after Jackpot acquired the domain in 2016) had no active operations in the United States—let alone for Lottery Courier Services. (*Id.* at 189:11-18; 193:4-10; 193:17-194:13; 199:1-200:7; 207:4-6; 209:7-10; 209:15-210:4; 210:13-21; 272:5-24.) As detailed above, these foreign uses (and the ability to passively access a website in the United States) did not constitute U.S. trademark use giving rise to a provable infringement claim. As such, these 2015 and 2017 emails cannot trigger the laches clock.

113.    According to Jackpot, the first time it considered entering the United States with Lottery Courier Services was late 2020, and steps toward that expansion did not begin until February 2021. (Ron Decl. ¶¶ 32-33, 35.) The first time Jackpot took any publicly-open steps to enter the United States was in April 2021, when it updated the landing page for its jackpot.com domain with a pop-up that stated, "Coming Soon – the NEW way to play the lottery. Sign up now to hear first when we launch in your state. Special Offers for early Signups." (*Id.* ¶ 36.) That notice did not identify any specific services or a launch date.

114.    The first time Jackpocket received any notice that Jackpot intended to offer Lottery Courier Services in the United States was on December 3, 2021, when Mr. Sullivan and Mr. Ron first spoke. (*See* Sullivan Decl. ¶ 59.) But even then, Jackpocket was unaware of whether Jackpot could enter the United States using the JACKPOT Marks for Lottery Courier Services given its operation of illegal derivative lotteries under those same marks overseas, let alone when. (S*ee id.* ¶¶ 57-59, 64, 86-95.)

115.    The first time Jackpocket had any real indication that Jackpot was actually taking affirmative steps to enter the United States under the JACKPOT Marks for Lottery Courier Services was May 20, 2022, when Jackpot announced that it had hired Akshay Khanna as its North American CEO. (*Id.* ¶ 76). That was the first time Jackpocket could have a provable infringement claim against Jackpot for its planned launch Lottery Courier Services in the United States under the JACKPOT Marks.

116.    May 20, 2022 is thus the earliest the clock for laches could begin to run.

### 2.    No matter what date is chosen to start the laches clock, Jackpocket did not delay in objecting and bringing suit.

117.    In the Second Circuit, "courts apply the analogous statute of limitation from the forum state" to measure whether there has been a delay. *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 196 (S.D.N.Y. 2008) (citation omitted).

118.    In New York, the analogous statute of limitations for trademark infringement claims under the Lanham Act is the six-year statute of limitations for fraud. *Id.* (citation omitted); *Fendi Adele S.R.L. v. Ashley Reed Trading, Inc.*, No. 06 Civ. 243, 2010 WL 571804, at *9 (S.D.N.Y. Feb. 16, 2010) ("In evaluating whether [a] plaintiff's delay in taking action was sufficiently long to invoke laches in a Lanham Act suit, the Second Circuit has held that the six-

year statute of limitations applicable to state-law fraud claims in New York is the appropriate measure.") (citation omitted).

119.    Under the doctrine of progressive encroachment, under which a plaintiff "'has no obligation to sue until the likelihood of confusion looms large' and his 'right to protection [has] clearly ripened.'" *ProFitness*, 314 F.3d at 68 (citation omitted); *Olay Co., Inc. v. Cococare Prods., Inc.*, 218 USPQ 1028, 1043 (S.D.N.Y. 1983) (finding two-year delay after defendant began local sales in small volume with minimal advertising did not bar plaintiff for all time in seeking injunctive relief from infringement because once plaintiff was aware of defendant's increased sales profile, it acted "reasonably expeditiously thereafter").

120.    The laches delay period ends when a party objects to the allegedly infringing use. *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1041 (2d Cir. 1980) (finding "[a] simple warning letter would have sufficed" to toll the delay period); *Gross*, 641 F. Supp. 2d at 196 (finding delay period ended when demand letter sent; "The letter came less than two years after plaintiffs were issued registrations for their marks and prior to when their rebranded trade dress appeared in stores.").

121.    Here, Jackpocket objected on May 23, 2022—three days after the laches clock could have started. (Sullivan Decl. ¶¶ 76-82.) Even considering any of the earlier days Jackpot relies on, Jackpocket's objection was timely and well within the 6-year time period, i.e., when Jackpot first considered an entry to the United States (late 2020; 1.5 years before the objection); when Jackpot took its first step to enter the United States (February 2021; 1 year and 3 months before the objection); when Jackpot updated its landing page with a notice to U.S. visitors (April 2021; 1 year and 1 month before the objection); or when Jackpot first told Jackpocket it hoped to enter the United States to offer Lottery Courier Services (December 2021; 6 months before the

objection). *See Gross*, 641 F. Supp. 2d at 196 (finding two-year delay insufficient for laches); *Frito-Lay, Inc. v. Bachman Co.*, 3 USPQ2d 1472, 1474 (S.D.N.Y. 1987) (finding four-year delay insufficient for laches).

