**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JACKPOCKET, INC.,

                Plaintiff,

    v.

LOITOMATRIX NY LLC,
LOTIOMATRIX CORPORATION,
LOTIOMATRIX OPERATIONS LIMITED
d/b/a JACKPOT.COM, LOTIOMATRIX
MALTA LIMITED, and 99DYNAMICS
LIMITED,

                Defendants.

---

Case No.  l:22-cv-05772(LJL)

**MEMORANDUM OF LAW** IN **SUPPORT OF DEFENDANTS' MOTION FOR**
**ATTORNEYS' FEES AND RELATED NONTAXABLE EXPENSES**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ......................................................................1

BACKGROUND ..........................................................................................3

    A.    Plaintiff's Historical Attempts To Block Competitors From Entering The
        Lottery Courier Services Market......................................................3

        1.    Plaintiff Creates A Regulatory "Moat" Around Itself ................3

        2.    Plaintiff Raises False Claims To State Lottery Regulators To
                Persuade Them To Block Potential Competitors .........................4

    B.    Plaintiff Deploys Its Anti-Competitive Playbook Against Jackpot.com ................5

        1.    Plaintiff Negotiates With Jackpot.com Concerning Its U.S.
                Launch, But Never Mentions Any Trademark Concerns ...........5

        2.    Plaintiff Files This Lawsuit As Part Of Its Effort To "Kill"
                Jackpot.com............................................................................6

        3.    Misrepresentations Based On A Manufactured Logo And The
                Legality Of Jackpot.com's Business ..........................................7

        4.    Use Of The Lawsuit To Generate Negative Publicity About
                Jackpot.com............................................................................9

        5.    Contemporaneous Efforts To Interfere With Licensing Regulators ..........10

        6.    Contemporaneous Efforts To Interfere With Jackpot.com's
                Contracts ..............................................................................11

    C.    Plaintiff's Attempts To Shield Its Misrepresentations And Weak Positions.........12

    D.    Plaintiff's Mere Filing Of This Lawsuit To Obtain Its Desired Relief.................13

LEGAL STANDARD.................................................................................14

ARGUMENT............................................................................................15

I.    THIS CASE IS "EXCEPTIONAL" UNDER § 1117(A) BECAUSE IT "STANDS
    OUT FROM OTHERS"........................................................................16

    A.    Plaintiff's Initiation Of This Lawsuit For An Anti-Competitive Purpose
        And With Improper Motive Makes This Case "Exceptional" ...............16

        1.    Plaintiff Initiated This Lawsuit As A Competitive Ploy............................16

        2.    Plaintiff's Bad-Faith Modification Of Its JACKPOCKET Mark To
                Bolster Its Position In This Lawsuit Further Evidences Its
                Improper Motivation ................................................................19

    B.    An Award Of Fees Would Advance Considerations Of Compensation and
        Deterrence .............................................................................20

    C.    Plaintiff's Claims Were Objectively Unreasonable .............................22

i

     D.      Plaintiff Litigated This Case In An Unreasonable Manner ...................................24

II.     THE COURT SHOULD AWARD JACKPOT.COM ITS RELATED
      NONTAXABLE EXPENSES ...........................................................................................25

III.    THE COURT SHOULD GRANT JACKPOT.COM LEAVE TO FILE A FEE
      APPLICATION DETAILING ITS REQUESTED ATTORNEYS' FEES AND
      RELATED NONTAXABLE EXPENSES ........................................................................26

CONCLUSION...........................................................................................................................28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anastasia Int'l, Inc. v. EM Online Pty Ltd.*,
  2013 WL 5550211 (S.D.N.Y. Oct. 4, 2013) .................................................... 17, 19

*Baker v. Urban Outfitters*,
  431 F. Supp. 2d 351 (S.D.N.Y. 2006) ........................................................... 15, 21

*Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*,
  2020 WL 729518 (S.D.N.Y. Feb. 13, 2020) ............................................... 16, 21, 26

*Benihana of Tokyo, LLC v. Benihana, Inc.*,
  2018 WL 3574864 (S.D.N.Y. July 25, 2018) ............................................. 17, 20, 21

*Cognex Corp. v. Microscan Sys., Inc.*,
  2014 WL 2989975 (S.D.N.Y. June 30, 2014) ...................................................... 15

*Dinsbach v. Harris*,
  2022 WL 742726 (D. Ariz. Mar. 11, 2022) ...................................................... 26

*Dropbox, Inc. v. Thru Inc.*,
  2017 WL 914273 (N.D. Cal. Mar. 8, 2017) ...................................................... 26
  728 F. App'x 717 (9th Cir. 2018) .................................................................. 25

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
  2017 WL 3610583 (S.D. Fla. Aug. 11, 2017) .................................................... 23

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
  2021 WL 1172335 (S.D.N.Y. Mar. 26, 2021) .................................................... 16

*H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd.*,
  2020 WL 6263649 (S.D. Cal. Oct. 22, 2020) .................................................... 16

*Imapizza, LLC v. At Pizza Ltd.*,
  2021 WL 2410713 (D.D.C. June 8, 2021) ...................................................... 15

*J.T. Colby & Co. v. Apple Inc.*,
  2013 WL 1903883 (S.D.N.Y. May 8, 2013) .................................................... 20

*Ketab Corp. v. Mesriani & Assocs., P.C.*,
  734 F. App'x 401 (9th Cir. 2018) .............................................................. 15, 16

*Leapers, Inc. v. SMTS, LLC*,
  2017 WL 3084370 (E.D. Mich. July 20, 2017) .................................................... 16

*LeBlanc-Sternberg v. Fletcher,*
    143 F.3d 748 (2d Cir. 1998)..........................................................................26

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.,*
    764 F. App'x 39 (2d Cir. 2019) ...................................................................15

*Mennen Co. v. Gillette Co.,*
    565 F. Supp. 648 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984) ..............17

*Miller v. Hurst,*
    2021 WL 859552 (M.D. Tenn. Mar. 8, 2021) ...........................................16

*Next Realty, LLC v. Next Real Est. Partners LLC,*
    2019 WL 1757781 (E.D.N.Y. Mar. 11, 2019) ............................................26

*Noble Biomaterials v. Argentum Med., LLC,*
    2011 WL 13113786 (M.D. Pa. Aug. 25, 2011) .........................................27

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
    572 U.S. 545 (2014)............................................................................14, 15

*Omega SA v. 375 Canal LLC,*
    2019 WL 2442434 (S.D.N.Y. June 12, 2019) ...........................................14

*4 Pillar Dynasty LLC v. N.Y. & Co.,*
    933 F.3d 202 (2d Cir. 2019)....................................................................14

*Pocket Plus, L.L.C. v. Runner's High, LLC,*
    2022 WL 575593 (N.D. Iowa Jan. 11, 2022)............................................16

*Reflex Media, Inc. v. Richard Easton Ltd.,*
    2022 WL 17852772 (D. Nev. Dec. 21, 2022)...........................................25

*Regeneron Pharms., Inc. v. Merus N.V.,*
    2018 WL 1472507 (S.D.N.Y. Mar. 26, 2018) ...........................................27

*Reply All Corp. v. Gimlet Media, Inc.,*
    2021 WL 1291103 (E.D.N.Y. Apr. 5, 2021) ...............................16, 22, 27

*RiseandShine Corp. v. PepsiCo, Inc.,*
    41 F.4th 112 (2d Cir. 2022) ...................................................................22

*Sleepy's LLC v. Select Comfort Wholesale Corp.,*
    909 F.3d 519 (2d Cir. 2018)...................................................14, 15, 17, 25

*TNS Media Rsch. LLC v. TiVo Rsch. & Analytics, Inc.,*
    2018 WL 2277836 (S.D.N.Y. May 18, 2018) ...........................................27

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
   123 F. Supp. 2d 582 (D. Kan. 2000).................................................................................... 27

*Universal City Studios, Inc. v. Nintendo Co.*,
   797 F.2d 70 (2d Cir. 1986)................................................................................... 15, 17

*VIDIVIXI, LLC v. Grattan*,
   2016 WL 4367972 (S.D.N.Y. Aug. 13, 2016)................................................... 16, 17

*Warren Tech., Inc. v. UL LLC*,
   2021 WL 4940833 (11th Cir. Oct. 22, 2021)........................................................ 16

*Wyatt Tech. Corp. v. Malvern Instrs., Inc.*,
   2010 WL 11404472 (C.D. Cal. June 17, 2010) ................................................... 26

*Zouvelos v. Sur. Fin. of Am., Inc.*,
   2018 WL 2075300 (E.D.N.Y. Jan. 29, 2018) ..................................................... 26

**Statutory Authorities**

15 U.S.C. § 1117(a) ................................................................................................. *passim*

**Rules and Regulations**

Fed. R. Civ. P. 54.............................................................................................. 25, 27

Defendants Lottomatrix NY LLC, Lottomatrix Corporation, Lottomatrix Operations Limited d/b/a Jackpot.com, Lottomatrix Malta Limited, and 99Dynamics Limited ("Jackpot.com" or "Defendants") respectfully move for: (1) an order pursuant to 15 U.S.C. § 1117(a) that this case is "exceptional" and Jackpot.com should be awarded its attorneys' fees and related nontaxable expenses; and (2) leave to file a fee application detailing and supporting its request.