122.    Even accepting 2017 as the date to start the laches clock, Jackpocket still acted within six years. *See Fendi*, 2010 WL 571804, at *9 (finding no delay and no laches because "[p]laintiffs initiated this suit within the applicable six-year period of limitations"). Because Jackpot has not yet even launched in the United States, it would be timely if Jackpocket filed suit today. *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 881 (E.D.N.Y. 1978) (noting the "ludicrous result" of dating laches from a junior user's first de minimis use where such use would not have entitled plaintiff to significant relief).

123.    Even if there was some delay, it would be excused under the doctrine of progressive encroachment. *See ProFitness*, 314 F.3d at 68 (a plaintiff "'has no obligation to sue until the likelihood of confusion looms large' and his 'right to protection [has] clearly ripened.'") (citation omitted); *Olay Co., Inc. v. Cococare Products, Inc.*, 218 USPQ. 1028, 1043 (S.D.N.Y. 1983) (finding two-year delay after defendant began local sales in small volume with minimal advertising does not bar plaintiff for all time in seeking injunctive relief from infringement. because once plaintiff was aware of defendant's increased sales profile, it acted "reasonably expeditiously thereafter").

### 3.    Jackpot has suffered no prejudice.

124.    In determining whether a defendant will be prejudiced, the court must assess "the injury to which the defendant . . . will be subjected if the injunction is issued." *Cuban Cigar Brands*, 457 F. Supp. at 1098 n.33. In a trademark case, there is no prejudice where an injunction would only prevent the defendant from using a certain trademark—particularly where, as here, the defendant spent little or no money advertising the mark. *See Tap Pubs., Inc. v. Chinese Yellow*

*Pages (N.Y.) Inc.*, 925 F. Supp. 212, 223-24 (S.D.N.Y. 1996); *McDonald's Corp. v. Druck and Gerner, DDS., P.C.*, 814 F. Supp. 1127, 1137-38 (N.D.N.Y. 1993).

125.    Jackpot has done nothing to develop, promote, or otherwise market the JACKPOT Marks in the United States. It has not directed any advertising to the United States and has spent no money specifically advertising here. (Oct. 11 Tr. at 212:6-213:12.) It has not done any prelaunch advertising. (*Id.* at 213:14-16.) It has no written advertising plans and has not hired any employee for its marketing department. (*Id.* at 213:17-19; 213:24-214:5; 222:25-223:6.) It has not created any U.S. mission or messaging, nor has it developed any brand guidelines, created any written creative, or created any slogan for the United States. (*Id.* at 214:22-216:1.) Oher than its website landing page (which Jackpot admitted was easy to change (*id.* at 232:2-3)), Jackpot has not created any brand elements for the United States. (*Id.* at 216:2-7.) Jackpot does not even have a planned date for the launch of any advertising. (*Id.* at 216:9-11.) Jackpot thus has not identified any prejudice it would suffer if enjoined from using the JACKPOT Marks.

126.    Jackpot's non-advertising and/or non-trademark-related expenditures (*see* Ron Decl. ¶ 35) do not give rise to prejudice. An injunction would not prevent Jackpot from using any of the capital it raised or the infrastructure and technology it has developed in preparing to launch in the United States. All it will prevent is the use of the infringing JACKPOT Marks, for which Jackpot has done virtually nothing to develop, promote, or advertise here. *See Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 613 F. Supp. 2d 1140, 1145 (W.D. Mo. Apr. 23, 2009) ("Importantly, granting [p]laintiffs' requested injunction will not interfere with [d]efendants' . . . services . . . [because] [d]efendants have a non-infringing name they can use in the interim . . . .").

127.    Further, there is no prejudice from an injunction regarding the jackpot.com domain. First, there is no cybersquatting claim here and Jackpocket only seeks an injunction against the use of jackpot.com for Lottery Courier Services. Second, the jackpot.com domain is not as valuable as Jackpot contends because, among other things, Google itself has explained that "there's no ranking benefit associated with having keywords in a domain name." (Anderson Rebuttal Report at 6-11.)