## PRELIMINARY STATEMENT

This case is "exceptional" under the fee award provision of the Lanham Act, 15 U.S.C. § 1117(a). That is, it "stands out from others." As the evidence at trial showed, Plaintiff Jackpocket, Inc. ("Plaintiff" or "Jackpocket") filed this lawsuit for an improper, anti-competitive purpose. Holding a near-monopoly in the nascent industry for lottery courier services in the U.S., Plaintiff sought to use this Court as a tool for stifling competition and preventing Jackpot.com's entry into the U.S. market. While the Court need only find that there is a "substantial overtone" in the case warranting an "inference that this suit was initiated as a competitive ploy," the Court has far more evidence before it than mere "overtones." For example:

- Plaintiff's business model was to "exploit" its "monopolies" in "big states" like New York;

- Plaintiff admitted it was "in the process of *trying to kill*" aspiring lottery courier services competitors, including Jackpot.com via this lawsuit, with its CEO admitting that Plaintiff initiated this suit to "keep [Jackpot.com] from entering the U.S. market";

- Plaintiff used the fact that Jackpot.com operated *legal* derivative lottery services outside the U.S. as a "cudgel" to try to exclude Jackpot.com from the lottery courier services market and "keep the United States market for itself";

- Plaintiff changed its mark to try to make it *more* similar to Jackpot.com's mark, which this Court found "does bespeak bad faith" and was not "anything more than one of its many attempts to preserve its competitive head start against Jackpot.com";

- Plaintiff actively tried to convince regulators not to issue lottery courier services licenses to, and counterparties not to enter contracts with, Jackpot.com in the U.S.; and

- Plaintiff's goal in filing this lawsuit was to maintain its monopoly as long as possible and to "eat up much of Jackpot's recent $35 million raise."

This is a far cry from standard enforcement of trademark rights; rather, it reveals a deliberate, multi-step plan to use the judicial branch as a pawn to stop a competitor from entering the market. As the Court recognized in its December 7, 2022 Opinion and Order, "[c]ompetition is not the evil that the Lanham Act was designed to guard against, and the Court refuses to use trademark law for that purpose." Dkt. 125 ("Op.") at 127. This alone satisfies the "exceptional case" standard.

Though the Court need go no further, considerations of compensation and deterrence support a finding that this case is "exceptional." While Plaintiff's claims failed on the merits, it nonetheless was able to exploit the courts to obtain the very relief it was not entitled to: a months-long delay of Jackpot.com's U.S. launch, and forcing Jackpot.com to spend a significant amount of the financing it had raised to defend the litigation rather than support its U.S. launch.

The objective unreasonableness of Plaintiff's claims and the unreasonable manner in which it litigated this case confirm that it is "exceptional." For example, Plaintiff made a series of misleading factual allegations, and then unreasonably sought to block discovery that would allow Jackpot.com to rebut those allegations. Plaintiff then improperly withheld nearly 55,000 pages of responsive, relevant documents and only agreed to produce them after Jackpot.com discovered the issue on the eve of trial and filed a motion to compel.

To be clear, Jackpot.com does not argue that this case is "exceptional" merely because none of Plaintiff's claims succeeded on the merits; every case has a winner and a loser. But Plaintiff's motivation and conduct go far beyond the norm—Plaintiff filed this suit to try to stop a competitor from entering the U.S. market using the same brand it had openly been using for at least *six years* across the globe in connection with lottery-related services, and to force that competitor to divert the funds it raised for its launch to defending itself in this suit. And the evidence at trial showed that this was part of a broader, ongoing campaign by Plaintiff to block

2

competitors from entering the U.S. market.   To a large extent, those anti-competitive tactics worked.  An award of attorneys' fees would help undo those bad-faith tactics.

Jackpot.com therefore respectfully requests that the Court: (1) find that Jackpot.com is entitled to its reasonable attorneys' fees and nontaxable expenses for this exceptional case; and (2) grant Jackpot.com leave to file a fee application supporting its requested fees and expenses.

## BACKGROUND

Because the Court is already well-versed in the facts underlying this action, Jackpot.com sets forth below only the facts and history most pertinent to this motion.

**A.**  **Plaintiff's Historical Attempts To Block Competitors From Entering The Lottery Courier Services Market**

**1.**  **Plaintiff Creates A Regulatory "Moat" Around Itself**

Plaintiff offers lottery courier services, which allow consumers to place orders for state lottery tickets online through a cellphone application or website.  *See* Op. 6-7.  Plaintiff initially launched its services in New York in 2013, but in 2016 its retail lottery license was revoked or suspended by the state due to regulatory issues.  *See* Op. 8-9 (citing Oct. 9, 2022 Declaration of Peter Sullivan ("Sullivan Decl.") ¶ 15); *id.* 8 n.4; *see also* DX-106 at 1-2.  After being shut down, Plaintiff began working to legalize lottery courier services in several states, aiming to create a regulatory "moat" around itself that would allow it to operate as a monopoly.  *See, e.g.,* DX-299 at '975 (telling potential investors that ███████████████████████████████████████████████████████████████████████████████[1]  Plaintiff's business model was to "exploit" its

---

[1]  *See also, e.g.*, DX-320 at '504 (Board Meeting Deck) ("2021 Opportunities" include: ████████████████████ DX-316 (investor presentation) at '424; DX-381 (investor presentation) at '343; DX-137 (2022 "New Market Strategy" presentation) at '903; DX-029 ("Senior Leadership" Slack) at '210.

"monopolies" in states like New York. *See* DX-043 at '043 ("███████████████

████████████████."

### 2.   Plaintiff Raises False Claims To State Lottery Regulators To Persuade Them To Block Potential Competitors

Plaintiff engaged in a years-long campaign of working with PR agencies and private investigators to prepare what it termed "oppo[sition] doc[s]" on its potential competitors (*see, e.g.*, DX-025 at '377-78), focusing on Plaintiff's false claim that these entities' "derivative" lottery operations overseas were illegal.[2]

After it put together its "oppo[sition] doc[s]," Plaintiff worked with its PR agencies, private investigators, and lobbyists to deploy the material in an effort to persuade regulators to ban those potential competitors before they could even launch in certain U.S. jurisdictions.  For example, in 2022, Plaintiff succeeded through its lobbyist in convincing the state of Arkansas not to license ██████.  As Andrew Fries (Senior VP for Public Affairs) reported to Peter Sullivan (CEO):

> [G]ot some good news in Arkansas that they won't be licensing ████████ on account of them adding to the price of the ticket w/ their fee.  Justin worked the Gov's Office GC on it.  They claim they may pursue legislation next session, but we're going to work behind the scenes to prevent that from happening as well.

DX-029 at '210.  This is just one example.  As the Court found at trial, "[t]he evidence shows that Plaintiff has used the fact that [Jackpot.com] and others have operated synthetic lotteries outside the United States as a cudgel to try to exclude [Jackpot.com and] others from the market and to keep the United States market for itself."  Op. 124 (citing 10/11 Hr'g Tr. 158-60; DX-029 at '216-18; DX-060 at '1256).  And Plaintiff's efforts to block competitors worked:  it was the ***only*** lottery

---

[2]   *See, e.g.*, DX-314 at '338 (July 18, 2017 memo from Kivvit regarding "The Lotter and Oregon"); DX-025 at '378 (May 4, 2018 email from Mr. Fries to Kivvit: "We need you guys to put together a concise, neatly packaged oppo doc on Lottoland ...."); *id*. at '377 (May 15, 2018 email from Kivvit to Plaintiff "re: LottoLand oppo doc" attaching two reports); DX-314 at '270 (January 2021: Plaintiff hiring Nardello and Co. to investigate alleged "compliance" and "legal" issues concerning Lottoland and The Lotter).

courier services provider in New York until July 2022, and in New Jersey until June 2021; and as of the date of trial, in each market it operates, Plaintiff had only a single (much smaller) competitor. *See* Op. 11-12 (citing Nov. 8 Simonson Reb. Rpt. ¶ 14 & n.21; Deposition of Michelle Wong ("Wong Dep.") at 136, 144).