128.    Finally, Jackpot cannot claim prejudice after failing to obtain an opinion before moving ahead with its plan of using one "brand" in "all jurisdictions," particularly where it admits it can use another brand (besides JACKPOT) (Oct. 11 Tr. at 206:2-5) and in fact has used other brands and domains for its B2B operations (*see* PX-433 at Jackpot.com_00001678).

129.    Jackpot's laches defense therefore fails.

### C.  Jackpocket's claims are not barred by the defenses of acquiescence or equitable estoppel.

130.    The defense of acquiescence requires the same elements of proof as laches, but also requires proof that Jackpocket gave Jackpot "active or explicit consent to use [its] allegedly infringing mark." *Deere & Co. v. MTD Holdings, Inc.*, No. 00 Civ. 5936, 2004 WL 324890, at *22 (S.D.N.Y. Feb. 19, 2004) (citation omitted)).

131.    For acquiescence, Jackpot must prove "(1) [Jackpocket] actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (emphasis added) (citation omitted).

132.    Acquiescence applies only "'in those cases where the trademark owner, by affirmative word or deed,' conveys its consent to another." *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 276 (S.D.N.Y. 2002). Mere silence is insufficient to establish

the active representation required for acquiescence. *Fendi*, 2010 WL 571804, at *8 ("[S]ilence is far from 'active acquiescence.'") (citation omitted); *Deere & Co.*, 2004 WL 324890, at *22 (same).

133. Jackpocket never made any affirmative assurances or representations that it would not assert its rights in its JACKPOCKET Marks against Jackpot. Indeed, Jackpot pleads only that Jackpocket's silence or inaction suggested Jackpot could proceed with its JACKPOT Marks. (*See* Dkt. 112 at ¶ 3.) This is not the "active representation" required to prove acquiescence and Jackpot's affirmative defense therefore fails. *Emmpresa*, 213 F. Supp. 2d at 277-78 (dismissing acquiescence and equitable estoppel defense because of defendant's "fail[ure] to establish evidence of any acts, conduct or omission on the part of [plaintiff] on which it could rely"); *Fendi*, 2010 WL 571804, at *8 (granting summary judgment for plaintiff on defendants' acquiescence defense because "[d]efendants' fail[ed] to adduce any evidence that [p]laintiffs made assurances that they would not assert their rights in the Fendi Marks against [d]efendants"); *Deere & Co.*, 2004 WL 324890, at *22 (granting summary judgment for plaintiff on defendant's acquiescence defense because "[d]efendant [did] not offer any evidence that Deere actively acquiesced in MTD's use of green and yellow on its lawn and garden equipment").

134. Even if there was some active representation here, Jackpot does not satisfy the remaining elements of acquiescence. The first time anybody from Jackpocket ever communicated with anybody from Jackpot was on December 3, 2021, when Mr. Sullivan and Mr. Ron first spoke ███████████████████████. (Sullivan Decl. ¶¶ 57-59; Ron Decl. ¶¶ 37, 39.) Jackpocket objected to Jackpot just over five months later (on May 23, 2022) and brought this suit less than two months after that (on July 7, 2022). (Sullivan Decl. ¶¶ 77, 82; *see also* Dkt. 1.) Thus, the greatest possible delay for purposes of acquiescence is five to seven months, which is insufficient as a matter of law to demonstrate acquiescence. *Coop. Regionale De Vins De Champagne v.*

*Chatam Int'l Inc.*, No. 86 CIV. 6343, 1987 WL 123987, at *3 (S.D.N.Y. Nov. 6, 1987) ("Five months, six months or eight months, however, is insufficient to constitute laches . . . . With the failure of the laches defense, the estoppel and acquiescence defenses must fail as well.").

135.    Regarding prejudice, for the same reasons Jackpot cannot establish prejudice for laches, it cannot establish prejudice for acquiescence.

136.    The defense of equitable estoppel is nearly identical, requiring Jackpot to prove that "(1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit." *Emmpresa*, 213 F. Supp. 2d at 276 (citation omitted). Like acquiescence, silence typically is insufficient to establish the required "misleading communication" for estoppel. *See id.*

137.    For purposes of equitable estoppel, however, silence may give rise to equitable estoppel, but *only if* a duty to speak exists. *Id.* at 277. Such a duty may arise "in the face of an explicit contrary assumption by an innocent party." *Gen. Elec. Capital Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994) (emphasis added).

138.    No such duty to speak existed here. *See Emmpresa*, 213 F. Supp. 2d at 277 ("Cubatabaco did not as a matter of law have a duty to speak."). Because there is no evidence Jackpot ever made any "explicit contrary" representation that it believed it could use its JACKPOT Marks in the United States without infringing the JACKPOCKET Marks, Jackpocket had no "duty to speak."