> ### B.   Plaintiff Deploys Its Anti-Competitive Playbook Against Jackpot.com

For more than half a decade, Jackpot.com has continuously offered iGaming and lottery betting services across the world under the name "Jackpot.com." Oct. 9, 2022 Declaration of Yariv Ron ("Ron Decl.") ¶¶ 5, 20-23; *see also* Op. 24-25. In late 2020, with the legality of lottery courier services in several U.S. states confirmed, Jackpot.com began taking steps to enter the U.S. market. Ron Decl. ¶¶ 28-29, 32, & 34-35; *see also* Op. 27 (summarizing evidence).

> ### 1.   Plaintiff Negotiates With Jackpot.com Concerning Its U.S. Launch, But Never Mentions Any Trademark Concerns

From late 2021 through April 2022, Jackpot.com's CEO, Yariv Ron, and Plaintiff's CEO, Peter Sullivan (and its CFO, Sean Siuda), engaged in discussions concerning a potential merger or business deal between the companies to facilitate Jackpot.com's expansion into the U.S. lottery courier services market. *See* Op. 29-30; *see also* Ron Decl. ¶¶ 37-53; Deposition of Peter Sullivan ("Sullivan Dep.") at 189:9-11, 188:12-24. Among other information, Mr. Ron provided Mr. Sullivan and Mr. Siuda with Jackpot.com's detailed plans to launch in the U.S. under the "Jackpot.com" brand. *See* Op. 30 (citing Ron Decl. ¶¶ 43-46; DX-015). Internally, however, Mr. Sullivan and others at Plaintiff admitted ████████████████████████████ ████████████████ *See* Op. 31-32. During these discussions, neither Mr. Sullivan nor anyone else from Plaintiff ever raised a concern to Jackpot.com regarding the prospect of supposed consumer confusion should Jackpot.com launch in the U.S. under its existing name. *See* Sullivan Dep. at 263:9-265:19.

2.    **Plaintiff Files This Lawsuit As Part Of Its Effort To "Kill" Jackpot.com**

Around May 2022, just after public reports that Jackpot.com hired a new U.S. CEO in furtherance of its forthcoming U.S. launch, Plaintiff's senior leadership team[3] developed and began acting upon a multi-prong plan to "try[] to kill[]" Jackpot.com before it launched. DX-060 (Mr. Fries: "we are in the process of trying to kill a bunch of these [aspiring lottery courier] guys right now," including Jackpot.com); *see also e.g.*, DX-175 (June 6, 2022, text message to Mr. Sullivan asking whether Jackpot.com had a "[l]egal path in the US?" to which Mr. Sullivan responded: "We won't let them for sure."). Plaintiff's plan included: (1) filing this lawsuit and seeking to enjoin Jackpot.com from using its name in the U.S.; (2) placing negative stories about Jackpot.com in media, repeating its false allegations to try to tarnish Jackpot.com's reputation (*see infra* Part B.4); and (3) attempting to convince regulators not to issue lottery courier services licenses to, and counterparties not to enter contracts with, Jackpot.com in the U.S. (*see infra* Part B.5-6). *See, e.g.*, DX-056; DX-134.

Mr. Sullivan was not shy about admitting at trial that this lawsuit was part of Plaintiff's anticompetitive efforts to prevent Jackpot.com from entering the U.S. As he testified:

> Q. [S]ince [Jackpot.com] announced their US deal and their public fundraising, ***you have been trying to keep [Jackpot.com] from entering the U.S. market, right?***
>
> A. We filed the cease-and-desist ***and then we filed this***.
>
> Q. And you have taken other efforts, too, right?
>
> A. We replied to the New York regulators when they asked us[4] if we had information about companies that did derivative lotteries that are entering the U.S.

---

[3]    Plaintiff's senior leadership team included, among others: CEO Mr. Sullivan; CFO Mr. Siuda; General Counsel Carter Vance; Senior VP of Public Affairs Mr. Fries; and VP of Marketing Michelle Wong.

[4]    Although Mr. Sullivan claimed that New York regulators "asked [Plaintiff]" if Plaintiff had information about such companies (Sullivan Decl. ¶ 22), there is no evidence in the record to substantiate his claim. Instead, the evidence shows that Plaintiff affirmatively put together "opposition" documents and negative

10/11 Hr'g Tr. (Sullivan) at 151:17-24 (emphasis added).  That is, through this lawsuit, Plaintiff sought to hobble Jackpot.com: (1) by delaying or preventing Jackpot.com's U.S. launch entirely; and (2) as the media coverage that Plaintiff pushed confirmed, by forcing Jackpot.com to "eat up much of Jackpot's recent $35 million raise."  DX-344 at 3 (*PlayUSA* article); DX-343 at '187 (confirming Plaintiff's PR firm, the Clyde Group, "coordinated with PlayUSA reporter about [the] lawsuit" and counted as a "win" as part of Plaintiff's PR strategy concerning Jackpot.com).

### 3.   Misrepresentations Based On A Manufactured Logo And The Legality Of Jackpot.com's Business

As part of its scheme to "kill" Jackpot.com, Plaintiff took steps to try to bolster its litigation position by: (1) manipulating its branding to try to make its own branding look more like Jackpot.com's; and (2) alleging (falsely) that Jackpot.com's legal overseas "derivative" lottery offerings were illegal, and thus should somehow preclude Jackpot.com's U.S. launch.

*First*, Plaintiff altered its logo to manufacture the appearance of ***greater*** similarity between the companies' marks than actually existed.  Just after Jackpot.com announced in May 2022 that it had hired a U.S. CEO, on May 23, 2022 Plaintiff filed an application with the U.S. Patent and Trademark Office ("USPTO") to register the mark JACKPOCKET.COM, and on the ***same day*** sent Jackpot.com a cease-and-desist letter claiming that Jackpot.com infringed Plaintiff's rights in that mark.  *See* 10/11 Hr'g Tr. (Sullivan) at 18:14-20; DX-128.  At the same time, Plaintiff modified its website to add ".com"—a suffix ***Jackpot.com*** used as part of its brand, logo and name since 2016—at the end of ***Plaintiff's*** logo:

---

research concerning Jackpot.com and sent these materials to regulators unsolicited, in an effort to convince the regulators not to grant operating licenses to Jackpot.com. *See infra* Part B.5.

| May 21, 2022 | :May 26, 2022 |
|---|---|
| JaCKPOCKet, | JaCKPOCKet,.com |
| Meet your lucky numbers | Meet your lucky numbers |

*Colllpare* DX-049 *with* DX-050.  Prior to this, Plaintiff had never used JACKPOCKET.COM as a logo or a mark; it only used a ".com" suffix as a "call to action" (10/11 Hr'g Tr. (Sullivan) at 20:23-21:1), that is, as a way to direct members of the public to the URL where they could find Plaintiff's website.  *See, e.g.,* DX-033 at '839; 10/11 Hr'g Tr. (Sullivan) at 19:21-30:8.  Only at about the same time that Plaintiff sent Jackpot.com a cease-and-desist letter and filed an application with the USPTO did Plaintiff also append ".COM" to its website logo, bringing it **closer** to Jackpot.corn's mark.  *See* Op. 33-34.  The Court found after trial that "bespeak[s] bad faith" (Op. 134-35), and was not "anything more than one of [Plaintiff's] many attempts to preserve its competitive head start against Jackpot.com" (Op. 96).

*Second,* Plaintiff repeatedly made the false claim, including in sworn documents, that Jackpot.corn's operation of derivative lottery services overseas was "illegal," and thus Jackpot.com could not operate legally in the U.S.  *See, e.g.,* Dkt. 1 ("Cornpl.") at ¶6 (alleging "derivative lotteries ... are illegal and frowned upon in the U.S. and elsewhere"); *id.* ¶35 (similar); Plf. Tr. Br. at 18, 22, 66 n.29, 78; Sullivan Dep. at 280:16-19 (testifying that "illegal overseas stuff" is "what derivative lotteries are").  But as Plaintiff's CEO admitted *(see* 10/11 Hr'g Tr. (Sullivan) at 34:1-21), it knows Jackpot.com is properly licensed to operate these derivative lotteries overseas.  *See* Op. 124 (Jackpot.corn's "operation of derivative lotteries outside the United

States has been lawful"); Op. 25 ("There is no evidence in the record that any of the services Jackpot.com provides run afoul of regulatory requirements."). Further, "[t]here … is no evidence that [Jackpot.com] ha[s] done anything illegal or [is] planning to do anything illegal," Op. 25, and U.S. regulators have told Jackpot.com that it can operate lottery courier services in their states while continuing to operate its overseas, derivative lottery business, Ron Decl. ¶¶ 25-26. Nonetheless, throughout the litigation, Plaintiff pressed these and other false assertions, and then sought to prevent Jackpot.com from obtaining discovery necessary for Jackpot.com to show their falsity. *See infra* Part C.