139.    Further, estoppel does not apply because, as discussed above, there is no delay or prejudice.

140.    Jackpot's acquiescence and equitable estoppel defenses thus fail.

**D.  Jackpocket's claims are not barred by the defense of waiver.**

141.    "Waiver is the intentional relinquishment of a known right." *Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 428 (S.D.N.Y. 2010) (citing *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983)). "To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Id.* (quoting *Voest-Alpine*, 707 F.2d at 685.)

142.    Jackpot did not present any facts showing that Jackpocket relinquished its rights in its JACKPOCKET Marks, let alone intentionally. This defense thus also fails. *See Coach*, 756 F. Supp. 2d at 428 (striking waiver defense and finding it insufficient as a matter of law where "there [was] no indication that Plaintiffs have intentionally relinquished any rights"); *Car-Freshner Corp. v. Just Funky LLC*, No. 19-CV-0289, 2019 WL 6270991, at *5 (N.D.N.Y. Nov. 25, 2019) (striking waiver defense and finding it insufficient as a matter of law because "of the factual and legal invalidity of the defense").

**E.  Innocent use is not a defense to trademark infringement and unfair competition.**

143.    "It is well established that wrongful intent is not a prerequisite to an action for trademark infringement or unfair competition, and that good faith is no defense." *Sunward Elecs.*, 362 F.3d at 25 (emphasis added) (citation omitted). As such, this defense fails.

**V.    JACKPOCKET IS ENTITLED TO A PERMANENT INJUNCTION**

144.    Courts "have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark" or to prevent further violation of the Lanham Act by the defendant. 15 U.S.C.

§ 1116(a). "A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment." 5 McCarthy, *supra* at § 30:1.

145.    A plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010) (noting *eBay* four-factor test is "the presumptive standard for injunctions in any context").

146.    Each factor weighs in favor of an injunction here.

### A.  Jackpocket's irreparable harm/injury is presumed.

147.    Under the Trademark Modernization Act of 2020, a plaintiff seeking an injunction is entitled to a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits. 15 U.S.C. § 1116(a); *see also Kelly Toys Holdings, LLC v. alialialiLL Store*, No. 21 Civ. 8434, 2022 WL 2072567, at *11-12 (S.D.N.Y. June 9, 2022) (converting a preliminary injunction into a permanent injunction).

148.    Here, because Jackpot is liable for trademark infringement and unfair competition, Jackpocket will presumptively and necessarily suffer irreparable harm if Jackpot is not enjoined.

149.    Even without the rebuttable presumption, Jackpocket has demonstrated irreparable harm. If Jackpot is not enjoined, consumers will continue to confuse JACKPOT with JACKPOCKET, as they have already done without Jackpot even operating in the United States. The false association with Jackpot will continue to put Jackpocket's hard-earned reputation and goodwill at Jackpot's mercy. The harm from this is not calculable and cannot be remedied by monetary damages.

150.    Absent injunctive relief, Jackpocket will thus suffer irreparable harm to its brand and goodwill. *See*, *e.g.*, *Museum of Mod. Art*, 339 F. Supp. 3d at 382 (noting that "[i]rreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" (quoting *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 336 (S.D.N.Y. 2010)); *U.S. Polo Ass'n*, 800 F. Supp. 2d at 540-41 (same; finding irreparable harm because "the reputation and goodwill cultivated by PRL's would be out of its hands" "given the likelihood of confusion").

151.    This factor favors an injunction.

**B.  Jackpocket has no adequate remedies at law.**

152.    Because Jackpocket's loss of reputation and goodwill is not precisely quantifiable, remedies at law cannot adequately compensate Jackpocket for its injuries. *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 ("Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Plaintiff for its injuries."); *Coty*, 277 F. Supp. 3d at 464 ("The second factor—whether remedies at law are adequate—also swings in Coty's favor, as money alone cannot make up for the company's unquantifiable 'losses of reputation and goodwill and resulting loss of customers.'") (quoting *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541); *see also generally Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) ("The irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights.").

153.    This factor favors an injunction.

## C. The balance of hardships favors a permanent injunction.

154.    The balance of hardships weighs in Jackpocket's favor. The confusion that has already been occurring and come to light from the use of the JACKPOT Marks is causing Jackpocket immediate and irreparable hardship, which will only continue to increase.