## 4.    Use Of The Lawsuit To Generate Negative Publicity About Jackpot.com

The filing of this lawsuit was the first prong of the public relations portion of Plaintiff's plan to "kill" Jackpocket.com. *See* DX-132. After Plaintiff filed suit on July 7, 2022, Plaintiff undertook a concerted post-filing PR effort to publicize the negative impact Plaintiff's lawsuit would have on Jackpot.com, repeating the same false claims about Jackpot.com it made in its pleading as part of a concerted effort to generate negative publicity about Jackpot.com pre-launch.

For example, Plaintiff used Clyde Group, its PR firm, to plant stories with news agencies hyping the negative effects the lawsuit would have on Jackpot.com. On July 15, 2022, Clyde Group reported to Plaintiff that it had, per Plaintiff's instructions, "conducted initial lawsuit outreach" in the week after Plaintiff filed its Complaint, confirmed it had "[c]oordinated with [a] PlayUSA reporter about [this] lawsuit," and counted as a "WIN" that *PlayUSA* had published the article. DX-343 at '187. That article contained a self-serving description of this case, repeating Plaintiff's false allegations that Jackpot.com was "trying to build its brand off the back of [Plaintiff's] hard work" and that Jackpot.com "operate[d] derivative lotteries … which are illegal and frowned upon in the US." DX-344 at 2 (*PlayUSA* article) (ellipse in original). It further

reported—clearly using information provided at Plaintiff's request—that the lawsuit could "set back [Jackpot.com's] launch" and "eat up much of Jackpot's recent $35 million raise." *Id.* at 3.

### 5.   Contemporaneous Efforts To Interfere With Licensing Regulators

Plaintiff also used its position of influence as the market leader to "lobb[y] regulators and state governments to encourage them not to sign licenses or otherwise do business with Jackpot.com and to block Jackpot.com from entering the U.S. lottery-courier-service market" (Op. 34)—efforts which focused on Plaintiff's same false allegation that Jackpot.com operated supposedly "illegal" business overseas.

For example, in late June 2022, as Plaintiff was preparing to file suit against Jackpot.com, its Senior VP for Public Affairs, Andrew Fries, and its General Counsel, Carter Vance, began preparing an opposition dossier on Jackpot.com. *See* DX-029 at '189 (June 23, 2022); *id* . at '216-21 (July 5, 2022).  Later that same day, Mr. Fries drafted "high level thoughts for [his call with NY gaming regulator] Rob Williams … tomorrow," which focused on a "[b]ad actor discussion" concerning Jackpot.com "severing the ability of a company w/offshore derivative products and/or outright sale of american [sic] lottery products from being able to simultaneously also act as a licensed courier in the US." DX-029 at '193.  Plaintiff zeroed in on its "best argument" to block Jackpot.com, which was to convince regulators they "should use their authority to force [Jackpot.com] to choose one or the other [*i.e.*, international lottery services or U.S. lottery courier services], they cannot double dip." *Id.*

After this initial call, Plaintiff's CEO, Mr. Sullivan, wanted to "get a piece that lumps ███████ and jackpot.com together" in a written document.  DX-029 at '210.  Following emails to the New York State Gaming Commission that encouraged the Commission not to license Jackpot.com (*see* DX-029 at '216; DX-059 at '308), Plaintiff's senior leadership then strategized about sending similar claims concerning Jackpot.com and ███████ to the Multi-State Lottery

Association, the North American Association of State and Provincial Lotteries, and Mega Millions without "out[ing] ourselves." DX-029 at '216-221. The next day, Mr. Vance sent an email to Mr. Burns and Ms. Dean:

> We have compiled information about two ... operators: █████ ..., and Jackpot.com .... As you know, these companies (and others) are financing their US operations from cash flow obtained abroad in these *illegal lotteries*.... [T]his is particularly frustrating to us as it should be to all US lotteries. We are operating on an unlevel playing field, when *illegal lottery operators* are allowed to support their US courier services with *millions of tainted funds* from abroad.

DX-059 (emphasis added). Again, Plaintiff's representation to state regulators that Jackpot.com offered "illegal lotteries" overseas was false. *See* Op. 34. Worse yet, Plaintiff falsely represented in litigation that these regulators *asked* Plaintiff for information concerning "derivative" lottery operators and Plaintiff provided information concerning Jackpot.com (*see* Sullivan Decl. ¶ 22), when this record indisputably shows it was *Plaintiff* who was trying to persuade the regulators not to license Jackpot.com in order to benefit Plaintiff's owns goal of preserving its monopoly.

## 6.    Contemporaneous Efforts To Interfere With Jackpot.com's Contracts

At the same time, Plaintiff also attempted to strongarm the Executive Director of the Texas Lottery Commission into convincing █████████ not to finalize a sponsorship agreement with Jackpot.com so that Plaintiff could underbid and still win the sponsorship. *See* Op. 34-35, 124-25. On July 26, 2022, Mr. Sullivan sent a text message to Mr. Siuda, stating: "Fries [SVP of Public Affairs] got an update from TX, Jackpot.com are looking to sign deal with █████. Let's block those assholes." DX-073. The same day, Mr. Fries wrote that he was working to have Executive Director of the Texas Lottery Commission, Gary Grief, interfere with the Jackpot.com-█████ deal on Plaintiff's behalf: "I had a long conversation with the TX lottery director. We need to get a deal done with the █████ asap. Jackpot.com is very close to doing their own deal, but Gary the director said he'd call his guy there and tell them not to do anything until he talked

to us." DX-029 at '060. The next day Mr. Sullivan wrote to Mr. Fries: "can we have Gary [Grief] make a call in to make sure he says we're preferred?" *Id.* at '062. Mr. Fries said he would "make sure Gary leans in" and a third executive commented: "Gary's input would certainly supersede ███████████ connection to jackpot.com CEO lol and ***avoid us having to outbid.***" *Id.* at '063 (emphasis added). Michelle Wong, another Jackpocket executive, messaged Mr. Sullivan later that day to ask whether Plaintiff would "be able to block out jackpot.com [from] future sponsorships," and Mr. Sullivan responded: "yeah that's the idea." *Id.* at '068.

Reviewing this evidence, the Court acknowledged that Plaintiff's conduct may have risen to a level "that would constitute tortious interference." Op. 125.

## C.   Plaintiff's Attempts To Shield Its Misrepresentations And Weak Positions

Plaintiff's misconduct continued in the unreasonable manner it litigated this action. For example, throughout this lawsuit, Plaintiff repeated claims regarding its "advertising" spend, high consumer awareness of its brand, and unsolicited media coverage. *See* Compl. ¶¶ 5, 24-29; Plf. Tr. Br. at 9-14. Ultimately, Plaintiff could not support these allegations.[5]  As another example, Plaintiff submitted a consumer recognition survey supposedly demonstrating recognition of the JACKPOCKET mark. Plf. Tr. Br. at 14, 53-54. But putting aside the many flaws in the survey design that rendered its results unhelpful (*see* Op. 91-92), this survey was ***by design*** misleading because, at the direction of Plaintiff's counsel, its universe was limited to respondents located in

---

[5]    *See, e.g.*, Op. 12-13 (Plaintiff's evidence insufficient to determine portion of supposed "advertising" spend actually "spent on marketing analytics, [Plaintiff's] advertising agency, and its public relations firm" and "no evidence … [of] any Jackpocket spending on advertising from its founding through 2017"); Op. 13 ("bulk of Jackpocket's advertising [] has come during the past two years"); Op. 17 (citing Hanson Report, finding majority of Plaintiff's "marketing expenditures" were mere "traffic steering"); Op. 17 (Plaintiff's "marketing expenditures and sales are highly correlated with jackpot sizes," not brand recognition) (emphasis added); Op. 89 (six supposedly "unsolicited" media coverage articles were Plaintiff's own press releases). What is notable is not that Plaintiff failed to meet its evidentiary burden, but the sheer breadth of matters on which Plaintiff proffered no probative evidence to support its positions.

New York and New Jersey, and not any of the other 11 states in which Plaintiff operated.  Op. 91-93.  As the Court recognized, "Jackpocket offer[ed] ***no evidence of any consumer recognition*** it has achieved in the vast majority of markets in which it operates."  Op. 92 (emphasis added).