155.    Contrasted with this, Jackpot will not suffer any legally cognizable hardship from not using JACKPOT as a brand/trademark for Lottery Courier Services in the United States. *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[A]n . . . infringer . . . cannot complain about the loss of ability to offer its infringing product.") (citation omitted); *3M Co.*, 458 F. Supp. 3d at 197 ("It would not be a 'hardship' for [d]efendant to refrain from engaging in unlawful activities related to [plaintiff's] brand.").

156.    Additionally, Jackpot has taken virtually no steps towards developing its JACKPOT Marks in the United States. And because Jackpot has not yet started offering services in the United States, or advertise or promote them, the balance of hardships clearly favors Jackpocket. *Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F. Supp. 203, 205 (S.D.N.Y. 1987) (issuing injunction before the defendant's product were sold, because "it seems to us that equity and common sense dictate the issuance of an injunction at this early stage, before defendants have needlessly devoted time, energy and financial resources to a futile endeavor."); *Bulman*, 882 F. Supp. 2d at 565 (finding the balance of hardships "weighs decidedly" in favor of plaintiffs where defendant's product was still in its testing phase and had not yet been fully launched).

157.    Further, given the fundamental principle of trademark territoriality, Jackpot's investment in its JACKPOT Marks overseas has no bearing on this case. *See Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 460 n.26 ("[E]vidence

concerning foreign trademark uses and registrations are irrelevant and inadmissible for purposes of determining whether a likelihood of confusion exists in the United States.").

158.    Jackpot also cannot show harm from having raised capital and/or developing infrastructure and technology for its product offering. An injunction would not prevent Jackpot from using any of the capital it raised or the infrastructure and technology it has developed. It is free to use a non-infringing mark with both. *Cmty. of Christ Copyright*, 613 F. Supp. 2d at 1145 ("Importantly, granting [p]laintiffs' requested injunction will not interfere with [d]efendants' . . . services . . . [because] [d]efendants have a non-infringing name they can use in the interim").

159.    Having been warned by Jackpocket in May 2022, Jackpot "ran the risk of a trade[mark] infringement claim." *Essie Cosms., Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 961 (E.D.N.Y. 1992). Jackpot thus "bear[s] the risk of having gone forward with a mode of operation now being declared illegal." *Id.* at 960-61.

160.    This factor favors an injunction.

### D. A permanent injunction will serve the public's interest.

166.    In analyzing the public interest, a court must consider "the public consequences in employing the extraordinary remedy of injunction" and ensure that the proposed injunction will not harm the public interest. *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir. 2020) (citation omitted); *SEC v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012).

167.    In trademark cases, the public interest "lies in avoiding confusion, particularly where [the] defendant would be able to continue its activities under another mark." *Mitchell Grp. USA LLC v. Udeh*, No. 14-CV-5745, 2017 WL 9487193, at *1 (E.D.N.Y. Mar. 8, 2017), *report and recommendation adopted*, No. 14 Civ. 5745, 2017 WL 3208532 (July 28, 2017); *see also 3M Co. v. Covcare, Inc.*, 537 F. Supp. 3d 385, 405 (E.D.N.Y. 2021) ("The consuming public has a protectable interest in being free from confusion, deception and mistake.") (citation omitted).

168.     The public is being immeasurably harmed by Jackpot's deception. Thinking they are placing their bets with the JACKPOCKET app they have seen, know, and trust, consumers will pay the second comer, who will get an unfair boost from the goodwill and public/industry trust that Jackpocket has long labored to build. Stopping this is clearly in the public's interest.

169.     This factor favors an injunction.

170.     Because all of the *eBay* factors favor entry of a permanent injunction, Jackpocket is entitled to an injunction enjoining Jackpot from using the JACKPOT Marks in the United States in connection with Lottery Courier Services.

Dated:  November 15, 2022          Respectfully submitted,

*/s/ Douglas A. Rettew*
Douglas A. Rettew (*pro hac vice*)
Danny Awdeh (*pro hac vice*)
Mary Kate Brennan
Patrick J. Rodgers (*pro hac vice*)
Troy Viger (*pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,**
   **GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001-4413
Tel: (202) 408-4000
Fax: (202) 408-4400
doug.rettew@finnegan.com
danny.awdeh@finnegan.com
marykate.brennan@finnegan.com
patrick.rodgers@finnegan.com
troy.viger@finnegan.com

Amy Sullivan Cahill
**STEPTOE & JOHNSON PLLC**
700 N. Hurstbourne Parkway, Suite 115
Louisville, Kentucky 40222
Tel: (502) 423-2054
Fax: (502) 423-2001
amy.cahill@steptoe-johnson.com

*Attorneys for Plaintiff*
*Jackpocket, Inc.*