Plaintiff also tried to prevent Jackpot.com from obtaining or presenting discovery necessary for Jackpot.com to challenge Plaintiff's misstatements.  Initially, Plaintiff fought against Jackpot.com obtaining ***any*** discovery or submitting its own rebuttal confusion survey.  *See* Dkt. 77.  Then, after the Court ordered discovery, Plaintiff improperly withheld ***nearly 55,000 pages*** of responsive documents that it had agreed to produce (compared to its production of about 5,500 pages).  *See* Declaration of Rachel E. Epstein ("Epstein Decl.") ¶¶ 4-6.  Plaintiff only produced these documents after Jackpot.com discovered the deficiency a week before trial and filed a motion to compel with the Court.  *See id*.; *see also* Dkts. 116, 119, & 121.

### D.   Plaintiff's Mere Filing Of This Lawsuit To Obtain Its Desired Relief

On December 7, 2022, the Court issued its Opinion and Order: (1) finding Plaintiff failed to prove any of its claims; and (2) denying Plaintiff's request for injunctive relief.  *See* Dkt. 125; *see also* Dkt. 137 (Final Judgement).  While Plaintiff's claims were dismissed on the merits, Plaintiff accomplished its anti-competitive goals:  (1) it delayed Jackpot.com's U.S. launch from its initial plan of launching no later than October 2022 to ultimately launch in late December 2022 (*see* Ron Decl. ¶¶ 85-86); and (2) it forced Jackpot.com to spend more than $7 million of the financing it had raised to support its U.S. launch instead to defend against Plaintiff's claims (*see* Ron Decl. at ¶ 57; Epstein Decl. ¶ 3).

By comparison, Plaintiff benefitted from its lawsuit by effectively obtaining a *de facto* injunction during the five-month period from filing its Complaint until the Court's Opinion, which allowed Plaintiff to maintain its near-monopoly without Jackpot.com's entry as a competitor.  Plaintiff gained a great amount financially from its effort—for example, during an eight-day

stretch from October 29 to November 5, 2022 when the Powerball jackpot exceeded $1.5 billion, Plaintiff achieved approximately ███ million in gross sales—amounting to ███ of Plaintiff's total gross sales throughout its history. *See* Op. 9.

## LEGAL STANDARD

Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Under § 1117(a), "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

In determining whether a case is "exceptional," "district courts [are] to be given wide latitude to 'engage in a case-by-case exercise of their discretion, considering the totality of the circumstances.'" *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 215 (2d Cir. 2019) (quoting *Octane Fitness*, 572 U.S. at 554). The standard is a "flexible" one, *id.* at 206, encompassing "a wide variety of factors, including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence,'" *Sleepy's LLC*, 909 F.3d at 530 (quoting *Octane Fitness*, 572 U.S. at 554 n.6). This standard is "more flexible" than the one the Second Circuit employed pre-*Octane*, which "had historically limited 'exceptional cases' to those involving fraud or bad faith or willful infringement." *Omega SA v. 375 Canal LLC*, 2019 WL 2442434, at *3 (S.D.N.Y. June 12, 2019) (quotations omitted).

The Court may place whatever weight it deems appropriate to any particular consideration; there is no "precise rule or formula for making these determinations." *Louis Vuitton Malletier,*

*S.A. v. My Other Bag, Inc.*, 764 F. App'x 39, 41 (2d Cir. 2019). For example, the Second Circuit has recognized that a plaintiff's bad motivation for bringing a lawsuit as a "competitive ploy" to interfere with a competitor's business may ***alone*** justify an award of attorneys' fees. *Sleepy's LLC*, 909 F.3d at 530; *see, e.g.*, *Octane Fitness*, 572 U.S. at 555 ("case presenting ***either*** subjective bad faith ***or*** exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award") (emphasis added); *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986) (affirming award of attorneys' fees: "The district court did not err when it found that Universal brought its Lanham Act claim in bad faith merely to join in the profits from Donkey Kong."); *Baker v. Urb. Outfitters, Inc.*, 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006) ("the presence of improper motivation in bringing a lawsuit or other bad faith conduct weighs heavily in favor of an award of costs and fees"), *aff'd,* 249 F. App'x 845 (2d Cir. 2007).[6]

The standard of proof is a preponderance of the evidence. *Octane Fitness*, 572 U.S. at 557.

## ARGUMENT

There is no dispute that Jackpot.com is the "prevailing party" under § 1117(a), as the Court dismissed all of Plaintiff's claims on the merits and entered final judgment in Jackpot.com's favor. Dkt. 137. Thus, the only question for the Court in this motion is to determine whether this case "stands out from others." *Sleepy's LLC*, 909 F.3d at 530. For the reasons below, it does.

---

[6]    Courts routinely find a case to be "exceptional" under § 1117(a) based largely on the presence of just one or two factors. *See, e.g.*, *Imapizza, LLC v. At Pizza Ltd.*, 2021 WL 2410713, at *14 (D.D.C. June 8, 2021) ("While Plaintiff's claims may not have been frivolous or brought in bad faith, they were objectively unreasonable, and that factor weighs heavily in favor of awarding fees."); *cf. Cognex Corp. v. Microscan Sys., Inc.*, 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (awarding fees under *Octane* where party offered "defenses that … were particularly weak and lacked support in the evidence" and "engaged in unreasonable litigation tactics"); *Ketab Corp. v. Mesriani & Assocs., P.C.*, 734 F. App'x 401, 409 (9th Cir. 2018) (affirming district court's decision to award defendant attorneys' fees after trial based on "frivolousness and objective unreasonableness of the case").

## I.   THIS CASE IS "EXCEPTIONAL" UNDER § 1117(a) BECAUSE IT "STANDS OUT FROM OTHERS"

Defendants in trademark cases are routinely awarded their attorneys' fees upon a showing that a case is "exceptional." *See, e.g.*, *Reply All Corp. v. Gimlet Media, Inc.*, 2021 WL 1291103, at *2-4 (E.D.N.Y. Apr. 5, 2021) (awarding defendant attorneys' fees under § 1117(a)); *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 2021 WL 1172335, at *7 (S.D.N.Y. Mar. 26, 2021) (same); *Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, 2020 WL 729518, at *3-5 (S.D.N.Y. Feb. 13, 2020) (same); *VIDIVIXI, LLC v. Grattan*, 2016 WL 4367972, at *4 (S.D.N.Y. Aug. 13, 2016) (same); *Ketab Corp.*, 734 F. App'x at 409 (same after bench trial).[7]

This Court should award Jackpot.com its reasonable attorneys' fees. Plaintiff's egregiously improper and anti-competitive motivation in bringing this case to protect its monopoly power alone justifies a finding that this case is "exceptional" under § 1117(a). While the Court need go no further to find that this case "stands out" from a run-of-the-mill trademark case, considerations of compensation and deterrence, as well as the objective weakness of Plaintiff's claims and its unreasonable litigation tactics, further favor finding the case "exceptional."

### A.   Plaintiff's Initiation Of This Lawsuit For An Anti-Competitive Purpose And With Improper Motive Makes This Case "Exceptional"

#### 1.   Plaintiff Initiated This Lawsuit As A Competitive Ploy

Courts will find a case "exceptional" under § 1117(a) if "[t]here is a substantial overtone in [the] case to warrant an inference that th[e] suit was initiated as a competitive ploy." *Anastasia*

---

[7]   The same is true outside of this Circuit. *See, e.g.*, *Warren Tech., Inc. v. UL LLC*, 2021 WL 4940833, at *2-3 (11th Cir. Oct. 22, 2021) (affirming award of attorneys' fees to defendant under § 1117(a) as "exceptional case"); *Pocket Plus, L.L.C. v. Runner's High, LLC*, 2022 WL 575593, at *6 (N.D. Iowa Jan. 11, 2022) (granting motion for attorneys' fees to defendant under § 1117(a) as "exceptional" case); *Miller v. Hurst*, 2021 WL 859552, at *6 (M.D. Tenn. Mar. 8, 2021) (same); *H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd.*, 2020 WL 6263649, at *3 (S.D. Cal. Oct. 22, 2020) (same); *BoxNic Anstalt v. Gallerie degli Uffizi*, 2020 WL 2991561, at *1 (D. Ariz. June 4, 2020) (same); *Leapers, Inc. v. SMTS, LLC*, 2017 WL 3084370, at *6 (E.D. Mich. July 20, 2017) (same).

*Int'l, Inc. v. EM Online Pty Ltd.,* 2013 WL 5550211, at *3 (S.D.N.Y. Oct. 4, 2013) (awarding defendant attorneys' fees on such ground) (quotations omitted); *see also Sleepy's LLC,* 909 F.3d at 530 (confirming initiation as "competitive ploy" may establish exceptional case under § 1117(a)); *Universal City Studios, Inc.,* 797 F.2d at 77 (similar); *VIDIVIXI, LLC,* 2016 WL 4367972, at *3 (similar); *Mennen Co. v. Gillette Co.,* 565 F. Supp. 648, 657 (S.D.N.Y.1983), *affd* 742 F.2d 1437 (2d Cir. 1984) (similar).

For example, *Benihana of Tokyo, LLC v. Benihana, Inc.* recognized a case is "exceptional" under the Lanham Act "where the lawsuit had been initiated for reasons other than a sincere belief in the merits of the underlying claims, and to serve ulterior business motives." 2018 WL 3574864, at *9 (S.D.N.Y. July 25, 2018) (quotations omitted) (collecting cases). There, Judge Engelmayer found that case "comfortably fits th[e] standard":

> It is apparent that [plaintiff] both initiated and later defended this lawsuit-and engaged in the underlying conduct that both its claims and [defendant's] predictable counterclaims put at issue   not out of a good faith attempt to vindicate legitimate rights. Instead, the record makes clear that [plaintiff] engaged in and then defended indefensible conduct to advance an ulterior motive.

*Id.; see also id.* at *11 (plaintiff "pursued this case in bad faith with the admitted ulterior goal of driving up [defendant's] legal expenditures"). The Second Circuit summarily affirmed the award of attorneys' fees to the defendant. *Id.,* 771 F. App'x 71 (2d Cir. 2019).

Here, as described in detail above, Plaintiff brought this case not to vindicate its trademark rights, but to delay Jackpot.com's U.S. launch, to deplete Jackpot.com's funds raised in support of its launch, and as part of Plaintiff's ongoing schemes to protect its monopoly in the nascent lottery courier services market for as long as possible. The evidentiary record demonstrates such anti-competitive motives:

- Plaintiff had long undertaken efforts to preserve its monopoly: Plaintiff admittedly sought to erect a regulatory "moat" around itself, which Plaintiff then tried to protect by preventing

competitors from entering the lottery courier services market.[8]  As early as 2017, and through to this lawsuit, Plaintiff undertook efforts with legal regulators and others to paint potential competitors as bad actors and prevent them from launching in the U.S.

- <u>Plaintiff admitted its plan was to "kill" Jackpot.com and prevent Jackpot.com's U.S. launch, including by filing this lawsuit.</u>  Shortly after filing this suit, Plaintiff's senior executives communicated with lobbyists to explain that Plaintiff "won't let" competitors embark on a "[l]egal path in the US,"[9] and that it was "*in the process of trying to kill a bunch of these [aspiring lottery courier services] guys right now*."  In these communications, Plaintiff identified Jackpot.com as one of the targeted "guys" it sought to "kill," *and specifically noted this lawsuit was part of its effort*.[10]  At trial, Mr. Sullivan admitted this suit was filed to "keep [Jackpot.com] from entering the U.S. market."[11]

- <u>Plaintiff used this lawsuit to generate negative press about Jackpot.com, revealing its anti-competitive motive.</u>  In July 2022, Plaintiff, through Clyde Group, "[c]oordinated with [a] PlayUSA reporter … about [this] lawsuit," and counted as a "WIN" that *PlayUSA* published the article, which included smears of Jackpot.com.  The article represented that the lawsuit "could eat up much of Jackpot's recent $35 million raise."[12]

- <u>Plaintiff simultaneously was trying to "force" Jackpot.com out of the U.S. market by falsely painting Jackpot.com as an "illegal" actor.</u>  During same time period, Plaintiff used Jackpot.com's confidential information, and mischaracterized Jackpot.com's overseas business, to try to convince regulatory agencies and reporters that Jackpot.com was a bad actor that should not be allowed to launch in the U.S.[13]  These actions, combined with the lawsuit, were coordinated efforts to prevent Jackpot.com from entering the U.S. market.[14]

- <u>Plaintiff simultaneously was interfering with Jackpot.com business relationships.</u>  At the same time, Plaintiff tried to use its connections to regulators to avoid competing with Jackpot.com.  For example, and as part of a sustained effort, Plaintiff attempted to convince

---

[8]   *See supra* Part A-B; *see also* PX-001 at '892; DX-137 at '903; DX-320 at '504; DX-316 at '424; DX-381 at '343; DX-306 at '308; DX-043 at '043 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ DX-029 at '193 (Fries providing guidance to other executives concerning a "bad actor discussion," and then explaining Plaintiff would "work behind the scenes to prevent [legislation] from happening" that may assist Plaintiff's competitor); DX-043 at '043.

[9]   *See supra* Part A-B; *see also* DX-175.

[10]   *See supra* Part B; *see also* DX-060.

[11]   10/11 Hr'g Tr. (Sullivan) at 151:17-24.

[12]   *See supra* Part B.4; *see also* DX-343; DX-344.  This is consistent with Plaintiff's guiding instruction to Clyde Group to paint Jackpot.com as "copying Jackpocket across the board." DX-056; *see also* DX-132 (same).

[13]   *See supra* Part B.4-5; DX-029 at 019; DX-029 at 023; DX-029 at '189; *see also* DX-042; Sullivan Dep. at 203:15-20 (confirming NDA); DX-059 at '308.

[14]   *See* 10/11 Hr'g Tr. (Sullivan) at 151:17-24; *see also* DX-059 at '308; DX-029 at 019, 023.

the head of the Texas Lottery Commission to intervene on Plaintiff's behalf and "block" Jackpot.com from entering into a sponsorship deal with ██████████████[15]

Collectively, there is not merely "a substantial overtone" but a blatant stench "warrant[ing] an inference that this suit was initiated as a competitive ploy." *Anastasia Int'l, Inc.*, 2013 WL 5550211, at *3.[16] As the Court noted, "[c]ompetition is not the evil that the Lanham Act was designed to guard against, and the Court refuse[d] to use trademark law for that purpose." Op. 127. As demonstrated by a preponderance of the evidence, Plaintiff's improper anti-competitive motivation for initiating this suit alone is enough to find this case "exceptional" under § 1117(a).

### 2. **Plaintiff's Bad-Faith Modification Of Its JACKPOCKET Mark To Bolster Its Position In This Lawsuit Further Evidences Its Improper Motivation**

Should the Court need further confirmation of Plaintiff's improper motivation for initiating this lawsuit, it need look no further than Plaintiff's last-minute alteration of its mark to bring it *closer* to Jackpot.com's mark. Specifically, in late May of 2022—*within days* of Plaintiff sending a cease-and-desist letter to Jackpot.com alleging trademark infringement and filing a trademark application to register JACKPOCKET.COM with the USPTO—Plaintiff modified parts of its website to display a never-used "JACKPOCKET.COM" mark in place of "JACKPOCKET," as if that were the mark it had used all along. *See* 10/11 Hr'g Tr. (Sullivan) at 18:17-20. Before that, it did not use JACKPOCKET.COM as a mark, but rather merely to identify the location of its website.[17] As the Court recognized, ***Plaintiff's "addition of '.com' to [its] logo does bespeak bad***

---

[15]  *See supra* Part B.6; *see also* DX-029 at '060-63; DX-073.

[16]  Plaintiff's improper motivation is all the more transparent when considering the parties' months-long history discussing a potential business deal in connection with Jackpot.com's entry into the U.S. market under the Jackpot.com name and brand (*see supra* Part B.1), yet Mr. Sullivan admitted that Plaintiff never uttered a word to Jackpot.com about potential consumer confusion. *See, e.g.*, Sullivan Dep. at 263:9-265:19.

[17]  When pushed, Plaintiff's lead supposed example of a pre-suit advertisement featuring the JACKPOCKET.COM mark was a 30-second YouTube clip that included only the JACKPOCKET mark. DX-033; 10/11 Hr'g Tr. (Sullivan) at 20:10-21:1. The only mention of "jackpocket.com" was Plaintiff's

*faith."* Op. 134 (emphasis added). That bad-faith attempt to manufacture evidence to strengthen a forthcoming legal case "supports the conclusion that the addition to the logo was made so that the Jackpocket logo would more closely resemble the Jackpot.com logo, the use of which Jackpocket was seeking to enjoin." Op. 134.

This effort to ***create*** a likelihood of confusion evidences Plaintiff's disregard of the trademark laws and use of the legal system to forward its anti-competitive goals. *See, e.g., J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *21 n.30 (S.D.N.Y. May 8, 2013) ("a senior user [cannot] alter its mark to more closely mimic the junior user's mark and then claim injury from the increased likelihood of confusion"). This "extraordinary" conduct ***alone*** warrants the Court to "find[] clear bad faith on the part of [Plaintiff]. Even under the pre-*Octane* standard, that bad faith would qualify as exceptional." *Benihana of Tokyo, LLC*, 2018 WL 3574864, at *11.

**B.    An Award Of Fees Would Advance Considerations Of Compensation and Deterrence**

Although expedited, this case was highly contentious and costly.  Notwithstanding that Jackpot.com had used its JACKPOT.COM mark on a consumer-facing website for over six years, and as its branding for serving customers in over 180 countries, this lawsuit nonetheless forced Jackpot.com to: (1) ultimately delay its long-planned launch in the U.S. for months, including when the industry saw record-setting lottery jackpots (*see* Ron Decl. ¶ 86; Op. 9); and (2) expend more than $7 million in attorneys' fees (*see* Epstein Decl. ¶ 3).  While Plaintiff ultimately lost on the merits, it nonetheless accomplished its stated goals underlying its initiation of this suit: delaying Jackpot.com's planned U.S. launch, forcing Jackpot.com to divert significant capital raised for its U.S. launch to defending against this lawsuit, and generating negative (and false)

---

web address at the end of the video, which was displayed as a way to contact Plaintiff, not as source-identifying a mark or designation. *See supra* Part B.3.

publicity concerning Jackpot.com.  Each of these goals furthered Plaintiff's improper motive of preserving its near-monopoly in the U.S. market.  In other words, by filing this lawsuit and seeking a preliminary and permanent injunction, Plaintiff was awarded a significant portion of the relief it sought: delay, significant expense, and reputational harm.

Given this, and Plaintiff's anti-competitive motivation for asserting the claims in the first place, an award of Jackpot.com's attorneys' fees would advance considerations of compensation and deterrence.  *See, e.g.*, *Manhattan Rev.*, 765 F. App'x at 577; *see also Benihana of Tokyo, LLC*, 2018 WL 3574864, at *11 (awarding attorneys' fees where defendant was "required to expend significant resources investigating … and defending against claims").  Such relief also would deter Plaintiff—and other plaintiffs who may seek to use the courts as a tool for achieving anti-competitive ends—from bringing claims to accomplish that improper purpose.  *See, e.g.*, *Beijing Daddy's Choice Sci. & Tech. Co.*, 2020 WL 729518, at *5; *Baker v. Urban Outfitters*, 431 F. Supp. 2d 351, 359 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x. 845 (2d Cir. 2007) (awarding fees "so as to deter this plaintiff, and other similarly situated plaintiffs, from bringing unreasonable claims based on a cost/benefit analysis that tells such plaintiffs that they can score big if they win and that there will be no adverse consequences if they lose").

To be sure, under the American Rule, defendants are not awarded their fees as a matter of course simply because they won their case.  But again, this case "stands out":  Plaintiff effectively received a months-long injunction that interfered with Jackpot.com's planned U.S. launch, and successfully remained a near-monopolist during the course of two record-setting jackpot runs.  Certainly, Plaintiff's own legal fees in this case were but a fraction compared to the revenue it has been able to earn without competing against Jackpot.com in the same market.  *See* Op. 9 (citing Declaration of Michelle Wong and describing Plaintiff's ███ million in gross sales during an eight-

day stretch from Oct. 29 – Nov. 5, 2022, which amounted to ███ of Plaintiff's gross sales throughout its history). An award of Jackpot.com's reasonable attorneys' fees would serve the important function of discouraging trademark holders from effectively "paying" for *de facto* injunctions they are not legally entitled to, and earning huge financial returns on their litigation investments.

### C.    Plaintiff's Claims Were Objectively Unreasonable

Although unnecessary to address to find this case "exceptional," the weakness of Plaintiff's claims from the outset further supports an award of Jackpot.com's attorneys' fees. A case is objectively unreasonable when it includes "fatally weak claim[s] with no hope for success." *Reply All Corp.*, 2021 WL 1291103, at *2. Either "factual contentions [that] are clearly baseless," or "an indisputably meritless legal theory" will support a finding that a lawsuit is objectively unreasonable. *Id.* (quotations omitted). Here, Plaintiff's lawsuit was comprised of both.

*First*, Plaintiff premised its lawsuit on a weak legal theory: Plaintiff argued that it was somehow entitled to preclude Jackpot.com (and by extension, all others competitors) from incorporating the word "jackpot" into a brand name in connection with lottery courier services—a term that is ubiquitous in the lottery and iGaming fields because it denotes the virtues of the products and services offered. This Court ruled that Plaintiff's case predicated on the exclusive right to exclude others from using the term "jackpot" in the provision of lottery courier services fails. Op. 70-78. That Plaintiff sought to enjoin a competitor's use of the word "jackpot" in this market—even though Plaintiff never claimed to own rights in the word "jackpot" itself—demonstrates the overreach of Plaintiff's claims. Should there be any question, the Second Circuit's decision in *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112 (2d Cir. 2022), issued just two weeks after Plaintiff filed its Complaint, exposed the facial weakness of Plaintiff's claims; at least by that point, Plaintiff should have rescinded its claims but failed to do so. *Cf. Fla. Int'l Univ.*

*Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 2017 WL 3610583, at *7 (S.D. Fla. Aug. 11, 2017) (case "exceptional" where plaintiff "failed to re-evaluate the strength of its case as discovery continued"). That Plaintiff did not prevail on a single contested *Polaroid* factor confirms it could not overcome the weakness of its mark in any event. Op. 66-127.[18]

*Second*, Plaintiff tried to bolster its weak claims with factual misstatements and misleading submissions. For example, Plaintiff repeatedly misrepresented that Jackpot.com's operation of derivative lotteries overseas was "illegal" and that Jackpot.com could not operate in the U.S. or that it would harm Plaintiff by association with "illegal" activities. This was all false, as all record evidence established that Jackpot.com's overseas activities were entirely *legal*, and the services it sought to offer in the U.S. likewise were entirely *legal*. *Compare* Compl. ¶ 6 *with* Op. 124-25 (Jackpot.com's "operation of derivative lotteries outside the United States has been lawful" and "[t]here is no evidence in the record that any of the services Jackpot.com provides run afoul of regulatory requirements."). And while Plaintiff repeatedly represented it would be harmed by any association with Jackpot.com, the Court recognized that "[t]here is evidence … that Jackpocket has intentionally sought to associate itself with the term 'jackpot,' both through its branding and its advertising and thus that ***any confusion was manufactured by Jackpocket***, its choice of brand, and its marketing strategy," Op. 38 (emphasis added), further exposing the weakness of its claims.

The weakness of Plaintiff's claims was corroborated through its skewed presentation of evidence. For example, Plaintiff submitted a confusion survey that tried to generate favorable results through a *Squirt* format, even though Plaintiff "offered little, if any, evidence that would

---

[18] It was not contested under the competitive proximity factor that both parties sought to offer lottery courier services. Op. 100. Each of the other factors was neutral or favored Jackpot.com. *See* Op. 93 (strength: any "acquired strength is insufficient to overcome the inherent weakness" of Plaintiff's mark); Op. 98 (similarity: "does not cut in Jackpocket's favor"); Op. 100 (bridging the gap: "neutral"); Op. 119 (actual confusion: "favors Jackpot.com"); Op. 121 (good faith: "favors Defendants"); Op. 125 (quality of products: "neutral"); Op. 126 (sophistication: "favors Jackpot.com").

support th[e] assumption" that the products are viewed together in close proximity, as a *Squirt* format requires.  Op. 108.  Plaintiff's recognition survey likewise was impermissibly tilted by Plaintiff's intentional design, limiting its universe to New York and New Jersey respondents (where Plaintiff's sales and advertising are among the highest), rather than all 13 states where Plaintiff offered its services (knowing such results would show low recognition), guaranteeing biased results.  *See* Op. 91-93; *see also* Plf. Tr. Br. at 14, 53-54.  That Plaintiff stretched its surveys in such unsupportable ways reflects the underlying weakness of its claims.

   **D.**  <u>**Plaintiff Litigated This Case In An Unreasonable Manner**</u>

   Finally, Plaintiff litigated this case in an unreasonable manner, interfering with Jackpot.com's ability to present a fair defense.  *See supra* Part C.

   For example, as the Court is aware, Plaintiff fought against permitting Jackpot.com to obtain ***any*** fact discovery, or to submit a rebuttal confusion survey, *see* Dkts. 77, 79, even though such discovery was necessary to show (and did show) that Plaintiff's claims were meritless.

   Additionally, Plaintiff improperly withheld nearly 55,000 pages of responsive and relevant documents which it had promised to collect and produce, and instead produced just 5,500 pages.  *See* Epstein Decl. ¶¶ 4-6.  Plaintiff only agreed to produce these promised documents after Jackpot.com discovered the deficiency two weeks before trial submissions were due, promptly raised it with Plaintiff's counsel, and then filed a motion to compel.  *See id.*; *see also* Dkts. 116, 119, & 121.  The withholding of this discovery was material—it included damning evidence that Plaintiff brought this case for anti-competitive purposes as part of a plan to stop Jackpot.com from entering the U.S. market ***at all*** (including by trying to influence state regulators against

Jackpot.com) and critical evidence the Court relied upon in its Opinion.[19]  Providing "inaccurate responses to discovery requests" by withholding plainly responsive documents further supports a finding that this case is "exceptional."  *Dropbox, Inc. v. Thru Inc.*, 728 F. App'x 717, 719-20 (9th Cir. 2018); *see also, e.g.*, *Reflex Media, Inc. v. Richard Easton Ltd.*, 2022 WL 17852772, at *1 (D. Nev. Dec. 21, 2022) (awarding fees where defendant "litigated in an unreasonable manner by refusing to respond to discovery requests, thereby delaying discovery").

*    *    *

The ultimate guidepost for determining whether a case is "exceptional" is simply whether the case "stands out from others."  *Sleepy's LLC*, 909 F.3d at 530.  Plaintiff's anti-competitive motivation alone satisfies this test, but the remaining considerations confirm it.  The Court should find this case is "exceptional," and that Jackpot.com is entitled to an award of its attorneys' fees.

## II.    THE COURT SHOULD AWARD JACKPOT.COM ITS RELATED NONTAXABLE EXPENSES

As the prevailing party in an exceptional case, the Court's award of attorneys' fees should include Jackpot.com's reasonable nontaxable expenses.[20]  Rule 54(d) permits a party to include in its motion for attorneys' fees a request for its "related nontaxable expenses."  Fed. R. Civ. P. 54(d)(2)(A).  The Second Circuit recognizes that "[a]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998).  Courts have included such

---

[19]    *See, e.g.*, DX-287 (cited Op. 14); DX-292 (cited Op. 28 & 73); DX-346 (cited Op. 29); DX-302 (cited Op. 88).

[20]    Because Plaintiff has filed a notice of appeal (Dkt. 138), Jackpot.com will separately file its notice of taxable costs with the Clerk, annexing a bill of costs, by no later than "thirty (30) days after the final disposition of the appeal."  S.D.N.Y. Local Rule 54.1(a).

nontaxable expenses as part of an attorneys' fee award under § 1117(a).[21]   Thus, an award of Jackpot.com's attorneys' fees should also necessarily include its related nontaxable expenses.

Here, Jackpot.com's nontaxable expenses related to its defense of this action include: (1) travel and accommodations, including for the preliminary injunction hearing; (2) photocopying; (3) PACER fees; (4) express mail; (5) delivery and messenger expenses; (6) electronic document collection, hosting, and processing (all of which was conducted on an expedited basis) and related fees; and (7) other litigation-related expenses.[22]   *See* Epstein Decl. ¶ 3.   These nontaxable expenses were necessarily incurred as part of Jackpot.com's defense to this ill-motivated lawsuit.   *See, e.g.*, *Dropbox, Inc.*, 2017 WL 914273, at *6 (awarding the prevailing party $419,610.41 for its nontaxable expenses, including for e-discovery charges).

## III.   THE COURT SHOULD GRANT JACKPOT.COM LEAVE TO FILE A FEE APPLICATION DETAILING ITS REQUESTED ATTORNEYS' FEES AND RELATED NONTAXABLE EXPENSES

Jackpot.com respectfully requests that, upon granting the instant motion, the Court also set a date by which Jackpot.com may submit a fee application setting forth the specific calculations of its attorneys' fees and related nontaxable expenses with appropriate supporting documentation. Jackpot.com respectfully submits that a deadline of fourteen (14) days from the date of the Court's order finding this case to be exceptional under 15 U.S.C. § 1117(a) is appropriate.

---

[21]   *See, e.g.*, *Beijing Daddy's Choice Sci. & Tech.*, 2020 WL 729518, at *1 & n.1 (awarding prevailing defendant nontaxable "costs"); *Next Realty, LLC v. Next Real Est. Partners LLC*, 2019 WL 1757781, at *4 (E.D.N.Y. Mar. 11, 2019) ("Courts generally award costs to prevailing parties in cases involving violations of the Lanham Act."); *Dropbox, Inc.*, 2017 WL 914273, at *5 (N.D. Cal. Mar. 8, 2017) ("attorney's fees under the Lanham Act may also include reasonable costs that the party cannot recover as the 'prevailing party' as long as such costs are reasonably incurred") (quotations omitted).

[22]   *See, e.g.*, *Zouvelos v. Sur. Fin. of Am., Inc.*, 2018 WL 2075300, at *10-11 (E.D.N.Y. Jan. 29, 2018) (recoverable expenses include: copies; postage; PACER fees); *Dinsbach v. Harris*, 2022 WL 742726, at *10 (D. Ariz. Mar. 11, 2022) (recoverable expenses include: online research expenses; copies; postage; delivery services; miscellaneous non-overhead expenses such as flash drives); *Wyatt Tech. Corp. v. Malvern Instrs., Inc.*, 2010 WL 11404472, at *2 (C.D. Cal. June 17, 2010) (recoverable expenses include: copying; electronic document processing; messenger/delivery expenses; travel expenses; and other fees).

Rule 54(d) "does not require that the motion be supported at the time of filing with the evidentiary material bearing on fees …. What is required is the filing of a motion sufficient to alert the adversary and the court that there is a claim for fees and the amount of such fees (or a fair estimate)." Fed. R. Civ. P. 54 (1993 Adv. Comm. Notes). This two-stage process of first ruling on the threshold matter of whether a case is "exceptional," and then directing the submission of a fee application, is commonplace. *See, e.g.*, *Reply All Corp.*, 2021 WL 1291103, at *4 (granting defendants' motion for attorney fees as "exceptional" case under § 1117(a), and referring case "for a calculation of the reasonableness and amount of fees due to Defendants"); *Noble Biomaterials v. Argentum Med., LLC*, 2011 WL 13113786, at *2-3 (M.D. Pa. Aug. 25, 2011) (granting motion under § 1117(a) for "attorneys' fees and related nontaxable expenses" and ordering submission of statement with "supporting affidavits and documentation" within 20 days); *cf. TNS Media Rsch. LLC v. TiVo Rsch. & Analytics, Inc.*, 2018 WL 2277836, at *7 (S.D.N.Y. May 18, 2018) (Patent Act: finding case "exceptional" and directing defendant "to submit a detailed request for the fees and expenses incurred defending against TRA's patent claims"); *Regeneron Pharms., Inc. v. Merus N.V.*, 2018 WL 1472507, at *15 (S.D.N.Y. Mar. 26, 2018) (similar).

Jackpot.com's fair estimate of the amount of attorneys' fees sought is approximately $7,250,000, and a fair estimate of the amount of related nontaxable expenses sought is approximately $250,000.[23]   Epstein Decl. ¶ 3.   If granted leave to file, Jackpot.com's fee application will be supported with appropriate documentation, including demonstration that Quinn Emanuel's hourly billing rate, and the number of hours billed, are reasonable. *Id*. ¶ 7.

---

[23]   Fed. R. Civ. P. 54(d)(2)(B)(iii). Jackpot.com seeks, and this Court should include in its ultimate award, Jackpot.com's fees incurred in bringing the instant motion and its forthcoming fee application. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 123 F. Supp. 2d 582, 587 (D. Kan. 2000) (awarding fees under § 1117(a), including "for work performed in presenting and preparing the fee application"). Jackpot.com's fee and nontaxable expense estimates do not include fees and nontaxable expenses incurred for preparing and filing this motion, a reply brief, a fee application, or oral argument on the motion or application.

## CONCLUSION

For the foregoing reasons, Jackpot.com respectfully requests that the Court: (1) find this to be an "exceptional" case under 15 U.S.C. § 1117(a) and award Jackpot.com its requested attorneys' fees and related nontaxable expenses; (2) grant Jackpot.com leave to submit a fee application setting forth and supporting its specific calculations of its requested fees and expenses.

Dated: New York, New York
      January 17, 2023

                    Respectfully submitted,

                    QUINN EMANUEL URQUHART &
                      SULLIVAN, LLP

                By: */s/ Rachel E. Epstein*
                    Rachel E. Epstein
                    Carey R. Ramos
                    Todd Anten
                    Donald J. Reinhard, II
                    rachelepstein@quinnemanuel.com
                    careyramos@quinnemanuel.com
                    toddanten@quinnemanuel.com
                    donaldreinhard@quinnemanuel.com

                    51 Madison Avenue, 22nd Floor
                    New York, NY 10010
                    Tel: (212) 849-7000
                    Fax: (212) 849-7100

                    *Attorneys for Defendants*